## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| CIBER, Inc., *et al.*,[1] | ) |
| | ) Case No. 17-10772 (___) |
| Debtors. | ) |
| | ) Joint Administration Pending |
| | ) |

## DECLARATION IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Jonathan P. Goulding, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am the proposed Chief Restructuring Officer of CIBER, Inc. and each of its subsidiaries (collectively, the "Debtors") that have filed voluntary petitions (the "Chapter 11 Petitions") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing these chapter 11 cases (the "Chapter 11 Cases").  The Debtors and their foreign non-Debtor affiliates (the "Foreign Affiliates") are referred to herein collectively as "Ciber" or the "Company."  CIBER, Inc. is a publicly-traded company, with its common stock currently trading on the New York Stock Exchange (the "NYSE") under the ticker symbol "CBR" as of the date hereof (the "Petition Date").

2.      I am also a Managing Director with Alvarez & Marsal North America, LLC (together with employees of its affiliates (all of which are wholly-owned by its parent company and employees), its wholly owned subsidiaries, and independent contractors, "A&M"), a global restructuring advisory firm.  I received my bachelor's degree in chemical engineering from the

---

[1]  The Debtors in the above-captioned Chapter 11 Cases, along with the last four digits of Debtor CIBER, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CIBER, Inc. (6833), CIBER International LLC, and CIBER Consulting, Incorporated.  The principal place of business for each Debtor is 6312 South Fiddler's Green Circle, Suite 600E, Greenwood Village, CO 80111.

University of Michigan in 1997.  In addition, I am a Certified Insolvency and Restructuring Advisor ("CIRA") and a Chartered Financial Analyst ("CFA") charterholder.

3.      In June 2016, A&M was retained by the Company to evaluate the Company's business plan, assist with the Company's cash flow forecast and liquidity management, and identify cost reduction opportunities.  On March 1, 2017, the Company's board of directors (the "Board") appointed me to serve as the Company's Chief Strategy Officer ("CSO").  On April 9, 2017, the Board appointed me to the role of Chief Restructuring Officer ("CRO"), subject to the approval of this Court, and the Company and A&M executed a separate agreement providing for the terms of my engagement as CRO.  As a result of A&M's previous engagement as a financial advisor to the Company, and my work as the CSO of the Company, I have become familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  As part of my duties as CRO in these Chapter 11 Cases, I will be advising the Debtors on their day-to-day operations, bankruptcy compliance, budgets, cash flows, financial analysis and overall sale efforts.

4.      I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the circumstances that compelled the commencement of these Chapter 11 Cases and in support of (a) the Chapter 11 Petitions filed on the Petition Date, and (b) the emergency and other relief that the Debtors have requested from the Court pursuant to the motions and applications filed contemporaneously herewith (collectively, the "First Day Pleadings").

5.      Except as otherwise indicated, all the facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtors' management team and the Debtors' other advisors, my review of relevant documents and information concerning

the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

6.      To familiarize the Court with the Debtors and the First Day Pleadings, the Declaration is organized into five sections.  The first section provides an overview of the circumstances leading to the commencement of these Chapter 11 Cases and the path forward. The second section provides information about the Debtors' corporate activities and business operations.  The third section provides an overview of the Debtors' organizational and capital structure.  The final section establishes relevant facts in support of the First Day Pleadings.

## I.      Events Leading up to the Chapter 11 Cases and the Path Forward

7.      Since its founding in 1974, Ciber has become an industry leader in information technology consulting services.  Ciber's growth was fueled largely by making over sixty (60) acquisitions at a cost of more than $1 billion.  Many of these entities continued to operate independently following their acquisitions by Ciber, due in large part to the varied nature of their services and geographic locations, which made it challenging for Ciber to manage and monitor their operating performance.  This challenge has been particularly acute with Ciber's acquisitions in Europe, and has contributed to significant operating losses.  For example, because the bonus structure for Ciber's European consultants is tied solely to utilization, not performance or profit, Ciber paid approximately $14 million in bonuses to its consultants for negative performance in 2016.

8.      In addition, since at least 2013, the market for information technology ("IT") consulting services in Europe has been relatively soft and, in 2014, a series of significant

defections by critical European employees led to reduced contracted revenue with Ciber's key customers and new customers, and made it difficult for Ciber to right-size its European operations.  Over the last two years, the Company has faced additional challenges, including the termination of a large customer contract, rising legal costs, and continued operating losses in large part from its European operations.

9.      Accordingly, after engaging in years of internal restructurings, Ciber began a process of divesting substantially all of its non-core assets, including much of its European operations, beginning in the second quarter of 2016, in an effort to improve and preserve critical liquidity necessary to fund core operations and pay employees.  The culmination of this effort resulted in the Debtors' decision to file these Chapter 11 Cases with the goal of consummating a swift sale of their remaining business.

10.      Prior to the Petition Date, Ciber conducted business in North America, Western Europe, and Asia.  At the height of its operations, Ciber employed over 8,600 employees and consultants, and generated over $1 billion in worldwide revenues.  Today, CIBER, Inc. employs approximately 2,200 employees, including billable employees and support staff, and 315 independent contractors.   In addition, Ciber's subsidiaries in India and Poland employ approximately 1,350 and 210 employees, respectively.   Ciber's total revenues in 2016 were approximately $610 million.

11.      In 2012, Ciber entered into an asset-based revolving credit facility (the "ABL Facility") with Wells Fargo, N.A. ("Wells Fargo"), which had an initial availability of $60 million.  The ABL Facility provided Ciber with a source of liquidity, when needed, to cover costs, pay employees, and generally fund operations.  As described above, Ciber has faced operating losses and business challenges over the last few years and, as a result, has engaged in a

4

series of internal restructurings intended to manage its costs and maintain compliance with the covenants in the ABL Facility.  Ultimately, however, Ciber was unable to lower its cost structure fast enough to avoid the application of the fixed charge coverage ratio in the ABL Facility (the "Fixed Charge Coverage Ratio"), which required Ciber to maintain at least $15 million of excess availability under the ABL Facility.

12.    Ciber first defaulted on the Fixed Charge Coverage Ratio in March 2016.  As a result of this default, Wells Fargo gained the right to declare all outstanding debt under the ABL Facility immediately due and payable.  Although Wells Fargo later waived this default, Ciber's operating and restructuring expenses have exceeded total revenues for each subsequent fiscal quarter, leaving Ciber with insufficient liquidity to comply with the Fixed Charge Coverage Ratio and causing additional defaults under the ABL Facility.  In this context, Ciber and Wells Fargo have been engaged in good faith discussions regarding Ciber's strategic alternatives, some of which are described below, for over a year.  As of the Petition Date, however, Ciber was in default under the ABL Facility.

13.    Shortly after its initial default, Ciber undertook a strategy to create liquidity through asset sales, which resulted in the sale of its operations in the Netherlands and Norway to subsidiaries of the ManpowerGroup, and its operations in Sweden to Bouvet.  These sales temporarily improved Ciber's liquidity position and provided breathing room for Ciber to consider all of its strategic alternatives.  In June 2016, Ciber retained A&M to evaluate its business plan, assist with its cash flow forecast and liquidity management, and identify cost reduction opportunities.  In September 2016, Ciber retained Houlihan Lokey Capital, Inc. ("Houlihan") to explore, among other things, the sale of substantially all of its European operations.

5

14.     Beginning in November 2016, Houlihan contacted approximately one hundred fifty (150) prospective purchasers and merger partners, but failed to locate a purchaser for Ciber's European business as a whole, due largely to the lack of synergies between the various European businesses.   Instead, Ciber sold its Spanish operations to a subsidiary of the ManpowerGroup and entered into an agreement to sell its German subsidiaries to Allgeier SE.[2] Concurrently with the sale of its Spanish assets, Ciber discussed additional transactions with numerous parties, including a refinancing of the ABL Facility.   During the course of these discussions, Ciber determined that it would be difficult to refinance the ABL Facility without consummating an additional asset sale.   To that end, Ciber began discussions with Infor (US), Inc. ("Infor") regarding the terms of a sale of Ciber's independent software vendor business for Infor's software platform (the "Infor ISV Business") and subsequently sold that business to Infor for an aggregate purchase price of $15 million on March 31, 2017.   In addition to providing Ciber with additional liquidity, the sale of the Infor ISV Business preserved the jobs of approximately 200 employees who now work for Infor.[3]

15.     As negotiations and discussions with strategic partners and lenders continued through the first quarter of 2017, Ciber received an indication of interest from an affiliate of CapGemini S.A. ("Capgemini") on February 20, 2017, and agreed to negotiate exclusively with Capgemini for a period of 4 weeks regarding the terms of a potential sale of substantially all of its operations in the United States and India (other than the Infor ISV Business) (the "Purchased Assets"), subject to a "fiduciary out" that permitted Ciber to cease negotiations if a higher, better,

---

[2] After a month of negotiations between the German subsidiaries and Allgeier, a transaction could not be consummated and the German subsidiaries were forced to file for insolvency protection on March 30, 2017.

[3] Contemporaneously herewith, the Debtors have filed a motion to assume the asset purchase agreement executed with Infor.

and unsolicited offer materialized. The exclusivity agreement also permitted Ciber to explore all potential alternatives for restructuring and to consummate the sale to Infor.

16. During the course of these discussions, Ciber received three (3) unsolicited bids from parties interested in acquiring its business, including a non-binding letter of interest from Ameri Holdings, Inc. These offers were carefully reviewed and considered by Ciber and the Board, but the Board ultimately determined that it was in the best interest of all stakeholders to continue to focus on its negotiations with Capgemini and Infor. Ciber, with the assistance of its advisors, also continued to explore all available traditional and alternative sources of capital for a refinancing of the ABL Facility. As these negotiations and discussions continued into March 2017, Ciber realized that it would not be able to refinance the ABL Facility. In fact, to date Ciber has been unable to secure financing from any source to replace the ABL Facility,[4] other than the proposed debtor-in-possession financing from Wells Fargo, which is described in further detail below (the "DIP Facility").

17. On March 31, 2017, after extensive negotiations with and due diligence by Capgemini regarding the structure of a transaction, Ciber received a detailed term sheet from Capgemini for the Purchased Assets through a bankruptcy court-supervised process for $50 million plus the assumption of certain liabilities. Between March 31, 2017 and the date hereof, Ciber and Capgemini engaged in good faith, arm's-length negotiations over the terms and conditions of a stalking horse asset purchase agreement, which was executed shortly before the Petition Date and provides for the sale of the Purchased Assets to Capgemini, subject to higher and better offers (the "Sale Transaction"). Accordingly, I believe it was a reasonable exercise of Ciber's business judgment to select Capgemini to serve as the stalking horse bidder (the

---

[4] Ciber did obtain financing from Faunus Group International, which replaced Wells Fargo as the lender on certain international receivables, in October 2016.

"Stalking Horse Bidder") for a sale of the Purchased Assets in these Chapter 11 Cases. Contemporaneously with the commencement of these Chapter 11 Cases, the Debtors will file a motion seeking to establish bidding and sale procedures (the "Bidding Procedures Motion"), approve Capgemini as the Stalking Horse Bidder, and authorize the Debtors to undertake a post-petition marketing process that will maximize value for the Debtors' estates. Importantly, a successful Sale Transaction would preserve over 2000 jobs.

18.     In light of Ciber's liquidity challenges and the filing of the Chapter 11 Cases, the proposed Sale Transaction with Capgemini and the DIP Facility represent the best option available to Ciber. In fact, at this time, the sale to Capgemini, together with the DIP Facility, which provides financing during the sale process, presents the Debtors with their only viable alternative to a cessation of operations and a subsequent liquidation under chapter 7 of the Bankruptcy Code.

19.     The Debtors have also filed with this Court a first-day motion seeking approval of the DIP Facility (the "DIP Financing Motion"). Both the DIP Financing Motion and the Bidding Procedures Motion contemplate a swift post-petition marketing and sale process that will allow the Debtors to run an orderly, expedited sale process while continuing to pay their key employees, vendors, and servicers, thereby preventing further erosion of Ciber's enterprise value. The accelerated timeline is warranted due to the nature of the Debtors' business. As a service-based provider, the Debtors' value depends heavily upon its ability to retain employees and customers. The proposed sale process assures employees that there is a viable plan to preserve their jobs and assures customers that they will have continued access to a reliable source of IT consulting services during the Chapter 11 Cases and into the future. The majority of the Debtors' employees are employed at will, and many of the Debtors' contracts with their key

8

customers are terminable on relatively short notice.  So, it is essential to move decisively and quickly to preserve the value they provide to the Debtors' business.

20.     The lenders under the DIP Facility have agreed to fund the Debtors during this process pursuant to the terms of the DIP Facility and an agreed-upon budget (the "Budget").  As demonstrated by the Budget, the DIP Facility is necessary to fund operating losses during these Chapter 11 Cases.  Given the extent of these projected operating losses and the expected costs and risks of these Chapter 11 Cases, the DIP Lenders have agreed to provide the DIP Facility for approximately forty-five (45) days, which is a sufficient amount of time to permit the Debtors to complete a sale of their assets and the repayment of their loans.  Without the DIP Lenders' support, the Debtors would be required to terminate substantially all of their employees.

21.     To enable the Debtors to achieve their objectives in these Chapter 11 Cases, the Debtors request certain emergency and other relief in the First Day Pleadings.  The First Day Pleadings seek, among other things, to stabilize and maintain the Debtor's remaining operations, ensure ongoing regulatory compliance, promote a seamless transition into chapter 11, and, most importantly, allow the Debtors' marketing and sale process to move forward so that a Sale Transaction can be achieved that will maximize the recovery to the Debtors' estates.

## II.     Ciber's Corporate History and Business Operations

### A.     Ciber's Corporate History

22.     Ciber is a leading global IT consulting, services, and outsourcing company headquartered in Greenwood Village, Colorado.  Ciber began operations in 1974 to assist companies in need of computer programming support.  In the mid-1980s and 1990s, Ciber embarked on a growth strategy that included expanding its range of computer-related services,

developing a professional sales force, and selectively acquiring other companies within the IT staffing industry.

23.     As of the date hereof, CIBER, Inc. employs approximately 2,200 employees, including billable employees and support staff, and 315 independent contractors.  In addition, Ciber's subsidiaries in India and Poland employ approximately 1,350 and 210 employees, respectively.  In 2016, Ciber generated revenues of approximately $610 million.  Ciber operates its businesses in the U.S., the U.K., and Denmark, with offshore delivery centers in India, Vietnam, and Poland.  Until recently, Ciber also operated its business in Finland, Germany, the Netherlands, Norway, Spain, and Sweden.

### B.     Ciber's Business Operations

24.     Ciber goes to market with two core service offerings:  (a) an integrated digital transformation offering ("Digital Transformation"), which encompasses IT staffing, custom application development and management ("ADM"), and business consulting; and (b) independent software vendor relationships ("ISVs"), which include long-standing partnerships with Microsoft and Oracle.  These focused offerings align with the needs of Global 2000 blue-chip companies in industries such as discrete manufacturing, retail and consumer products, public sector and education, healthcare and life sciences, energy and utilities, financial services, process manufacturing, and distribution, logistics and transportation.  In addition to these key service offerings, Ciber also offers IT services for other emerging technologies.

### 1.     Digital Transformation

25.     Digital Transformation is a recently-launched integrated offering.  It is designed to meet the demands of Ciber's target customers for software as a product, cloud-based development and solutions, analytics, and digital customer experiences.  Digital Transformation

aligns Ciber's proficiencies to serve its clients' needs for agile development operations and continuous delivery requirements.   Specifically, Digital Transformation combines three of Ciber's core competencies:  sourcing flexibility derived from Ciber's IT staffing services, ADM project delivery, and business consulting and advisory services, each of which are discussed in further detail immediately below.

26.    <u>IT Staffing</u>.    Digital Transformation preserves the foundation of Ciber's information technology staffing business and creates synergy through an integrated ADM and business consulting set of offerings.  Digital Transformation staffing offerings include program and project management, business analysis, software and system design, and testing and implementation. These staffing services accelerate business change through effective talent identification, implementation, and rescaling, which enables Ciber's clients to shift their labor pyramid mix to become more competitive.

27.    <u>ADM Services</u>.   Ciber's ADM services provide planning, analysis, design, development, testing and quality assurance, implementation, and maintenance of business applications.   These offerings include services focused on digital marketing, application development and enterprise modernization. ADM services are integrated with Ciber's business consulting and staffing services. Ciber's model of proximity, nearshore, and offshore delivery capabilities provides scale and cost of remote delivery centers while providing intimate business knowledge and client focus.

28.    <u>Consulting Services</u>.    Digital Transformation includes business consulting services, which focus on transforming the businesses of Ciber's clients by offering expertise in IT strategy, enterprise architecture and vertical business systems.   These services also include advisory services that provide the strategies, business plans and confidence necessary to

11

transform and modernize IT.  Ciber's cloud-first strategies assess how to best use the cloud, develop a migration plan, and blueprint the solution.  Ciber's consultants guide clients through validating business needs, timing, investment and expected returns, enabling them to respond to changing market demands and make more informed business decisions.

### 2.   ISVs

29.    Ciber has long-standing relationships with leading providers of enterprise applications, including Microsoft and Oracle.  Ciber provides expert project management, application and technical consulting, and database administration for implementation projects and managed-services engagements.  Ciber's consulting solutions include enterprise application strategy and project planning, systems implementation and integration, training and application management.

30.    <u>Microsoft</u>.  Ciber and Microsoft have been long-standing global partners.  Ciber has been recognized as a Global Dynamics Partner, a Public Sector Global Partner of the Year, a member of Microsoft Dynamics President's Club, and a Microsoft Inner Circle Partner.  Ciber is currently recognized as a Microsoft Gold Partner, specializing in Data Analytics, Data Platform, Cloud Platform, Application Development and Collaboration and Content.  While Ciber works with Microsoft clients in many industries, Ciber specializes in financial services (Banking, Wealth Management and Insurance) and Public Sector/Not-for- Profit.  Ciber's typical Microsoft customers have very sophisticated needs and requirements and therefore Ciber's solutions require a broad spectrum of expertise.  Ciber focuses on Microsoft Dynamics in its Applications business, HDInsight and .NET development in its ADM business, and resells Microsoft Azure in its Technology Solutions business unit.  Ciber also supports Office 365, Sharepoint, Yammer, Lync, and SQL Server development.

31.     Oracle.  Ciber is an Oracle Platinum Partner and offers a variety of traditional and cloud-based services.  Ciber is a business process outsourcer for Oracle which enables it to provide business services and Oracle software on a subscription basis in a hosted managed services environment.  Ciber has expertise in helping clients implement, upgrade, and maintain Oracle's E-Business Suite, PeopleSoft, Hyperion and Cloud product lines.  Since 1990, Ciber has helped clients across the globe leverage their Oracle applications to improve business processes, reduce costs, and provide better support for management decision-making.  Ciber primarily partners with Oracle in public sector, education, healthcare, and life sciences.

III.     **Ciber's Organizational and Capital Structure**

A.      **Ciber's Prepetition Organizational Structure**

32.     CIBER, Inc. is the direct parent of the other two Debtors.  Ciber has no other domestic affiliates.  CIBER, Inc. is also the direct or indirect parent of a number of Foreign Affiliates.  A chart depicting the Debtors' prepetition organizational structure, including the Foreign Affiliates, is attached hereto as **Exhibit A**.

B.      **Ciber's Prepetition Capital Structure**

1.      **The ABL Facility**

33.     On May 7, 2012, Ciber entered into the ABL Facility with Wells Fargo, which provided Ciber with an asset-based revolving line of credit of up to $60 million.  The maximum amount available for borrowing at any time under the ABL Facility is determined according to a borrowing base valuation of eligible account receivables.  Ciber's obligations under the ABL Facility are guaranteed by the Debtors and a number of the Foreign Affiliates and are secured by substantially all of Ciber's domestic, Dutch, U.K., and German assets.

13

34.     Under the ABL Facility, borrowings by CIBER, Inc. accrue interest at a rate of the London interbank offered rate ("<u>LIBOR</u>") plus a margin ranging from 225 to 275 basis points, or, at Ciber's option, a base rate equal to the greatest of (a) the Federal Funds Rate plus 0.50%, (b) LIBOR plus 1%, and (c) the "prime rate" set by Wells Fargo plus a margin ranging from 125 to 175 basis points.  The ABL Facility had an initial maturity date of May 7, 2017.

35.     Under the terms of the ABL Facility, Ciber is required to be in compliance with a minimum trailing 12-month fixed charge coverage ratio of consolidated EBITDA (as defined in the ABL Facility) to consolidated fixed charges if (a) an event of default has occurred and is continuing, or (b) Ciber fails to maintain excess availability of at least the greater of (i) $15 million or (ii) an amount equal to 25% of the aggregate amount of the commitments under the ABL Facility at any time.  Ciber first breached the Fixed Charge Coverage Ratio in the first quarter of 2016, when the balance available for borrowing under the ABL Facility fell below $15 million.  Ciber has not been in compliance with the Fixed Charge Coverage Ratio subsequently.

36.     CIBER, Inc., certain other borrowers under the ABL Facility, and Wells Fargo have entered into a series of amendments to the terms of the ABL Facility, which, among other things, aimed to address certain defaults by the Debtors and/or certain other Borrowers (as defined in the ABL Facility), as applicable, under the ABL Facility.   Pursuant to such amendments, the Debtors and/or other borrowers under the ABL Facility, as applicable, were required to, among other things:

(a)     permanently repay all of the outstanding balance under the ABL Facility prior to the May 7, 2017 maturity date otherwise applicable under the ABL Facility;

(b)     appoint a chief strategy officer to oversee and manage the performance of cash management;

(c)     deliver to the administrative agent updated 13 Week Forecasts (as defined in the ABL Facility); and

(d)      consummate certain material transactions.

37.      In addition, pursuant to such amendments, Wells Fargo agreed to make advances of Revolving Loans (as defined in the ABL Facility) to Borrowers as and when necessary to enable Borrowers to pay certain Protected Employee Amounts (as defined in the ABL Facility). Furthermore, certain of the amendments modified the definition of "Permitted Overadvance Amounts" to change the relevant time periods and amounts in such definition under the ABL Facility.

### 3.      The IBM Facility

38.      CIBER, Inc. also maintains a receivables facility pursuant to a Wholesale Financing Agreement dated March 9, 2004 (the "Wholesale Financing Agreement") with IBM Credit LLC (the "IBM Facility"), which had $1.9 million outstanding as of the Petition Date. In the course of its business, CIBER, Inc. acquires certain products and engages IBM Credit LLC to finance CIBER, Inc.'s purchase of such products under the terms of the IBM Facility. The IBM Facility is secured by a security interest, in relevant part, in all accounts, instruments and proceeds arising from the purchase and resale of certain inventory and equipment.

39.      The IBM Facility is subject to (a) a Security Interest Subordination Agreement (the "Subordination Agreement") whereby Wells Fargo's (as Prepetition Agent) lien on Shared Collateral (as defined in the Subordination Agreement) is fully subordinate to any lien that IBM Credit LLC may have as of the date of the Subordination Agreement or thereafter hold in the Shared Collateral under the Wholesale Financing Agreement and (b) an Allocation Agreement whereby Wells Fargo (as Prepetition Agent) and IBM Credit LLC set forth their respective rights to the Shared Collateral.

40.      The Debtors have agreed that IBM Credit LLC's interest in any Shared Collateral shall remain subject and subordinate to the IBM Liens (as defined in the Subordination

96349.8 04/10/2017

Agreement) and that the Debtors shall not use any Cash Collateral (as defined in the Subordination Agreement) derived from such Shared Collateral.  The Debtors have agreed to place any proceeds derived from the Shared Collateral into a separate, segregated account, and that such proceeds may only be distributed upon further order of the Court.

### 4. Intercompany Claims

41.     The Debtors maintain business relationships with each other and with their Foreign Affiliates, resulting in intercompany receivables and payables in the ordinary course of business.  During the course of these Chapter 11 Cases, in accordance with the Budget, the Debtors expect to make Intercompany Transfers, as defined in the Cash Management Motion (defined below), to Foreign Affiliates in the aggregate amount of $3.5 million.  The Debtors do not have any material outstanding intercompany loans to their Foreign Affiliates, or intend to make any such loans during the Chapter 11 Cases.

### 5. Ciber's Common Stock

42.     As of the Petition Date, there were approximately 82 million common shares of CIBER, Inc. outstanding, with a par value of $.01 per share.  On November 17, 2016, CIBER, Inc. received a written notice from the NYSE stating that it was not in compliance with listing standards, which require that the average closing price of a listed company's common stock be above $1.00 per share over a consecutive 30-day trading period.

## IV. Relevant Facts in Support of the First Day Pleadings[5]

43.     To enable the Debtors to continue operating effectively and minimize potential adverse effects from the commencement of the Chapter 11 Cases, the Debtors are requesting certain emergency and other relief in the First Day Pleadings.  I have reviewed each of the First

---

[5] Capitalized terms used in this section of this Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Pleading.

Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on corporate officers and advisors. I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein. I believe that the relief sought in the First Day Pleadings is necessary to promote a seamless transition into chapter 11 and maximize value for all stakeholders.

44.     If I were called to testify as a witness in this matter, I would testify competently to the facts set forth in the First Day Pleadings.  As a result of A&M's previous engagement as a financial advisor to Ciber, and my work as the CSO of Ciber, I have formed opinions as to: (a) the urgency and necessity for obtaining the emergency relief sought by the Debtors in the First Day Pleadings; (b) the need for the Debtors to continue to effectively maintain their current activities and, as seamlessly as possible, commence the Chapter 11 Cases; (c) the detrimental effects upon the Debtors and their estates if the Debtors do not obtain the relief requested in the First Day Pleadings; and (d) the immediate and irreparable harm that the Debtors, their estates, and their stakeholders would be exposed to in the event that the Court does not approve such relief.  My opinions are based on my review of various materials and information and discussions with the Debtors' management team and the Debtors' professional advisors.

45.     As described herein, the First Day Pleadings seek, among other things, to stabilize and maintain the Debtors' remaining operations by (a) allowing the Debtors to obtain post-petition financing from, and use the cash collateral of, their prepetition lender, (b) obtaining approval of expedited bidding and sale procedures so the Debtors can move forward with a rapid and value-maximizing sale process, (c) ensuring the continuation of the Debtors' existing cash management system, and (d) maintaining employee morale and confidence, thereby promoting a

seamless transition into chapter 11 and preserving the Debtors' going concern value for the benefit of all stakeholders.

46.     The relief sought in the First Day Pleadings is critical to giving employees, customers, vendors, and other parties in interest comfort that a transaction is moving forward that will allow the Debtors' business to continue operating, which is necessary to minimize the adverse impact of the Chapter 11 Cases on, and preserve and maximize the value of, the Debtors' estates.  The Debtors, in consultation with their professional advisors, carefully tailored the relief requested in the First Day Pleadings so that the Debtors will not suffer any immediate and irreparable harm as a result of the commencement of the Chapter 11 Cases.  Accordingly, for the reasons stated herein and in the First Day Pleadings, I believe that the relief requested in each of the First Day Pleadings is in the best interests of the Debtors, their estates, and their creditors, and, therefore, should be approved.

47.     For the convenience of the Court, below is a summary of the factual statements set forth in each First Day Pleading in support of the relief requested therein.

**A.      Debtors' Motion For Interim And Final Orders Authorizing Debtors To: (A) Use Cash Collateral On An Emergency Basis Pending A Final Hearing; (B) Incur Postpetition Debt On An Emergency Basis Pending A Final Hearing; And (C) Grant Adequate Protection And Provide Security And Other Relief To Wells Fargo Bank, N.A., As Agent And Lenders (the "DIP Financing Motion")**

48.     By the DIP Financing Motion, the Debtors request entry of interim and final orders, authorizing the Debtors to enter into a Postpetition Credit Agreement (as defined in the DIP Financing Motion) with Wells Fargo in its capacity as DIP Lender.  The DIP Facility will "roll up" the prepetition ABL Facility as collections are made on such facility and will be secured by a lien on all of the Debtors' assets except for customary excluded collateral, and upon the terms outlined in the DIP Financing Motion, which include a granting of additional post-

petition liens and superiority expense claims.  Of the total $41 million asset-based revolving DIP Facility, $37 million will be available on an initial basis to meet the Debtors' immediate cash needs, and with the remainder becoming available upon entry of a final order approving the Debtors' entry into the DIP Facility.

49.     By the DIP Financing Motion, the Debtors seek entry of orders granting, for the benefit of the Lenders, as security for the Obligations (i) a valid first priority (other than with respect to the Permitted Priority Liens and the Carveout) Lien on all of the Collateral pursuant to sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code and (ii) if and to the extent the adequate protection of the interests of Prepetition Agent and Prepetition Lenders in the Prepetition Collateral proves insufficient, an allowed administrative expense in the Chapter 11 Cases having priority under section 364(c)(1) of the Bankruptcy Code over all other administrative expenses, subject only to the Permitted Priority Liens and the Carveout.   In addition to the DIP Facility, the Debtors also require the use of the Prepetition Lenders' Cash Collateral, which is secured by liens on substantially all of the Debtors' assets, to fund their operations throughout these Chapter 11 Cases.

50.     Subject to the terms of the Postpetition Credit Agreement, the DIP Lender has agreed to make certain advances that will allow the Debtors to pay certain expenditures in accordance with the Budget satisfactory to the DIP Lender, a copy of which is attached to the DIP Financing Motion.  The proceeds of the DIP Facility will be used to fund the ordinary course operations of the Debtors during these proceedings, to pay certain fees and expenses associated with the DIP Facility, to provide for adequate protection payments to the Prepetition Lenders, subject to the Budget, and to pay for certain of the Debtors' administrative expenses incurred during the Chapter 11 Cases.

51.     As reflected in the Budget, the DIP Facility will fund operating losses during these Chapter 11 Cases while the Debtors work to sell their assets to the highest and best bidder or otherwise maximize the value of these estates for the benefit of their stakeholders through these proceedings.   The Budget shows that, beginning on the Petition Date, the Debtors' borrowings, which currently stand at approximately $29 million under the Prepetition Credit Agreement, will increase by as much as $7 million during the budget period.  Given the extent of the Debtors' projected operating losses and the expected costs and risks of these proceedings, the DIP Lenders have agreed to provide the DIP Facility for approximately forty-five (45) days, which is sufficient to permit the sale of the Debtors' assets and repayment of their loans. Without the DIP Lenders' support, the Debtors would be required to terminate their employees.

52.     I believe that the Postpetition Credit Agreement and Adequate Protection Package represent the best terms currently available to the Debtors.  Without access to the DIP Facility and authority to use Cash Collateral, I believe that the Debtors will not be able to meet their direct operating expenses and would face the prospect of a complete cessation of operations.  For the reasons set forth above and in the DIP Financing Motion, the Debtors submit, and I believe, that the relief requested in the DIP Financing Motion is in the best interest of the Debtors, their estates, their creditors, and all other stakeholders, and therefore should be approved.

**B.      Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing, But Not Directing, The Debtors To (A) Maintain Their Accounts And Cash Management System And Honor Certain Prepetition Obligations Related Thereto, (B) Continue Using Existing Checks, Business Forms, And Records, And (C) Continue Conducting Intercompany Transactions In The Ordinary Course, (II) Granting Administrative Priority Status To Post-Petition Intercompany Claims Against Debtors, And (III) Granting Related Relief (the "Cash Management Motion")**

53.     In the ordinary course of their businesses, the Debtors maintain a cash management system to fund their operations and manage their cash flow (the "Cash Management

System"). Using the Cash Management System, the Debtors are able to efficiently collect funds generated by their operations and distribute them, as necessary, to pay their obligations. Upon information and belief, each of the Debtors' Accounts is maintained at a bank that is party to a UDA with the U.S. Trustee and is thus deemed an authorized depository under the guidelines promulgated by the U.S. Trustee. The Debtors have no investment accounts. Accordingly, I believe that authorizing the Debtors to maintain the Accounts and the Cash Management System, and honor certain prepetition obligations related thereto, is appropriate and warranted under the circumstances.

54. In the ordinary course of business, the Debtors conduct Intercompany Transactions with each other and with their Foreign Affiliates that result in Intercompany Claims. More specifically, the Debtors obtain a wide variety of services from their Foreign Affiliates at arms'-length and in the ordinary course of business, including computer programming and back office services, and the Foreign Affiliates reimburse the Debtors for their allocable share of the Debtors' corporate overhead. The Debtors and the Foreign Affiliates use Intercompany Transfers to and from the Master Operating Account and the North American Operating Account to (a) settle these Intercompany Transactions, and (b) facilitate borrowing by the Foreign Affiliates from third party lenders.

55. Pursuant to the terms of the DIP Facility, the Debtors are not permitted to engage in any Intercompany Transactions with Foreign Affiliates or send any Intercompany Transfers to Foreign Affiliates that are not provided for in the Budget.[6] If the Intercompany Transactions that are provided for in the Budget were to be discontinued, the Debtors' business would be irreparably harmed. Preserving the "business as usual" operating model and avoiding any

---

[6] The Debtors are seeking authority by the Wages Motion (defined below) to make Intercompany Transfers to Foreign Affiliates on account of wages and other compensation due to Foreign Affiliate Employees for prepetition services.

substantial disruption to the Intercompany Transactions will facilitate the Debtors' reorganization efforts.    Accordingly, I believe that authorizing the Debtors to continue conducting Intercompany Transactions, as provided for in the Budget, in the ordinary course is appropriate and warranted under the circumstances.

56.    In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted between the Debtors and their Foreign Affiliates, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor, or between a Debtor and a Foreign Affiliate. Intercompany Claims are not immediately settled in cash and are reflected as journal entry receivables and payables, as applicable, in the parties' respective accounting systems.    The Debtors track all fund transfers in their respective accounting systems and can ascertain, trace, and account for all Intercompany Transactions. If Intercompany Claims against Debtors are accorded administrative expense status, each individual Debtor or Foreign Affiliate will continue to bear repayment responsibility for its ordinary course transactions and will not fund, at the expense of its own creditors, the operations of another entity.    Accordingly, I believe that granting administrative priority status to postpetition Intercompany Claims against Debtors is appropriate and warranted under the circumstances.

**C.    Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing, But Not Directing, Debtors To (A) Pay And Honor Prepetition Wages, Salaries, Other Compensation, Reimbursable Business Expenses, And Employee Benefit Obligations, And (B) Maintain And Continue Certain Compensation And Benefit Programs Postpetition; And (II) Granting Related Relief (the "<u>Wages Motion</u>")**

57.    The Debtors' workforce (the "<u>Workforce</u>") is comprised of approximately 2,200 full and part time employees (the "<u>Employees</u>") and 315 independent contractors (the "<u>Independent Contractors</u>"), which are located primarily in the United States, and approximately

1,560 employees (the "Foreign Affiliate Employees") of foreign non-Debtor affiliates (the "Foreign Affiliates") in Poland and India.  Each of the Employees and Independent Contractors is employed or hired, as applicable, by CIBER, Inc.  The Foreign Affiliate Employees are employed by Foreign Affiliates.

58.     The members of the Workforce perform a wide variety of functions crucial to the Debtors' operations.  Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  Many members of the Workforce are highly trained personnel who are critical to revenue generation and cannot easily be replaced.  Accordingly, without the continued, uninterrupted services of the members of the Workforce, the Debtors' reorganization will be materially impaired.

59.     At the same time, the vast majority of Workforce relies exclusively on their compensation and benefits to pay their daily living expenses and to support their families. Thus, the members of the Workforce will be exposed to significant financial constraints if the Debtors are not permitted to continue paying wages and salaries, providing employee benefits, and maintaining certain programs in the ordinary course of business. Accordingly, I believe that the relief requested in the Wages Motion is necessary and appropriate under the facts and circumstances of these Chapter 11 Cases.

**D.     Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing, But Not Directing, The Debtors To Pay Certain Pre-Petition Taxes And Fees And (II) Granting Related Relief (the "Taxes and Fees Motion")**

60.     In the ordinary course of business, the Debtors incur and remit Taxes and Fees to applicable taxing and other regulatory authorities.  Although the Debtors are current on all of their Taxes and Fees that have become due as of the Petition Date, certain Taxes and Fees attributable to the prepetition period have accrued and will not become due and payable until after the Petition Date.

23

61.     Under the Taxes and Fees Motion, the Debtors seek authority to pay prepetition Taxes and Fees as they come due.  I believe this relief represents a sound exercise of the Debtors' business judgement because, absent payment of the Taxes and Fees, the Debtors may incur substantial liabilities to the Authorities.  Certain Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would be administratively burdensome to the estates and potentially damaging to the ongoing viability of the Debtors' enterprise.  The Debtors and their directors and officers also may be subject to personal or criminal liability for the nonpayment of the Taxes and Fees in certain jurisdictions, which undoubtedly would divert the attention of those key personnel from their duties related to the restructuring and the day-to-day operations of the Debtors' business.  Any unexpected or inopportune interruption of the Debtors' activities during the course of these Chapter 11 Cases could greatly diminish the value of the estates and frustrate the Debtors' chapter 11 efforts.  Accordingly, I believe that the relief requested in the Taxes and Fees Motion is necessary and appropriate under the facts and circumstances of these Chapter 11 Cases.

**E.      Debtors' Motion For Entry Of An Order (I) Extending Time To File Schedules Of Assets And Liabilities, Schedules Of Current Income And Expenditures, Schedules Of Executory Contracts And Unexpired Leases, Statements Of Financial Affairs, And Rule 2015.3 Financial Report; (II) Waiving The Requirement To File A List Of Equity Security Holders; And (III) Granting Related Relief (the "Schedules Extension Motion")**

62.     In the days leading up to the Petition Date, the Debtors' primary focus was preparing for these Chapter 11 Cases.  As a result, the Debtors have not yet collected the information necessary to prepare the Schedules and Statements.  To do so, the Debtors will have to compile information from books, records, and documents relating to claims, assets, and contracts from each Debtor entity.  Collecting this information will require a significant expenditure of time and effort on the part of the Debtors and their respective employees.

24

However, at this critical juncture, focusing the attention of key personnel on other critical aspects of the Chapter 11 Cases is necessary to allow each Debtor to transition into chapter 11 in a manner that maximizes value for their estates, their creditors, and other parties in interest. Accordingly, I believe that an extension of time to file the Schedules and Statements by (i) 30 days, for a total of 44 days from the Petition Date, or (ii) the date of the hearing on the sale of substantially all of the Debtors' assets, *whichever is earlier*, without prejudice to the Debtors' ability to request additional extensions, is appropriate and warranted under the circumstances. Such an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements in advance of any deadline to file proofs of claim in these Chapter 11 Cases and in advance of any sale hearing.

63.    Furthermore, although the Debtors intend to work cooperatively with the U.S. Trustee and any other necessary parties in these Chapter 11 Cases to provide access to relevant information regarding the business and financial affairs of the Debtors and their non-debtor subsidiaries.  As set forth above, the Debtors' primary focus has been preparing for these Chapter 11 Cases.  As a result, the Debtors require additional time to work with their financial advisors and the U.S. Trustee to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.  Accordingly, I believe that an extension of the time by which the Debtors must file their initial 2015.3 Report is appropriate and warranted under the circumstances.

64.    As noted above, CIBER, Inc. is a public company and the sole parent to the other Debtors.  I believe that preparing the Equity List with last-known addresses and sending notices to all parties is unnecessary at this time and would create an additional expense without a concomitant benefit to the estates.   To the extent equity security holders are entitled to

distributions or entitled to vote on a chapter 11 plan, those parties can nevertheless be provided with the appropriate bar date or plan-related notices and then have an opportunity to assert their interests. Thus, equity security holders will not be prejudiced should they not receive copies of motions and notices on a routine basis. Further, the equity markets will have notice of the Debtors' restructuring efforts through information disseminated by the Debtors and the publication of pleadings filed in these Chapter 11 Cases on the Debtors' notice and claims agent's website, http://cases.primeclerk.com/ciber.

F. **Motion Of The Debtors For An Order Authorizing Debtors To (I) File A Consolidated List Of Creditors, (II) File A Consolidated List Of Debtors' Twenty Creditors Holding Largest Unsecured Claims And (III) Mail Initial Notices (the "Creditor Matrix Motion")**

65. The Debtors currently keep and update various computerized lists of the names and addresses of each of their respective creditors that will be entitled to receive certain notices and other pleadings filed in the Chapter 11 Cases. I believe that the information contained in these computer files can be consolidated and used in an efficient manner to provide Notices and other pleadings to parties in interest. As such, I believe that permitting the Debtors to file these lists in a consolidated form, identifying their creditors and equity security holders in substantially the same formats that are currently maintained by the Debtors in the ordinary course of business, is appropriate and warranted under the circumstances.

66. The Debtors have identified approximately 10,200 entities to which notice of certain proceedings in the Debtors' Chapter 11 Cases must be provided. Due to the number of creditors in these cases, I believe that a permitting the Debtors to file a single consolidated list of their combined twenty (20) largest unsecured creditors in these Chapter 11 Cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors.

**G.      Debtors' Motion For Entry Of Order Directing Joint Administration Of Chapter 11 Cases (the "<u>Joint Administration Motion</u>")**

67.      Given the integrated nature of the Debtors' operations, I believe that the joint administration of these Chapter 11 Cases will provide significant administrative convenience without prejudicing the substantive rights of any party in interest.  Joint administration of these Chapter 11 Cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's resources and the resources of all parties in interest.  Accordingly, I believe that joint administration Chapter 11 Cases is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**H.      Debtors' Application For Entry Of An Order Appointing Prime Clerk LLC As Claims And Noticing Agent Pursuant To 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f) And Local Rule 2002-1(f) (the "<u>Claims Agent Application</u>")**

68.      The Debtors request entry of an order, pursuant to section 156(c) of title 28 of the United States Code, authorizing the retention and appointment of Prime Clerk as claims and noticing agent in these Chapter 11 Cases.  I believe that the relief requested in the Claims Agent Application will ease the administrative burden on the Clerk of the Court in connection with these Chapter 11 Cases. Moreover, the Debtors have obtained and reviewed engagement proposals from two other court-approved claims and noticing agents to ensure a competitive process.  Based on all engagement proposals obtained and reviewed, I believe that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

<u>**CONCLUSION**</u>

69.      Accordingly, for the reasons stated herein and in each of the First Day Pleadings, on behalf of the Debtors, I respectfully request that the relief sought by the First Day Pleadings be granted.

96349.8 04/10/2017

I swear under penalty of perjury that the foregoing is true and correct.

Dated: April 9, 2017

CIBER, Inc.

*/s/ Jonathan P. Goulding*

Jonathan P. Goulding
Chief Restructuring Officer

96349.8 04/10/2017