## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CIBER, Inc., *et al.*,[1] | ) | Case No. 17-10772 (___) |
| | ) | |
| Debtors. | ) | Joint Administration Pending |
| | ) | |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO (A) PAY AND HONOR PREPETITION WAGES, SALARIES, OTHER COMPENSATION, REIMBURSABLE BUSINESS EXPENSES, AND EMPLOYEE BENEFIT OBLIGATIONS, AND (B) MAINTAIN AND CONTINUE CERTAIN COMPENSATION AND BENEFIT PROGRAMS POSTPETITION; AND (II) GRANTING RELATED RELIEF

By this motion (the "Motion"), the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and "Final Order," respectively), pursuant to sections 105(a), 363(b), 507(a)(4), 507(a)(5), 541, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing, but not directing, the Debtors, in accordance with their past and current policies and practices, to: (a) honor any prepetition obligations to Employees (as defined below), and continue to honor ongoing obligations in the ordinary course of business, on account of accrued wages, salaries, or commissions, including vacation, severance, and sick leave pay (collectively, the "Employee

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CIBER, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CIBER, Inc. (6833), CIBER International LLC, and CIBER Consulting, Incorporated. The principal place of business for each Debtor is 6312 South Fiddler's Green Circle, Suite 600E, Greenwood Village, CO 80111.

Compensation"); (b) honor any prepetition obligations, and continue to honor ongoing obligations in the ordinary course of business, on account of certain employee benefit plans, flexible savings accounts, and retirement savings plans (collectively, the "Employee Benefits"); (c) reimburse the Employees and Independent Contractors (as defined below) for prepetition expenses incurred on behalf of the Debtors in the ordinary course of business (the "Reimbursable Expenses"); (d) pay all related prepetition payroll taxes and other deductions (the "Withholding Obligations"); (e) pay all amounts due and owing to Independent Contractors and Foreign Affiliate Employees (as defined below) who provide invaluable services to the Debtors, including critical client-facing consulting services (the "Independent Contractor Obligations"); and (f) pay, to the extent that any of the foregoing programs is administered, brokered, insured, or paid through a third-party administrator or provider (an "Administrator"), any prepetition claims of such Administrator in the ordinary course of business (the "Administration Fees").  In addition, the Debtors request that the Court authorize banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to all of the foregoing.  In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-l(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363(b), 507(a)(4), 507(a)(5), 541, 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(m).

## BACKGROUND

4.      On April 9, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). No party has requested the appointment of a trustee or examiner in the Chapter 11 Cases, and no statutory committees have been appointed or designated.

5.      A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the Chapter 11 Cases, are set forth in greater detail in the *Declaration in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

## THE DEBTORS' WORKFORCE

6.      The Debtors' workforce (the "Workforce") is comprised of approximately 2,200 full and part time employees (the "Employees") and 315 independent contractors (the "Independent Contractors"), which are located primarily in the United States, and approximately 1,560 employees (the "Foreign Affiliate Employees") of foreign non-Debtor affiliates (the "Foreign Affiliates") in Poland and India. Each of the Employees and Independent Contractors is employed or hired, as applicable, by CIBER, Inc. ("Ciber"). The Foreign Affiliate Employees are employed by Foreign Affiliates.

3

7.      The Workforce performs a wide variety of functions crucial to the Debtors' operations.    Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  Many members of the Workforce are highly trained personnel who are critical to revenue generation and cannot easily be replaced.  Accordingly, without the continued, uninterrupted services of the members of the Workforce, the Debtors' reorganization will be materially impaired.

8.      At the same time, the vast majority of the Workforce relies exclusively on their compensation and benefits to pay their daily living expenses and to support their families. Thus, the members of the Workforce will be exposed to significant financial constraints if the Debtors are not permitted to continue paying wages and salaries, providing employee benefits, and maintaining certain programs in the ordinary course of business. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these Chapter 11 Cases.

## RELIEF REQUESTED

9.      By this Motion, the Debtors request entry of the Interim Order and the Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively: (a) authorizing, but not directing, the Debtors to (i) pay and/or honor, in their sole discretion, prepetition claims related to Employee Compensation, Employee Benefits, Reimbursable Expenses, Withholding Obligations, Independent Contractor Obligations, and Administration Fees, and all costs related thereto (collectively, the "Prepetition Employee Obligations"),[2] and (ii) maintain and continue to honor the Prepetition Employee Obligations as they were in effect as

---

[2] The summaries of the Debtors' various practices, programs, and policies discussed herein are qualified entirely by the Debtors' official policies or other practices, programs, or agreements (each, an "Official Policy").  In the event of any inconsistency or ambiguity between these summaries and an Official Policy, the terms of the applicable Official Policy shall govern.

96902.7 04/10/2017

of the Petition Date and as such may be modified, amended, or supplemented from time to time in the ordinary course of business; and (b) authorizing the Banks to honor and process check and electronic transfer requests for payment of the Prepetition Employee Obligations.

10.     The Debtors request authority, but not direction, to make payments related to the Prepetition Employee Obligations that come due during the period between the Petition Date and the entry of the Final Order (the "Interim Period"), subject to entry of the Final Order to the extent the total payments to any Employee on account of Employee Compensation exceeds $12,850.  At the Final Hearing, the Debtors will seek authority, but not direction, to make all payments related to the Prepetition Employee Obligations on a final basis.

11.     The Debtors submit that any delay in paying the Prepetition Employee Obligations, including failure to maintain Employee Compensation, Employee Benefits, and Independent Contractor Obligations, will adversely impact the Debtors' relationships with their workforce and could irreparably harm the Workforce's morale, dedication, confidence, and cooperation.  The Debtors cannot risk the substantial damage to their business and the pending sale process that would certainly occur if such delay or failure were to happen.

12.     The Debtors further request that the Court schedule a hearing (the "Final Hearing") as soon as practicable after the 21st day following the entry of the Interim Order to consider approval of the relief requested by the Motion on a final basis, and establish the date that is seven days prior to the Final Hearing as the deadline for parties to file objections to the Motion.

## THE DEBTORS' PREPETITION EMPLOYEE OBLIGATIONS

### A.     Employee Compensation

13.     Employee Compensation is comprised of base wages and salaries, including vacation, severance, and sick leave pay ("Wages and Salaries"), and sales-based compensation, including commissions for sales and other incentive based compensation ("Incentive

Compensation"). The Debtors' average payroll is approximately $9 million per pay period for the Employees. The Debtors also spend approximately $2.2 million per year on Incentive Compensation.

### 1.  Wages and Salaries

14.    In the ordinary course of business, the Debtors incur payroll obligations for Wages and Salaries, including paid time off for vacation and personal absences (*e.g.*, jury duty, bereavement, etc.) and seven fixed holidays. The Employees are paid on a bi-weekly payroll schedule. Payrolls are processed so paychecks are distributed on alternate Fridays, with a one week delay, following the completed time period for which Employees are being paid. Prior to the Petition Date, the Debtors' last payroll was paid to Employees on April 7, 2017, on account of Wages and Salaries earned from March 18, 2017 through March 31, 2017.

15.    Because Employees are paid in arrears, the Employees are owed accrued but unpaid Wages and Salaries as of the Petition Date. As of the Petition Date, the Debtors estimate that they owe approximately $4.8 million in the aggregate to the Employees on account of Wages and Salaries (excluding Incentive Compensation and Reimbursable Expenses) for prepetition services, all of which will become due during the Interim Period. For the avoidance of doubt, the Debtors are not seeking authorization to pay any prepetition Employee Compensation owed to Employees that are no longer employed by the Debtors.

16.    By this Motion, the Debtors seek authorization, but not direction, to pay the outstanding amounts owed to Employees as of the Petition Date for accrued and unpaid Wages and Salaries, subject to entry of the Final Order to the extent the total payments to any Employee for Employee Compensation exceed $12,850, and to continue to make payments in respect of Wages and Salaries in the ordinary course of business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

### 2.   Incentive Compensation

17.   A significant portion of Employee Compensation, particularly for the Debtors' sales workforce, is sales- and incentive-based compensation.   Prior to the Petition Date, the Debtors maintained a variety of ordinary course Incentive Compensation programs (collectively, the "Plans"), which include:

(a)   annual incentive plans for business development executives, account partners, account managers, and national account partners designed to provide a level of target compensation that is both market competitive and motivates the appropriate selling behaviors and activities that result in profitable revenue and gross profit growth;

(b)   annual compensation plans for practice client partners, solutions architects, and other Employees that provide for annual bonuses based upon the overall attainment of annual net revenue objectives;

(c)   an incentive plan intended to compensate in-house recruiters with bonuses for hiring billable and non-billable consultants and other employees;

(d)   a salaried exempt incentive plan intended to reward full-time salaried exempt employees that do not fall under separate sales, recruiting, or management incentive plans for individual personal performance and contribution to the Debtors' financial goals; and

(e)   an incentive plan approved by the Debtors' board and shareholders that provides Employees, consultants, and directors selected for participation in the plan with stock-based compensation, intended to incentivize those individuals to continue in the long-term service of the Debtors.

18.   In order to be eligible to receive Incentive Compensation under the majority of the Plans, the participant must be employed by the Debtors on the date that the Incentive Compensation is paid in accordance with the Debtors' normal pay cycles and practices.   As of the Petition Date, the Debtors estimate that they owe approximately $9 million on account of Incentive Compensation to members of the Debtors' workforce pursuant to the Plans.   For the avoidance of doubt, the Debtors are not seeking authorization from the Court by this Motion to pay any Incentive Compensation to the Debtors' insiders.

19.     By this Motion, the Debtors seek authorization, but not direction, to pay the outstanding amounts owed under all of the Plans as of the Petition Date for accrued and unpaid Incentive Compensation in accordance with the terms of the applicable Plan, subject to entry of the Final Order to the extent the total payments to any Employee for Employee Compensation exceed $12,850, and to continue to make payments in respect of the Incentive Compensation in the ordinary course of business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

**B.     Payroll Administration Fees**

20.     The Debtors use Ceridian Corporation ("Ceridian") to administer their payroll and time management systems.  The Debtors pay Ceridian approximately $30,000 in the aggregate per month for these administrative services.  As of the Petition Date, the Debtors believe that approximately $225,000 is owing to Ceridian in respect of prepetition costs and fees for these administrative services, all of which will become due during the Interim Period.[3]  The Debtors seek authority to pay all prepetition amounts owing to Ceridian in respect of these Administration Fees (the "Payroll Administration Fees") and to continue to make payments in respect of the Payroll Administration Fees in the ordinary course of business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

**C.     Employee Benefits**

21.     The Debtors provide eligible Employees with a wide variety of Employee Benefits, including (a) time off programs, (b) health, life, and other insurance plans, (c) retirement plans,

---

[3] The amount of Payroll Administration Fees that the Debtors currently owe to Ceridian is abnormally high, because Ceridian did not receive payment from the Debtors of their Administration Fees during a significant portion of 2016 due to a clerical error.  Going forward, the Debtors do not expect Ceridian's Administration Fees to exceed $30,000 in the aggregate per month.

96902.7 04/10/2017

(d) educational benefit plans, and (e) other employee benefits (collectively, the "Benefit Programs").

### 1.    Time Off Programs

22.    The Debtors sponsor time off programs that fall into two categories, paid time away from work ("Paid Time") and unpaid time away from work ("Unpaid Time").  The Paid Time programs include paid time off for short term disability for non-occupational related illness or injury (including maternity-related disability), and long-term disability.[4]  The Unpaid Time programs include authorized unpaid leaves of absence, military duty leave, and family and medical leave.  By this Motion, the Debtors seek authorization, but not direction, to continue their Paid Time and Unpaid Time programs on a postpetition basis in the ordinary course of business and consistent with prepetition practices.

### 2.    Insurance Plans

23.    The Debtors provide eligible Employees and their covered dependents with comprehensive insurance protection, including (a) medical insurance, (b) dental insurance, (c) vision insurance, (d) life, accidental death and dismemberment, and short- and long-term disability insurance, and (e) workers' compensation insurance.

### a.    Health Plans

24.    The Debtors offer eligible Employees a choice of several health insurance plans (collectively, the "Health Plans") administered by UnitedHealthcare ("UHC").  The costs of the Health Plans are shared by the Debtors and the Employees through paycheck withholding. Without the Health Plans, the Employees would be forced to either forego health insurance coverage entirely or obtain potentially expensive out-of-pocket insurance coverage, which would

---

[4] As set forth above, the Debtors also provide eligible Employees with time off for vacation and personal absences (e.g., jury duty, bereavement, etc.) and seven fixed holidays, all of which have been categorized for the purposes of this Motion as Wages and Salaries.

96902.7 04/10/2017

likely adversely affect the Employees' morale.  The Debtors' average cost (after taking into account Employee contributions) of maintaining the Health Plans, including administrative costs and premiums, is approximately $1,445,000 in the aggregate per month.  As of the Petition Date, the Debtors estimate that they owe approximately $1,445,000 on account of the Health Plans, all of which will become due during the Interim Period.  By this Motion, the Debtors seek authorization, but not direction, to pay prepetition amounts due on account of the Health Plans, and to continue to pay postpetition costs of the Health Plans in the ordinary course of business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

### b.    Dental Plan

25.    The Debtors offer eligible Employees a dental insurance plan (the "Dental Plan") administered by UHC.  The costs of the Dental Plan are shared by the Debtors and the eligible Employees through paycheck withholding.  The Debtors' average cost (after taking into account Employee contributions) of maintaining the Dental Plan, including administrative costs and premiums, is approximately $120,000 in the aggregate per month.  As of the Petition Date, the Debtors estimate that they owe approximately $120,000 on account of the Dental Plan, all of which will become due during the Interim Period.  By this Motion, the Debtors seek authorization, but not direction, to pay prepetition amounts due on account of the Dental Plan, and to continue to pay postpetition costs of the Dental Plan in the ordinary course of business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

### c.    Vision Plan

26.    The Debtors offer eligible Employees vision care coverage (the "Vision Plan") administered by UHC.  The costs of the Vision Plan are shared by the Debtors and the eligible Employees through paycheck withholding.  The Debtors' average cost (after taking into account Employee contributions) of maintaining the Vision Plan, including administrative costs and

96902.7 04/10/2017

premiums, is approximately $31,000 in the aggregate per month. As of the Petition Date, the Debtors estimate that they owe approximately $31,000 on account of the Vision Plan, all of which will become due during the Interim Period. By this Motion, the Debtors seek authorization, but not direction, to pay prepetition amounts due on account of the Vision Plan, and to continue to pay postpetition costs of the Vision Plan in the ordinary course of business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

### d.    Life and Disability Plans

27.    The Debtors provide their Full Time Employees with basic life insurance, accidental death and dismemberment insurance, short-term disability insurance, and long-term disability insurance (collectively, the "Life and Disability Plans"), all of which are administered by Dearborn National, with the exception of the short-term disability insurance, which is administered by the Debtors. The Life and Disability Plans are fully funded by the Debtors (except with respect to any supplemental coverage that is paid by the Employees through paycheck withholding). In the aggregate, the Debtors' average monthly cost of maintaining the Life and Disability Plans, including administrative costs and premiums, is approximately $71,000. As of the Petition Date, the Debtors estimate that they owe approximately $60,000 on account of the Life and Disability Plans, all of which will become due during the Interim Period. By this Motion, the Debtors seek authorization, but not direction, to pay prepetition amounts due on account of the Life and Disability Plans, and to continue to pay postpetition costs of the Life and Disability Plans in the ordinary course of business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

### e.    Workers' Compensation Plan

28.    The Debtors provide all eligible Employees with workers' compensation insurance (the "Workers' Compensation Plan") as required by federal and state law. The Workers'

Compensation Plan is administered by Zurich American Insurance Company, and the average annual cost of maintaining the Workers' Compensation Plan, including administrative costs and premiums, is approximately $193,000 in the aggregate. As of the Petition Date, the Debtors are current with their obligations under the Workers' Compensation Plan. The Debtors anticipate that they will owe approximately $193,000 when they renew their annual policy on March 1, 2018.

29.     By this Motion, the Debtors seek authorization, but not direction, to satisfy all obligations related to the Workers' Compensation Plan, including, without limitation, premiums, financings, deductibles, and any related fees, costs, and expenses, and continue their Workers' Compensation Plan in the ordinary course and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

### f.    COBRA

30.     Pursuant to the requirements of the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), the Debtors provide temporary continuation of healthcare benefits at group rates to former Employees after their termination, retirement, or disability leave.  The former Employees bear all costs associated with COBRA.  While the Debtors do not expect any costs to arise associated with this benefit, the Debtors request that former Employees and eligible dependents retain the right to coverage under the Debtors' Health, Vision, and Dental Plans in accordance with the requirements of the terms of COBRA and request authorization to pay obligations (if any) arising under such plans, regardless of when such obligations accrued.

### 3.    Retirement Plan

31.     The Debtors allow eligible Employees to participate in a 401(k) plan (the "Retirement Plan").  Principal Financial serves as the trustee of Retirement Plan at a cost of approximately $15,000 in the aggregate per month. The Retirement Plan is funded by Employees, through paycheck withholding, and the Debtors through matching contributions (capped at $2,000

12

per Employee per calendar year, with approximately $75,000 in monthly matches). As of the
Petition Date, the Debtors estimate that they owe approximately $30,000 on account of fees and
matching contributions related to the Retirement Plan, all of which will become due during the
Interim Period. By this Motion, the Debtors seek authorization to continue to pay postpetition
costs of the Retirement Plan in the ordinary course of business and consistent with their prepetition
practices during the pendency of the Chapter 11 Cases.

### 4.  Education Benefits

32.      It is the general policy of the Debtors to provide employees and their dependents
with opportunities for training and education. The Debtors provide all Employees with
computer-based training classes on most current industry applications ("Ciber University"). The
Debtors also reimburse Employees for certain tuition costs incurred by Employees and their
dependents (the "Education Assistance Program" and, together with Ciber University, the
"Education Benefits"), up to $1,000 per calendar year. As of the Petition Date, the Debtors are
current with their obligations related to the Education Benefits. By this Motion, the Debtors
request the authority to continue honoring obligations associated with the Education Benefits in
the ordinary course and consistent with their prepetition practices during the pendency of the
Chapter 11 Cases.

### 5.  Other Employee Benefits

33.      The Debtors provide eligible Employees with a number of miscellaneous benefits
(the "Other Employee Benefits"), which include an employee stock purchase plan, a dependent
care flexible spending plan, a health care flexible spending plan, a commuter benefits program, a
computer assistance plan, company-provided telephones, an employee referral bonus program,
and other fringe benefits. In the aggregate, the average monthly cost of maintaining the Other
Employee Benefits (to the extent the Other Employee Benefits require payment from the Debtors)

13

is approximately $22,000. The Debtors seek authorization, but not direction, to pay prepetition amounts due on account of the Other Employee Benefits, and to continue to pay postpetition costs of the Other Employee Benefits in the ordinary course of business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

### D.    Reimbursable Expenses

34.    Prior to the Petition Date, the Debtors reimbursed Employees and Independent Contractors for Reimbursable Expenses incurred on behalf of the Debtors in the scope of their duties. The Reimbursable Expenses are incurred in the ordinary course of the Debtors' business operations and include, without limitation, expenses for meals, travel, automobile mileage, and other business-related expenses. Employees and Independent Contractors use online expense report software to submit expense reports and receive reimbursement for approved expenses. All Reimbursable Expenses must be approved by a member of management.

35.    Historically, the Debtors pay approximately $900,000 in the aggregate on account of Reimbursable Expenses each month. As of the Petition Date, the Debtors estimate that they owe approximately $900,000 in Reimbursable Expenses that have not yet been reimbursed by the Debtors, all of which will become due during the Interim Period. Although the Debtors ask that Employees and Independent Contractors submit reimbursement requests promptly, Employees and Independent Contractors may submit reimbursement requests for prepetition Reimbursable Expenses after the Petition Date.

36.    Absent authority to pay the Reimbursable Expenses incurred prepetition, the Employees and Independent Contractors could be obligated to pay such amounts out of their personal funds. The Debtors therefore seek authority to pay all outstanding prepetition Reimbursable Expenses, and to continue the foregoing policy in the ordinary course of business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

### E.    Withholding Obligations

37.    The Debtors routinely deduct certain amounts from Employees' compensation that represent various Withholding Obligations, including, for example, various federal, state and local income, and Federal Insurance Contribution Act ("FICA") and other taxes (the "Employee Withholdings"). The amount deducted and remitted by the Debtors in respect of Employee Withholdings has recently averaged approximately $5.52 million per month in the aggregate. As of the Petition Date, the Debtors estimate that they owe approximately $1.48 million in Employee Withholdings, all of which will become due during the Interim Period.

38.    The Debtors are also responsible for remitting to their Administrators, for their own account, various taxes and fees associated with payroll pursuant to the Federal Insurance Contributions Act and federal and state laws regarding unemployment and disability taxes (the "Payroll Taxes"). On average, the Debtors pay approximately $700,000 in the aggregate for employer-obligated Payroll Taxes each month. As of the Petition Date, the Debtors estimate that they owe approximately $362,000 in Payroll Taxes, which includes approximately $175,000 in late payroll tax penalties, all of which will become due during the Interim Period.

39.    The Debtors therefore seek authority to deduct and remit all outstanding prepetition Employee Withholdings and Payroll Taxes, and to continue to deduct and remit Employee Withholdings and Payroll Taxes in the ordinary course of business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

### F.    Independent Contractors and Foreign Affiliate Employees

40.    In addition to the Employees, the Debtors also contract with approximately 165 Independent Contractors, and utilize the services of the Foreign Affiliate Employees, who provide who provide invaluable services to the Debtors, equivalent to those provided by many Employees, including critical client-facing consulting services. Upon information and belief, during the past

12 months, at least 75 percent of the amounts earned by the Independent Contractors and Foreign Affiliate Employees were earned from the Debtors. The Independent Contractors and Foreign Affiliate Employees are not paid through the Debtors' payroll system, but are instead paid in arrears through the Debtors' accounts payable system and intercompany transfers, respectively. If the Debtors are unable to continue their relationships with and pay the Independent Contractors and Foreign Affiliate Employees, the Debtors' business operations will be substantially impaired.

41.     Because Independent Contractors are paid in arrears, the Independent Contractors are owed accrued but unpaid compensation. On average, the Debtors pay approximately $3.75 million in the aggregate to the Independent Contractors and $2 million to the Foreign Affiliates on account of the Foreign Affiliate Employees on a monthly basis. As of the Petition Date, the Debtors estimate that they owe approximately $6 million in the aggregate to the Independent Contractors and $1.8 million in the aggregate to the Foreign Affiliates on account of the Foreign Affiliate Employees for prepetition services, all of which will become due during the Interim Period. By this Motion, the Debtors seek authorization, but not direction, to pay the outstanding amounts owed to Independent Contractors and Foreign Affiliates on account of the Foreign Affiliate Employees as of the Petition Date, and to continue to pay postpetition amounts due to the Independent Contractors and Foreign Affiliates on account of the Foreign Affiliate Employees in the ordinary course of business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.

### G.     Direction to Banks

42.     The Debtors seek an order authorizing the Banks to receive, process, honor, and pay all of the Debtors' prepetition checks and fund transfers on account of any Prepetition Employee Obligations, including all checks issued with regard to Employee Benefits, and prohibiting the Banks from placing any holds on, or attempting to reverse, any automatic transfers

to any account of an Employee or other party for Prepetition Employee Obligations. The Debtors also seek an order authorizing them to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected, and to reimburse, at their sole discretion, Employees and Independent Contractors for any fees or expenses incurred in connection with any rejected checks as a result of the Debtors' bankruptcy filing.

### H.    The Infor APA

43.    On March 31, 2017, Ciber closed the previously announced asset purchase agreement, dated March 20, 2017, between Infor (US), Inc. and Ciber, as amended (the "Infor APA"). Pursuant to the Infor APA, Ciber was required to satisfy certain existing Obligations (as defined in the Infor APA) of Ciber relating to the period prior to March 31, 2017 for any Transferred Employees (as defined in the Infor APA) (the "Transferred Employee Obligations"), including certain Prepetition Employee Obligations. Accordingly, on March 31, 2017, (a) Infor (US), Inc. wired to Ciber an amount of $1,333,745.69, out of the proceeds otherwise payable pursuant to the Infor APA, to satisfy the Transferred Employee Obligations and (b) Ciber issued a special payroll, in the form of written checks, in an aggregate amount of $1,333,745.69, to such employees and delivered such checks by overnight courier. Certain of the payments to the Transferred Employees exceed $12,850. Absent Ciber's agreement to issue the special payroll, Infor (US), Inc. would not have agreed to close, and the Debtors' stakeholders would not have received the proceeds of, the Infor APA. As of the Petition Date, the Debtors estimate that written checks on account of the Transferred Employee Obligations, in an aggregate amount of approximately $105,000, have not yet been cashed.

44.    Accordingly, notwithstanding anything to the contrary contained herein, the Debtors seek entry of an order authorizing the Banks to receive, process, honor, and pay all of the

Debtors' prepetition checks and fund transfers on account of any Transferred Employee Obligations, and prohibiting the Banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Transferred Employee Obligations, regardless of whether such payments exceed $12,850.

## BASIS FOR RELIEF REQUESTED

### A.    Certain of the Proposed Payments Are Afforded Priority Under Section 507(a) of the Bankruptcy Code

45.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, and employee benefit contributions be afforded priority in payment in an amount up to $12,850 for each member of the Workforce. The Debtors seek authority, but not direction, to pay such amounts up to the statutory cap of $12,850 prior to entry of the Final Order.

### B.    The Proposed Payments Are Appropriate Under Sections 105(a), 363, 1107(a), and 1108 of the Bankruptcy Code

46.    Courts in this jurisdiction and others have approved relief similar to the relief requested in this Motion. *See, e.g.*, *Official Comm. of Unsecured Creditors v. Med. Mut. Of Ohio (In re Primary Health Sys., Inc.)*, 275 B.R. 709, 710 (Bankr. D. Del. 2002), *aff'd*, No. 99-615, 2003 U.S. Dist. LEXIS 26256 (D. Del. Feb. 27, 2003) (allowing payment of prepetition wages and employee benefits programs and policies upon a finding that such relief was "in the best interest of the Debtors and their estates. . . ."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories grounded in sections 1107(a), 1108, 363(b), and 105(a) of the Bankruptcy Code.

47.    Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors-in-possession are fiduciaries "holding the bankruptcy estate[s] and operating the

business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). One aspect of a debtor-in-possession's fiduciary duties is the obligation to "protect and preserve the estate." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court expressly stated that the preplan satisfaction of claims would be a valid exercise of the debtor's fiduciary duty when paying the claimant (a) is critical to preserve the estate, (b) will avoid causing the estate significant economic harm, and (c) is the only practical or legal way by which the debtor can deal with the claimant. *Id.* at 498.

48.    Consistent with a debtor's fiduciary duties, courts have authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g., Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed for debtor to pay prepetition wages). Specifically, the business judgment standard requires that a debtor "articulate some business justification, other than mere appeasement of major creditors. . . ." *Id.* at 175.

49.    Likewise, the Court is empowered to approve payment of certain prepetition claims, including the Prepetition Employee Obligations, under section 105 of the Bankruptcy Code and the "doctrine of necessity." Section 105(a) of the Bankruptcy Code authorizes this Court to "issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). For the reasons set forth herein, and in light of the critical need for the Debtors to preserve the value of their estates, authorizing the Debtors to pay the aforementioned obligations as requested herein and to honor their prepetition and ongoing obligations to the Workforce is proper in accordance with section 105 of the Bankruptcy Code. *See, e.g., In re*

*Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid").

50.    As discussed above, the Debtors' payments on account of the Prepetition Employee Obligations, and the continuance of certain programs in the ordinary course of business and on a postpetition basis, are necessary to preserve and protect the Debtors' assets and estates. For the foregoing reasons, the Debtors submit that the relief sought by this Motion is based upon a sound exercise of their business judgment. Accordingly, the Court should grant the requested relief under sections 105, 363, 1107, and 1108 of the Bankruptcy Code and the doctrine of necessity.

### C.    Certain of the Payments Represent Trust Fund Payments and Are Appropriate Under Section 541 of the Bankruptcy Code

51.    To the extent the Debtors are obligated to pay any Withholding Obligations postpetition, these payments will not prejudice the Debtors' estates because such withholdings would be held in trust for the benefit of the payees and, thus, do not constitute property of the Debtors' estates under section 541 of the Bankruptcy Code. *See Begier v. IRS*, 496 U.S. 53, 58-59 (1990); *see also* 11 U.S.C. § 541(d); *see also In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993) (concluding that property that debtor holds in trust—either express or constructive—for another does not become property of the estate when the debtor files for bankruptcy, and stating that "Congress clearly intended the exclusion by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust"); *EBS Pension L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.)*, 243 B.R. 231 (Bankr. D. Del. 2000) (same).

96902.7 04/10/2017

52.     The 2005 amendments to the Bankruptcy Code amended section 541(b) to explicitly remove from property of the estate "any amount withheld by an employer from the wages of employees for payment as contributions" to certain ERISA qualified, tax-deferred annuities and health insurance plans. *See* 11 U.S.C. § 541(b)(7)(A).  Out of an abundance of caution, the Debtors seek authority, but not direction, to make these payments to the appropriate payees, as necessary and in the ordinary course of business on a postpetition basis, under sections 541(b)(7)(A) and 541(d) of the Bankruptcy Code because doing so will not impair the interests of the Debtors' other unsecured creditors.

### D.     Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Transfer Requests

53.     To facilitate the implementation of the above-requested relief, the Debtors further request that the Court authorize all Banks to receive, process, honor, and pay any and all checks drawn on, or electronic transfer requests from, their accounts, whether such checks or requests are presented or submitted prior to or after the Petition Date, to the extent such checks or requests are expressly identified by the Debtors as related directly to the payment of the Prepetition Employee Obligations, including all checks issued with regard to Employee Benefits, or to the continuance of certain programs in the ordinary course of business and on a postpetition basis.

### RESERVATION OF RIGHTS

54.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors and their estates, a waiver of the rights of the Debtors and their estates to dispute any claim, or an approval or assumption of any agreement or contract under section 365 of the Bankruptcy Code.  The Debtors and their estates expressly reserve their rights to dispute any claim asserted by a member of the Workforce under applicable non-bankruptcy law.  Likewise, if this Court grants the relief sought herein, any payment made

pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the rights of the Debtors and their estates to dispute such claim subsequently.

## THE DEBTORS HAVE SATISFIED BANKRUPTCY RULE 6003

55.     Bankruptcy Rule 6003 provides that the relief requested in the Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm . . . ." *See* Fed. R. Bankr. P. 6003.    As described herein, the continued service and dedication of the Employees or Independent Contractors have been and are essential to assist the Debtors in effectively and efficiently maintaining their business operations without interruption.    In order to successfully preserve and protect the Debtors' estates and their assets, and minimize the personal hardship that the members of the Workforce will suffer if prepetition obligations are not paid when due or as otherwise expected, the Debtors believe that it is necessary and in the best interests of the estates and all stakeholders to seek the relief requested herein.    Accordingly, the Debtors submit that the relief requested is necessary to avoid immediate and irreparable harm and, therefore, Bankruptcy Rule 6003 is satisfied.

## WAIVER OF BANKRUPTCY RULE 6004(h)

56.     To implement the relief requested herein successfully, the Debtors respectfully request that the Interim Order and the Final Order provide that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

57.     Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee; (b) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (c) Wells Fargo Bank, N.A. (d) the

Securities & Exchange Commission; (e) the Office of the United States Attorney General for the

District of Delaware; (f) the Internal Revenue Service; (g) the U.S. Department of Justice; and

(h) the offices of the attorneys general for the states in which the Debtors operate.  Notice of this

Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In

light of the nature of the relief requested herein, the Debtors submit that no other or further notice

is necessary.

*[Space Left Blank Intentionally]*

96902.7 04/10/2017

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Interim Order and the Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and such other and further relief as is just.

Dated:  April 10, 2017
        Wilmington, Delaware

Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
**SAUL EWING LLP**
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, Delaware  19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873
mminuti@saul.com
mdisabatino@saul.com

-and-

Sharon L. Levine (*pro hac vice* admission pending)
Dipesh Patel (*pro hac vice* admission pending)
**SAUL EWING LLP**
1037 Raymond Boulevard, Suite 1520
Newark, New Jersey 07102
Telephone: (973) 286-6718
Facsimile: (973) 286-6821
slevine@saul.com
dpatel@saul.com

-and-

Brett H. Miller (*pro hac vice* admission pending)
Dennis L. Jenkins (*pro hac vice* admission pending)
Daniel J. Harris (*pro hac vice* admission pending)
Benjamin Butterfield (*pro hac vice* admission pending)
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
brettmiller@mofo.com
djenkins@mofo.com
dharris@mofo.com
bbutterfield@mofo.com

*Proposed Counsel for Debtors and
Debtors-in-Possession*

96902.7 04/10/2017