## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CIBER, Inc., *et al.*,[1] | ) | Case No. 17-10772 (___) |
|  | ) |  |
| Debtors. | ) | Joint Administration Pending |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' ASSETS, INCLUDING APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CIBER, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CIBER, Inc. (6833), CIBER International LLC, and CIBER Consulting, Incorporated. The principal place of business for each Debtor is 6312 South Fiddler's Green Circle, Suite 600E, Greenwood Village, CO 80111.

By this motion (the "Motion"), CIBER, Inc. ("Ciber") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases") seek: (a) entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), pursuant to sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (i) approving the proposed auction and bidding procedures attached hereto as **Exhibit B** (the "Bidding Procedures") for the sale of substantially all the assets relating to the Debtors' North American business along with 100% of the capital stock in wholly-owned non-Debtor subsidiary CIBERsites India Private Limited (the "Purchased Assets"), (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"), (iii) approving the form and manner of notice of all procedures, protections, schedules, and agreements, and (iv) scheduling a hearing (the "Sale Hearing") to approve the sale transaction (the "Sale Transaction");, (b) following the Sale Hearing, entry of a sale order (the "Sale Order") (i) approving the sale of the Debtors' assets free and clear of all liens, claims, interests, and encumbrances ("Interests"), and (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (c) granting related relief.  In further support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.      The goal of these chapter 11 cases is to consummate a sale of the Debtors' assets that will maximize recoveries for all of the Debtors' stakeholders.  As discussed in more detail below, due to the nature of the Debtors' business, a prompt postpetition marketing and sale process is essential to achieving that goal.  Approval of the Bidding Procedures is a critical and necessary step, which is designed to permit a fair and reasonable marketing process and obtain the highest and best offer for the Debtors' assets.

2.      As detailed in the First Day Declaration, the Debtors, with the assistance of their advisors, considered all strategic options and concluded that a sale in accordance with the Bidding Procedures set forth herein is the best way to maximize the value of the Debtors' assets and yield the best possible recovery for creditors.  The Debtors, with the assistance of Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), seek to successfully conclude the global marketing process for the Debtors' assets that began approximately five months ago.

3.      As a result of Houlihan Lokey's extensive marketing efforts,[3] on April 10, 2017, the Debtors executed an agreement (the "Stalking Horse Purchase Agreement") with Capgemini America, Inc. ("CG America" or the "Stalking Horse Bidder") for the purchase of the Purchased Assets, which include: (a) substantially all of the assets relating to the Debtors' North American business; and (b) the Debtors' equity interest in CIBERsites India Private Limited ("CIBERsites"),

---

[2]  Capitalized terms used but not otherwise defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this Motion or the Bidding Procedures, as applicable.

[3]  The Debtors' prepetition marketing and negotiation efforts are detailed in the *Declaration of Adam Dunayer in Support of the Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures in Connection With the Sale of Substantially All of the Debtors' Assets By Public Auction; (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; and (C) Approving the Form and Manner of Notice Thereof; (II)(A) Authorizing and Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests; and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* attached hereto as **Exhibit C** and incorporated herein by reference (the "Dunayer Declaration").

a wholly-owned non-Debtor subsidiary based in India.[4] The Stalking Horse Purchase Agreement contemplates a purchase price of $50 million for the Purchased Assets plus the assumption of certain liabilities, and reflects CG America's agreement to act as a stalking horse bidder in a Court-supervised bidding and auction process. The Stalking Horse Purchase Agreement will provide for continued employment to the Debtors' employees, permit the assumption of significant liabilities of the Debtors and allow the Debtors' customers to continue receiving first-class services without interruption.

4.    As required under the Debtors' debtor-in-possession financing facility (the "DIP Facility") and by the Stalking Horse Purchase Agreement, the Bidding Procedures contemplate a swift postpetition marketing process and entry of an order approving the Sale Transaction by no later than forty (40) days after the Petition Date. Speed is critical here because, even with the additional liquidity to be provided by the DIP Facility, the Debtors will run out of access to liquidity within just a few months. The Debtors' receipt of the additional liquidity is conditioned on the Debtors' pursuit of an expedited sale process and, without access to those funds, the Debtors will likely have no choice but to pursue an immediate cessation of operations and liquidation of the estates, which would produce a fraction of the proceeds that are contemplated under the Stalking Horse Purchase Agreement.

5.    The accelerated timeframe is also warranted due to the nature of the Debtors' business. As a service-based provider, the Debtors' value relies heavily on its employees generating revenue and customers agreeing to continue using the Debtors' services, which in most cases permit the termination of services with little notice. Finally, as set forth in more detail in the Dunayer Declaration, as a result of the extensive prepetition marketing efforts, an extended

---

[4] The assets of the Debtors' other foreign subsidiaries are not the subject of the Stalking Horse Purchase Agreement.

postpetition marketing process should not be necessary to maximize value here because many potentially interested parties have been aware of the Debtors' interest in selling substantially all of their assets for several months, and some began to conduct due diligence prior to the Petition Date. As a result, an extended marketing process would likely only deteriorate the value available to the Debtors' stakeholders.  Accordingly, the Debtors have filed this Motion seeking a prompt sale process that will maximize value for the Debtors' stakeholders.

## BACKGROUND

6.    On April 9, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in the Chapter 11 Cases, and no statutory committees have been appointed or designated.

7.    A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the Chapter 11 Cases, are set forth in greater detail in the *Declaration in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") [D.I. 3], filed contemporaneously herewith and incorporated by reference herein.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by

the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

9.      By this Motion, the Debtors seek entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**: (a) approving the proposed Bidding Procedures attached hereto as **Exhibit B**, including approval of the Break-Up Fee and the Expense Reimbursement (as such terms are defined below) as allowed administrative expenses with super priority pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code; (b) establishing the Assumption and Assignment Procedures, including notice of proposed cure amounts; (c) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (d) scheduling the Sale Hearing to approve the Sale Transaction.

10.      The Debtors also seek entry of the Sale Order:[5] (a) approving the sale of the Debtors' assets free and clear of all Interests; and (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases.

11.      Contemporaneously herewith, the Debtors have filed a motion seeking to have this motion heard on shortened notice pursuant to Rule 2002 and Local Rules 6004-1(c) and 9006-1(e) (the "Motion to Shorten").

---

[5]  The proposed form of Sale Order will be filed with the Court on the date that is one (1) calendar day prior to the Sale Hearing.

662323.1 04/10/2017

## THE PROPOSED SALE

**A.      The Debtors' Prepetition Marketing Efforts**

12.     As set forth in the First Day Declaration, Ciber is a leading global information technology ("IT") consulting, services and outsourcing company founded in 1974 and headquartered in Greenwood Village, Colorado.  Ciber employs approximately 2,200 employees, including billable employees and support staff, and 315 independent contractors.  Ciber operates its businesses in the U.S. and the U.K., with offshore delivery centers in India, Vietnam, and Poland.  Until recently, Ciber also operated its business in Germany, the Netherlands, Norway, Spain, and Sweden.

13.     In need of a long-term solution to address liquidity concerns, in September 2016, the Debtors retained Houlihan Lokey to explore restructuring opportunities, including potential mergers and potential dispositions of substantially all of the Debtors' assets.  Based on the advice of Houlihan Lokey and their other professional advisors, the Debtors ultimately determined that a sale of all or substantially all of the Debtors' assets would be the best way to maximize value. Between November 2016 and the Petition Date, Houlihan Lokey contacted more than one hundred and fifty (150) prospective purchasers and merger partners, including both financial and strategic partners.  Approximately twenty-five (25) of these parties signed non-disclosure agreements and were given access to due diligence materials.

14.     Of the parties who expressed interest in completing a transaction, one potential purchaser was interested only in acquiring the Debtors' assets through a Bankruptcy Court supervised 363 sale.  Although a few parties expressed interest in an out-of-court stock acquisition, they did not approach the Debtors until shortly prior to the Petition Date, and the Debtors lacked a sufficient liquidity runway to allow them sufficient time to complete due diligence.

662323.1 04/10/2017

15.    While the Debtors and their advisors maintained the view that a sale of substantially all of their assets would be the best way to maximize value, given the Debtors' diminishing access to liquidity and negative operating cash flow, as detailed in the First Day Declaration and the Dunayer Declaration, it became clear that the best, and indeed, <u>only</u> option to prevent an abrupt cessation of operations and liquidation of assets would be to file for protection under chapter 11 of the Bankruptcy Code. Accordingly, in the weeks prior to the Petition Date, the Debtors and their advisors began to prepare for a bankruptcy filing while pursuing discussions with potential stalking horse bidders for substantially all of the Debtors' assets.

16.    After speaking with several potentially interested parties, on March 31, 2017, the Debtors ultimately determined to proceed with an offer from CG America, a newly created investment vehicle created for the Sale Transaction by Capgemini S.A. ("Capgemini"). Between March 31, 2017 and the Petition Date, the Debtors, Houlihan Lokey, and the Debtors' other professional advisors engaged in further discussions with CG America regarding the terms of the Stalking Horse Purchase Agreement and other ancillary agreements, and the remaining legal and financial due diligence necessary to consummate a transaction. Ultimately, these negotiations resulted in the execution of the Stalking Horse Purchase Agreement on April 10, 2017 whereby CG America agreed to act as the Stalking Horse Bidder for the sale of substantially all of the Debtors' North American assets as well as their equity in non-Debtor subsidiary CIBERsites for a purchase price consisting of: (a) approximately $50 million in cash and cash equivalents; and (b) the assumption of certain liabilities. The Stalking Horse Purchase Agreement is attached hereto as **Exhibit D**.

662323.1 04/10/2017

**B.     The Primary Terms of the Stalking Horse Purchase Agreement**

17.     The Stalking Horse Purchase Agreement contemplates the sale of the Purchased
Assets to the Stalking Horse Bidder, subject to higher or better bids, on the following material
terms:[6]

18.     <u>Seller</u>: Debtor CIBER, Inc. (in such capacity, "<u>Seller</u>").[7]

19.     <u>Purchaser</u>: Capgemini America, Inc. (in such capacity, "<u>Purchaser</u>").[8]

20.     <u>Purchase Price (Stalking Horse Purchase Agreement § 2.1)</u>:   The Purchase
Price consists of (a) $50,000,000 in cash plus (ii) the assumption of certain liabilities.

21.     <u>Purchased Assets (Stalking Horse Purchase Agreement § 1.1)</u>: The Stalking
Horse Purchase Agreement provides that the Purchaser will acquire: (a) all of the capital stock in
non-Debtor subsidiary CIBERsites; and (b) all or substantially all of the assets relating to the
Debtors' North American business, including: (i) all of Seller's properties, rights, claims and
assets (other than the Excluded Assets) of every kind and description; (ii) to the extent that they
may be assumed and assigned pursuant to sections 363 and 365 of the Bankruptcy Code, all
Contracts related to or used in the Business and all rights of Seller under such Contracts, but
excluding any Rejected Contracts; (iii) trade and non-trade accounts receivable, notes receivable

---

[6] The summary of the terms contained in this Motion is qualified in its entirety by reference to the provisions of the Stalking Horse Purchase Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Purchase Agreement and the summary set forth herein, the terms of the Stalking Horse Purchase Agreement shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Stalking Horse Purchase Agreement.

[7] Non-Debtor affiliate CIBERsites is a party to the Stalking Horse Purchase Agreement but solely purposes of section 8.20 thereof. The Stalking Horse Purchase Agreement contemplates the purchase of substantially all of the Debtors' North American assets as well as all of the shares of capital stock in CIBERsites. However, section 8.20 of the Stalking Horse Purchase Agreement provides that the Debtors that it wishes to purchase the assets of CIBERsites rather than the equity in CIBERsites. In the event the Stalking Horse Bidder makes such election, the Stalking Horse Purchase Agreement shall be deemed revised so that CIBERsites becomes a party to the entire Stalking Horse Purchase Agreement and shall be deemed to be a seller thereunder.

[8] CG America is an investment vehicle created for this transaction by Capgemini.

and negotiable instruments of Seller; (iv) cash and cash equivalents; (v) organizational documents; (vi) cash deposits of clients or customers held by each Seller as security for receivables or obligations; (vii) deposits of each Seller as security for rent, electricity, telephone, bonds or other sureties or otherwise, and prepaid charges and expenses; (viii) all tangible assets of Seller related to or used in the Business other than certain excluded assets; (ix) personnel files for certain employees; (x) chattel paper; (xi) permits and pending applications; (xii) rights of set off and subrogation against third parties; (xiii) intellectual property; (xiv) goodwill; (xv) inventory; (xvi) tax refunds and creditors; (xvii) rights under insurance policies; (xviii) rights under non-disclosure agreements; (xiv) personal property; (xv) telephone and fax numbers and email addresses; and (xvi) avoidance claims or causes of action.

22.    **Excluded Assets (Stalking Horse Purchase Agreement § 1.1)**: The Stalking Horse Purchase Agreement provides that the Purchaser will not acquire, among other things, (a) assets that are not related to the Business or part of the Purchased Assets, including but not limited to any assets used in or related to Seller's or any of its affiliates' business operations outside of North America and India; (b) all corporate-level services or functions; (c) all agreements and contracts other than the Assigned Contracts; (d) shares of capital stock or other equity interests in other entities held by any Seller; (e) current and prior director and officer insurance policies of Seller; (f) certain of Seller's financial accounting books and records; and (g) leases relating to certain real property.

23.    **Sale of Avoidance Actions (Stalking Horse Purchase Agreement § 1.1)**: The Purchased Assets include all avoidance claims or causes of action under the Bankruptcy Code or applicable Law (including, without limitation, any preference or fraudulent conveyance claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and all other claims or causes of

10

action under any other provision of the Bankruptcy Code or applicable laws related to the Purchased Assets and/or Assumed Liabilities.

24. **Assumed Liabilities (Stalking Horse Purchase Agreement § 1.3)**: The Stalking Horse Purchase Agreement provides for the assumption by the Purchaser of various liabilities, including, among other things: (a) all liabilities of Seller arising from ownership of the Purchased Assets and the Business arising after the Closing Date; (b) certain liabilities arising under the accounts payable related to the operation of the Business (including all costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with those executory contracts and unexpired leases that, pursuant to the terms of the Stalking Horse Purchase Agreement, will be assumed by the Debtors and Assigned to the Stalking Horse Bidder) as of the closing of the Sale Transaction, as well as the accounts payable set forth on Schedule 1.3(b) to the Stalking Horse Purchase Agreement; and (c) all liabilities, if any, set forth on Schedule 1.3(c) to the Stalking Horse Purchase Agreement relating to unpaid payroll and other amounts owed to certain employees of the Debtors who accept offers of employment from CG America.

25. **Excluded Liabilities (Stalking Horse Purchase Agreement § 1.4)**: The Stalking Horse Purchase Agreement provides that the Purchaser will not assume various liabilities in connection with the Sale Transaction, including, among other things: (a) all liabilities arising out of, related to or otherwise in respect of the Purchased Assets and/or Business arising prior to the Closing other than the Assumed Liabilities; (b) all liabilities arising out of or related to the Excluded Assets; (c) liability for indebtedness with respect to borrowed money or intercompany indebtedness among Seller; (d) all guarantees of third party obligations and reimbursement obligations to guarantors of Seller's obligations under letters of credit; (e) taxes arising from or attributable to the pre-closing period, and taxes arising from or relating to Excluded Assets; (f)

liabilities under executory contracts and unexpired leases that are not assumed by the Debtors and assigned to the Stalking Horse Bidder as part of the transaction; (g) liabilities for fees, costs and expenses incurred by Seller in connection with the Stalking Horse Purchase Agreement or the administration of the Cases; (h) all liability related to the WARN Act relating to any action or inaction of the Debtors prior to or upon the Closing Date; and (i) environmental liabilities.

26.    **Limitations on Successor Liability (Stalking Horse Purchase Agreement §
8.13)**: The Stalking Horse Purchase Agreement provides that the Purchaser shall not be the successor to any Liability of Seller, and will not assume, nor in any way be liable or responsible for, any claim or liability of any Seller other than certain assumed liabilities.

27.    **Closing and Other Deadlines (Stalking Horse Purchase Agreement § 3.4)**: The Stalking Horse Purchase Agreement may be terminated by the Purchaser if the following milestones are not met (the "Sale Milestones").

| Event | Milestone |
|---|---|
| Deadline for Entry of the Bidding Procedures Order | April 24, 2017 |
| Auction (if necessary) | May 15, 2017 |
| Sale Order | May 19, 2017 |
| Sale Closing | May 24, 2017[9] |

28.    **Good Faith Deposit (Stalking Horse Purchase Agreement § 2.3)**: The Stalking Horse Purchase Agreement provides that upon entry the Bidding Procedures Order, Purchaser and

---

[9] The Stalking Horse Purchase Agreement provides that the closing must occur prior to or on the forty fifth (45th) day after the date on which the Stalking Horse Purchase Agreement is executed (the "Outside Date"). However, under certain conditions, the Outside Date may be extended by the mutual written consent of Seller and Purchaser, for a period up to thirty (30) days.

the Sellers shall enter into an escrow agreement, and Purchaser shall deposit into escrow with the Escrow Agent an amount equal to $5,000,000.

29. **Break-Up Fee, Expense Reimbursement, and Overbid Protection (Stalking Horse Purchase Agreement § 7.1)**: The Stalking Horse Purchase Agreement includes certain protections for the Stalking Horse Bidder. Specifically, subject to Court approval as part of the Bidding Procedures Order, the Debtors will be required to pay the Stalking Horse Bidder a fee (the "Break-Up Fee") in the amount of $1,500,000 of the purchase price and reimburse the Stalking Horse Bidder for all of its reasonably documented costs and expenses related to pursuing, negotiating, and documenting the transactions contemplated by the Stalking Horse Purchase Agreement, which shall not exceed $500,000 (the "Expense Reimbursement and together with the Break-Up Fee, the "Bid Protections").

30. The Bid Protections are payable if the Debtors close an Alternative Transaction. The Stalking Horse Purchase Agreement defines "Alternative Transaction" to include: (a) approval by the Bankruptcy Court of a sale of a material portion of the Purchased Assets to a person other than the Stalking Horse Bidder, or (b) the filing of a plan of reorganization that does not contemplate the sale of the Purchased Assets to the Stalking Horse Bidder in accordance with the terms of the Stalking Horse Purchase Agreement. The Stalking Horse Purchase Agreement provides that the obligations of Seller to pay the Bid Protections shall be allowed super-priority administrative expense claims under sections 503(b) and 507 of the Bankruptcy Code and shall not be subordinate to any other administrative expense claim against Seller.

31. In addition to the Bid Protections, the Stalking Horse Purchase Agreement requires that the Bidding Procedures Order provide for an initial overbid protection in an amount equal to $3,000,000, and minimum bid increments thereafter of $500,000.

662323.1 04/10/2017

32.     **"Fiduciary Duty" Out**: The Bidding Procedures provide that, "[n]othing in these Bidding Procedures shall require the Debtors' board of directors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent the Debtors' board of directors determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law . . . ."

33.     **Allocation of Sale Proceeds (Stalking Horse Purchase Agreement § 11.2)**: The Stalking Horse Purchase Agreement provides that as soon as reasonably practicable and in no event later than sixty (60) days after the closing date, the Purchaser shall provide the Sellers with an allocation of the purchase price for federal income tax purposes, including any liabilities property included therein among the Purchased Assets and the agreements provided for in the Stalking Horse Purchase Agreement for federal, state and local income tax purposes (the "Initial Allocation"). Within fifteen (15) days of the receipt of the Initial Allocation, the Sellers may deliver a written notice to Purchaser, disputing any items in the Initial Allocation. Thereafter, the parties have fifteen (15) days to reach a consensual resolution, and if they are unable to do so, the matter is referred to an account for arbitration.

34.     **Record Retention (Stalking Horse Purchase Agreement § 8.9)**: The Stalking Horse Purchase Agreement provides that the Sellers and the Purchaser agree that each of them shall preserve and keep the books and records in their possession related to the pre-closing business of the Debtors for a period commencing on the date of the Stalking Horse Purchase Agreement and ending at such date on which an orderly wind-down of the Sellers' operations has occurred in the reasonable judgment of the Sellers (or any subsequently appointed bankruptcy

estate representative, including a trustee, a creditor trustee or a plan administrator) and shall make such books and records available to the other parties.

## C.    The Bidding Procedures

35.    The Bidding Procedures, which are attached hereto as **Exhibit B**, are designed to maximize value for the Debtors' estates, while effectuating an expeditious sale of the Debtors' assets.  Among other things, the Bidding Procedures set forth procedures for interested parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing.

36.    Certain of the salient terms of the Bidding Procedures are highlighted below:[10]

---

[10]  The summary of the terms contained in this Motion is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In  the event of any inconsistencies between the provisions of the Bidding Procedures and the summary set forth herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the  accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

662323.1 04/10/2017

- **Key Proposed Dates (subject to the Court's availability):**

| Milestone | Proposed Date |
|---|---|
| Deadline for Entry of the Bidding Procedures Order | April 24, 2017 |
| Deadline to Object to Approval of the Sale Transaction to the Stalking Horse Bidder | 4:00 p.m. (prevailing Eastern Time) on May 2, 2017 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on May 9, 2017 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on May 11, 2017 |
| Sale Hearing | May 16, 2017 |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder Other than the Stalking Horse Bidder | 12:00 p.m. (prevailing Eastern Time) on May 15, 2017 |
| Sale Closing (*i.e.*, the Outside Date) | May 24, 2017[11] |

- **Bid Deadline:** The following parties must receive a Bid in writing, on or before May 9, 2017 at 4:00 p.m. (prevailing Eastern Time) or such other date as may be agreed to by the Debtors: (a) the Debtors, their counsel, and investment banker; (b) counsel to the Stalking Horse Bidder; (c) counsel to Wells Fargo Bank, N.A., as debtor-in-possession lender and Agent under the debtor-in-possession credit facility (in such capacity, "Wells Fargo"); and (d) CIBERsites India Private Limited.

- **Auction Qualification Process:** As set forth in further detail in the Bidding Procedures, a Qualified Bidder must, among other requirements, (a) deliver financial statements demonstrating the financial capability of the bidder to consummate the sale, (b) propose a purchase price for all or substantially all of the Debtors' assets, including any assumption of liabilities, that in the Debtors' reasonable business judgment, has a value that equals or exceeds $55,000,000 (*i.e.*, the sum of (i) the purchase price set forth in the Stalking Horse Purchase Agreement, (ii) the Break-Up Fee and Expense Reimbursement, and (iii) $3,000,000); (c) provide a good faith deposit in the amount of ten percent (10%) of the purchase price; (d) provide an executed non-contingent sale agreement on the same or better terms as those contained in the Stalking Horse Purchase Agreement filed with the Court; and (e) specify any regulatory or third-party approvals required to consummate the

---

[11] As noted above, under the terms of the Stalking Horse Purchase Agreement, the Outside Date may be extended by the mutual written consent of Seller and Purchaser, for a period up to thirty (30) days. The Debtors anticipate that, in the event the Stalking Horse Bidder is the Successful Bidder, the Sale Transaction could close in advance of the Outside Date.

Sale Transaction and the time period that obtaining such approvals is expected to require.

- **Auction and Sale Procedures:** If the Debtors receive more than one Qualified Bid by the Bid Deadline, the Debtors shall conduct an Auction on May 11, 2017 (prevailing Eastern Time) at the offices of proposed co-counsel for the Debtors, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, or such other place and time as the Debtors shall notify in writing all Qualified Bidders that have submitted Qualified Bids. If the Debtors do not receive any Qualified Bid (other than the Stalking Horse Bid) on or prior to the Bid Deadline, the Debtors shall promptly cancel the Auction and seek approval of the Sale Transaction of the Purchased Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement at the Sale Hearing.

## D.    The Notice Procedures

37.     Within one (1) business day following entry of an order approving the Bidding Procedures, or as soon practicable thereafter (the "Mailing Date"), in accordance with Bankruptcy Rule 2002(a) and (c), the Debtors (or their agents) shall serve the auction and sale notice (the "Auction and Sale Notice"), substantially in the form attached hereto as **Exhibit E,** by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Successful Bidder; (e) the Office of the United States Trustee; (f) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis, excluding insiders); (g) counsel to Wells Fargo; (h) the Securities & Exchange Commission; (i) the Office of the United States Attorney General for the District of Delaware; (j) the Internal Revenue Service; (k) the U.S. Department of Justice; (l) the offices of the attorneys general for the states in which the Debtors operate; (m)

counsel to the Stalking Horse Bidder; and (m) all parties entitled to notice pursuant to Local Rule 2002-1(B) (collectively, the "Notice Parties").

38.    The Auction and Sale Notice shall indicate that copies of the Motion, the Stalking Horse Purchase Agreement, the Bidding Procedures Order, and all other documents filed with the Court can be obtained on the website of the Debtors' proposed claims and noticing agent, Prime Clerk LLC, https://cases.primeclerk.com/ciber. The Auction and Sale Notice will also indicate the proposed deadline for objecting to the Sale Transaction to the Successful Bidder and the anticipated date and time of the Sale Hearing, subject to the Court's availability. In addition, the Auction and Sale Notice shall provide notice that the Debtors will seek to assume and assign certain executory contracts to be identified in accordance with the Assumption and Assignment Procedures (as described further below) at the Sale Hearing. The Debtors request that such notice be deemed to be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

39.    The Debtors also propose, pursuant to Bankruptcy Rules 2002 and 6004 and Local Rule 6004-1(E)(5), to publish the Auction and Sale Notice on the Mailing Date, or as soon thereafter as is practicable, substantially in the form attached hereto as **Exhibit F**, in the *Financial Times* and an industry publication on one occasion. The Debtors request that such publication notice be deemed sufficient and proper notice of the Sale Transaction to any other interested parties whose identities are unknown to the Debtors.

40.    As soon as reasonably practicable after the conclusion of the Auction, if any, the Debtors shall file on the docket, but not serve, a notice identifying the Successful Bidder(s), substantially in the form attached hereto as **Exhibit G** (the "Post-Auction Notice").

E.    **The Assumption and Assignment Procedures**

41.    At the closing of the Sale Transaction, the Debtors anticipate that they will assume

certain executory contracts and unexpired leases designated by the Stalking Horse Bidder (or other

Successful Bidder(s)) ("Designated Contracts") pursuant to section 365(b) of the Bankruptcy

Code and assign such Designated Contracts to the Stalking Horse Bidder (or other Successful

Bidder(s)).  The Debtors accordingly are seeking approval of proposed procedures to govern the

assumption and assignment of all Designated Contracts (the "Assumption and Assignment

Procedures").  Because the Assumption and Assignment Procedures are set forth in detail in the

attached Bidding Procedures Order, they are not restated herein.  Generally speaking, however, the

Assumption and Assignment Procedures: (a) outline the process by which the Debtors will serve

notice, in substantially the form attached hereto as **Exhibit H** (the "Assumption and Assignment

Notice"), to all counterparties to the Designated Contracts regarding the proposed assumption and

assignment and related cure amounts, if any; and (b) establish objection and other relevant

deadlines and the manner for resolving disputes relating to assumption and assignment of

Designated Contracts.

## BASIS FOR RELIEF

A.    **Approval of the Proposed Sale Transaction is Appropriate Under Section 363 of the Bankruptcy Code**

42.    The Sale Transaction should be approved as a sound exercise of the Debtors'

business judgment.  Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate. . . ." 11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification for a

sale or use of assets outside the ordinary course of business.  *See, e.g.*, *Myers v. Martin (In re

Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward*

*Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re*

*Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991). Once a court determines that a valid

business justification exists for a sale outside of the ordinary course of business, the court must

determine whether (a) adequate and reasonable notice of the sale was given to interested parties,

(b) the sale will produce a fair and reasonable price for the property, and (c) the parties have acted

in good faith. *See In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5

(Bankr. D. Del. Nov. 20, 2012); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008). As

described below, the proposed Sale Transaction meets each of these requirements.

### 1.    The Sale Transaction Represents a Sound Exercise of the Debtors' Business Judgment

43.    Here, a strong business justification exists for the Sale Transaction. As described

above and in the First Day Declaration, the Debtors have concluded that, due to a shortfall in

available liquidity, an expedited sale of substantially all their assets to the Stalking Horse Bidder

(or other Successful Bidder(s)) represents the best, if not the only, opportunity for the Debtors to

preserve their going concern value for the benefit of their stakeholders. As a result, an expeditious

sale of the Debtors' assets is a reasonable exercise of the Debtors' business judgment and is in the

best interests of all of the Debtors' stakeholders.

### 2.    The Bidding Procedures are Fair and Designed to Maximize the Value Received For the Debtors' Assets

44.    The Debtors believe that the Bidding Procedures satisfy each of the remaining

requirements for approval of a sale under section 363 of the Bankruptcy Code by (a) providing

sufficient notice of each element of the proposed sale process, (b) facilitating a value-maximizing

sale, and (c) ensuring an unbiased and good faith sale process. The detailed Bidding Procedures

outlined above and set forth in **Exhibit B** provide notice designed to fully inform all parties with a

stake in the sale process regarding the portions of the sale process most relevant to their interests.

662323.1 04/10/2017

For example, the Bidding Procedures ensure that any entities asserting an Interest in the Debtors' assets and parties to the Designated Contracts will receive notice of the proposed Sale Transaction, the procedures for objecting to the Sale Transaction, and the proposed assumption and assignment of their respective contracts or leases. Similarly, the Bidding Procedures outline all material aspects of the potential purchaser notification, bid qualification, due diligence, bid submission, bid selection, and auction process, including the timing for each. Thus, the Bidding Procedures provide assurance to each entity potentially interested in purchasing the Debtors' assets that their respective rights will be protected and the Sale Transaction process will be fair and reasonable.

45.     Further, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their reasonable business judgment, the highest and best offer for the Debtors' assets. Moreover, the Bidding Procedures provide the Debtors with the flexibility to modify the Bidding Procedures, if necessary, to maximize value for the Debtors' estates. Accordingly, the Debtors believe the Court should approve the Bidding Procedures.

46.     The Debtors submit that similar bidding procedures have been approved in the Third Circuit. *See, e.g., In re Sungevity, Inc., et al.*, No. 17-10561 (KG) (Bankr. D. Del. Mar. 29, 2019), ECF No. 124; *In re DirectBuy Holdings, Inc., et al.*, No. 16-12435 (CSS) (Bankr. D. Del. Dec. 1, 2016), ECF No. 126; *In re BPS US Holdings, Inc., et al.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016), ECF No. 233; *In re Emerald Oil, Inc., et al.*, No. 16-10704 (KG) (Bankr. D. Del. Aug. 31, 2016), ECF No. 664; *Savient Pharms., Inc.*, No. 13-12680 (MFW) (Bankr. D. Del. Nov. 4, 2013, ECF No. 110.

### 3.     The Break-Up Fee and Expense Reimbursement are Necessary to Preserve the Value of the Debtors' Estate

47.     The Debtors believe that granting the Bid Protections to the Stalking Horse Bidder will ensure the Debtors' ability to maximize the realizable value of the Debtors' assets for the

benefit of the Debtors' estates, their creditors, and other parties in interest. The Stalking Horse Bidder conditioned its willingness to serve as a stalking horse bidder on the inclusion of these provisions in the Stalking Horse Purchase Agreement. If approved by the Court, the Debtors would be required to pay the Stalking Horse Bidder a Break-Up Fee of $1,500,000.00 and up to $500,000 in Expense Reimbursement in the event that the Break-Up Fee and the Expense Reimbursement are payable under the terms of the Stalking Horse Purchase Agreement.

48.    The United States Court of Appeals for the Third Circuit has held that break-up fees and expense reimbursements must meet the standards applicable to the allowance of administrative expenses under section 503(b) of the Bankruptcy Code. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999)). The Third Circuit has identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if the assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *O'Brien*, 181 F.3d at 537. Second, "if the availability of break-up fees and expense [reimbursements] were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

49.    The Bid Protections should be approved and afforded super-priority administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code because they provide a clear benefit to the Debtors' estates. By conducting due diligence, participating in negotiations for a potential transaction and entering into the Stalking Horse Purchase Agreement, the Stalking

Horse Bidder has established a bid standard, including a price floor, and initiated a sales process that will serve as a catalyst for other bidders to submit higher and better bids. The Debtors submit that the amount of the Break-Up Fee and the Expense Reimbursement is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder, including conducting the legal and financial diligence necessary to negotiate and enter into the Stalking Horse Purchase Agreement, which will serve as the baseline for other bids for the Purchased Assets.

50.     Moreover, the Debtors believe that the execution of the Stalking Horse Purchase Agreement by the Stalking Horse Bidder provides an incentive for others who expressed interest initially, but did not take efforts to negotiate definitive documents or submit competitive bids, to consider expending the time and effort to do so now. To the extent that the Stalking Horse Purchase Agreement entices other potentially interested purchasers to participate in the bidding and auction process, the Break-Up Fee will provide a material benefit to the Debtors' estates in the form of an increased sale price. On the other hand, in the event that others are not encouraged by the Stalking Horse Bid to undertake additional efforts and participate in the Auction, the Break-Up Fee will not be paid and, thus, should not affect the value received by the Debtors for the Purchased Assets. As such, the Debtors submit that it is appropriate to enter into the Stalking Horse Purchase Agreement containing the Bid Protections pursuant to the Bidding Procedures.

51.     Here, the Stalking Horse Bidder has conditioned its willingness to enter into the Stalking Horse Purchase Agreement on the Court's approval of, among other things, the Break-Up Fee and Expense Reimbursement. The proposed Break-Up Fee and Expense Reimbursement were the result of arm's-length negotiations between representatives of the Debtors and the Stalking Horse Bidder, which is not an insider of the Debtors. The Debtors submit that the Break-Up Fee

and Expense Reimbursement are justified to induce the Stalking Horse Bidder to enter into the Stalking Horse Purchase Agreement and to adequately compensate them for the risks they are taking. The proposed transaction with the Stalking Horse Bidder ensures that the Debtors will have at least one substantial offer for the Purchased Assets.

52.    As set forth in the Dunayer Declaration, the purchase price consists of $50 million plus the assumption of assumed liabilities that have a value of approximately $18 million. Based on the $68 million consideration amount, the proposed Breakup Fee is approximately 2.21% of the aggregate consideration. The proposed Expense Reimbursement is capped at $500,000, or approximately 0.74% percent of the total consideration being offered by the Stalking Horse Bidder. The Bid Protections accordingly fall well within the range of bid protections typically approved by bankruptcy courts in the Third Circuit. *See, e.g.*, *In re American Apparel, LLC, et al.*, No. 16-12551 (BLS) (Bankr. D. Del. Dec. 5, 2016), ECF No. 216 (approving break-up fee of 3.0% in connection with a $66 million sale of assets); *In re BPS US Holdings Inc., et al.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016), ECF No. 233 (approving break-up fee of 3.5% in connection with a $575 million sale of assets); *In re SynCardia Systems, Inc.*, No. 16-11599 (MFW) (Bankr. D. Del. Aug. 5, 2016), ECF No. 175 (approving break-up fee of 3.0% in connection with a $19 million sale of assets); *In re Synagro Techs., Inc.*, No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013), ECF No. 137 (approving break-up fee of 3.0% in connection with a $455 million sale of assets); *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012), ECF No. 206 (approving break-up fee of 3.0% in connection with a $258 million sale of assets).

**B.    The Proposed Sale Satisfies the Requirements of Section 363(f)
of the Bankruptcy Code for a Sale Free and Clear of Interests**

53.    The Sale Transaction also meets the requirements to be a sale free and clear of

Interests.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of

liens, claims, interests, and encumbrances if:

> (1)  applicable nonbankruptcy law permits sale of such property
>      free and clear of such interest;
>
> (2)  such entity consents;
>
> (3)  such interest is a lien and the price at which such property is
>      to be sold is greater than the aggregate value of all liens on
>      such property;
>
> (4)  such interest is in bona fide dispute; or
>
> (5)  such entity could be compelled, in a legal or equitable
>      proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

54.    A sale that meets the requirements for a sale free and clear of Interests pursuant to

section 363(f) of the Bankruptcy Code also bars claimants from asserting successor liability against

the successful purchaser.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir.

2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment

discrimination and rights under travel voucher program); *In re NE Opco, Inc.*, 513 B.R. 871, 876

(Bankr. D. Del. 2014); *In re Ormet Corp.*, No. 13-10334 (MFW), 2014 WL 3542133, at *3

(Bankr. D. Del. July 17, 2014); *Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.)*, 351

B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of

property without concern that a creditor will file suit based  on a successor liability theory).

55.    The Debtors submit that the Sale Transaction will satisfy the requirements of

section 363(f) of the Bankruptcy Code.  The Debtors will provide all parties asserting claims

against the Purchased Assets, including, but not limited to, all creditors and interest holders of the Debtors, with notice of, and an opportunity to object to, the Sale Transaction. Absent objection, each such party will be deemed to have consented to the Sale Transaction. *See, e.g.*, *FutureSource LLC v. Reuters, Ltd.*, 312 F.3d 281 (7th Cir. 2002) (failure to object may constitute consent, if there was adequate notice; *In re Christ Hosp.*, No. CIV.A. 14-472 ES, 2014 WL 4613316, at *14 (D.N.J. Sept. 12, 2014) ("Silence by affected claim holders may constitute consent for purposes of section 363(f)(2)"). In addition, the Debtors believe that certain of the parties asserting claims against the Assets could be compelled to accept a monetary satisfaction of such interests. Accordingly, approval of the sale of the Purchased Assets free and clear of all Interests is warranted.

**C.     A Successful Bidder Should Be Afforded the Protections of Section 363(m) and 363(n) of the Bankruptcy Code**

56.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.)*, 992 F.2d 7, 8 (1st Cir. 1993).

57.     As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the terms of the Sale Transaction and the assignment of the Designated Contracts related thereto. Moreover, at the Sale Hearing, the Debtors will present evidence that the terms of Sale Transaction were negotiated at arm's length, with both parties represented by their own counsel. Accordingly, the Debtors request that the Sale Order include a provision concluding that the Successful Bidder is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing the Successful Bidder with

26

such protection will ensure that the maximum price will be received by the Debtors and the closing of the same will occur promptly.

58.     Moreover, neither the Debtors nor the Stalking Horse Bidder have engaged in any conduct that would cause or permit the Stalking Horse Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. If, following the Auction, the Stalking Horse is not the Successful Bidder, the Debtors will have negotiated an alternative asset purchase agreement with the Successful Bidder in good faith and at arms'-length. The Bidding Procedures are designed to prevent the Debtors or the Successful Bidder from engaging in any conduct that would cause or permit the Stalking Horse Purchase Agreement or the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.

59.     Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Stalking Horse Bidder or other Successful Bidder (or Successful Bidder(s)) (a) is purchasing the Purchased Assets in good faith, (b) is entitled to the full protections of section 363(m) of the Bankruptcy Code, and (c) has not entered into an agreement with other potential bidders or otherwise engaged in conduct that violates section 363(n) of the Bankruptcy Code.

**D.     Assumption and Assignment of the Designated Contracts Should be Authorized**

60.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Further, section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance . . . is provided. . . ." 11 U.S.C. § 365(f)(2). Assumption and assignment of the Designated Contracts in connection with the Sale Transaction is appropriate.

27

1.    **Assumption of the Designated Contracts is a Reasonable Exercise of the Debtors' Business Judgment**

61.    Assumption or rejection of a contract is a matter of the debtor's business judgment. *See Nat'l Labor Relations Bd. v. Bildisco and Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd sub nom.*, *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."); *In re Physiotherapy Holdings, Inc.*, 506 B.R. 619, 622 (Bankr. D. Del. 2014) (citing *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003)).  A debtor's decision in this regard is "entitled to great deference from the Court." *See In re Armstrong World Indus.*, 348 B.R. 136, 162 (Bankr. D. Del. 2006).  In order to satisfy the business judgment test, a debtor must only show that assumption or rejection of an executory contract will benefit the estate. *See Bildisco*, 682 F.2d at 79; *see also In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) ("Under the business judgment standard, the sole issue is whether the rejection benefits the estate.").

62.    To facilitate the Sale Transaction and to maximize the value received for the Debtors' assets, the Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of the Designated Contracts to the Successful Bidder. Certain of the Debtors' executory contracts and unexpired leases will be necessary for the Successful Bidder's continued operation of the Debtors' assets.

63.    The Debtors further request that the Sale Order provide that the Designated Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder, notwithstanding any provisions in the Designated Contracts, including those described in sections 365(b)(2), 365(f)(1), and 365(f)(3) of the Bankruptcy Code that prohibit such assignment.

64.     The Debtors also request that the Sale Order provide that to the extent any provision in any Designated Contract assumed and assigned (a) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, such assumption or assignment (including, without limitation, any "change of control" provision), or (b) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following: (i) the commencement of the Cases, (ii) the insolvency or financial condition of the Debtors at any time before the closing of the Cases, (iii) the Debtors' assumption and assignment of such Designated Contract, or (iv) the consummation of the Sale Transaction, then such provisions shall be deemed modified so as to not entitle the non-Debtor party thereto to prohibit, restrict or condition such assumption or assignment, to modify, terminate or declare a breach or default under such Designated Contract, or to exercise any other default-related rights or remedies with respect thereto, including, without limitation, any such provision that purports to allow the non-Debtor party thereto to recapture such Designated Contracts, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith.  The Debtors request that all such provisions be deemed to constitute unenforceable anti-assignment provisions and are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

2.     **Any Defaults Under the Designated Contracts Will be Cured and Evidence of Adequate Assurance of Future Performance by the Successful Bidder Will be Provided**

65.     Once an executory contract or unexpired lease is assumed, the trustee or debtor in possession may generally elect to assign such contract, so long as it cures any defaults and provides adequate assurance of future performance. *See* 11 U.S.C. § 365(f)(2)(B) (a debtor may assign an executory contract or unexpired lease of nonresidential property if "adequate assurance of future performance by the assignee of such contract or lease is provided. . . ."). The requirements to show

"adequate assurance of future performance" will depend on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001); *In re Decora Indus.*, No. 00-4459 (JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guaranty of payment."). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

66.    The Debtors contemplate that the Successful Bidder will be able to provide adequate assurance of future performance in connection with any Designated Contracts because such Successful Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale Transaction. The Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Successful Bidder to perform under the Designated Contracts. The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Designated Contracts, as required under section 365(f)(2)(B) of the Bankruptcy Code.

67.    Moreover, as set forth above, the Debtors have proposed to file a Designated Contract List containing a list of the Designated Contracts and the Cure Amounts that the Debtors believes are due under each such Designated Contract. The Debtors will serve a Cure Notice on all Contract Notice Parties and provide them with an opportunity to be heard. In the absence of an

662323.1 04/10/2017

objection by a non-Debtor party to a Designated Contract, the Contract Notice Party will receive the specified Cure Amount, if any, at the closing of the Sale Transaction with funds paid by the Successful Bidder, as will be required under the terms of any asset purchase agreement entered into between the Debtors and the Successful Bidder.

68.    Accordingly, the Debtors submit that implementation of the Assumption and Assignment Procedures regarding assumption and assignment of the Designated Contracts is appropriate in this case.  The Court, therefore, will have a sufficient basis to authorize the Debtors to assume and assign the Designated Contracts as will be set forth in the asset purchase agreement.

## SATISFACTION OF BANKRUPTCY RULE 6003

69.    Bankruptcy Rule 6003 provides that the relief requested in the Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm . . . ." *See* Fed. R. Bankr. P. 6003.  As described herein, a rapid sale process is critical to the Debtors' ability to preserve their going concern value and maximize the value of their estates.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## WAIVER OF BANKRUPTCY RULE 6004(h) AND 6006(d); AUTOMATIC STAY

70.    To implement the foregoing immediately, the Debtors seeks a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) and the assumption and assignment of the Designated Contracts under Bankruptcy Rule 6006(d).

71.    Here, a waiver of the stay is appropriate because the Sale Transaction was extensively marketed and notice of the Sale Transaction was and will be adequately provided to all parties-in-interest.  Likewise, the non-Debtor parties to the Designated Contracts will be provided with adequate notice of, and opportunity to object to, the assumption and assignment of the Designated Contracts.

662323.1 04/10/2017

## **NOTICE**

72.    Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee; (b) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to Wells Fargo Bank, N.A.; (d) the Securities & Exchange Commission; (e) the Office of the United States Attorney General for the District of Delaware; (f) the Internal Revenue Service; (g) the U.S. Department of Justice; (h) counsel to the Stalking Horse Bidder; and (h) the offices of the attorneys general for the states in which the Debtors operate. Notice of this Motion and any order entered hereupon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

[remainder of page left intentionally blank]

662323.1 04/10/2017

## CONCLUSION

WHEREFORE the Debtors respectfully request entry of the Bidding Procedures Order and

the Sale Order granting the relief requested herein and such other and further relief as is just.

Dated:  April 10, 2017
        Wilmington, Delaware

                                   Mark Minuti (DE Bar No. 2659)
                                   **SAUL EWING LLP**
                                   1201 N. Market Street, Suite 2300
                                   P.O. Box 1266
                                   Wilmington, Delaware 19899
                                   Telephone: (302) 421-6840
                                   Facsimile: (302) 421-5873
                                   mminuti@saul.com

                                       -and-

                                   Sharon L. Levine (*pro hac vice* admission pending)
                                   Dipesh Patel (*pro hac vice* admission pending)
                                   **SAUL EWING LLP**
                                   1037 Raymond Boulevard, Suite 1520
                                   Newark, New Jersey 07102
                                   Telephone: (973) 286-6718
                                   Facsimile: (973) 286-6821
                                   slevine@saul.com
                                   dpatel@saul.com

                                       -and-

                                   Brett H. Miller (*pro hac vice* admission pending)
                                   Dennis L. Jenkins (*pro hac vice* admission pending)
                                   Todd M. Goren (*pro hac vice* admission pending)
                                   Daniel J. Harris (*pro hac vice* admission pending)
                                   **MORRISON & FOERSTER LLP**
                                   250 West 55th Street
                                   New York, New York 10019
                                   Telephone: (212) 468-8000
                                   Facsimile: (212) 468-7900
                                   brettmiller@mofo.com
                                   djenkins@mofo.com
                                   dharris@mofo.com
                                   tgoren@mofo.com

                                   *Proposed Counsel for Debtors and*
                                   *Debtors-in-Possession*