**SOLICITATION VERSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CMTSU Liquidation, Inc., *et al.*,[1] | ) | Case No. 17-10772 (BLS) |
| f/k/a CIBER, Inc., *et al.* | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

---

## DISCLOSURE STATEMENT FOR THE DEBTORS' PLAN OF
## LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**MORRISON & FOERSTER LLP**
Brett H. Miller (admitted *pro hac vice*)
Dennis L. Jenkins (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
Daniel J. Harris (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921

*Counsel for Debtors and Debtors-in-Possession*

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL OF THE ACTIONS NECESSARY TO EFFECTUATE THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT MAY BE ATTACHED HERETO AND THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b), AND IT WAS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION

REGARDING THE DEBTORS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS, THEREFORE, SPECULATIVE.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS THAT WAS AVAILABLE AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.   ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THE DEBTORS MAY OBJECT TO CLAIMS AND INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH OBJECTIONS TO CLAIMS OR INTERESTS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND THE DEBTORS EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED AMENDED DISCLOSURE STATEMENT FROM TIME TO TIME.

CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF

CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED.  YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING, BUT NOT LIMITED TO, THE PLAN AND ARTICLE VII OF THIS DISCLOSURE STATEMENT ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS THAT ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND ANY TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED ACCEPT THE PLAN.

# TABLE OF CONTENTS

Page

**ARTICLE I. INTRODUCTION AND OVERVIEW OF THE PLAN** ................................................................ 1
- A.    The Plan .............................................................................................................................. 1
- B.    The Adequacy of this Disclosure Statement ...................................................................... 2
- C.    Summary of Classes and Treatment of Claims and Interests ............................................. 3
- D.    Summary of the Class 3 Cash-Out Election ....................................................................... 5
- E.    Voting on and Confirmation of the Plan ............................................................................ 5
- F.    Class Voting on the Plan .................................................................................................... 6
- G.    Votes Required for Acceptance by a Class ......................................................................... 6
- H.    Certain Factors to Be Considered Prior to Voting ............................................................. 6
- I.    Classes Not Voting on the Plan .......................................................................................... 7
- J.    Solicitation Procedures ...................................................................................................... 7
  - 1.    Administrative Advisor ........................................................................................... 7
  - 2.    Solicitation Package ................................................................................................ 7
  - 3.    Distribution of the Solicitation Package and Plan Supplement .............................. 8
- K.    Voting Procedures .............................................................................................................. 9
  - 1.    Voting Deadline ...................................................................................................... 9
  - 2.    Voting Instructions ................................................................................................. 9
  - 3.    Opt-Out Forms ...................................................................................................... 10
- L.    Confirmation Objection Deadline .................................................................................... 10
- M.    Confirmation Hearing ...................................................................................................... 10

**ARTICLE II. DEBTORS' ORGANIZATIONAL STRUCTURE AND BUSINESSES** ....................................... 11
- A.    The Debtors' Corporate History ....................................................................................... 11
- B.    The Debtors' Business Operations ................................................................................... 11
  - 1.    Digital Transformation .......................................................................................... 11
  - 2.    ISVs ...................................................................................................................... 12
- C.    The Debtors' Organizational and Capital Structure ......................................................... 12
  - 1.    Organizational Structure ....................................................................................... 12
  - 2.    Capital Structure ................................................................................................... 13
- D.    The Post-Effective Date Debtors' Assets ......................................................................... 14

**ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 CASES** ......................................................... 15
- A.    Ciber's Operational Challenges ....................................................................................... 15
- B.    Ciber Defaults Under the ABL Facility ........................................................................... 16
- C.    Ciber Begins to Market its Assets and Plan For Bankruptcy .......................................... 16

**ARTICLE IV. EVENTS DURING THE CHAPTER 11 CASES** ............................................................... 18
- A.    First Day Pleadings and Other Case Matters ................................................................... 18
  - 1.    First Day Pleadings ............................................................................................... 18
  - 2.    Debtors' Retention of Professionals ..................................................................... 19
  - 3.    Appointment of the Committee/Retention of Professionals ................................. 19
- B.    DIP Facility and Case Milestones .................................................................................... 19
- C.    Claims Bar Dates .............................................................................................................. 21
- D.    Schedules and Statements ................................................................................................ 22
- E.    Sale Transaction ............................................................................................................... 22
- F.    Deadline to Assume or Reject Non-Residential Real Property Leases ............................ 23
- G.    Removal Deadline ............................................................................................................ 23
- H.    Key Employee Incentive Plan and Key Employee Retention Plan .................................. 23
  - 1.    Key Employee Incentive Plan ............................................................................... 23
  - 2.    Key Employee Retention Plan .............................................................................. 24
- I.    Litigation With the State of Washington .......................................................................... 25
- J.    Estimation Procedures ...................................................................................................... 25

i

# TABLE OF CONTENTS

### (continued)

|  |  | | Page |
|---|---|---|---|
| K. | | Significant Potential Liabilities | 26 |
| | 1. | Pending Litigation | 26 |
| | 2. | Significant Proofs of Claim Filed During the Chapter 11 Cases | 28 |
| | 3. | Significant Claims That Have Been Resolved or Are Resolved Under the Plan | 32 |
| | 4. | Indemnity Obligations Under the Plan | 34 |
| L. | | Wind-Down of Ciber's Foreign Non-Debtor Affiliates | 36 |
| M. | | The Committee's Claims Demand Letter | 39 |
| **ARTICLE V. SUMMARY OF THE PLAN** | | | **40** |
| A. | | Administrative and Priority Claims | 40 |
| | 1. | Administrative Claims | 40 |
| | 2. | Priority Tax Claims | 41 |
| | 3. | Professional Fee Claims | 42 |
| | 4. | U.S. Trustee Statutory Fees | 42 |
| B. | | Classification, Treatment, and Voting of Claims and Interests | 42 |
| | 1. | Summary of Classifications | 43 |
| | 2. | Class Identification | 43 |
| | 3. | Treatment of Classes of Claims and Interests | 43 |
| | 4. | Interest on Allowed Claims | 46 |
| | 5. | Special Provision Governing Unimpaired Claims | 46 |
| | 6. | Elimination of Vacant Classes | 46 |
| | 7. | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 46 |
| | 8. | Limited Substantive Consolidation | 47 |
| C. | | Means for Implementation of the Plan | 48 |
| | 1. | Distributions on Account of Allowed Claims and Allowed Interests | 48 |
| | 2. | Sources of Consideration for Plan Distributions | 48 |
| | 3. | Post-Effective Date Debtors | 48 |
| | 4. | Management of the Post-Effective Date Debtors | 50 |
| | 5. | Creation of the Oversight Committee | 52 |
| | 6. | Standard of Care for Manager, Sole Officer and Director, and Oversight Committee | 53 |
| | 7. | Creation of Reserves | 53 |
| | 8. | Zayo Settlement | 55 |
| | 9. | D&O Policies | 55 |
| | 10. | Sale Order; Purchase Agreement | 55 |
| | 11. | Wind Down | 55 |
| | 12. | Cancellation of Securities and Agreements | 56 |
| | 13. | Corporate Action | 57 |
| | 14. | Effectuating Documents; Further Transactions | 57 |
| | 15. | Exemption from Certain Taxes and Fees | 57 |
| | 16. | Causes of Action | 58 |
| | 17. | Post-Effective Date Fees and Expenses | 58 |
| | 18. | Closing the Chapter 11 Cases | 59 |
| D. | | Treatment of Executory Contracts and Unexpired Leases | 59 |
| | 1. | Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases | 59 |
| | 2. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 59 |
| | 3. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 60 |
| | 4. | Purchase Agreement; Assigned Contracts | 61 |
| | 5. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 61 |
| | 6. | Insurance Policies | 61 |
| | 7. | Indemnification Claims | 62 |
| | 8. | Reservation of Rights | 62 |

# TABLE OF CONTENTS
## (continued)

Page

E.  Provisions Governing Distributions .......................................................................... 63
    1.  Calculation of Amounts to Be Distributed ...................................................... 63
    2.  Disbursing Agent .............................................................................................. 63
    3.  Delivery of Distributions and Undeliverable or Unclaimed Distributions ...... 63
    4.  Compliance with Tax Requirements/Allocations ............................................. 65
    5.  Claims Paid or Payable by Third Parties .......................................................... 66
F.  Procedures For Resolving Contingent, Unliquidated, and Disputed Claims and Interests .......... 67
    1.  Resolution of Disputed Claims and Interests ................................................... 67
    2.  Disallowance of Claims .................................................................................... 68
    3.  Amendments to Claims ..................................................................................... 68
G.  Settlement, Release, Injunction, and Related Provisions ......................................... 69
    1.  Compromise and Settlement of Claims, Interests, and Controversies ............. 69
    2.  Release of Liens ................................................................................................ 69
    3.  Subordinated Claims ......................................................................................... 69
    4.  Debtors' Release ............................................................................................... 70
    5.  Third Party Release ........................................................................................... 71
    6.  Exculpation ....................................................................................................... 72
    7.  Injunction .......................................................................................................... 73
    8.  Waiver of Statutory Limitations on Releases ................................................... 74
    9.  Setoffs ............................................................................................................... 74
H.  Conditions Precedent to the Effective Date of the Plan ........................................... 75
    1.  Conditions Precedent to the Effective Date of the Plan ................................... 75
    2.  Waiver of Conditions ........................................................................................ 75
    3.  Effect of Non-Occurrence of the Effective Date .............................................. 75
I.  Modification, Revocation, or Withdrawal of the Plan .............................................. 76
    1.  Modification and Amendments ......................................................................... 76
    2.  Effect of Confirmation on Modifications ......................................................... 76
    3.  Revocation or Withdrawal of the Plan ............................................................. 76
J.  Retention of Jurisdiction .......................................................................................... 76
K.  Miscellaneous Provisions ......................................................................................... 79
    1.  Additional Documents ...................................................................................... 79
    2.  Dissolution of Committee ................................................................................. 79
    3.  Reservation of Rights ....................................................................................... 79
    4.  Successors and Assigns .................................................................................... 79
    5.  Service of Documents ....................................................................................... 79
    6.  Term of Injunctions or Stays ............................................................................ 80
    7.  Entire Agreement .............................................................................................. 80
    8.  Nonseverability of Plan Provisions .................................................................. 80
    9.  Waiver or Estoppel ........................................................................................... 81

**ARTICLE VI. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ...................... 81**
A.  Confirmation Hearing ............................................................................................... 81
B.  Confirmation Standards ............................................................................................ 82
    1.  Feasibility ......................................................................................................... 82
    2.  Best Interests Test ............................................................................................. 83
C.  Alternative Plans ....................................................................................................... 84
D.  Acceptance by Impaired Classes .............................................................................. 84
E.  Confirmation Without Acceptance by All Impaired Classes .................................... 85
    1.  No Unfair Discrimination ................................................................................. 85
    2.  Fair and Equitable Test ..................................................................................... 85

ny-1292331

# TABLE OF CONTENTS

### (continued)

Page

**ARTICLE VII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING** ............................ 86

A.   Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims and
Allowed Interests Under the Plan ................................................................................. 86

    1.   The Amount of Allowed Claims May Adversely Affect Recoveries ............................ 86

    2.   The Debtors Cannot State with Certainty What Recovery Will Be Available to
Holders of Allowed Claims and Allowed Interests.................................................. 86

    3.   Any Valuation of the Post-Effective Date Debtors' Assets is Speculative and
Could Potentially Be Zero ........................................................................................ 87

    4.   The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries ........... 87

    5.   Certain Tax Implications of the Debtors' Chapter 11 Cases........................................ 87

B.   Certain Bankruptcy Law Considerations ...................................................................... 87

    1.   Parties in Interest May Object to the Plan's Classification of Claims and
Interests or the Amount of Such Claims or Interests ............................................. 87

    2.   Failure to Satisfy Vote Requirements ..................................................................... 88

    3.   The Debtors May Not Be Able to Secure Confirmation of the Plan............................ 88

    4.   Nonconsensual Confirmation .................................................................................. 89

    5.   Risk of Nonoccurrence of the Effective Date ........................................................ 89

    6.   Contingencies May Affect the Votes of Class 3 to Accept or Reject the Plan ............. 89

C.   Disclosure Statement Disclaimer ................................................................................. 89

    1.   The Financial Information Contained in this Disclosure Statement Has Not Been
Audited ..................................................................................................................... 89

    2.   Information Contained in this Disclosure Statement Is for Soliciting Votes ................. 90

    3.   This Disclosure Statement Was Not Reviewed or Approved by the United States
Securities and Exchange Commission ..................................................................... 90

    4.   This Disclosure Statement May Contain Forward Looking Statements ........................ 90

    5.   No Legal or Tax Advice is Provided to You by this Disclosure Statement.................... 90

    6.   No Admissions Made ............................................................................................... 90

    7.   Failure to Identify Projected Objections ................................................................. 90

    8.   No Waiver of Right to Object or to Recover Transfers and Assets .............................. 91

    9.   Information Was Provided by the Debtors and Was Relied Upon by the Debtors'
Advisors .................................................................................................................... 91

    10.   Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update .............. 91

    11.   No Representations Outside this Disclosure Statement Are Authorized ...................... 91

D.   Liquidation Under Chapter 7 ....................................................................................... 91

**ARTICLE VIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES.................** 92

A.   Certain United States Federal Income Tax Consequences to the Debtors ..................... 93

    1.   General...................................................................................................................... 93

    2.   Post-Effective Date CMTSU LLC............................................................................ 93

    3.   Transfer of Post-Effective Date Debtors' Assets to Post-Effective Date CMTSU
LLC and Liquidation of CMTSU Liquidation 2, Inc................................................. 94

    4.   Cancellation of Debt ................................................................................................ 94

    5.   IRC Section 382........................................................................................................ 95

B.   Certain United States Federal Income Tax Consequences to the Holders of Allowed
Claims in Class 3 and Allowed Interests in Class 4 ..................................................... 95

    1.   Consequences to Holders of Allowed Claims in Class 3 ......................................... 95

    2.   Consequences to Holders of Allowed Interests in Class 4 ...................................... 96

    3.   Information Reporting and Backup Withholding ...................................................... 96

**ARTICLE IX. RECOMMENDATION OF THE DEBTORS** .......................................................... 97

ny-1292331

## **EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code |
| EXHIBIT B | Solicitation Procedures Order |
| EXHIBIT C | Liquidation Analysis |

v

# ARTICLE I.

## INTRODUCTION AND OVERVIEW OF THE PLAN

This disclosure statement (this "<u>Disclosure Statement</u>") provides information regarding the *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"), which the Debtors are seeking to have confirmed by the Bankruptcy Court.[1]  A copy of the Plan is attached hereto as **<u>Exhibit A</u>**.  The rules of interpretation set forth in Article I of the Plan shall govern the interpretation of this Disclosure Statement.

**The Debtors' governing bodies have approved the Plan and believe that the Plan is in the best interests of the Debtors' Estates.  As such, the Debtors recommend that all Holders of Claims entitled to vote accept the Plan by returning their Ballots so as to be <u>actually</u> <u>received</u> by Prime Clerk (as defined below) no later than <u>November 1, 2017, at 4:00 p.m. (prevailing Eastern Time)</u>.  Assuming that the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing <u>on November 15, 2017 at 10:00 a.m. (prevailing Eastern Time)</u>.**

The Committee has indicated that it intends to object to the Plan on a number of grounds. As noted below, the Debtors believe the Committee's allegations are wholly without merit and that the Plan maximizes value for Holders of Allowed Claims and Allowed Interests.  The Committee has only two creditors as members, one of which has one of the largest Disputed Claims in these Chapter 11 Cases.  Given that one of the key tasks of the wind-down will be opposing one of the Committee member's Claims, the Debtors believe an independent fiduciary, as contemplated by the Plan, is necessary.  Moreover, if the Plan is rejected by creditors, the Debtors' Estates will bear significant costs, thereby reducing the distributions projected in the Disclosure Statement (and which costs the Debtors believe would far exceed any potential benefit from the Committee's preferred approach).

A.    *The Plan*

The Debtors filed for chapter 11 bankruptcy protection on April 9, 2017.  The purpose of a chapter 11 bankruptcy case is to resolve the affairs of the debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors filed the Plan, the terms of which are more fully described herein, contemporaneously with the filing of this Disclosure Statement.  The Plan contemplates a liquidation of the Debtors and their Estates and is therefore referred to as a "plan of liquidation."  The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and Allowed Interests and to distribute all property of the Estates that is or becomes available for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the Plan accomplishes this objective.  The Debtors also believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of conversion to and completion of liquidation under chapter 7 of the Bankruptcy Code.

---

[1] Unless otherwise specified herein, capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

The Plan classifies Holders of Claims and Interests according to the type of the Holder's Claim or Interest, as more fully described below.  Only those Holders of Claims in Class 3 (General Unsecured Claims)[2] are voting to accept or reject the Plan.

The Plan also proposes a governance structure for the Post-Effective Date Debtors.  As set forth in further detail in the Plan, for the limited purpose of implementing the Plan, administering and distributing the Post-Effective Date Debtors' Assets and winding down the business and affairs of the Debtors and the Post-Effective Date Debtors, all management and governance responsibility of Post-Effective Date CMTSU LLC shall rest solely with the Manager.  The Plan provides that Jon Goulding, the Debtors' current Chief Restructuring Officer, shall be retained as the initial Manager on terms consistent with his prepetition engagement.  The form of engagement letter between the Post-Effective Date Debtors and the Manager shall be included in the Plan Supplement.

B.      *The Adequacy of this Disclosure Statement*

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan.  The Debtors submit this Disclosure Statement in accordance with such requirements.  This Disclosure Statement includes, without limitation, information about:

- the procedures for voting on the Plan and projected recoveries under the Plan (Article I hereof);

- the Debtors' organizational structure, business operations, and assets and liabilities (Article II hereof);

- the events leading to the Chapter 11 Cases (Article III hereof);

- the events during the Chapter 11 Cases, including significant pleadings Filed in the Chapter 11 Cases and certain relief granted by the Bankruptcy Court in connection therewith (Article IV hereof);

- the classification and treatment of Claims and Interests under the Plan, including identification of the Holders of Claims voting on the Plan (Article V hereof);

- the means for implementation of the Plan, the provisions governing distributions to certain Holders of Claims and Interests pursuant to the Plan, the procedures for resolving Disputed Claims and Interests, and other significant aspects of the Plan (Article V hereof);

---

[2] As described below, in June 2017, Ciber, Inc. changed its name to CMTSU Liquidation, Inc.

- the releases contemplated by the Plan that are integral to the overall settlement of Claims and Interests pursuant to the Plan (Article V hereof);

- the statutory requirements for confirming the Plan (Article VI hereof);

- information regarding alternatives to Confirmation of the Plan and certain risk factors that Holders of Claims should consider before voting to accept or reject the Plan (Article VII hereof); and

- certain United States federal income tax consequences of the Plan (Article VIII hereof).

In light of the foregoing, the Debtors believe that this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

C.      *Summary of Classes and Treatment of Claims and Interests*

As set forth in Articles II and III of the Plan, and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Priority Tax Claims, and Professional Fee Claims, which are unclassified Claims under the Plan) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant to the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table below summarizes the classification and treatment of all classified Claims and Interests under the Plan. The classification, treatment, and estimated recoveries of classified Claims and Interests are described in summary form below for illustrative purposes only and are subject to material change. The estimated amounts of Allowed Claims set forth in the following table are based on the Debtors' books and records. ***Additionally, the recoveries available to Holders of Claims and Interests set forth below are estimates and actual recoveries may materially differ based on, among other things, the amount of Claims and Interests actually Allowed. Depending on the amount of Allowed Claims and Allowed Interests, the actual recoveries available to Holders of Allowed Claims and Allowed Interests could be materially lower compared to the estimates provided below. To the extent that any inconsistency exists***

3

*between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.*[3]

| Class | Claim or Interest | Plan Treatment | Voting Rights | Aggregate Asserted Amount of Claims or Interests | Estimated Approximate Amount of Allowed Claims or Allowed Interests | Estimated Plan Recovery[4] |
|---|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) | $1,202,449 | $31,131 | 100% |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) | $292,305 | $7,000 | 100% |
| 3 | General Unsecured Claims[5] | Impaired | Entitled to Vote | $150,647,000 | $17,274,000 - $44,121,000 | 37% - 100% |
| 4 | Interests in CMTSU Liquidation, Inc. | Impaired | Not Solicited[6] | N/A | 82,897,395 (shares outstanding) | $0.00 - $0.022 (per share) |
| 5 | Interests in CMTSU Liquidation 2, Inc. | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | N/A |
| 6 | Interests in CMTSU Liquidation 3, LLC | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) | N/A | N/A | N/A |

[3] The estimates set forth herein were made prior to the Governmental Bar Date, which is October 6, 2017. Accordingly, the actual Allowed Claims amount could vary depending upon the proofs of claim that are submitted by Governmental Units.

[4] The Estimated Plan Recoveries set forth herein are based on the Liquidation Analysis attached hereto as **Exhibit C**, which estimates that between $16.1 mm and $19.2 mm will be available for distribution after the Effective Date.

[5] The amount of General Unsecured Claims in this table does not include Zayo's proposed $27.75 million Claim, which is proposed to be Allowed under the Plan and which would receive over $9.7 million in Cash pursuant to the Class 3 Cash-Out Election. If Zayo were included, the aggregate amount of General Unsecured Claims would be $188.7 million and the range of estimated Allowed General Unsecured Claims would be between $45.0 million and $71.9 million. If Zayo were to receive its pro rata distribution on its proposed $27.75 million Claim rather than receive the Class 3 Cash-Out Election, the range of estimated recoveries to Holders of Allowed General Unsecured Claims would be between 36.0% and 64.3%.

[6] Although the votes of Holders of Interests in CMTSU Liquidation, Inc. in Class 4 are not being solicited, each such Holder is entitled to opt out of the "Third Party Release" provision in Article VIII.E of the Plan by timely returning an Opt-Out Form (as defined in the Solicitation Procedures Order) to Prime Clerk.

4

Except to the extent that the Debtors or Post-Effective Date CMTSU LLC, as applicable, and a Holder of an Allowed Claim or Allowed Interest, as applicable, agree to a less favorable treatment, such Holder shall receive under the Plan the treatment described in Article V below in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

D.      *Summary of the Class 3 Cash-Out Election*

As detailed in Article V hereof, the Plan provides that, except to the extent that a Holder of an Allowed Claim in Class 3 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Claim in Class 3, each such Holder shall receive its Pro Rata share of Cash in the General Unsecured Claims Reserve.  However, each Holder of an Allowed Class 3 Claim that votes to accept the Plan may make the Class 3 Cash-Out Election on such Holder's Class 3 Ballot or upon allowance of such Class 3 Claim.

A Holder of an Allowed Class 3 Claim that makes the Class 3 Cash-Out Election will receive Cash in an amount equal to 35% of such Holder's Allowed Class 3 Claim on the Effective Date or as soon as reasonable practicable thereafter.

As indicated in Article I.C hereof, it is estimated that Holders of Allowed Class 3 Claims will receive a recovery of between 37% and 100% of the face amount of their Allowed Claims. Although Holders of Allowed Claims in Class 3 that make the Class 3 Cash-Out Election will receive a lower recovery, they will receive their distributions before other Holders of Allowed Claims in Class 3.  The Class 3 Cash-Out Election will also serve as a benefit to the Debtors' Estates, because it will result in additional Cash being available for distribution on account of: (a) Allowed Class 3 Claims for which a Class 3 Cash-Out Election is not made; and (b) Allowed Interests in Class 4 (to the extent that there is a recovery for Class 4).

E.      *Voting on and Confirmation of the Plan*

By order of the Bankruptcy Court, entered on September 29, 2017 [Docket No. 667] (the "Solicitation Procedures Order"), voting tabulation procedures have been established, which include certain vote tabulation rules that temporarily allow or disallow Claims for voting purposes.  A copy of the Solicitation Procedures Order is attached hereto as **Exhibit B**.

F.       *Class Voting on the Plan*

Class 3 is the only Class voting to accept or reject the Plan.  If your Claim or Interest is not included in Class 3, you will not receive a Solicitation Package (as defined below) or a Ballot.  If your Claim is included in Class 3, you should read your Ballot and carefully follow the instructions set forth therein.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or Prime Clerk LLC, the Debtors' Claims and Noticing Agent, on behalf of the Debtors, otherwise provide to you.

G.       *Votes Required for Acceptance by a Class*

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the amount and number of claims voting to accept as a percentage of the allowed claims that have voted.  Thus, Class 3 will have accepted the Plan if: (a) the Holders of at least two-thirds in dollar amount of such Claims entitled to vote and actually voting in Class 3 vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims entitled to vote and actually voting in Class 3 vote to accept the Plan.

H.       *Certain Factors to Be Considered Prior to Voting*

There are a variety of factors that all holders of Claims voting on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors cannot assure that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes or Interests entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Priority Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders within Class 3 or necessarily require a re-solicitation of the votes of Holders of Claims in Class 3.

For a further discussion of risk factors, please refer to Article VII hereof, entitled "Certain Risk Factors to be Considered Before Voting."

6

## I.    *Classes Not Voting on the Plan*

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if: (a) their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan; or (b) if they will receive no property under the plan, in which case they are deemed to reject the proposed plan.  The following Classes of Claims and Interests are not voting to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Conclusively Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Conclusively Presumed to Accept |
| 4 | Interests in CMTSU Liquidation, Inc. | Impaired | Not Solicited |
| 5 | Interests in CMTSU Liquidation 2, Inc. | Impaired | Deemed to Reject |
| 6 | Interests in CMTSU Liquidation 3, LLC | Unimpaired | Conclusively Presumed to Accept |

## J.    *Solicitation Procedures*

### 1.    <u>Administrative Advisor</u>

The Debtors retained Prime Clerk LLC ("<u>Prime Clerk</u>") as their administrative advisor to, among other things, assist with the plan solicitation and voting process in the Chapter 11 Cases.[7]

### 2.    <u>Solicitation Package</u>

Subject to the exceptions set forth in the Solicitation Procedures Order, Holders of Claims in Class 3 as of September 25, 2017 (the "<u>Voting Record Date</u>") that are entitled to vote on the Plan will receive solicitation materials (the "<u>Solicitation Package</u>"), which will include, in part, the following:

- the Solicitation Procedures Order, as entered by the Court and without attachments;

- the notice of the hearing to consider confirmation of the Plan (the "<u>Confirmation Hearing Notice</u>") attached to the Solicitation Procedures Order as <u>Exhibit 6</u>;

- a CD-ROM or USB Flash Drive containing this Disclosure Statement, which shall include the Plan as an exhibit thereto

---

[7] The Debtors also retained Prime Clerk as their claim and noticing agent pursuant to 28 U.S.C. § 156(c).

(except as otherwise provided in the Solicitation Procedures Order) together with a complete copy of the Solicitation Procedures Order, including all attachments;

- if the recipient is entitled to vote on the Plan (as set forth in the Solicitation Procedures Order), a Ballot customized for each Holder and conforming to Official Bankruptcy Form No. B314, and a postage-prepaid return envelope; and

- any supplemental documents filed with the Bankruptcy Court and any documents that the Bankruptcy Court orders to be included in the Solicitation Package.

The Debtors will also provide copies of the Solicitation Package (other than a Ballot) to: (a) the Office of the United States Trustee; (b) counsel for the Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; and (e) all parties that have filed requests for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

3.    Distribution of the Solicitation Package and Plan Supplement

The Debtors will cause Prime Clerk to begin to distribute the Solicitation Packages to Holders of Claims in Class 3 on or before October 2, 2017.  Accordingly, Holders of Claims in Class 3 will have thirty (30) days before the deadline to cast their Ballots to vote on the Plan (*i.e.*, **4:00 p.m. prevailing Eastern Time on November 1, 2017**) (the "Voting Deadline").

The Solicitation Package (except for the Ballots) may also be obtained:  (a) from Prime Clerk by (i) visiting, free of charge, https://cases.primeclerk.com/ciber; (ii) CIBER Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at ciberballots@primeclerk.com; or (iii) calling (844) 648-5578; or (b) for a fee via PACER at http://www.deb.uscourts.gov.

The Debtors intend to file the Plan Supplement at least fourteen (14) days prior to the Voting Deadline.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  Parties may obtain a copy of the Plan Supplement (a) from Prime Clerk by (i) visiting, free of charge, https://cases.primeclerk.com/ciber; (ii) writing to CIBER Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at ciberballots@primeclerk.com; or (iii) calling (844) 648-5578; or (b) for a fee via PACER at http://www.deb.uscourts.gov.

As described above, certain Holders of Claims and Interests may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Interests in Class 4 are Impaired but are not receiving a Solicitation Package because their vote is not relevant to confirmation of the Plan.  In addition, Holders of Interests in Class 5 are Impaired but are receiving no distribution under the Plan, and they are therefore not entitled to vote because they are deemed to reject the Plan.  Such

Holders will not receive a Solicitation Package and will instead receive only the appropriate Notice of Non-Voting Status (as defined in the Solicitation Procedures Order).

K.      *Voting Procedures*

If, as of the Voting Record Date, you are a Holder of a Claim in Class 3, and you are entitled to vote on the Plan pursuant to the Solicitation Procedures Order, you may vote to accept or reject the Plan in accordance with the Solicitation Procedures Order by either completing the Ballot and returning it in the envelope provided or completing the Ballot online via Prime Clerk's E-Ballot portal, which can be found on the Debtors' case information website (located at https://cases.primeclerk.com/CIBER).

If your Claim or Interest is not included in Class 3, except as otherwise set forth herein and in the Solicitation Procedures Order, you will not receive a Solicitation Package.

1.      <u>Voting Deadline</u>

To be counted as a vote to accept or reject the Plan, a Ballot must be **actually** **received** by Prime Clerk no later than the Voting Deadline.

2.      <u>Voting Instructions</u>

As described above, the Debtors have retained Prime Clerk as administrative advisor to, among other things, assist with the plan solicitation and voting process in the Chapter 11 Cases. **Prime Clerk is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for Class 3**.

| BALLOTS |
|---|
| To be counted, all Ballots must be **actually** <u>**received**</u> by Prime Clerk by the Voting Deadline, which is **November 1, 2017 at 4:00 p.m., prevailing Eastern Time**, via Prime Clerk's E-Ballot portal **or** at the following address:<br><br>CIBER Ballot Processing<br>c/o Prime Clerk<br>830 3rd Avenue, 3rd Floor<br>New York, New York 10022<br><br>If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline maintained by Prime Clerk at:<br>(844) 648-5578 |

More detailed instructions regarding the procedures for voting on the Plan are contained on the Ballots distributed to Holders of Claims in Class 3 that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions. Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted. Ballots received by

9

facsimile or electronic means (other than via Prime Clerk's E-Ballot platform) will not be counted unless otherwise agreed in writing by the Debtors.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim held by such Holder.  By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast, or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are revoked.

All Ballots will be accompanied by postage prepaid return envelopes.  It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

3.    Opt-Out Forms

Each Holder of a Claim or Interest that is not voting on the Plan shall receive an Opt-Out Form entitling such Holder to opt out of the "Third Party Release" provision in Article VIII.E of the Plan.  The last date and time by which Opt-Out Forms must be received by Prime Clerk is November 8, 2017 at 4:00 p.m. (prevailing Eastern Time).

L.    *Confirmation Objection Deadline*

The deadline to file objections to Confirmation is **November 1, 2017 at 4:00 p.m., prevailing Eastern Time** (the "Confirmation Objection Deadline").    All objections to Confirmation must be in writing and must specify in detail the name and address of the objector and all grounds for the objection.  Any such objection must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Solicitation Procedures Order so that they are **actually receiving** on or before the Confirmation Objection Deadline.

M.    *Confirmation Hearing*

Assuming the requisite acceptances are obtained for the Plan, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled on November 15, 2017 at 10:00 a.m., prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in Courtroom 1 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served on any entities that have Filed objections to the Plan.  The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing such hearing.  The Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing without further notice to parties in interest, subject to the terms of the Plan.

## ARTICLE II.

## DEBTORS' ORGANIZATIONAL STRUCTURE AND BUSINESSES

A.    *The Debtors' Corporate History*

As of the Petition Date, the Debtors operated a leading global information technology ("IT"), consulting services, and outsourcing business and were headquartered in Greenwood Village, Colorado.  The Debtors began operations in 1974 to assist companies in need of computer programming support.  In the mid-1980s and 1990s, the Debtors embarked on a growth strategy that included expanding their range of computer-related services, developing a professional sales force, and selectively acquiring other companies within the IT staffing industry.

As of the Petition Date, the Debtors employed approximately 2,200 employees, including billable employees and support staff, and 315 independent contractors.  In addition, as of the Petition Date, the Debtors' affiliates in India and Poland employed approximately 1,350 and 210 employees, respectively.  As of the Petition Date, the Debtors operated their businesses in the United States, the United Kingdom, and Denmark, with offshore delivery centers in India, Vietnam, and Poland.  Until recently, the Debtors also operated in Finland, Germany, the Netherlands, Norway, Spain, and Sweden.  The Debtors' total revenues in 2016 were approximately $610 million.

B.    *The Debtors' Business Operations*

As of the Petition Date, the Debtors offered two core services:  (a) an integrated digital transformation offering ("Digital Transformation"), which encompassed IT staffing, custom application development and management ("ADM"), and business consulting; and (b) independent software vendor relationships ("ISVs"), which included long-standing partnerships with Microsoft and Oracle.  These focused offerings aligned with the needs of Global 2000 blue-chip companies in industries such as discrete manufacturing, retail and consumer products, public sector and education, healthcare and life sciences, energy and utilities, financial services, process manufacturing, and distribution, logistics, and transportation.  In addition to these key service offerings, the Debtors also offered IT services for other emerging technologies.

1.    Digital Transformation

The Debtors' Digital Transformation business was designed to meet the demands of the Debtors' target customers for software as a product, cloud-based development and solutions, analytics, and digital customer experiences.  Digital Transformation aligned the Debtors' proficiencies to serve their clients' needs for agile development operations and continuous delivery requirements.  Specifically, Digital Transformation combined three of the Debtors' core competencies:  sourcing flexibility derived from the Debtors' IT staffing services, ADM project delivery, and business consulting and advisory services, each of which are discussed in further detail immediately below.

IT Staffing. Digital Transformation preserved the foundation of the Debtors' information technology staffing business and created synergy through an integrated ADM and business consulting set of offerings. Digital Transformation staffing offerings included program and project management, business analysis, software and system design, and testing and implementation. These staffing services accelerated business change through effective talent identification, implementation, and rescaling, which enabled the Debtors' clients to shift their labor pyramid mix to become more competitive.

ADM Services. The Debtors' ADM services provided planning, analysis, design, development, testing and quality assurance, implementation, and maintenance of business applications. These offerings included services focused on digital marketing, application development, and enterprise modernization. ADM services were integrated with the Debtors' business consulting and staffing services. The Debtors' model of proximity, nearshore, and offshore delivery capabilities provided scale and cost of remote delivery centers while providing intimate business knowledge and client focus.

Consulting Services. Digital Transformation included business consulting services, which focused on transforming the businesses of the Debtors' clients by offering expertise in IT strategy, enterprise architecture, and vertical business systems. These services also included advisory services that provided the strategies, business plans, and confidence necessary to transform and modernize IT. The Debtors' cloud-first strategies assessed how to best use the cloud, develop a migration plan, and blueprint the solution. The Debtors' consultants guided clients through validating business needs, timing, investment, and expected returns, which enabled them to respond to changing market demands and make more informed business decisions.

2.  ISVs

As of the Petition Date, the Debtors had long-standing relationships with leading providers of enterprise applications, including Microsoft and Oracle. The Debtors provided expert project management, application and technical consulting, and database administration for implementation projects and managed-services engagements. The Debtors' consulting solutions included enterprise application strategy and project planning, systems implementation and integration, training, and application management.

C.  *The Debtors' Organizational and Capital Structure*

1.  Organizational Structure

CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.) ("Ciber")[8] is the direct parent of the two other Debtors. The Debtors have no other domestic affiliates. Ciber is also the direct or indirect

---

[8] Section 8.14 of the Purchase Agreement (as defined below) obligated the Debtors to discontinue use of the "Ciber" name upon closing of the Sale Transaction (as defined below). Accordingly, in June 2017, Ciber Inc. changed its name to CMTSU Liquidation, Inc., Ciber Consulting, Incorporated changed its name to CMTSU Liquidation 2, Inc., and Ciber International LLC changed its name to CMTSU Liquidation 3, LLC. On August 7, 2017, the Bankruptcy Court entered an order amending the caption of the Chapter 11 Cases to reflect the change in the Debtors' names [Docket No. 505].

ny-1292331

parent of a number of foreign affiliates.   A chart depicting the Debtors' prepetition organizational structure, including the foreign affiliates, is attached to the *Declaration in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 3] as **Exhibit A**.

2.    Capital Structure

The Debtors' prepetition capital structure included $29,706,200.51 in funded debt as of the Petition Date, consisting of (a) $28,523,125.75 outstanding under the ABL Facility (as defined below); and (b) $1,183,074.76 outstanding under the IBM Facility (as defined below).

a.    *The ABL Facility*

On May 7, 2012, Ciber entered into an asset-based revolving credit facility (the "ABL Facility") with Wells Fargo, N.A. ("Wells Fargo"), which had an initial availability of $60 million.   Ciber's obligations under the ABL Facility was guaranteed by the other Debtors and several of the foreign affiliates and was secured by substantially all of the Debtors' domestic, Dutch, U.K., and German assets.

As of the Petition Date, $28,523,125.75 was outstanding under the ABL Facility.   In accordance with the Final DIP Order (as defined below), the ABL Facility was repaid upon the closing of the Sale Transaction (as defined below).

b.    *The IBM Facility*

Ciber also maintained a receivables facility pursuant to a Wholesale Financing Agreement dated March 9, 2004 (the "Wholesale Financing Agreement") with IBM Credit LLC (the "IBM Facility"), which had $1,183,074.76 outstanding as of the Petition Date.   Prior to the Petition Date, in the course of its business, Ciber acquired certain products and engaged IBM Credit LLC ("IBM Credit") to finance Ciber's purchase of such products under the terms of the IBM Facility.   The IBM Facility was secured by a security interest, in relevant part, in all accounts, instruments, and proceeds arising from the purchase and resale of certain inventory and equipment.

Paragraph 19 of the Final DIP Order provided that the proceeds from the sale of Shared Collateral (as defined in the Final DIP Order) shall be placed in a separate, segregated account to be distributed upon further order of the Bankruptcy Court.   Accordingly, in connection with the Sale Transaction, the Debtors placed $1,183,074.76 from the proceeds of the Sale Transaction into a segregated account.   Thereafter, on June 9, 2017, the Debtors wired the funds held in the segregated account to IBM Credit.

Following the payment, the parties entered into a *Stipulation Authorizing Payment to IBM Credit, LLC Nunc Pro Tunc to the Payment Date* (the "Stipulation").   The Stipulation, which was approved by the Bankruptcy Court on July 12, 2017 [Docket No. 458], retroactively approves the payment to IBM Credit.   The Stipulation further provides that the payment is in "full and final satisfaction of any claims . . . and rights that IBM Credit asserts, has or may have against the Debtors and [their] estates" with respect to the Wholesale Financing Agreement.

c.     *Common Stock*

As of the Petition Date, there were approximately 82 million common shares of Ciber outstanding, with a par value of $.01 per share.  On November 17, 2016, Ciber received a written notice from the New York Stock Exchange stating that it was not in compliance with listing standards, which require that the average closing price of a listed company's common stock be above $1.00 per share over a consecutive 30-day trading period.

D.     *The Post-Effective Date Debtors' Assets*

As detailed below, during the Chapter 11 Cases, the Debtors sold substantially all of their assets pursuant to section 363(b) of the Bankruptcy Code.  The Plan provides that, on the Effective Date, the Debtors' remaining assets will vest in the Post-Effective Date Debtors and thereafter be transferred to Post-Effective Date CMTSU LLC free and clear of all claims, liens, charges, or other encumbrances.  Some of these assets may generate additional proceeds for distribution to Holders of Allowed Claims and Allowed Interests.  These assets include, but are not limited to, the following:[9]

- Cash remaining in the Debtors' Estates on and after the Effective Date;

- the Debtors' rights with respect to the Post-Effective Date Debtors' Insurance Policies and any rights to assert claims with respect to such insurance policies;

- any proceeds received on account of the €1,137,704.70[10] claim filed by Ciber in the insolvency proceeding of non-Debtor affiliate Ciber AG, which is pending in the Local Court of Cologne, Germany;

- certain funds that are being held in an escrow account established in connection with the sale of Ciber's assets in the Netherlands to subsidiaries of the ManpowerGroup, the release of which is subject to a number of contingencies;

- $525,000 worth of current assets, including: (a) $69,000 in various income tax refunds relating to income tax in Canada, India and Texas that are unlikely to have any recoverable value;[11] (b) $319,000 in potential federal tax refunds; (c) $30,000 that the Debtors believe they might be owed in connection with a contract between the Debtors and Federal Express but which is of questionable recoverable value; and (d) a $107,000 receivable from Ciber UK, which is unlikely to have any recoverable value;

[9] Due to various contingencies and uncertainties associated with recovery, the Debtors have assumed that certain of the assets listed below will not generate additional proceeds for distribution to stakeholders in calculating the recovery percentages set forth herein and in preparing the Liquidation Analysis attached hereto as **Exhibit C**.

[10] Based on a conversion rate of 1.1262, which was the average conversion rate on the date on which the claim was filed, the claim amount is roughly $1,281,283.03.

[11] There may be offsetting items going forward that reduce the refunds or result in a tax owing balance.

14

- $215,000 relating to expected returns from the captive insurance program and the Debtors' workers' compensation insurance policy, which is collectible in four (4) years but is expected to be substantially less than the face amount of the obligation;[12] and

- the Debtors' rights with respect to the Post-Effective Date Debtors' Retained Causes of Action and any proceeds generated therefrom, including, but not limited to, claims asserted against the State of Hawaii, Department of Transportation seeking damages of approximately $17 million (as described in Article IV hereof).

The Post-Effective Date Debtors' Retained Causes of Action may include certain Avoidance Actions. Potential Avoidance Actions may include claims to avoid certain payments made within the preference period set forth in section 547 of the Bankruptcy Code. Under section 547 of the Bankruptcy Code, payments are subject to avoidance as preferences only if they were made (a) on or within ninety (90) days before the Petition Date; or (b) between ninety days and one year before the Petition Date, if the recipient of the payment was an insider at the time of the transfer. As indicated in the Debtors' Schedules (as defined below), an aggregate of $4,171,191 in payments were made to non-affiliate insiders in the year prior to the petition date, and an aggregate of $25,503,167 in payments were made to non-insiders in the ninety (90) days prior to the Petition Date. The payments made to insiders are comprised primarily of regular compensation and expense reimbursement paid to the Debtors' officers and expense reimbursement for the Debtors' directors and officers. The Debtors believe that it is highly unlikely that these regular compensation and expense reimbursement payments could ultimately be subject to a successful avoidance action. In addition, the payments made to the Debtors' directors and officers are subject to the releases and related provisions set forth in Article VIII of the Plan.

## ARTICLE III.

## EVENTS LEADING TO THE CHAPTER 11 CASES

A.    *Ciber's Operational Challenges*

Between its founding in 1974 and the Petition Date, Ciber became an industry leader in information technology consulting services. Ciber's growth was fueled largely by making over sixty (60) acquisitions at a cost of more than $1 billion. Many of these entities continued to operate independently following their acquisitions by Ciber, due in large part to the varied nature of their services and geographic locations, which made it challenging for Ciber to manage and monitor their operating performance. This challenge was particularly acute with Ciber's acquisitions in Europe and contributed to significant operating losses. For example, because the bonus structure for Ciber's European consultants was tied solely to utilization, not performance or profit, Ciber paid approximately $14 million in bonuses to its consultants for negative performance in 2016.

In addition, between 2013 and the Petition Date, the market for IT consulting services in Europe was relatively soft, and, in 2014, a series of significant defections by critical European

---

[12] The Debtors collected $228,000 in returns from the captive insurance program in September 2017.

employees led to reduced contracted revenue with Ciber's key customers and new customers, and made it difficult for Ciber to right-size its European operations. During the two years prior to the Petition Date, the company faced additional challenges, including the termination of a large customer contract, rising legal costs, and continued operating losses in large part from its European operations.

B.    *Ciber Defaults Under the ABL Facility*

In 2012, Ciber entered into the ABL Facility, which provided it with a source of liquidity, when needed, to cover costs, pay employees, and generally fund operations. As described above, Ciber faced operating losses and business challenges in the years prior to the Petition Date and, as a result, it engaged in a series of internal restructurings that were intended to manage its costs and maintain compliance with the covenants in the ABL Facility. Ultimately, however, Ciber was unable to lower its cost structure fast enough to avoid the application of the fixed charge coverage ratio in the ABL Facility (the "Fixed Charge Coverage Ratio"), which required Ciber to maintain at least $15 million of excess availability under the ABL Facility.

Ciber first defaulted on the Fixed Charge Coverage Ratio in March 2016. As a result of this default, Wells Fargo gained the right to declare all outstanding debt under the ABL Facility immediately due and payable. Although Wells Fargo later waived this default, Ciber's operating and restructuring expenses exceeded total revenues for each subsequent fiscal quarter, leaving Ciber with insufficient liquidity to comply with the Fixed Charge Coverage Ratio and causing additional defaults under the ABL Facility. In this context, Ciber and Wells Fargo began to engage in good faith discussions regarding Ciber's strategic alternatives, some of which are described below, for over a year. As of the Petition Date, however, Ciber was in default under the ABL Facility.

C.    *Ciber Begins to Market its Assets and Plan For Bankruptcy*

Shortly after its initial default, Ciber undertook a strategy to create liquidity through asset sales, which resulted in the sale of its operations in the Netherlands and Norway to subsidiaries of the ManpowerGroup, and the sale of its operations in Sweden to Bouvet. These sales temporarily improved Ciber's liquidity position and provided breathing room for Ciber to consider all of its strategic alternatives. In June 2016, Ciber retained Alvarez & Marsal North America, LLC ("A&M") to evaluate its business plan, assist with its cash flow forecast and liquidity management, and identify cost reduction opportunities. In September 2016, Ciber retained Houlihan Lokey Capital, Inc. ("Houlihan") to explore, among other things, the sale of substantially all of its European operations.

Beginning in November 2016, Houlihan contacted approximately one hundred fifty (150) prospective purchasers and merger partners, but it failed to locate a purchaser for Ciber's European business as a whole, due largely to the lack of synergies between the various European businesses. Instead, Ciber sold its Spanish operations to a subsidiary of the ManpowerGroup and entered into an agreement to sell its German subsidiaries to Allgeier SE ("Allgeier"). [13]

---

[13] After a month of negotiations between the German subsidiaries and Allgeier, a transaction could not be consummated and the German subsidiaries were forced to file for insolvency protection on March 30, 2017.

Concurrently with the sale of its Spanish assets, Ciber discussed additional transactions with numerous parties, including a refinancing of the ABL Facility.  During the course of these discussions, Ciber determined that it would be difficult to refinance the ABL Facility without consummating an additional asset sale.  To that end, Ciber began discussions with Infor (US), Inc. ("Infor") regarding the terms of a sale of Ciber's independent software vendor business for Infor's software platform (the "Infor ISV Business") and subsequently sold that business to Infor for an aggregate purchase price of $15 million on March 31, 2017.  In addition to providing Ciber with additional liquidity, the sale of the Infor ISV Business preserved the jobs of approximately 200 employees who now work for Infor.[14]

As negotiations and discussions with strategic partners and lenders continued through the first quarter of 2017, Ciber received an indication of interest from an affiliate of CapGemini S.A. ("Capgemini") on February 20, 2017, and it agreed to negotiate exclusively with Capgemini for a period of four (4) weeks regarding the terms of a potential sale of substantially all of its operations in the United States and India (other than the Infor ISV Business) (the "Purchased Assets"), subject to a "fiduciary out" that permitted Ciber to cease negotiations if a higher, better, and unsolicited offer materialized.  The exclusivity agreement also permitted Ciber to explore all potential alternatives for restructuring and to consummate the sale to Infor.

During the course of these discussions, Ciber received three (3) unsolicited bids from parties interested in acquiring its business, including a non-binding letter of interest from Ameri Holdings, Inc.  These expressions of intent were carefully reviewed and considered by Ciber and the Board of Directors of Ciber (the "Board").  The Board ultimately determined that these transactions were unlikely to close under the circumstances and that it was in the best interests of all stakeholders to continue to focus on its negotiations with Capgemini and Infor.  Ciber, with the assistance of its advisors, also continued to explore all available traditional and alternative sources of capital for a refinancing of the ABL Facility.  As these negotiations and discussions continued into March 2017, Ciber realized that it would not be able to refinance the ABL Facility.

On March 31, 2017, after extensive negotiations with and due diligence by Capgemini regarding the structure of a transaction, Ciber received a detailed term sheet from Capgemini for the Purchased Assets—structured as a purchase of all of the assets relating to the Debtors' North American business, along with 100% of the capital stock in wholly-owned non-Debtor subsidiary CIBERsites India Private Limited—through a bankruptcy court-supervised process for $50 million plus the assumption of certain liabilities.  Between March 31, 2017 and the Petition Date, Ciber and Capgemini engaged in good faith, arm's-length negotiations over the terms and conditions of a stalking horse asset purchase agreement (the "Stalking Horse Purchase Agreement"), which was executed shortly before the Petition Date and provided for the sale of the Purchased Assets to Capgemini, subject to higher and better offers (the "Sale Transaction").

---

Following the insolvency filing, an insolvency administrator was appointed pursuant to German law.  On June 6, 2017, Ciber filed a claim in the insolvency proceeding against Ciber AG, one of the German subsidiaries, in the amount of approximately €1,137,704.70 for accounts payable.  Based on a conversion rate of 1.1262, which was the average conversion rate on June 6, 2017, the claim amount is roughly $1,281,283.03.

[14] The Debtors moved for and were ultimately granted authority to assume the Infor Asset Purchase Agreement and the Infor Transition Services Agreement [Docket No. 138].

As discussed in more detail in Article IV hereof, simultaneously with the commencement of the Chapter 11 Cases, the Debtors filed a motion seeking approval of bidding procedures pursuant to which a competitive sale process would take place.  By this process, the Debtors would solicit bids for the sale of substantially all of the Purchased Assets.

## ARTICLE IV.

## EVENTS DURING THE CHAPTER 11 CASES

On the Petition Date, each of the Debtors filed with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors, and both the commencement and the continuation of prepetition litigation against the Debtors.

A.    *First Day Pleadings and Other Case Matters*

1.    First Day Pleadings

On the Petition Date, the Debtors filed numerous "first day" motions seeking various relief intended to ensure a seamless transition of the Debtors' business operations into chapter 11 and facilitate an efficient administration of the Chapter 11 Cases.  The relief requested in these motions, among other things, allowed the Debtors to continue certain normal business activities that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code may have required prior court approval.  Substantially all of the relief requested in the first day motions was granted by the Bankruptcy Court.  These motions and the resulting orders are available for review on the website maintained by Prime Clerk at https://cases.primeclerk.com/ciber.

The final orders entered pursuant to the Debtors' first day motions authorized the Debtors to, among other things:

- pay prepetition wages, compensation, reimbursable business expenses, and employee benefit obligations, and maintain and continue certain compensation and benefit programs post-petition [Docket Nos. 49 and 149];

- maintain their existing bank accounts and cash management system, continue use of existing business forms and records, and continue conducting intercompany transactions in the ordinary course [Docket Nos. 45 and 137];

- obtain debtor-in-possession financing [Docket Nos. 50, 151, and 245] (discussed in more detail below); and

18

- pay certain prepetition taxes and fees [Docket Nos. 44 and 136].

2.      Debtors' Retention of Professionals

The Bankruptcy Court authorized the Debtors to employ several professional advisors during the Chapter 11 Cases. First, the Debtors were authorized to (a) retain A&M to provide a chief restructuring officer and certain additional personnel; and (b) designate Jon Goulding as their Chief Restructuring Officer effective as of the Petition Date [Docket No. 197].

In addition, the Debtors were authorized to retain the following professionals: (a) Morrison & Foerster LLP as bankruptcy counsel [Docket No. 194]; (b) Houlihan as investment banker [Docket No. 196]; (c) Polsinelli PC as local bankruptcy counsel [Docket No. 195]; (d) Grant Thornton LLP as tax advisor [Docket No. 480]; and (e) Prime Clerk LLC as claims and noticing agent [Docket No. 47] and as administrative agent [Docket No. 291].

3.      Appointment of the Committee/Retention of Professionals

On April 19, 2017, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee"). The initial Committee members were ScanSource, Inc., Agile Global Solutions, Inc., and Consilio LLC. ScanSource, Inc. and Agile Global Solutions, Inc. subsequently resigned from the Committee. On July 7, 2017, the U.S. Trustee filed an amended notice of appointment, designating a newly composed Committee consisting of Consilio LLC and SAP America, Inc. [Docket No. 437].

The Committee was authorized to retain (a) Perkins Coie LLP as its counsel [Docket No. 296], (b) Shaw Fishman Glantz & Towbin LLC as its local/co-counsel [Docket No. 290], and (c) BDO Consulting as its financial advisor [Docket No. 289].

Since the Committee's formation, the Debtors have consulted with the Committee concerning the administration of the Chapter 11 Cases and the sale of the Debtors' assets, and the Committee has remained an active participant in these Chapter 11 Cases. The Debtors have kept the Committee informed of matters relating to the Debtors' sale and liquidation efforts and have conferred with, and sought the concurrence of, the Committee throughout the Chapter 11 Cases.

B.      *DIP Facility and Case Milestones*

On the Petition Date, the Debtors filed a motion [Docket No. 15] seeking Bankruptcy Court authority to, among other things: (a) enter into a debtor-in-possession financing agreement (the "DIP Agreement") with Wells Fargo, as agent, and the lenders parties thereto (the "DIP Lenders"), to obtain cash advances and other extensions of credit in an aggregate amount not to exceed $45 million (the "DIP Facility") in accordance with the terms of the DIP Agreement; (b) grant to the DIP Lenders a priority lien on substantially all of the Debtors' assets, subject only to the Carveout, Permitted Priority Liens, the Prepetition Liens and Replacement Liens (each as defined in the DIP Agreement); and (c) grant superpriority administrative expense status to the DIP Lenders, subject only to the Carveout and the Stalking Horse Bid Protections (as defined in the DIP Agreement).

19

The DIP Facility generally provided for the following:

- a revolver, which provided for a total funding commitment of $45 million;

- interest payable at a rate of 5.25% plus the greater of (a) the Federal Fund Rates plus 0.5%; (b) the LIBOR Rate (as defined in the DIP Agreement) plus 1 percentage point; and (c) the prime rate; and

- borrowings and disbursements made in accordance with the terms of an agreed 6-week budget (the "DIP Budget").

On April 11, 2017, the Bankruptcy Court entered an order approving the DIP Facility on an interim basis [Docket No. 50], allowing the Debtors to access the $37 million interim financing commitment under the DIP Facility.

Thereafter, on May 2, 2017, the Bankruptcy Court entered an order approving the DIP Facility on a final basis [Docket No. 226] (as amended, the "Final DIP Order"). On May 19, 2017, the Bankruptcy Court entered an order amending certain provisions of the Final DIP Order in order to give the Debtors sufficient time to consummate the Sale Transaction (as defined below) [Docket No. 245].

The Final DIP Order, as amended, provided the DIP Lenders with, among other things, (a) a security interest and lien on substantially all of the Debtors' assets, subject only to the Carveout, Permitted Priority Liens, the Prepetition Liens, and Replacement Liens; (b) a superpriority administrative expense claim, subject only to the Carveout and the Stalking Horse Bid Protections; and (c) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the Aggregate Collateral. The Final DIP Order also provided that no Agent, Lender, or any of the Aggregate Collateral (each as defined in the DIP Agreement) shall be subject to the doctrine of marshaling.

The DIP Agreement, as modified by the Final DIP Order, also required the Debtors to achieve certain case milestones on or prior to their corresponding deadlines, as set forth below:

| Date | Milestone |
|------|-----------|
| One (1) day after Petition Date (April 10, 2017) | Filing of motion to sell the Purchased Assets and seeking approval of sale procedures (the "Sale Procedures Motion") |
| Five (5) days after Petition Date (April 14, 2017) | Entry of an order shortening notice with respect to the Sale Procedures Motion |
| Fourteen (14) days after Petition Date (April 24, 2017) | Entry of an order granting the Sale Procedures Motion |
| Thirty-five (35) days after Petition Date (May 15, 2017) | Auction for the Purchased Assets |
| May 22, 2017 | Entry of an order approving the Sale Transaction |
| June 9, 2017 | Closing of the Sale Transaction |

As described below, the Sale Transaction with HTC (as defined below) closed on June 8, 2017 [Docket No. 354].  In accordance with the Final DIP Order, a portion of the proceeds of the Sale Transaction were used to pay in full the $35.7 million outstanding under the DIP Facility as of the closing date.[15]  Concurrently therewith, the DIP Lenders released all liens and security interests against the Debtors that were granted in connection with the DIP Facility.

C.    *Claims Bar Dates*

On May 30, 2017, the Bankruptcy Court entered an order [Docket No. 294] (the "Bar Date Order") establishing: (a) July 14, 2017 as the General Bar Date (as defined in the Bar Date Order); (b) October 6, 2017 as the Governmental Unit Bar Date (as defined in the Bar Date Order); (c) the later of the General Bar Date and the date that is thirty (30) days after entry of an order providing for the rejection of an executory contract or unexpired lease as the Rejection Bar Date (as defined in the Bar Date Order); and (d) the later of the General Bar Date and the date that is thirty (30) days after the date that notice of any amendment to the Schedules is served on the claimant as the Amended Schedules Bar Date (as defined in the Bar Date Order).

If the Plan is confirmed, Holders of Administrative Claims incurred but unpaid prior to the Effective Date will have to File and serve such Claims on the Post-Effective Date Debtors within thirty (30) days after the Effective Date, or such Claims shall be forever barred against the Debtors or their Estates.  Under the terms of the Plan, objections to the requests for payment of such Administrative Claims must be Filed and served on the Post-Effective Date Debtors and the requesting party on or before the Administrative Claims Objection Bar Date, subject to being extended by Order of the Bankruptcy Court upon motion of Post-Effective Date CMTSU LLC.

---

[15] Ciber, Inc. Current Report (Form 8-K) (June 8, 2017).

ny-1292331

D.    *Schedules and Statements*

On May 12, 2017, the Debtors filed their Schedules of Assets and Liabilities [Docket Nos. 212, 214, 216] (the "Schedules") and Statements of Financial Affairs [Docket Nos. 213, 215, 217] (the "Statements" and together with the Schedules, the "Schedules and Statements"). These documents contain basic information including, among other things, schedules of creditors holding unsecured priority and non-priority claims against the Debtors. Copies of the Schedules and Statements are available on the website maintained by Prime Clerk for the Chapter 11 Cases at https://cases.primeclerk.com/ciber.

E.    *Sale Transaction*

On April 10, 2017, the Debtors filed a motion [Docket No. 8] (the "Bidding Procedures Motion") seeking entry of an order (the "Bidding Procedures Order"), among other things, (a) approving proposed bidding procedures (the "Bidding Procedures") in connection with the proposed sale of the Purchased Assets; (b) granting the Debtors authority to enter into the Stalking Horse Purchase Agreement, including approval of the provisions entitling Capgemini to a break-up fee and expense reimbursement in the event that the Debtors were to enter into a Sale Transaction with another purchaser (the "Bid Protections"); (c) establishing procedures for the assumption and assignment of executory contracts and unexpired leases (the "Assumption and Assignment Procedures") in connection with the Sale Transaction; and (d) scheduling a hearing (the "Sale Hearing") to approve the Sale Transaction. The Bidding Procedures Motion also sought entry of an order (the "Sale Order") approving the Sale Transaction.

On May 2, 2017, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. 150], (a) approving, among other things, the Bidding Procedures and Assumption and Assignment Procedures; (b) authorizing the Debtors to enter into the Stalking Horse Purchase Agreement subject to the receipt of a higher or otherwise better offer; and (c) approving the Bid Protections. The Bidding Procedures were designed to promote ease of bidding and to maximize the total potential value of the Purchased Assets, and (a) established Capgemini as the stalking horse bidder for the Purchased Assets; and (b) established Capgemini's bid of $50 million plus the assumption of certain liabilities as the stalking horse bid. Subsequent to entry of the Bidding Procedures Order, the Debtors continued to pursue a further, open, transparent, and thorough marketing effort to ensure the Debtors would receive the highest possible value for the Purchased Assets.

On or prior to the bid deadline of May 15, 2017, in addition to the Stalking Horse Purchase Agreement, the Debtors received two (2) bids for the Purchased Assets, one from Techgenics Inc. ("Techgenics") and one from HTC Global Ventures, LLC ("HTC" or "Purchaser"). After conducting a full analysis of the Bids, the Debtors, with the advice of their advisors, determined that the bids submitted by Techgenics and HTC constituted Qualified Bids (as defined in the Bidding Procedures Order).

Thereafter, on May 17, 2017, the Debtors conducted an auction for the sale of the Purchased Assets at the offices of Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019. The bidders engaged in multiple rounds of bidding over the course of the day. At the conclusion of the auction, and after consultation with Wells Fargo and the Committee, the

22

Debtors selected HTC as the Successful Bidder (as defined in the Bidding Procedures Order). The terms of HTC's bid, pursuant to which it agreed to purchase the Purchased Assets for a purchase price of $93 million along with the assumption of certain liabilities, are set forth in the executed Asset Purchase Agreement between the Debtors and HTC (as amended, the "HTC APA" or "Purchase Agreement").  The Debtors and HTC subsequently entered into Amendment No. 1 to the Purchase Agreement, pursuant to which HTC increased the assumption of certain liabilities of the Debtors and reduced the cash purchase price from $93 million to $90.7 million.

On May 19, 2017, the Bankruptcy Court held a hearing to consider the Sale Transaction. With the exception of certain limited objections regarding the amount necessary to cure defaults under certain executory contracts that were assumed and assigned to HTC as part of the Sale Transaction, the hearing was uncontested.  Thus, on May 19, 2017, the Bankruptcy Court entered the Sale Order [Docket No. 246], which authorized the Debtors to sell the Purchased Assets to HTC free and clear of all liens, claims, and encumbrances, subject to certain carve-outs as set forth in the HTC APA.  The Sale Transaction closed on June 8, 2017 [Docket No. 354].

F.    *Deadline to Assume or Reject Non-Residential Real Property Leases*

On July 11, 2017, the Bankruptcy Court entered an order [Docket No. 449] extending the Debtors' deadline to assume or reject unexpired leases of non-residential real property by ninety days (90) through and including November 6, 2017.

G.    *Removal Deadline*

On July 6, 2017, the Debtors filed a motion [Docket No. 433] (the "Removal Extension Motion") seeking entry of an order extending the period within which the Debtors may remove actions to the Bankruptcy Court by one-hundred and twenty (120) days through and including November 7, 2017 without prejudice to the Debtors' right to seek further extensions of the removal deadline.  The Bankruptcy Court entered an Order granting the Removal Extension Motion on August 7, 2017 [Docket No. 504].

H.    *Key Employee Incentive Plan and Key Employee Retention Plan*

On May 11, 2017, the Bankruptcy Court entered an order [Docket No. 199] approving the Debtors' key employee incentive plain ("KEIP") and key employee retention plan ("KERP").

1.    Key Employee Incentive Plan

The KEIP applies to (a) Michael Boustridge, the Debtors' President and Chief Executive Officer; (b) Christian Mezger, the Debtors' Chief Financial Officer and an Executive Vice President; and (c) David Arcemont, the Debtors' Chief Administrative Officer and a Senior Vice President (collectively, the "KEIP Participants").

Under the KEIP, the KEIP Participants are eligible to receive an incentive payment (the "KEIP Payment") corresponding to the incremental value generated by the KEIP Participants for the benefit of all creditors.  The "threshold" KEIP Payment is not earned unless the Debtors outperform the DIP Budget by generating at least $2 million of incremental cash flow and close the Sale Transaction at a price at least equal to that which was initially offered by Capgemini.

All other KEIP payments are tied to obtaining additional consideration for the Sale Transaction or recovering other non-operating receipts (collectively, "Incremental Proceeds"). The payout structure under the KEIP is set forth in the following chart:

| Performance Level | Performance Metric | % of Base Salary | Total Cost |
|---|---|---|---|
| Threshold | Stalking Horse Bid & Outperform DIP Budget by $2M | 15% | $235,950 |
| Tier 1 | $5M of Incremental Proceeds[1] | 25% | $393,250 |
| Tier 2 | $10M of Incremental Proceeds[1] | 50% | $786,500 |
| Stretch | $25M of Incremental Proceeds[1] | 100% | $1,573,000 |

[1] Incremental proceeds includes additional sale consideration, assumption of additional liabilities, and other non-operating receipts.

As of the date hereof, the Debtors have made a total of $783,000 in payments under the KEIP.  It is currently anticipated that another $790,000 in KEIP Payments will come due in the near future.

2.      Key Employee Retention Plan

The Debtors limited participation in the KERP to seventeen (17) of the Debtors' employees (the "KERP Participants") that were not expected to be transferred to the purchaser of the Purchased Assets but who were nevertheless critical for the Debtors to retain through the closing of the Sale Transaction, and in some instance potentially up to six (6) months following the Sale Transaction.

Pursuant to the KERP, the KERP Participants are eligible to receive retention payments (the "KERP Payments") in three equal installments on May 31, 2017, August 31, 2017, and November 30, 2017.  The KERP includes a discretionary pool of $200,000 that was established to provide retention payments to other critical employees that are neither KERP Participants nor insiders of the Debtors.  The following chart provides a high-level summary of the KERP, including the number of KERP Participants and the estimated total plan cost:

| Program | Participants | Total Cost | Cost per Participant |
|---|---|---|---|
| KERP | 17 | $407,891 | $23,994 |
| Discretionary Pool | TBD | $200,000 | TBD |
| Total | TBD | $607,891 | TBD |

All KERP Payments were contingent on the successful closing of the Sale Transaction, which closed on June 8, 2017.

As of the date hereof, the Debtors have made a total of $56,000 in payments under the KERP.  It is currently anticipated that an additional $60,000 in KERP Payments will come due in September 2017 and that an additional $26,000 in KERP Payments will come due in November 2017.

ny-1292331

I.      *Litigation With the State of Washington*

On April 21, 2017, Ciber filed a complaint [Adv. Pro. Docket No. 1] in an action captioned *Ciber, Inc. vs. State of Washington* (*In re Ciber, Inc.*), Adv. Pro. No. 17-50351 (BLS), whereby Ciber sought, *inter alia*, declaratory relief, turnover, and approximately $13 million in damages related to alleged breaches by the State of Washington acting through the Washington State Board for Community & Technical Colleges (together, "Washington") of a contract for the implementation of an integrated enterprise resource planning system for Washington and its 34 community and technical colleges (the "SBCTC Contract"). On June 19, 2017, Washington filed an answer [Adv. Pro. Docket No. 12], alleging that Washington had fully performed its obligations under the SBCTC Contract and that Ciber had failed to meet the milestones required for any further payment under the SBCTC Contract. Washington also asserted a counterclaim against Ciber for breach of the SBCTC Contract.

After extensive arm's-length negotiations, Ciber and Washington agreed to the terms of a global settlement that was memorialized in a settlement agreement (the "Washington Settlement"), including a payment by Washington to Ciber of $2.8 million and a release from third-party CenturyLink Communications, LLC and certain of its affiliates with respect to over $1 million in purported termination liability and rejection damages related to the SBCTC Contract. The Washington Settlement also included mutual releases by Ciber and Washington as well as provisions relating to the orderly transition of certain services from Ciber to Washington. On July 11, 2017, the Bankruptcy Court entered an order authorizing the Debtors to enter into the Washington Settlement [Docket No. 541].

J.      *Estimation Procedures*

On August 16, 2017, the Debtors filed the *Debtors' Motion Pursuant to Sections 105 and 502(c) of the Bankruptcy Code For Approval of Alternative Dispute Resolution and Claims Estimation Procedures* [Docket No. 523] (the "Estimation Motion"). By the Estimation Motion, the Debtors seek entry of an order authorizing and establishing procedures (the "Disputed Claims Procedures") for resolving or, in the alternative, estimating for reserve purposes certain asserted or known General Unsecured Claims against the Debtors in excess of $5 million (the "ADR Disputed Claims").

Under the proposed Disputed Claims Procedures, the Debtors will attempt to resolve the ADR Disputed Claims by sending each holder of an ADR Disputed Claim a proposed allowed amount for its ADR Disputed Claim. The Debtors' insurance providers shall be permitted to participate in the resolution of the ADR Disputed Claims to the extent any such insurer's policy covers an ADR Disputed Claim and such participation is authorized under applicable policy documents. As set forth in the Disputed Claims Procedures, the Debtors shall consistently engage with the Committee and keep the Committee fully informed regarding the negotiation, mediation, and estimation process, as applicable, with respect to any ADR Disputed Claim. Within seven (7) days after receiving such proposal, the holder of the ADR Disputed Claim shall serve the Debtors with a response that either accepts the proposal or rejects it and makes a counteroffer. If the parties reach a resolution regarding the proper allowed amount, the parties shall work, in good faith, to promptly memorialize a settlement to be filed with the Bankruptcy Court.

25

If the Debtors are unable to reach a consensual resolution with the holder of an ADR Disputed Claim, the Debtors may, in their sole and absolute discretion, refer such ADR Disputed Claim to mediation.  If the mediation does not result in a resolution, the Debtors may initiate an estimation proceeding with respect to the Holders of certain ADR Disputed Claims pursuant to section 502(c) of the Bankruptcy Code.

K.    *Significant Potential Liabilities*

As set forth herein, the Debtors are parties to two pending civil actions in which the opposing parties seek in excess of $5 million in damages from the Debtors.  In addition, seven (7) parties have filed proofs of claim against the Debtors' Estates seeking in excess of $5 million. The Allowed amounts of such Claims could materially impact recoveries for Holders of Allowed Claims in Class 3 and Holders of Allowed Interests in Class 4.

1.    Pending Litigation

a.    *Hawaii Department of Transportation*

On September 25, 2015, Ciber filed a complaint (the "Complaint") against the State of Hawaii, Department of Transportation ("HIDOT") in the Circuit Court for the First Circuit of the State of Hawaii (the "Circuit Court"), Case No.: 15-1-1881-09 (the "HIDOT Action").  The Complaint asserts, among other things, claims for breach of contract, unjust enrichment, and promissory estoppel based on HIDOT's non-payment and wrongful termination of a contract between Ciber and HIDOT pursuant to the Hawaii Public Procurement Code.  The Complaint seeks, among other things, damages based on HIDOT's repudiation of the agreements between Ciber and HIDOT in the amount of $6,938,071.06, based on what the parties agreed would be paid to Ciber under the agreements.  Alternatively, Ciber seeks $17,039,904 based on its total cost of performance under the agreements.

On November 16, 2015, HIDOT filed counterclaims against Ciber for false claims, fraud, fraudulent inducement, negligent misrepresentation, declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of express warranty, unjust enrichment, and violation of Haw. Rev. Stat. § 480-2 et seq.  HIDOT's counterclaim seeks "no less than $19 million" in compensatory damages, plus punitive damages, restitution, fines, and treble damages under the Hawaii False Claims Act and the costs of a replacement system.  On February 23, 2016, the Circuit Court dismissed HIDOT's claims for negligent misrepresentation and breach of the implied covenant of good faith and fair dealing.  *Ciber, Inc. v. State of Haw., Dep't of Transp*., 15-1-1881-09, Dkt. No. 53 (Haw. Cir. Ct. Feb. 23, 2016).

On May 8, 2017, Ciber removed the HIDOT Action to the United States Bankruptcy Court for the District of Hawaii (the "Hawaii Bankruptcy Court") and filed a motion seeking to transfer venue to the Bankruptcy Court where the Chapter 11 Cases are pending.  HIDOT filed an objection along with a separate motion seeking to have the HIDOT Action remanded.  On July 19, 2017, the Hawaii Bankruptcy Court entered an order granting HIDOT's motion to remand and denying Ciber's motion to transfer venue.  HIDOT's claims against the Debtors are subject to the automatic stay pursuant to section 362 of the Bankruptcy Code.  The Debtors and

26

HIDOT have agreed, subject to the entry of an appropriate Bankruptcy Court order, to modify the automatic stay to permit specified discovery to proceed on a fixed timeline.

A portion of the Debtors' defense costs relating to HIDOT's claims and any amounts that the Debtors may have to pay on account of HIDOT's claims may be covered by certain insurance policies. The Debtors are currently seeking coverage from XL Catlin, one of the Debtors' policy providers, subject to a $1 million retention and a $10 million aggregate limit of liability. That policy may also cover certain amounts that the Debtors could become obligated to pay on account of HIDOT's affirmative claims. The Debtors also believe that additional defense costs and any amounts that they become obligated to pay on account of HIDOT's affirmative claims are covered under additional insurance policies.[16]

HIDOT has not yet filed a proof of claim in the Chapter 11 Cases, but the Debtors anticipate that HIDOT will do so prior to the October 6, 2017 Governmental Bar Date. **The Debtors vigorously dispute the counterclaims asserted by HIDOT and believe that they fully complied with their contractual obligations to HIDOT and all other applicable laws. The Debtors also believe that HIDOT owes the Debtors approximately $17 million for HIDOT's repudiation of the agreements between Ciber and HIDOT. HIDOT's claims are subject to the Estimation Motion.**

b.    *Pennsylvania Turnpike Commission*

On August 31, 2012, the Pennsylvania Turnpike Commission (the "Commission") commenced a civil action (the "PTC Action") against Ciber and Dennis Miller, a former Ciber employee, by filing a praecipe for writ of summons in the Court of Common Pleas of Dauphin County, Pennsylvania. The civil action is styled *Pennsylvania Turnpike Commission v. CIBER, Inc. and Dennis Miller*, Civil Action No. 2012-cv-7716. On May 7, 2015, the Commission filed an amended complaint (the "Amended Complaint"), asserting eight (8) counts against Ciber and Mr. Miller.

The Commission's claims stem from the alleged breach of three (3) separate contracts between Ciber and the Commission that were entered into between 2005 and 2008 pursuant to which Ciber provided services related to, among other things, the planning and implementation of a new Commission Enterprise Resource Planning System. The Amended Complaint alleges that Ciber breached all three of the contracts, and also asserts related causes of action for, among

---

[16] Specifically, the Debtors believe that they are entitled to coverage under: (a) a Customarq General Liability Insurance Policy (the "GL Policy"), No. 3578-86-66 provided by Great Northern Insurance Company ("Great Northern"), which provides to Ciber coverage limits of $1 million each occurrence, $2 million in the aggregate, $1 million for products-completed operations, and $1 million for advertising and personal injury; and (b) an Umbrella Policy ("Umbrella Policy"), No. 7980-31-19 provided by Federal Insurance Company ("Federal"), which provides to Ciber coverage limits of $20 million each occurrence, $20 million in aggregate, $20 million for products-completed operations, and $20 million for advertising and personal injury. However, Great Northern and Federal have taken the position that HIDOT's allegations do not meet the terms of the GL Policy or the Umbrella Policy. Accordingly, on August 1, 2016, Ciber commenced suit (the "Coverage Suit") against Federal and Great Northern, seeking a declaratory judgment that the policies provide coverage for HIDOT's affirmative claims and asserting related causes of action for breach of contract, breach of the duty of good faith and fair dealing, and unreasonable delay or denial of benefits. The Coverage Suit is captioned *Ciber, Inc. v. Federal Insurance Company*, No. 16-CV-1957, and it is pending in the United States District Court for the District of Colorado.

other things, violations of the Pennsylvania Procurement Code and Pennsylvania's Antibid-Rigging Act and civil conspiracy.

Prior to the Petition Date, the parties were in the process of taking discovery. After the Debtors commenced the Chapter 11 Cases, on June 26, 2017, the Commission filed a motion seeking relief from the automatic stay [Docket No. 403] so that it could remove the PTC Action to the United States Bankruptcy Court for the Middle District of Pennsylvania (the "Pennsylvania Bankruptcy Court") and then transfer venue to the Bankruptcy Court in which the Chapter 11 Cases are pending. Thereafter, on June 30, 2017, the Debtors and the Commission entered into a stipulation, proposing to modify the automatic stay solely to allow the Commission to proceed with the filing of a notice of removal of the PTC Action to the Pennsylvania Bankruptcy Court and seeking to transfer venue to the Bankruptcy Court in which the Chapter 11 Cases are pending [Docket No. 420]. The Bankruptcy Court entered an order approving the stipulation on July 5, 2017 [Docket No. 426].

In accordance with the Bankruptcy Court's order, on July 7, 2017, the Commission filed a notice removing the PTC Action to the Pennsylvania Bankruptcy Court and thereafter filed a motion to transfer venue to the Bankruptcy Court in which the Chapter 11 Cases are pending. The Pennsylvania Bankruptcy Court granted the motion to transfer venue on August 15, 2017 [Docket No. 517].

On July 14, 2017, the Commission filed a proof of claim (claim number 491) against Ciber asserting "in excess of $45,000,000" for the causes of action asserted in the Amended Complaint. **The Debtors vigorously dispute the allegations in the Amended Complaint and in the Commission's proof of claim. The Debtors believe that they fully complied with all of their contractual obligations to PTC and all other applicable laws. Accordingly, the Debtors believe that they have no liability to the Commission arising from the allegations made in the Amended Complaint or otherwise. The Commission's claims are subject to the Estimation Motion.**

    2.    <u>Significant Proofs of Claim Filed During the Chapter 11 Cases</u>

In addition to the claims asserted in the foregoing civil actions, seven (7) alleged creditors have asserted unsecured claims in excess of $5 million against Ciber's Estate. The Debtors have entered into settlements with two of those creditors. The five (5) remaining claims are summarized below:

    a.    *SAP America, Inc.*

On July 13, 2017, SAP America, Inc. ("SAP") filed a proof of claim (claim number 461) asserting an unsecured claim against Ciber's Estate in the amount of $10,795,235.14. SAP and Ciber are parties to several agreements pursuant to which SAP provided to Ciber, among other things, licensed software, cloud services, and consulting services relating to project development under a statement of work. In addition, Ciber is an SAP partner that is authorized to sell certain SAP products and services to third-party end-users.

In its proof of claim, SAP asserts that its claim arises from amounts owed under four separate agreements:

| Agreement | Alleged Amount Owed | Description |
|---|---|---|
| Statement of Work dated May 16, 2015 ("SOW") | $7,000,000.00 | Pursuant to the SOW, SAP provided Ciber with certain project consulting and other services. SAP alleges that between December 31, 2015 and May 31, 2016 it issued five invoices that had not been paid as of the Petition Date. |
| Order Form for SAP Cloud Services, dated December 31, 2014 ("SuccessFactors Order Form") | $1,935,350.90 | SAP alleges that pursuant to the SuccessFactors Order Form, Ciber received access and a subscription to certain Success Factors software cloud services from SAP. SAP further alleges that there is $1,935,350.90 due under the SuccessFactors Order Form for cloud services rendered from March 25, 2016 through March 24, 2018. |
| Order Form for HANA Enterprise Cloud Package, dated December 31, 2015 (the "HEC Order Form") | $1,804,383.19 | SAP alleges that under the HEC Order Form, Ciber licensed certain hosted, on demand services from SAP. SAP contends that there is currently $1,804,383.19 due under the HEC Order Form. |
| SAP PartnerEdge Master Partner Agreement, dated March 14, 2016 (the "MPA") | $55,501.05 | SAP alleges that the MPA authorized Ciber to resell certain SAP software to third parties. SAP alleges that Ciber owes it certain annual fees pursuant to the MPA and that the amount currently owed is $55,501.05. |
| Total: | $10,795,235.14 | |

**The Debtors dispute SAP's claim on a number of grounds. Among other things, SAP failed at the implementation stage and was unable to satisfy various material contractual obligations owed to Ciber. SAP's claim is subject to the alternative dispute resolution portion of the Estimation Motion.**

         b.    *LS Selborne House Limited*

LS Selborne House Limited ("LS Selborne") filed two proofs of claim (claim numbers 566 and 592) [17] asserting unsecured claims against Ciber's Estate in the total amount of $15,299,321.30.

LS Selborne leased certain office space located at 62 Buckingham Gate, London SW1, United Kingdom to the Debtors' non-debtor affiliate, Ciber UK Ltd. ("Ciber UK") pursuant to a lease dated December 18, 2015 (the "LS Selborne Lease"). Pursuant to section 7.1 and schedule 6 of the LS Selborne Lease, Ciber agreed to guarantee certain of Ciber UK's obligations under the LS Selborne Lease. Accordingly, LS Selborne contends that Ciber is liable for various unpaid rent and other fees, including: (a) $2,670.52 for rent that came due prior to the Petition Date; (b) $654,152.16 for rent that came due after the Petition Date; and (c) $14,642,498.62 in amounts that will come due prior to the expiration of the LS Selborne Lease on December 17, 2025.

---

[17] Although LS Selborne filed two separate proofs of claim, both proofs of claim appear to assert the same claim against the same Debtor.

**The Debtors dispute LS Selborne's claim on a number of grounds, including that it is capped pursuant to section 502(b)(6) of the Bankruptcy Code. LS Selborne's claim is subject to the Estimation Motion.**

c.  *Lansing Board of Water & Light*

Lansing Board of Water & Light ("Lansing") filed a proof of claim (claim number 410) asserting an unsecured claim against Ciber's Estate of "no less than $9,359,158.72" on account of a purported "breach of contract."

According to Lansing, its claim arises "from [Ciber's] failure to develop a computer system for [Lansing] as it had contracted to do." Lansing further asserts that Ciber failed to perform under the contract and that Lansing was forced to upgrade its existing hardware due to Ciber's failure to perform, which caused it to incur nearly $1.6 million in additional labor costs. By the claim, Lansing seeks to hold Ciber liable for all damages it incurred under the relevant contracts.

**The Debtors dispute Lansing's claim on a number of grounds. Among other things, the Debtors believe that they fully complied with their contractual obligations and that Lansing wrongfully terminated the agreement. Lansing's claim is subject to the Estimation Motion.**

d.  *Ciber AG*

On July 10, 2017, Ciber AG ("Ciber Germany") filed a proof of claim (claim number 324) asserting an unsecured claim against Ciber's Estate in the amount of $16,639,570.[18] Ciber is the sole indirect shareholder of Ciber Germany. Ciber Germany commenced an insolvency proceeding in the Local Court of Cologne, Germany, and it is currently being administered by Hans-Gerd Jauch, who was appointed by the German court to serve as Ciber Germany's insolvency administrator (the "Insolvency Administrator") on April 6, 2017.

According to the Insolvency Administrator, Ciber Germany's books and records reflect that, on March 15, 2017, Ciber owed Ciber Germany the sum of $16,639,570 and that Ciber Germany owed Ciber the sum of $14,260,882. The Insolvency Administrator alleges that on that same day, (a) Ciber caused these amounts to be "credited against each other"; and (b) the $2,378,686 "balance remaining after the credit against each other was removed from the [Ciber Germany] records without apparent consideration."

The Insolvency Administrator contends that the setoff is subject to avoidance under German law and that Ciber Germany thus has a claim against Ciber for $16,639,570. The Insolvency Administrator contends, in the alternative, that should the Bankruptcy Court conclude that the setoff was permissible, Ciber Germany nevertheless has a claim for $2,378,686 for the balance that should have remained after the setoff.

---

[18] The proof of claim also alleges that Ciber Germany has unliquidated claims for yet-to-be asserted causes of action against Ciber for alleged mismanagement, breach of fiduciary duty, and unjust enrichment.

**The Debtors dispute the Insolvency Administrator's claim on several grounds, including that setoff and removal of the balance was proper and that the claims may be subject to recharacterization.   The Insolvency Administrator's claim is subject to the Estimation Motion.   However, the Debtors and the Insolvency Administrator have reached an agreement, pursuant to which the Insolvency Administrator will stipulate to an allowed claim for voting purposes (albeit, in an amount that is substantially less than the asserted amount of the claim), and, in exchange, will be excused from the estimation portion of the Estimation Motion.**

e.     *Ciber Managed Services GmbH*

On July 10, 2017, Ciber Managed Services GmbH ("Ciber Managed Services") filed a proof of claim (claim number 323) asserting an unsecured claim against Ciber's Estate in the amount of $5,363,701.   Ciber is the sole indirect shareholder of Ciber Managed Services, which is located in Germany.   Like Ciber AG, Ciber Managed Services commenced an insolvency proceeding in the Local Court of Cologne, Germany.   Ciber Managed Services is also being administered by Hans-Gerd Jauch, as Insolvency Administrator.

According to the Insolvency Administrator, the grounds for Ciber Managed Services' claim are twofold.   First, the Insolvency Administrator alleges that within three months prior to the commencement of Ciber Managed Services' insolvency proceeding, Ciber Managed Services transferred $2,702,161 to Ciber.   The Insolvency Administrator contends that this payment is subject to avoidance under German law.

Second, according to the proof of claim, on March 15, 2017, Ciber owed Ciber Managed Services the sum of $2,661,540 and Ciber Managed Services owed Ciber the sum of $253,258. On the same day, Ciber caused these amounts to be "credited against each other" and caused the $2,408,281 post-setoff balance to be removed from Ciber Managed Services' records without apparent consideration.

The Insolvency Administrator contends that the setoff is subject to avoidance under German law and that Ciber Managed Services thus has a claim against Ciber for $2,661,540. Alternatively, the Insolvency Administrator contends that if the Bankruptcy Court concludes that the setoff was proper, Ciber Managed Services nevertheless has a claim for the $2,408,281 balance that should have remained after the setoff.

**The Debtors dispute the Insolvency Administrator's claim on a number of grounds, including that the setoff, the removal of the balance, and the transfer of funds to Ciber was proper and that the claims may be subject to recharacterization.   The Insolvency Administrator's claim is subject to the Estimation Motion.   However, the Debtors and the Insolvency Administrator have reached an agreement in principle, pursuant to which the Insolvency Administrator will stipulate to an allowed claim for voting purposes (albeit, in an amount that is substantially less than the asserted amount of the claim), and, in exchange, will be excused from the estimation portion of the Estimation Motion.**

31

3.    Significant Claims That Have Been Resolved or Are Resolved Under the Plan

As described below, the Debtors have reached settlements with two (2) of the creditors that asserted claims in excess of $5,000,000.

a.    *Zayo Group, LLC*

On February 21, 2013, Zayo Group, LLC ("Zayo") and the Debtors entered into the a Master Services Agreement (together with all amendments, supplements, and addendums, the "Zayo MSA") pursuant to which Zayo provided the Debtors with colocation, cloud, telecommunications, and other related services. For the services and goods contemplated under the Zayo MSA, the parties agreed to enter into separate Service Order Forms ("SOF") and Statements of Work ("SOW").

On November 25, 2015, Ciber and Zayo entered into the Master Service Agreement Third Addendum (the "Third Addendum"). Pursuant to the Third Addendum, Zayo provided to Ciber a one-time credit of $3,250,000.00 (the "Credit") to be used toward the payment of certain services under the Zayo MSA. The Third Addendum was entered into concurrently with the Master Service Agreement Fourth Addendum (the "Fourth Addendum"), which contemplated that Zayo would construct a data center in Germany exclusively for the Debtors and pursuant to their specifications. In 2016, Zayo completed construction of the data center. Zayo has stated that the cost of construction was approximately $5,000,000. Pursuant to the Fourth Addendum, the Debtors also renewed all services provided by Zayo as of November 25, 2015 (the "Renewed Services") through at least December 31, 2021.

As consideration for Zayo's agreement to undertake the responsibility of entering into a new market and constructing a foreign data center, the Debtors agreed to certain minimum monthly revenue commitments, including, but not limited to, a foreign service revenue commitment of $350,000 per month thru June 27, 2022. In the event that the Debtors sought to terminate the services early, the parties agreed to the following damages provision under the Zayo MSA (the "Early Termination Provision"):

> Early Termination: Charges. **If Service(s) is/are terminated by Client** [Debtors] for convenience before the end of the SOF Term, which can only be done on thirty (30) days prior written notice, **Client will pay an early termination charge of one hundred percent (100%) of its recurring charges for the remainder of the SOF Term** . . . . the parties specifically agree that the damages which [Zayo] would incur arising from any breach or early termination for convenience of this Agreement by Client are based upon future facts and conditions which are difficult for the parties to presently predict, anticipate, ascertain or calculate. The parties further agree that such liquidated damages, as determined herein, are based upon the best efforts of the parties to estimate the nature and amount of [Zayo's] actual damages, are not penal in nature, and are intended to place [Zayo] in the same position it would have achieved, had this Agreement been fully performed by the parties according to the original terms. . . .

Pursuant to the MSA, Zayo and the Debtors agreed to the Early Termination Provision because Zayo's damages arising from the Debtors' early termination of the Zayo MSA would be difficult to assess and quantify. While it is possible to calculate the costs of fixed assets associated with the Zayo MSA, the parties agreed that would be difficult to quantify the costs of human resources and the opportunity costs if the Zayo MSA were terminated prior to its expiration. Plus, certain of the third-party services associated with fixed assets were pre-paid by Zayo and not easily transferrable to any other party thereby substantially reducing the value of the equipment and Zayo's ability to reuse or resell the equipment to other potential clients.

After the sale of substantially all of the Debtors' assets and in connection with the transition to the buyer, the Debtors and Zayo commenced discussions regarding the wind-down of services and ultimate termination of the Zayo MSA. On September 5, 2017, Zayo and the Debtors entered into the *Stipulation Authorizing the Rejection of the Master Services Agreement Between the Debtors and Zayo Group, LLC* [Docket No. 560] (the "Zayo Stipulation"), which was approved by the Court [Docket No. 563]. Pursuant to the Zayo Stipulation, the Zayo MSA was rejected effective August 25, 2017 and Zayo reserved its right to seek allowance of or otherwise assert other claims, including administrative expense claims arising from the Debtors minimum monthly revenue commitments accruing after the Petition Date (which Zayo asserted equal approximately $1,000,000). In addition, Zayo and the Debtors agreed to negotiate in good faith regarding the resolution of all claims Zayo may assert against the Debtors' estates.

After the commencement of the cases, Zayo filed proof of claim numbers 345 and 453 for unpaid services arising from the Zayo MSA prior to the Petition Date in the amount of $531,010.54.[19] Zayo also filed proof of claim number 631 in the amount of $37,537,152 for damages arising from the rejection of the Zayo MSA. As a result of unpaid prepetition services and the rejection of the Zayo MSA, Zayo asserted a general unsecured claim in the aggregate amount of $38,068,162.54 plus an administrative expense claim for postpetition services in the amount of no less than $1,000,000.

In accordance with the Zayo Stipulation and after a series of arm's length, good faith negotiations with Zayo, the Debtors determined that it was in the best interest of the estates: (a) allowing Zayo's general unsecured claims in an aggregate amount of $27,750,000; (b) requiring Zayo to waive its administrative expense claim in the amount of approximately $1,000,000; (c) waiving and releasing any and all claims the Debtors' estates might have against Zayo under chapter 5 of the Bankruptcy Code; (d) Zayo agreeing to elect under the Plan to receive an early and one time distribution in the amount of 35% of its allowed general unsecured claim; and (e) condition the settlement upon the Debtors making the distribution to Zayo on or before December 31, 2017.

While the Debtors believe that the amount of Zayo's asserted claim may have been overstated in that it failed to account for Zayo's costs in providing services under the Zayo MSA and potentially subject to other defenses, given the existence of the Early Termination Provision and the uncertainty in litigating such issues, the Debtors believe this settlement fairly values such potential defenses and is fair and reasonable under the circumstances. The settlement also avoids the costs of litigating Zayo's claims, which could be time consuming and expensive and with an

---

[19] Claim numbers 345 and 453 appear to be duplicates.

ny-1292331

uncertain outcome, including a claim for the full asserted amount under the Zayo MSA (*i.e.*, $38 million).  In addition, the Debtors believe that Zayo's agreement to take the Class 3 Cash-Out Election, also provides potential value to the Debtors' other stakeholders.  Specifically, Zayo's acceptance of the Class 3 Cash-Out Election, preserves the possibility of payment in full of all other Allowed Claims.  In light of the claims asserted by Zayo, such a result would likely have been impossible otherwise.

   b.  *GPIF Tuscany Plaza LLC*

   The Debtors leased their former corporate headquarters in Greenwood Village, Colorado from GPIF Tuscany Plaza LLC ("GPIF") pursuant to a lease agreement dated August 24, 2015 (the "GPIF Lease").  The GPIF Lease does not expire until December 31, 2025.  On June 22, 2017, the Debtors moved to reject the GPIF Lease effective June 30, 2017 pursuant to section 365 of the Bankruptcy Code [Docket No. 399].  The Bankruptcy Court entered an order granting the motion on July 11, 2017 [Docket No. 450].

   In light of the rejection of the GPIF Lease, on June 27, 2017, GPIF filed a proof of claim (claim number 269) asserting an unsecured claim against Ciber's Estate in the amount of $8,356,695.00, consisting of (a) $7,989,292 for rent that allegedly would have come due between July 1, 2017 and the expiration of the GPIF Lease; (b) $23,210 in past due rent for the months of April, May, June, and July of 2017; (c) $580 in late charges for the past due rent; and (d) $343,613 in deferred rent.

   The Debtors disputed GPIF's claim on several grounds, including that it is capped pursuant to section 502(b)(6) of the Bankruptcy Code.  However, the Debtors and GPIF entered into a stipulation [Docket No. 617] providing that GPIF shall have an allowed Class 3 General Unsecured Claim in the amount of $812,737.77.  The Bankruptcy Court approved the stipulation on September 15, 2017 [Docket No. 618].

   4.  Indemnity Obligations Under the Plan

   Certain of the Debtors' corporate documents and agreements obligate them to indemnify their directors and officers and advance certain legal costs in connection with certain legal proceedings (the "Indemnity Provisions").  For instance, Ciber's bylaws provide that, subject to certain exceptions, Ciber "shall indemnify, to the fullest extent permitted by, and in the manner permissible under, the laws of the State of Delaware, any person who was or is threatened to be made, a party to any threatened, pending or completed action, suit, or proceeding, whether criminal, civil, administrative, or investigative, by reason of the fact that he, is or was a director or officer of [Ciber] . . . against expenses (including attorneys' fees), judgments, fines, ERISA excise taxes or penalties, and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding, including any action, suit or proceeding by or in the right of [Ciber]."  Further, Ciber's bylaws provide that Ciber "shall advance all reasonable expenses incurred by or on behalf of [an officer or director of Ciber] in connection with any Proceeding within ten days after the receipt by [Ciber] of a statement or statements from such person requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding."  Historically, the Debtors have also entered into indemnity agreements with the individual Board Members, the most recent of which were executed in

March 2017 and April 2017 (the "2017 Indemnity Agreements"). The Committee has asserted that the Debtors did not receive fair value in exchange for the 2017 Indemnity Agreements and that the 2017 Indemnity Agreements contained material modifications and enhancements that expanded the Debtors' indemnity obligations beyond the authorization of the Debtors' bylaws and certificates of incorporation. The Debtors believe that the 2017 Indemnity Agreements are consistent with other indemnification agreements historically entered into with the Board Members and with the Debtors' already existing indemnity obligations pursuant to, among other things, their bylaws. Further, the Debtors are unaware of any Indemnification Claims that would not have otherwise been reimbursable pursuant to the Debtors' pre-existing indemnification obligations.

Among other potential indemnification and advancement obligations, the Debtors' obligations under the Indemnity Provisions apply to a pending Securities and Exchange Commission ("SEC") inquiry (the "SEC Inquiry"). Beginning in November 2016, the Denver SEC Staff ("Staff") requested certain documents related to financial disclosures from the Debtors, dating back to January 1, 2014. The SEC Inquiry was directed at the Debtors generally and not the Board or any specific Board Member. Notwithstanding, the Board hired Gibson, Dunn & Crutcher LLP ("Gibson Dunn") to collect and produce the documents on behalf of the Debtors. After the commencement of the Chapter 11 Cases, the SEC issued subpoenas to ensure preservation of materials. Due to the fact that the SEC Inquiry is exempt from the automatic stay pursuant to section 362(b)(4) of the Bankruptcy Code, the Board undertook the defense of the SEC Inquiry during the Chapter 11 Cases to, among other things, maximize access to insurance coverage. The Board continues to cooperate with the Staff and anticipates full compliance with all requests. To date, the Staff has not provided further detail about the focus of its inquiry other than to state that it is looking into possible violations of various securities laws.

Due to the incurrence of costs in connection with the SEC Inquiry, the Board Members have asserted General Unsecured Claims and are likely to assert Administrative Claims against the Debtors arising from the Indemnity Provisions. In full settlement and satisfaction of the Claims that have been or may be asserted by the Board Members, Article V of the Plan treats the Board Members' Indemnification Claims as follows: (a) each Board Member shall be granted an Allowed General Unsecured Claim against CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.) consisting of (i) $475,097.60 for prepetition costs or expenses incurred by the Board Members relating to the SEC Inquiry, (ii) costs or expenses incurred by the Board Members between the Petition Date and the Effective Date relating to any action (including any Cause of Action), proceeding, or demand, whether formal or informal, other than the SEC Inquiry, to the extent such costs or expenses are subject to advancement or indemnification under the Indemnification Provisions pursuant to their terms, and (iii) post-Effective Date costs or expenses incurred by the Board Members relating to the SEC Inquiry or any other action (including any Cause of Action), proceeding, or demand, whether formal or informal, to the extent such costs or expenses are subject to advancement or indemnification under the Indemnification Provisions pursuant to their terms; and (b) each Board Member shall be granted an Allowed Administrative Claim against CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.) for all costs or expenses incurred by the Board Members between the Petition Date and the Effective Date relating to the SEC Inquiry; provided, however, that the amount that shall be reserved in the General Unsecured Claims Reserve on account of any General Unsecured Claims Allowed pursuant to Article V.G of the Plan shall be set forth in the Plan Supplement; provided, further, that the amount of the Claims Allowed

35

pursuant to Article V.G of the Plan shall be allocated among the Board Members in their discretion; provided, further, that for purposes of voting and distributions, the Board Members shall be treated as having one consolidated Allowed Claim in the aggregate amounts set forth above with respect to the Claims Allowed pursuant to Article V.G of the Plan; provided, further, that if the Board Members receive more than payment in full on account of their Allowed Claims, the Board Members shall return to Post-Effective Date CMTSU LLC any Cash they received from the Debtors in excess of the full amount of such Allowed Claims, subject to the rights, if any, of any insurance company with respect to such Cash.

The Debtors believe that the Board Members have valid pre- and post-petition Claims against the Debtors under the Indemnification Provisions, and the resolution reflected in the Plan with respect to the Indemnification Claims asserted by the Board Members reflects the Debtors' business judgment and is fair and equitable.  With respect to the General Unsecured Claims being granted to each Board Member (subject to allocation in accordance with the Plan), the Board has incurred approximately $475,097.60 in prepetition costs and are likely to incur additional costs after the Effective Date, each relating to the SEC Inquiry.  Because the costs the Board Members will incur after the Effective Date is currently unknown, the amount of the Board Members' Allowed General Unsecured Claims will be reserved for in the General Unsecured Claims Reserve and disclosed in the Plan Supplement.

With respect to the Allowed Administrative Claim, the Board has responded and will continue to respond to the Staff on behalf of the Debtors during the pendency of these Chapter 11 Cases.  As of August 31, 2017, the Board has incurred postpetition costs of approximately $726,654 that are subject to advancement or indemnification from Ciber, including in connection with the SEC Inquiry.  By serving on the Board after the filing of these Chapter 11 Cases and responding to the SEC Inquiry on behalf of the Debtors, the Debtors believe that they will be able to access available insurance coverage for the costs incurred by the Board Members in connection with the SEC Inquiry.  Further, by undertaking the defense of the SEC Inquiry and hiring Gibson Dunn, the Board has incurred costs that would have otherwise been borne by the Debtors' Estates.  Accordingly, the Board Members believe that they have provided and will continue to provide a demonstrable benefit to the Debtors' Estates that supports the allowance of the Administrative Claim.  Moreover, the Debtors believe that allowance of Indemnification Claims for the Board Members is no different than the relief granted by the Bankruptcy Court in connection with the Debtors' first-day motion to pay certain wages [Docket No. 6] whereby the Debtors were authorized to reimburse employees for expenses incurred in the ordinary course of the Debtors' business and consistent with their prepetition practices during the pendency of the Chapter 11 Cases.  In any event, the Debtors expect that amounts that they become obligated to pay pursuant to the Indemnity Provisions will be covered by insurance, which will reduce the amount of the Allowed General Unsecured Claims and Allowed Administrative Claims in favor of Board Members that are proposed to be allowed under the Plan.

L.    *Wind-Down of Ciber's Foreign Non-Debtor Affiliates*

Certain of Ciber's foreign non-Debtor affiliates have either dissolved, have been sold or are in the process of winding down their operations.  With the exception of Ciber's non-Debtor affiliates in Germany, the Debtors are hopeful that the wind-down of the foreign non-Debtor affiliates will result in the elimination of any claims that such affiliates may have against the

36

Debtors' Estates.[20]  Below is a description of certain of the completed or ongoing wind down processes:

- **United Kingdom**:  Faced with a deficit of approximately GBP 20 million, on June 26, 2017, Ciber International B.V. ("CIBV"), an indirect subsidiary of Ciber and the direct parent of Ciber UK Ltd ("Ciber UK"), sold 100% of the equity in Ciber UK to the local management team consisting of Andrew Startin and Aiden Dunning in a transaction backed by RCapital (together, the "Purchasers"). Andrew Startin and Aiden Dunning were employees of Ciber UK and Mr. Dunning also served as General Counsel to CIBV and performed services that were cross-charged to the Debtors.  Christian Mezger, the Debtors' current CFO and a board member of CIBV (as well as certain other foreign non-Debtor affiliates), was involved in negotiating the transaction on behalf of CIBV.

  The Debtors believe that the sale of Ciber UK was negotiated at arm's-length between CIBV and RCapital together with Mr. Startin and Mr. Dunning.  As part of the transaction, the Purchasers agreed not to pursue any Claims or Causes of Action that could be asserted by Ciber UK against the Debtors' Estates so long as the Debtors agreed not to pursue any Claims or Causes of Action against Ciber UK.  By virtue of this "standstill" agreement, the option to bring Claims or Causes of Action against Ciber UK resides solely with the Debtors' Estates. However, the Debtors are not signatories to the transaction documents and believe that they did not release any Claims or Causes of Action against Ciber UK. Further, the transaction between CIBV and the Purchasers avoided liquidation proceedings for Ciber UK, which would have resulted in material Claims being asserted against the Debtors' Estates, and enabled Ciber UK to pursue a restructuring in the form of a UK Company Voluntary Arrangement.

- **Netherlands**: On June 16, 2016, Ciber completed a sale of certain assets and liabilities of Ciber Nederland, B.V.  As a result of the sale, Ciber no longer operates a business in the Netherlands.

- **Germany:** Ciber's German affiliates commenced insolvency proceedings in the Local Court of Cologne, Germany on or around March 30, 2017.  As noted above in Article IV.K.1, Hans-Gerd Jauch was appointed as the insolvency administrator on April 6, 2017.

- **Sweden**: Ciber completed a sale of certain assets of Consultants in Business Engineering and Research Sweden AB ("Ciber Sweden") on September 19, 2016. The last remaining employees of Ciber Sweden completed their work and were terminated in July 2017.  Ciber Sweden is now non-operational and will likely take steps to pursue a formal dissolution in the near future.

---

[20] As detailed in Article IV.K hereof, certain of Ciber's non-Debtor affiliates in Germany have filed proofs of claim against Ciber's Estate.

- **Denmark**: CIBER Danmark A/S (Denmark) ("Ciber Denmark") is winding-up its affairs and expects to have fulfilled its remaining contractual obligations by the end of August 2017.  Ciber Denmark is contemplating strategies for divesting itself of its 50% interest in Ciber-CMC Joint Venture Corporation (Vietnam).  Ciber Denmark will likely take steps to pursue a formal dissolution in the near future.

- **Spain**: Consultants In Business Engineering Research, S.L. ("Ciber Spain") no longer has any employees, and its administrative tasks are being handled by a third party.  Ciber Spain will likely take steps to pursue a formal dissolution in the near future.

- **Poland**: CIBER Polska Sp. ("Ciber Poland") will likely take steps to pursue a formal dissolution in the near future.

- **Switzerland**: Ciber Schweiz GmbH ("Ciber Switzerland") retained a liquidator, who was installed as a director of Ciber Switzerland.  Ciber Switzerland is completing necessary accounting adjustments in order to prepare for an audit.  Once the audit is completed, Ciber Switzerland will likely take steps to pursue a formal dissolution.

- **France**: Ciber France SAS ("Ciber France") recently paid its outstanding tax liabilities and is awaiting verification of payment from the taxing authorities.  After receiving such verification, Ciber France can proceed with collecting remaining outstanding accounts receivable and settling outstanding vendor obligations.  At that point, Ciber France will likely take steps to pursue a formal dissolution.

With the possible exception of Ciber Poland (which directly supports Ciber's U.S. operations) and Ciber Nederland, B.V., the costs associated with winding up the foreign operations are all expected to be self-funded and should not impose any additional costs on the Debtors' Estates.  The Debtors have been advised that Ciber Nederland, B.V. may owe certain tax payments to the Dutch taxing authorities arising from a 2015 tax refund taken in connection with a 2012 acquisition.  If the Debtors are able to obtain the release of the funds currently being held in the escrow accounts established in connection with the sale of Ciber's assets in the Netherlands and Spain to subsidiaries of the ManpowerGroup in the near term, such funds will be used to satisfy the tax obligations.  To the extent that the funds currently being held in escrow are not released before the tax obligations come due, the Debtors may have to pay the taxes to complete the wind-down of Ciber Nederland, B.V.  However, if the funds held in escrow are released after the Debtors pay the taxes, the funds will be released to the Debtors.  Accordingly, the wind-down of Ciber Nederland, B.V. should be cash neutral.

Several of the Debtors' foreign non-Debtor affiliates have asserted Claims against Ciber's Estate.  The Debtors intend to reconcile and dispute these Claims as appropriate.  Moreover, with the exception of the Claims asserted by Ciber Germany and Ciber Managed Services (which are detailed in Article IV.K. hereof), if the wind down of the foreign affiliates is conducted as suggested by the Debtors, the Debtors expect that such Claims will be withdrawn

by the foreign affiliates since the Debtors expect that they will be able to make payment in full to their creditors from other available sources.

M.      *The Committee's Claims Demand Letter*

In a letter dated September 19, 2017 (the "<u>Claims Demand Letter</u>"), counsel for the Committee demanded that the Debtors "immediately commence and prosecute an action" asserting three separate claims pursuant to Chapter 5 of the Bankruptcy Code: (a) claims seeking avoidance of certain payments made to insiders during the preference period; (b) avoidance and recovery of the tax payments made for the benefit of the Debtors' CEO and CFO in connection with certain bonus payments made in 2016; and (c) claims to avoid the indemnification agreements that the Debtors and certain of their directors and officers entered into in late March 2017 and early April 2017.  The Claims Demand Letter observes that each of these claims would be subject to the releases and related provisions set forth in Article VIII of the Plan.  On September 20, 2017, Debtors' counsel, on behalf of the Debtors, responded to the Claims Demand Letter via email, requesting that the Committee provide the Debtors with a legal and factual basis to pursue these Causes of Action.

Based on the Debtors' understanding of the alleged Causes of Action identified by the Committee, the Debtors do not believe that the Causes of Action are colorable.  First, as detailed in Article II.D hereof, the payments made to insiders during the preference period are comprised primarily of regular compensation and expense reimbursement paid to the Debtors' officers and expense reimbursement for the Debtors' directors and officers.  The Debtors believe that it is highly unlikely that any of these regular compensation or expense reimbursement payments could ultimately be subject to a successful Avoidance Action.

Second, the Debtors understand that the Causes of Action that the Committee proposes to be asserted against the Debtors' CEO and CFO arise from the payment of certain not duly authorized bonuses in 2016 that were returned to the Debtors "net of taxes" (*i.e.*, only those amounts that were paid to the CEO and CFO).  The Committee's theory appears to rest on the faulty premise that amounts *never received* by the CEO and CFO caused the CEO and CFO to receive an indirect benefit in the form of IRS tax credits, the value of which the Committee implies may be recoverable by the Debtors' Estates.  At the time the bonuses were paid, taxes were withheld and remitted to the taxing authorities as part of the normal payroll process.  However, the amount withheld and remitted to the IRS was not immediately refunded to the Debtors.  Rather, the overpayment allowed the Debtors, and not the individuals, to reduce their future payroll obligations to the IRS (in respect of the amounts paid to the CFO) and also seek a refund of such amounts not used for the payroll reduction (in respect of the amounts paid to the CEO).  As a result, the Debtors have already received or will receive 100% of the bonus amounts—either directly from the employee, due to a reduction in payroll taxes, or through a tax refund.  In any event, neither the CEO nor the CFO received any value, direct or indirect, from the Debtors' tax credits on their individual tax returns.  For the foregoing reasons, the Debtors do not believe that these Causes of Action are colorable.

Finally, as described in Article IV.K.3. hereof, the indemnification agreements entered into with the Board Members prior to the Petition Date are consistent with prior indemnification agreements that the Debtors historically entered into with the Board Members.  Additionally,

these agreements simply codify the Debtors' pre-existing indemnification obligations that arise under the Debtors' bylaws and under applicable law.  The Debtors believe that they did not incur additional liability by entering into the indemnification agreements in March 2017 and April 2017.  Moreover, (consistent with Delaware law) each of the indemnification agreements contains a commitment from each Board Member to repay any amounts advanced by the Debtors to the extent that it is later determined that the Board Member was not entitled to indemnification.  For these reasons, the Debtors do not believe that the obligations underlying the indemnifications agreements are subject to avoidance under applicable fraudulent transfer law.

On September 25, 2017, the Committee filed a motion [Docket No. 650] seeking Bankruptcy Court authority to pursue the claims identified in the Claims Demand Letter on behalf of the Debtors' estates.

## ARTICLE V.

## SUMMARY OF THE PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and it is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and the definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors and the Debtors' estates, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.    *Administrative and Priority Claims*

1.    <u>Administrative Claims</u>

Subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors or Post-Effective Date CMTSU LLC agree to less favorable treatment, or such Holder has been paid by the Debtors prior to the Effective Date, Post-Effective Date CMTSU LLC shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash from the Debtors' Estates in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Administrative Claim:  (a) if an

ny-1292331

Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Effective Date Debtors, as applicable; or (d) at such time and upon such terms as set forth in an Order of the Bankruptcy Court; provided, however, that any Administrative Claim that has been assumed by the Purchaser pursuant to the Purchase Agreement shall not be an obligation of the Debtors or the Post-Effective Date Debtors.  "Allowed Administrative Claim" shall not for any purpose under the Plan include interest attributable to or otherwise accrued during any period on or after the Petition Date.

ADMINISTRATIVE CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE.  THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

a.    *Administrative Claims Bar Date*

Holders of Administrative Claims incurred but unpaid prior to the Effective Date must File and serve such Claims on the Post-Effective Date Debtors within thirty (30) days after the Effective Date or such claims shall be forever barred against the Debtors or their Estates. Objections to the requests for payment of such Administrative Claims must be Filed and served on the Post-Effective Date Debtors and the requesting party on or before the Administrative Claims Objection Bar Date.

b.    *Administrative and Priority Claims Reserve*

On the Effective Date or as soon as practicable thereafter, the Debtors or Post-Effective Date CMTSU LLC, as applicable, shall fund the Administrative and Priority Claims Reserve in Cash as described in Article IV of the Plan.  Any amounts remaining in the Administrative and Priority Claims Reserve after payment of all Allowed Priority Claims and the U.S. Trustee Fees shall be used by Post-Effective Date CMTSU LLC to make distributions in accordance with the Plan.

2.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim and, as applicable, the Debtors or the Post-Effective Date Debtors agree to a less favorable treatment, or such Holder has been paid by the Debtors prior to the Effective Date, in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive payment in Cash in accordance with section 1129(a)(9)(C) of the Bankruptcy Code from Post-Effective Date CMTSU LLC on the Effective Date or as soon as reasonably practicable thereafter.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course

41

of business as such obligations become due.  Any Claims asserted by a Governmental Unit on account of any penalties and assessments shall not be Priority Tax Claims.  On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or Order of the Bankruptcy Court, act, or action under applicable law, regulation, Order or rule, or the vote, consent, authorization, or approval of any Person or Governmental Unit.

PRIORITY TAX CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE.  THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

      3.    <u>Professional Fee Claims</u>

      a.    *Final Fee Applications*

All final requests for payment of Professional Fee Claims shall be Filed and served on the Post-Effective Date Debtors no later than the first Business Day that is forty-five (45) days after the Effective Date.  After notice provided in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court Orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

      b.    *Professional Fee Claims*

The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash by Post-Effective Date CMTSU LLC to such Professionals, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by an Order of the Bankruptcy Court, which Order is not subject to a stay.

PROFESSIONAL FEE CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE.  THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

      4.    <u>U.S. Trustee Statutory Fees</u>

All U.S. Trustee Fees that are due prior to the Effective Date shall be paid in full by the Debtors or Post-Effective Date CMTSU LLC, as applicable, on the Effective Date or as soon as reasonably practicable thereafter.  In accordance with Article IV.M of the Plan, from and after the Effective Date, Post-Effective Date CMTSU LLC shall pay all U.S. Trustee Fees in Cash for each quarter (including any fraction thereof) from the Administrative and Priority Claims Reserve and, as applicable, to the extent that such fees are based on the disbursements made by the Post-Effective Date Debtors, until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

B.    *Classification, Treatment, and Voting of Claims and Interests*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.       Summary of Classifications

All Claims and Interests, other than Administrative Claims, Priority Tax Claims, and Professional Fee Claims, are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distribution under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

2.       Class Identification

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as set forth below.  To the extent that there are no Holders of Claims or Interests in a particular Class or Classes, such Claims or Interests shall be treated as set forth in Article III.B of the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Interests in CMTSU Liquidation, Inc. | Impaired | Not Solicited |
| 5 | Interests in CMTSU Liquidation 2, Inc. | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Interests in CMTSU Liquidation 3, LLC | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |

3.       Treatment of Classes of Claims and Interests

Except to the extent that the Debtors or Post-Effective Date CMTSU LLC, as applicable, and a Holder of an Allowed Claim or Allowed Interest, as applicable, agree to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Claim or Allowed Interest.

ny-1292331

a.      *Class 1—Other Priority Claims*

(a)     *Classification*:  Class 1 consists of all Other Priority Claims against the Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class 1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Claim in Class 1, each such Holder shall receive on the Effective Date or as soon as reasonably practicable thereafter, to the extent not already paid by the Debtors prior to the Effective Date, Cash in an amount equal to such Allowed Class 1 Claim.

(c)     *Voting*:  Class 1 is Unimpaired.  Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan with respect to Class 1 Claims.

b.      *Class 2—Secured Claims*

(a)     *Classification*:  Class 2 consists of all Secured Claims against the Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class 2 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Claim in Class 2, each such Holder shall receive, on the Effective Date or as soon as reasonably practicable thereafter, as the Debtors or Post-Effective Date CMTSU LLC, as applicable, determines:

(i)      payment in full in Cash of such Holder's Allowed Class 2 Claim;

(ii)     the collateral securing such Holder's Allowed Class 2 Claim; or

(iii)    such other treatment rendering such Holder's Allowed Class 2 Claim Unimpaired.

(c)     *Voting*:  Class 2 is Unimpaired.  Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan with respect to Class 2 Claims.

c.      *Class 3—General Unsecured Claims*

(a)     *Classification*: Class 3 consists of all General Unsecured Claims against the Debtors.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class 3 agrees to a less favorable treatment of its Allowed Claim, in full

44

and final satisfaction, settlement, and release of and in exchange for each Allowed Claim in Class 3, each such Holder shall receive its Pro Rata share of Cash in the General Unsecured Claims Reserve; provided, however, that each Holder of an Allowed Class 3 Claim may make the Class 3 Cash-Out Election on such Holder's Class 3 Ballot or upon allowance of such Class 3 Claim; provided, further, that a Holder of a Class 3 Claim shall not be permitted to exercise the Class 3 Cash-Out Election unless such Holder votes to accept the Plan. "Allowed General Unsecured Claim" shall not, except to the limited extent provided in Article III.C of the Plan, include interest attributable to or otherwise accrued during any period on or after the Petition Date.

(c)     *Voting*: Class 3 is Impaired. Therefore, Holders of Class 3 Claims are entitled to vote to accept or reject the Plan with respect to Class 3 Claims.

d.     *Class 4—Interests in CMTSU Liquidation, Inc.*

(a)     *Classification*: Class 4 consists of all Interests in CMTSU Liquidation, Inc.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Interest in Class 4 agrees to a less favorable treatment of its Allowed Interest, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Interest in Class 4, each such Holder shall be entitled to retain such Interests, which shall entitle such Holder to receive its Pro Rata share of Cash, if any, from the Remaining Funds.

(c)     *Voting*: Class 4 is Impaired. However, the votes of Holders of Class 4 Interests are not being solicited with respect to Class 4 Interests.

e.     *Class 5—Interests in CMTSU Liquidation 2, Inc.*

(a)     *Classification*: Class 5 consists of all Interests in CMTSU Liquidation 2, Inc.

(b)     *Treatment*: On the Effective Date, all Interests in CMTSU Liquidation 2, Inc. shall be deemed cancelled, terminated, extinguished, and void.

(c)     *Voting*: Class 5 is Impaired. Holders of Interests in Class 5 are deemed to have rejected the Plan with respect to Class 5 Interests pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan with respect to Class 5 Interests.

f.     *Class 6—Interests in CMTSU Liquidation 3, LLC*

(a)     *Classification*: Class 6 consists of all Interests in CMTSU Liquidation 3, LLC.

(b)    *Treatment*:  On the Effective Date, all Interests in CMTSU Liquidation 3, LLC shall be Reinstated.

(c)    *Voting*:  Class 6 is Unimpaired.  Holders of Interests in Class 6 are deemed to have accepted the Plan with respect to Class 6 Interests pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan with respect to Class 6 Interests.

4.    Interest on Allowed Claims

Unless otherwise specifically provided for in the Plan (including Article III.C of the Plan), by applicable law (including, without limitation, section 506(b) of the Bankruptcy Code), or agreed-to by, as applicable, the Debtors or the Post-Effective Date Debtors, interest shall not accrue or be paid on any Claim or Interest, and no Holder of any Claim or Interest shall be entitled to interest accruing on and after the Petition Date on account of any Claim or Interest. Notwithstanding the preceding sentence, in the event that the Cash in the General Unsecured Claims Reserve exceeds the sum of all Allowed General Unsecured Claims, excluding any amounts of such Claims attributable to interest accruing on such Allowed Claims on or after the Petition Date, such excess Cash shall be distributed on a Pro Rata basis to the Holders of Allowed General Unsecured Claims on account of any portion of their respective Allowed Claims attributable to interest accruing on or after the Petition Date through the Effective Date, until such interest is paid in full.  All such interest shall accrue at the Federal Judgment Rate, and no other postpetition interest shall be paid in respect of any Allowed General Unsecured Claims. Without limiting the foregoing, interest shall not accrue or be paid on any Claim or Interest after the Effective Date, and except as otherwise provided in the Plan, Holders of Allowed Claims and Allowed Interests shall not be entitled to interest, dividends, or accruals on the distributions regardless of whether such distributions are delivered on or at any time after the Effective Date.

5.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors, the Post-Effective Date Debtors, or the Debtors' Estates with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

6.    Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

7.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent that Confirmation

46

pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Interests to render such Class of Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

       8.    <u>Limited Substantive Consolidation</u>

       For purposes of voting, Confirmation, and distributions under the Plan, the Chapter 11 Cases shall be deemed to be one consolidated case as of the Effective Date. All property of each of the Debtors' Estates shall be deemed to be property of a consolidated Entity consisting of all of the Debtors' Estates. Each Claim against any of the Debtors will be deemed to be a Claim against a consolidated Entity consisting of all of the Debtors, and any proof of Claim Filed against one or more of the Debtors will be deemed to have been Filed against the consolidated Entity. All guarantees by one of the Debtors in favor of any of the other Debtors will be eliminated, and all guarantees executed by any of the Debtors in favor of a creditor will be deemed to be a single obligation. Any and all Claims among or between Debtor entities shall be waived and not entitled to any distribution under the Plan. Substantive consolidation shall have no effect on valid, enforceable and unavoidable Liens except for Liens that secure a Claim that is eliminated by virtue of substantive consolidation and Liens against collateral that cease to exist by virtue of substantive consolidation. Substantive consolidation shall not (a) create a Claim in a Class different from the Class in which a Claim would have been placed in the absence of substantive consolidation; (b) change the priority or nature of a Claim in a manner different from the priority or nature of such Claim in the absence of substantive consolidation; (c) affect each Debtors' separate corporate existence or independent ownership of property for any purposes other than for the limited purpose of making distributions under the Plan; or (d) affect any Causes of Action of each of the Debtors.

       Substantive consolidation of the Debtors is an important component of a successful implementation of the Plan. It is well established that section 105(a) of the Bankruptcy Code empowers bankruptcy courts to substantively consolidate multiple debtors. Indeed, courts frequently substantively consolidate estates where doing so would not result in any harm to the creditors. <u>See</u> <u>In re Abeinsa Holding, Inc.</u>, 562 B.R. 265, 281 (Bankr. D. Del. 2016) (confirming plan that provided for partial substantive consolidation where there was no "evidence that the Debtors are employing substantive consolidation to disadvantage a group of creditors . . . or alter their rights").

       Here, the subsidiary Debtors—CMTSU Liquidation 2, Inc. and CMTSU Liquidation 3, LLC—do not own any material assets, and the Debtors believe that there will ultimately be no creditors of these entities. As a result, no party is impacted by the proposed consolidation here. Further, the Debtors do not believe that any Claims among or between Debtor entities existed as of the Petition Date or currently exist. As such, the Plan waives any and all Claims among or between Debtor entities and clarifies that, to the extent that any do exist, such Claims are not entitled to any distribution under the Plan. Based on the foregoing, the Debtors believe that the Plan's proposed consolidation structure is supported by the applicable legal standards and practical considerations.

C.    *Means for Implementation of the Plan*

    1.    Distributions on Account of Allowed Claims and Allowed Interests

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Administrative Claim, Allowed Priority Tax Claim, Allowed Professional Fee Claim, Allowed Secured Claim, Allowed Other Priority Claim, Allowed General Unsecured Claim, and Allowed Interest shall receive distributions under the Plan in full in Cash to the extent not already paid prior to the Effective Date.

    2.    Sources of Consideration for Plan Distributions

The Plan provides for the distribution of all Cash held by or for the benefit of the Debtors on and after the Effective Date.  In addition to Cash on hand, the Debtors' property consists primarily of: (a) the Debtors' rights under the Purchase Agreement and other Transaction Documents, in each case in accordance with the terms of the Purchase Agreement and any other Transaction Document, as applicable; (b) the Debtors' rights with respect to any Executory Contracts or Unexpired Leases identified on the Contract Assumption Schedule; (c) the Debtors' rights with respect to the Insurance Policies, including the D&O Policies; and (d) the Debtors' rights with respect to the Post-Effective Date Debtors' Causes of Action and any proceeds generated therefrom.

    3.    Post-Effective Date Debtors

        a.    *Vesting and Transfer of Assets*

On the Effective Date, pursuant to section 1141 of the Bankruptcy Code, all property of the Estates, and any property acquired by the Debtors during the Chapter 11 Cases, shall vest in the respective Debtors, free and clear of all Claims, Liens, charges, or other encumbrances and Interests except as provided in the Plan and the Confirmation Order.  On the Effective Date, each of the Debtors will assign, convey, and transfer to Post-Effective Date CMTSU LLC, all of their respective right, title, and interest in and to the Post-Effective Date Debtors' Assets (other than, for the avoidance of doubt, the Interests in Post-Effective Date CMTSU LLC, which shall remain with Post-Effective Date CMTSU Inc.).  No Person (other than Post-Effective Date CMTSU LLC) will have any interest, legal, beneficial, reversionary, or otherwise, in the Post-Effective Date Debtors' Assets upon their assignment, conveyance and transfer to Post-Effective Date CMTSU LLC (other than as provided in the Plan).  Value equal to any proceeds or consideration that is obtained by Post-Effective Date CMTSU Inc. through the application or use of the Debtors' tax attributes shall be transferred to Post-Effective Date CMTSU LLC and distributed in accordance with the Plan.  Notwithstanding the foregoing, the Debtors reserve the right to create a new corporate entity to serve as the vehicle through which the Post-Effective Date Debtors will conduct the wind down of their business and affairs in which case all of the Post-Effective Date Debtors' Assets shall be transferred to such entity as described herein and all references to Post-Effective Date CMTSU LLC in the Plan shall instead be deemed to apply to

such newly created entity. Such assignment, conveyance, and transfer to Post-Effective Date CMTSU LLC, and any subsequent assignment, conveyance or transfer of all or any portion of the Post-Effective Date Debtors' Assets, will be exempt from any stamp, transfer, deed, sales, use or other similar tax and will be free and clear of any liens, claims and encumbrances. Without limiting the foregoing, the Confirmation Order shall specifically authorize and order each respective clerk, recorder or other governmental official charged with accepting, filing or recording any instrument of conveyance or transfer to file or record any such document without imposition or collection of any such tax or charge.

> b.    *General*

From and after the Effective Date, the Post-Effective Date Debtors shall continue in existence for purposes of: (a) winding down the Debtors' businesses and affairs as expeditiously and efficaciously as reasonably possible; (b) resolving and making distributions on all Allowed Claims and Allowed Interests; (c) administering the Post-Effective Date Debtors' Assets; (d) filing appropriate tax returns for the Debtors and the Post-Effective Date Debtors, as necessary; (e) dissolving the Debtors and the Post-Effective Date Debtors in accordance with the Plan; (f) administering the Plan in an efficacious manner, with no objective to continue or engage in the conduct of a trade or business; (g) filing the final monthly report (for the month in which the Effective Date occurs) and any subsequent quarterly reports required under the U.S. Trustee guidelines, and paying all U.S. Trustee Fees from the Effective Date through the date of a final decree closing the Chapter 11 Cases; and (h) maintaining the D&O Policies and transferring or terminating any other insurance policies, as deemed necessary by the Post-Effective Date Debtors in accordance with the terms of the Plan.

In connection with the Post-Effective Date Debtors' Assets, any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity attaching to any documents or communications (in any form, including, without limitation, written, electronic or oral) shall be transferred and shall vest in Post-Effective Date CMTSU LLC. Post-Effective Date CMTSU LLC's receipt of such privileges associated with the Post-Effective Date Debtors' Assets shall not operate as a waiver of other privileges possessed or retained by the Debtors. For the avoidance of doubt, the privileges and immunities that shall be transferred and vest in Post-Effective Date CMTSU LLC shall include all privileges and immunities that existed prior to the entry of the Sale Order as related (in any manner) to Causes of Action and objections to any Claims or Interests.

> c.    *Post-Effective Date CMTSU LLC*

On the Effective Date, the limited liability company agreement of Post-Effective Date CMTSU LLC shall be amended and restated in form of the Amended and Restated Post-Effective Date CMTSU LLC Agreement, which shall provide, among other things that, except as set forth herein: (a) for the limited purpose of implementing the Plan, administering and distributing the Post-Effective Date Debtors' Assets and winding down the business and affairs of the Debtors and the Post-Effective Date Debtors, all management and governance responsibility of Post-Effective Date CMTSU LLC shall rest solely with the Manager; (b) the Manager shall not have any interest in Post-Effective Date CMTSU LLC; (c) it is the intention of the parties that Post-Effective Date CMTSU LLC shall continue to be treated as a disregarded

49

entity for U.S. federal income tax purposes; and (d) the Manager shall only be replaced for cause as set forth in Article IV.D of the Plan.

            d.     *Post-Effective Date CMTSU Inc.*

On the Effective Date, the certificate of incorporation and bylaws of CMTSU Liquidation, Inc. shall be amended and restated in the form of the Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation and the Amended and Restated Post-Effective Date CMTSU Inc. Bylaws.  Post-Effective Date CMTSU Inc. shall remain in existence until such time as the wind down of the Debtors and the Post-Effective Date Debtors is complete, at which point the Sole Officer and Director shall have the authority to dissolve Post-Effective Date CMTSU Inc. under applicable law and without the necessity of a shareholder vote.  On and after the Effective Date, the Sole Officer and Director shall be appointed as the sole officer and director of Post-Effective Date CMTSU Inc., without further Order of the Bankruptcy Court. The Sole Officer and Director shall be vested with the authority granted to him or her pursuant to the Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation and the Amended and Restated Post-Effective Date CMTSU Inc. Bylaws.

            e.     *Dissolution of CMTSU Liquidation 2, Inc.*

On the Effective Date, CMTSU Liquidation 2, Inc. shall be deemed to have dissolved as of the Effective Date.

            4.    <u>Management of the Post-Effective Date Debtors</u>

Subject to the limitations of the Plan, including the provisions of Article IV.D of the Plan, the powers of the Manager shall include any and all powers and authority to implement the Plan and to administer and distribute the Post-Effective Date Debtors' Assets and wind down the business and affairs of the Debtors and the Post-Effective Date Debtors, including: (a) liquidating, receiving, holding, and investing, supervising, and protecting the Post-Effective Date Debtors' Assets; (b) commencing, asserting, litigating, and prosecuting any and all Causes of Action; (c) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Post-Effective Date Debtors' Assets; (d) objecting to, resolving and/or making distributions to Holders of Allowed Claims and Allowed Interests from the Post-Effective Date Debtors' Assets as contemplated under the Plan; (e) establishing and maintaining bank accounts in the name of Post-Effective Date CMTSU LLC, including the Administrative and Priority Claims Reserve, the Wind Down Reserve, and the General Unsecured Claims Reserve; (f) employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (g) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (h) maintaining, transferring, or terminating the Insurance Policies; (i) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns and, to the extent applicable, using the Debtors' tax attributes; (j) representing the interests of the Post-Effective Date Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (k) exercising such other powers as may be vested in it pursuant to Order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

Until such time as Holders of Class 3 Claims are paid in full in accordance with the Plan, the Oversight Committee may, as determined by it in good faith, and subject to the approval of the Bankruptcy Court on notice to the Manager and the Post-Effective Date Debtors, remove the Manager for cause (including any of the following forms of misconduct, whether during Manager's employment by any of the Debtors either before or after the Petition Date): violation of any term of his employment agreement with the Debtors; commission of any felony or of any misdemeanor involving dishonesty or moral turpitude; theft or misuse of the Debtors' property or time; use of alcohol on the Debtors' premises or appearing on such premises while intoxicated; illegal use of any controlled substance; illegal gambling; discriminatory or harassing behavior, whether or not illegal under federal, state or local law; willful misconduct; or falsifying any document or making any false or misleading statement relating to the Manager's employment by any of the Debtors.  If the Manager is removed, the Oversight Committee, in its sole discretion, shall select a replacement Manager who shall serve on an "at will" basis, in the Oversight Committee's sole discretion and on terms and conditions acceptable to both parties.

The Manager may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court, the Oversight Committee, and the Post-Effective Date Debtors.  Any successor Manager shall serve on an "at will" basis, in the Oversight Committee's sole discretion and on terms and conditions acceptable to it, and, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor, and all responsibilities of the predecessor Manager relating to Post-Effective Date CMTSU LLC shall be terminated.

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Manager and the Sole Officer and Director on or after the Effective Date (including taxes) and any reasonable fee and expense reimbursement claims (including attorneys' and advisors' fees and expenses) made by the Manager or the Sole Officer and Director shall be paid in Cash from the Post-Effective Date Debtors' Assets without any further notice to or action, Order, or approval of the Bankruptcy Court.  The Manager shall be authorized to engage counsel and advisors, including, for the avoidance of doubt, Alvarez & Marsal North America, LLC.  The initial Manager and Sole Officer and Director shall be retained on terms consistent with his prepetition engagement.  The form of engagement letter between the Post-Effective Date Debtors and the Manager shall be included in the Plan Supplement.

In executing his duties and responsibilities under the Plan, the Manager and the Sole Officer and Director may rely, and shall be protected from liability in acting upon: (a) any books, records, documents, instruments or papers maintained by the Debtors or the Post-Effective Date Debtors in the ordinary course of business; (b) any instrument, paper, pleading, notice, Order, or other document on file with the Bankruptcy Court that the Manager or the Sole Officer and Director, as applicable, believes to be genuine and signed or presented by the proper party or parties; (c) the advice of counsel; (d) the Plan; or (e) any direction or approval by the Oversight Committee.  Neither the Manager nor the Sole Officer and Director shall be required to give any bond or surety or other security for the performance of its respective duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Manager or the Sole Officer and Director is so otherwise ordered, all costs and expenses of the Manager or the Sole Officer and Director in procuring any such bond or surety shall be paid for with Cash derived from the Post-Effective Date Debtors' Assets.

5.     Creation of the Oversight Committee

On the Effective Date, the Oversight Committee shall be formed.  The Oversight Committee shall be comprised of three (3) individuals consisting of: (a) a designee appointed by the Debtors that shall be a creditor; (b) a designee appointed by the Committee; and (c) a designee appointed to represent the Holders of Class 4 Interests.  In the event that an Oversight Committee Member resigns, remaining Oversight Committee Members may, in their discretion, select a replacement Oversight Committee Member.  After all Class 3 Claims have been paid in full in accordance with Article III.B of the Plan, representatives of the Holders of Class 4 Interests shall select three (3) individuals to serve on the Oversight Committee, and all Oversight Committee Members then serving on the Oversight Committee shall be discharged and shall have no further obligations under the Plan.

**The Committee has expressed concerns regarding the makeup of the Oversight Committee.**

The Oversight Committee's authority, duties and responsibilities shall be:  (a) meeting with the Manager on a periodic basis (as the Oversight Committee and the Manager agree, or as may be requested by the Oversight Committee in its reasonable discretion) regarding the execution of the Manager's duties under the Plan and the status of the same; (b) consulting with the Manager regarding all matters covered by the Plan including (i) the pursuit of Causes of Action against third parties; (ii) objecting to and/or resolving Claims; and (iii) such other matters affecting administration of the Estates as may be agreed upon by the Oversight Committee and the Manager; and (c) the matters addressed below.

The Oversight Committee shall be authorized to engage counsel and advisors for the Oversight Committee.  Subject to review and approval of the Oversight Committee, Post-Effective Date CMTSU LLC shall pay in the ordinary course all reasonable fees and expenses of professionals and advisors retained on its behalf or on behalf of the Oversight Committee, and such fees and expenses shall not be subject to the review and approval of the Bankruptcy Court. The Oversight Committee Members may be entitled to compensation as may be agreed to by the Manager and the Oversight Committee.

The Manager may, in his discretion, seek the consent of the Oversight Committee regarding any matter at issue and shall not take any of the actions set forth below without the prior consent (such consent not to be unreasonably withheld) or authorization of the Oversight Committee or Order of the Court: (a) allowance of any disputed, unliquidated or contingent Claim over $500,000; (b) engaging, terminating or altering the engagement of any professionals or advisors representing or otherwise acting on behalf of the Post-Effective Date Debtors; (c) making a disbursement to any individual, Entity, or professional or advisor representing or otherwise acting on behalf of Post-Effective Date CMTSU LLC or the Oversight Committee in excess of $100,000; (d) modifying or seeking authority from the Bankruptcy Court to amend, modify or change the Plan, any document in the Plan Supplement, or the Confirmation Order; (e) releasing any Claim or Cause of Action (including Claims and Causes of Action assertable under Chapter 5 of the Bankruptcy Code); (f) pursuing Causes of Action against any party, including commencing litigation on behalf of Post-Effective Date CMTSU LLC; (g) increasing any item of remuneration that Manager or the Sole Officer and Director may receive for work on behalf of

52

the Post-Effective Date Debtors; (h) objecting to Claims or Interests; or (i) establishing or funding the Administrative and Priority Claims Reserve, the Wind Down Reserve, or the General Unsecured Claims Reserve, or adding or disbursing any funds therefrom.  With respect to the allowance of any disputed, unliquidated or contingent Claim over $3 million, the Manager shall obtain written consent or authorization of the Oversight Committee and approval of the Bankruptcy Court, after notice and a hearing (with notice to all parties requesting notice of pleadings in these Chapter 11 Cases plus the Holders of the twenty (20) largest Class 3 Claims).

The Oversight Committee shall dissolve upon the later of (a) the date that all distributions are made in accordance with Article III.B of the Plan and (b) the closing of the Chapter 11 Cases and entry of a final decree.

6.      Standard of Care for Manager, Sole Officer and Director, and Oversight Committee

The Manager and the Sole Officer and Director, in performance of his duties, will exercise sound discretion and independent judgment while exerting his best efforts to perform his duties in a professional manner.  The Manager and the Sole Officer and Director shall not be liable to the Debtors, Post-Effective Date CMTSU LLC, and any Holder of a Claim or Interest, except as determined by a Final Order of a court of competent jurisdiction not subject to appeal, that the Manager and the Sole Officer and Director was grossly negligent, willfully disregarded his duties and responsibilities under the Plan, acted for his benefit to the derogation of the rights of Post-Effective Date CMTSU LLC or has otherwise engaged in either willful misconduct or the abandonment of his duties.

The Oversight Committee Members shall perform their respective duties with reasonable diligence and care.  Neither the Oversight Committee nor the Oversight Committee Members or their successors or assigns, affiliates, directors, officers, employees, agents, shareholders, attorneys or other professionals shall be liable to the Debtors, Post-Effective Date CMTSU LLC, or any Holder of a Claim or Interest, except as determined by a Final Order of a court of competent jurisdiction not subject to appeal that any such Oversight Committee Member willfully disregarded his duties and responsibilities under the Plan or has otherwise engaged in willful misconduct in the performance of his duties under the Plan.

7.      Creation of Reserves

a.      *Administrative and Priority Claims Reserve*

On the Effective Date or as soon as reasonably practicable thereafter, Post-Effective Date CMTSU LLC shall establish and thereafter maintain the Administrative and Priority Claims Reserve in an authorized depository in the United States.  Funds in the Administrative and Priority Claims Reserve shall be used by Post-Effective Date CMTSU LLC only for the payment of U.S. Trustee Fees and Allowed Priority Claims to the extent that such Allowed Claims have not been paid in full on or prior to the Effective Date.  Any amounts remaining in the Administrative and Priority Claims Reserve, after payment in full of all Allowed Priority Claims and the U.S. Trustee Fees, or reserving for any Disputed Priority Claims sufficient to permit payment in full of such Priority Claims, may be released from the reserve, transferred to the

53

General Unsecured Claims Reserve, and used for other distributions by Post-Effective Date CMTSU LLC pursuant to the Plan.

**The Debtors currently estimate that $2,000,000 will be deposited in the Administrative and Priority Claims Reserve.  However, this estimate is subject to change between the date hereof and the Effective Date.**

        b.     *Wind-Down Reserve*

On the Effective Date or as soon as reasonably practicable thereafter, Post-Effective Date CMTSU LLC shall establish and thereafter maintain the Wind Down Reserve with the Wind Down Reserve Amount in an authorized depository in the United States.  Post-Effective Date CMTSU LLC may replenish the Wind Down Reserve at any time in the sole discretion of the Manager in consultation with the Oversight Committee.  Funds in the Wind Down Reserve shall be used by Post-Effective Date CMTSU LLC only for the payment of fees and expenses relating to the implementation of the Plan and wind down and dissolution of the Debtors and Post-Effective Date Debtors pursuant to the Plan.  Any amounts remaining in the Wind Down Reserve after payment of all fees and expenses relating to the implementation of the Plan and wind down and dissolution of the Debtors may be released from the reserve, transferred to the General Unsecured Claims Reserve, and used for distributions by Post-Effective Date CMTSU LLC pursuant to the Plan.

**The Debtors currently estimate that $6,000,000 will be deposited in the Wind Down Reserve.  However, this estimate is subject to change between the date hereof and the Effective Date.**

        c.     *General Unsecured Claims Reserve*

On the Effective Date or as soon as reasonably practicable thereafter, Post-Effective Date CMTSU LLC shall establish and thereafter maintain the General Unsecured Claims Reserve in an authorized depository in the United States.  Funds in the General Unsecured Claims Reserve shall be used by Post-Effective Date CMTSU LLC only for payment of Allowed Class 3 Claims.  Any amounts remaining in the General Unsecured Claims Reserve (including any amounts transferred from the Administrative and Priority Claims Reserve or the Wind Down Reserve) after payment of all Allowed Class 3 Claims and reserving for Disputed Class 3 Claims that may become Allowed, each in full in Cash pursuant to the Plan, including any interest payable pursuant to Article III.C of the Plan, shall constitute Remaining Funds.

**The Debtors currently estimate that $22,000,000 will be deposited in the General Unsecured Claims Reserve, before accounting for the payment on account of Zayo's Class 3 Cash-Out Election (discussed below).  After accounting for Zayo's Class 3 Cash-Out Election, the Debtors expect that approximately $12.3 million will remain in the General Unsecured Claims Reserve.  However, this estimate is subject to change between the date hereof and the Effective Date and does not include approximately $2 million in estimated post-Effective Date receipts.**

8.      Zayo Settlement

In full and final satisfaction of any and all Claims, including, for the avoidance of doubt, the Claims identified in the Proofs of Claim filed by Zayo (Claim Nos. 345, 453, and 631), any other Claims or Administrative Claims reserved in the Zayo Stipulation, and any rights that Zayo asserts, has or may have against the Debtors and their Estates, Zayo shall be granted an Allowed Class 3 Claim against CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.) in the amount of $27,750,000. Zayo shall be deemed to have made the Class 3 Cash-Out Election without the need to return a Ballot exercising such election.  The Debtors and their Estates agree to waive any Avoidance Actions that could be asserted against Zayo.

The settlement reflected in Article IV.J of the Plan shall only be effective if: (i) the Effective Date occurs on or before the Zayo Settlement Termination Date, and (ii) Zayo receives its distribution on account of its Allowed Class 3 Claim on or before the Zayo Settlement Termination Date.  Should the Effective Date or Zayo's distribution on account of its Allowed Class 3 Claim occur after the Zayo Settlement Termination Date, the settlement reflected in Article IV.J of the Plan shall no longer be effective and the parties' rights are reserved, unless Zayo provides express written consent waiving these conditions.

9.      D&O Policies

Notwithstanding anything to the contrary contained in the Plan or in the Confirmation Order, Confirmation of the Plan and the assignment of the D&O Policies to the Post-Effective Date Debtors in connection with the Plan shall not impair or otherwise modify (i) any obligations arising under the D&O Policies or (ii) any Board Member's or officer's rights to receive any benefits or coverage under such D&O Policies subject to the terms thereof.  In addition, after the Effective Date, the Post-Effective Debtors shall not terminate or otherwise reduce coverage under any D&O Policy, and all Board Members and officers of the Debtors covered by such policy shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such Board Members and/or officers remain in such positions after the Effective Date, all subject to the terms of the D&O Policies.

10.     Sale Order; Purchase Agreement

Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in the Plan or the Confirmation Order shall, or shall be deemed to, amend, modify, or waive any term or condition of the Sale Order, the Purchase Agreement, or any other Transaction Document or limit, alter, or impair any of the rights or remedies of the Purchaser under any of the foregoing.

11.     Wind Down

On the Effective Date, the persons acting as Board Members, managers, and officers of the Debtors shall be deemed to have resigned and relieved of all duties under the Debtors' organizational documents.

On and after the Effective Date, the Post-Effective Date Debtors shall be authorized to implement the Plan and any applicable Orders of the Bankruptcy Court.  As soon as reasonably

practicable after the Effective Date, the Post-Effective Date Debtors shall take such other actions as the Post-Effective Date Debtors may determine to be necessary or desirable to carry out the purposes of the Plan.  From the Effective Date through the date of the filing of a final decree closing the Chapter 11 Cases, the Post-Effective Date Debtors shall file the final monthly report (for the month in which the Effective Date occurs) and any subsequent quarterly reports required under the U.S. Trustee guidelines.

The Post-Effective Date Debtors shall have the power and authority to take any action necessary to implement the Plan and wind down and dissolve the Debtors and Post-Effective Date Debtors.  Any expenses and costs incurred by the Post-Effective Date Debtors in connection with the wind down and dissolution activities described in the preceding sentence shall be paid solely from the Post-Effective Date Debtors' Assets.  In addition, the Post-Effective Date Debtors shall execute and file for the Debtors a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under applicable law.  Upon such filings, the Debtors and the Post-Effective Date Debtors:  (a) for all purposes shall be deemed to have withdrawn their business operations from any state or territory in which they were previously conducting, or were registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal; (b) shall be deemed to have terminated the requisite corporate formation documents relating to each such Debtor and Post-Effective Date Debtor; and (c) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

12.    Cancellation of Securities and Agreements

On the Effective Date, except as otherwise specifically provided for in the Plan: (a) the obligations of the Debtors under any certificate, share, note, bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled as to the Debtors; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; provided, that, notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of allowing such Holders to receive distributions under the Plan as provided herein; provided, further, that notwithstanding anything to the contrary herein, any right of the Debtors to, or any benefit to the Debtors with respect to, any escrowed funds, letters of credit, financial assurances, trust accounts, or other accounts shall not be cancelled, released, settled, or compromised.

13.    <u>Corporate Action</u>

On the Effective Date, the certificate of incorporation and bylaws of Post-Effective Date CMTSU Inc. shall be amended and restated in the form of the Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation and the Amended and Restated Post-Effective Date CMTSU Inc. Bylaws.  The Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation will prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code without any further actions by the stockholders or directors of the Debtors or the Post-Effective Date Debtors.  After the Effective Date, the Amended and Restated Post-Effective Date CMTSU Inc. may amend and restate its Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation as provided therein or by applicable law.

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Post-Effective Date Debtors) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

The Manager and Sole Officer and Director shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as it may deem necessary or appropriate in its reasonable discretion to implement the provisions of Article IV of the Plan.

The authorizations and approvals contemplated by Article IV of the Plan shall be effective notwithstanding any requirements under applicable nonbankruptcy law.

14.    <u>Effectuating Documents; Further Transactions</u>

Prior to the Effective Date, the Debtors, and, on and after the Effective Date, the Post-Effective Date Debtors, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

15.    <u>Exemption from Certain Taxes and Fees</u>

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (b) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the

Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

16.   Causes of Action

On the Effective Date, all interests in and to the Causes of Action shall be transferred from the Post-Effective Date Debtors to Post-Effective Date CMTSU LLC.  The Manager, in the exercise of its business judgment and acting in accordance with the Plan, will determine whether to pursue such Causes of Action in accordance with the best interests of the Holders of Claims and Interests entitled to distributions under this Plan, and shall have all requisite authorization, approval and standing (without further action by the Debtors, Post-Effective Date Debtors or the Bankruptcy Court) to prosecute any of the Causes of Action in the name of, on behalf of, in the stead of, or as assignee of the Debtors, the Post-Effective Date Debtors, and/or the Debtors' respective Estates.

Any recovery of Cash on such Causes of Action shall be distributed pursuant to the Plan. A nonexclusive schedule of the Post-Effective Date Debtors' Retained Causes of Action is contained in the Plan Supplement.  In accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any Cause of Action in the Plan Supplement shall not be deemed an admission, denial or waiver of any Cause of Action that any Debtor or Estate may hold against any Entity.  Post-Effective Date CMTSU LLC shall have the ability to settle any and all Post-Effective Date Debtors' Causes of Action without further Order of the Bankruptcy Court.

17.   Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, Post-Effective Date CMTSU LLC shall, in the ordinary course of business and without any further notice or application to or action, Order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Post-Effective Date Debtors.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code, the Local Bankruptcy Rules, or the Professional Fee Order in seeking retention or compensation for services rendered after such date shall terminate, and the Post-Effective Date Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, Order, or approval of the Bankruptcy Court.

18.     Closing the Chapter 11 Cases

When all Disputed Claims and Interests have become Allowed or disallowed, the Post-Effective Date Debtors have dissolved in accordance with Article IV.M of the Plan and all remaining Post-Effective Date Debtors' Assets have been distributed in accordance with the Plan, and the business and affairs of the Debtors have been otherwise wound down, the Post-Effective Date Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

D.      *Treatment of Executory Contracts and Unexpired Leases*

1.      Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan and the Contract Assumption Schedule; (b) is subject to a pending motion to assume or assume and assign such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be, or has been, assumed or assumed and assigned to the Purchaser or another third party, as applicable, in connection with the Sale Transaction; (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan or with the Purchaser; or (e) is one of the Insurance Policies.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Contract Assumption Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

2.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any Cure Obligations under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Obligation in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, by the Debtors or Post-Effective Date CMTSU LLC, as applicable, as an Allowed Administrative Claim, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (a) the amount of the Cure Obligation; (b) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure Obligations shall be satisfied following the later to occur of the Effective Date or entry of a Final Order or Orders resolving the dispute and approving the assumption; provided, that prior to the Effective Date, the Debtors, and on and after the Effective Date, the Post-Effective Date Debtors, may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, Order, or approval of the Bankruptcy Court.

The Debtors shall cause notice of the proposed assumption and proposed Cure Obligations (solely to the extent such Cure Obligations were not already established in connection with the Sale Transaction and Sale Order) to be sent to applicable counterparties. Any objection by such counterparty shall be Filed and served within fourteen (14) days after service of the Contract Assumption Schedule. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Obligation shall be deemed to have assented to such assumption or Cure Obligation. For the avoidance of doubt, in accordance with the Bid Procedures Order and the Sale Order, the Cure Obligations relating to the Assigned Contracts shall be binding on the parties thereto for all purposes in the Chapter 11 Cases and otherwise, and shall constitute a final determination of the total Cure Obligations required to be paid in connection with the assumption and assignment of such Executory Contracts and Unexpired Leases.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Anything in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, Order, or approval of the Bankruptcy Court or any other Entity**.

3.    Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an Order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Claims and Noticing Agent and served on the Debtors or, after the Effective Date, the Post-Effective Date Debtors, no later than thirty (30) days after the earlier of the Confirmation Date or the effective date of the rejection of the applicable Executory Contract or Unexpired Lease. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors or, after the Effective Date, the Post-Effective Date Debtors, no later than fourteen (14) days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease or the Confirmation Order if deemed rejected under the Plan.

**Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (1) be treated as a creditor with respect to such Claim; (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection; or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Post-Effective Date Debtors, the Debtors' Estates, or the property of any of the foregoing without the need for any objection by the Debtors or the Post-Effective Date**

**Debtors, or further notice to, or action, Order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary**. All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims in Class 3 against the Debtors, except as otherwise provided by Order of the Bankruptcy Court.

4.      Purchase Agreement; Assigned Contracts

The Debtors' assumption or rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to the Purchaser's rights and obligations, including any Cure Obligations assumed by the Purchaser in accordance with the Purchase Agreement, with respect to any such Executory Contracts or Unexpired Leases that constitute Assigned Contracts.

5.      Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors or on behalf of the Debtors' Estates during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

6.      Insurance Policies

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, and any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases) (a) pursuant to sections 365 and 1123 of the Bankruptcy Code, the Insurance Policies shall be assumed by the Debtors and assigned to the Post-Effective Date Debtors on the Effective Date unless any such Insurance Policy previously was rejected by the Debtors or the Debtors' Estates pursuant to an Order of the Bankruptcy Court or is the subject of a motion to reject pending on the Effective Date; (b) coverage for defense and indemnity under any Insurance Policies, including the D&O Policies, shall remain available to all individuals within the definition of "Insured" in any such Insurance Policies, including the D&O Policies, as if the Chapter 11 Cases had not been filed; (c) nothing shall affect any party's rights under any of the

61

Insurance Policies, and all obligations and liabilities of the Debtors thereunder, whether arising before or after the Effective Date, shall survive, shall be or become obligations of the Post-Effective Date Debtors, and shall not be amended, modified, waived, released, discharged or impaired, and the Debtors' insurers shall not be required to file a Proof of Claim, Administrative Claim or Claim related to a Cure Obligation with respect thereto; provided, however, that the assignment of the Insurance Policies shall be effective as of the Effective Date and not alter, modify, amend, affect, impair or prejudice any rights, obligations or defenses of any insurers, the Debtors (or, after the Effective Date, the Post-Effective Date Debtors) or any other individual or entity, as applicable, under any Insurance Policy.

7.      Indemnification Claims

Indemnification Claims that have been or may be asserted by the Board Members shall be treated as follows: (a) each Board Member shall be granted an Allowed General Unsecured Claim against CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.) consisting of (i) $475,097.60 for prepetition costs or expenses incurred by the Board Members relating to the SEC Inquiry, (ii) costs or expenses incurred by the Board Members between the Petition Date and the Effective Date relating to any action (including any Cause of Action), proceeding, or demand, whether formal or informal, other than the SEC Inquiry, to the extent such costs or expenses are subject to advancement or indemnification under the Indemnification Provisions pursuant to their terms, and (iii) post-Effective Date costs or expenses incurred by the Board Members relating to the SEC Inquiry or any other action (including any Cause of Action), proceeding, or demand, whether formal or informal, to the extent such costs or expenses are subject to advancement or indemnification under the Indemnification Provisions pursuant to their terms; and (b) each Board Member shall be granted an Allowed Administrative Claim against CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.) for all costs or expenses incurred by the Board Members between the Petition Date and the Effective Date relating to the SEC Inquiry; provided, however, that the amount that shall be reserved in the General Unsecured Claims Reserve on account of any General Unsecured Claims Allowed pursuant to Article V.G of the Plan shall be set forth in the Plan Supplement; provided, further, that the amount of the Claims Allowed pursuant to Article V.G of the Plan shall be allocated among the Board Members in their discretion; provided, further, that for purposes of voting and distributions, the Board Members shall be treated as having one consolidated Allowed Claim in the aggregate amounts set forth above with respect to the Claims Allowed pursuant to Article V.G of the Plan; provided, further, that if the Board Members receive more than payment in full on account of their Allowed Claims, the Board Members shall return to Post-Effective Date CMTSU LLC any Cash they received from the Debtors in excess of the full amount of such Allowed Claims, subject to the rights, if any, of any insurance company with respect to such Cash.

8.      Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have ninety (90) days following entry of a Final

Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

E.    *Provisions Governing Distributions*

1.    <u>Calculation of Amounts to Be Distributed</u>

Each Holder of an Allowed Claim or Allowed Interest against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class from the Debtors or Post-Effective Date CMTSU LLC.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  If and to the extent that there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article III.B of the Plan.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim or Allowed Interest shall, on account of such Allowed Claim or Allowed Interest, receive a distribution in excess of the Allowed amount of such Claim or Interest plus any interest accruing on such Claim or Interest that is actually payable in accordance with the Plan.

2.    <u>Disbursing Agent</u>

Under the Plan, the Disbursing Agent shall be Post-Effective Date CMTSU LLC.  The Disbursing Agent shall make all distributions under the Plan.

3.    <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>

a.    *Record Date for Distribution*

On each Distribution Record Date, and solely with respect to those Claims receiving a distribution on each Distribution Record Date, the Claims Register shall be closed and the Disbursing Agent shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on each Distribution Record Date.

b.    *Delivery of Distributions in General*

i.    Payments and Distributions on Disputed Claims or Interests

Distributions made after the Effective Date to Holders of Disputed Claims or Interests that are not Allowed Claims or Allowed Interests as of the Effective Date but which later become Allowed Claims or Allowed Interests shall be deemed to have been made by the Disbursing Agent on the Effective Date, unless the Disbursing Agent and the Holder of such Claim or Interest agree otherwise.

ii.    Special Rules for Distributions to Holders of Disputed Claims or Interests

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Disbursing Agent, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest, other than with respect to Professional Fee Claims, until all Disputed Claims or Interests held by the Holder of such Disputed Claim or Interest have become Allowed Claims or Allowed Interests or have otherwise been resolved by settlement or Final Order.

iii.    Distributions

On and after the Effective Date, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims and Allowed Interests under the Plan.

Prior to making any distributions on Allowed Class 3 Claims, the Disbursing Agent shall set aside appropriate reserves of Cash in the General Unsecured Claims Reserve in order to satisfy Disputed Class 3 Claims in accordance with the Plan to the extent such Claims become Allowed Claims.  Any amounts set aside to pay or reserve for Disputed Claims shall include the amounts needed to fund the ongoing costs and expenses of such reserve, including, without limitation, taxes in respect of Disputed Claims, if any.

Any distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim or Interest that would have been entitled to receive that distribution is not an Allowed Claim or Allowed Interest on such date, shall be held by the Disbursing Agent and distributed on the next Subsequent Distribution Date that occurs after such Claim or Interest is Allowed.

c.    *Minimum; De Minimis Distributions*

No Cash payment of less than $10.00 in the aggregate, in the reasonable discretion of the Disbursing Agent, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.  If a Holder of an Allowed Claim or Allowed Interest would be entitled to receive less than $10.00 in the aggregate as of the time of a particular distribution, but would be entitled to receive more than $10.00 in combination with later distributions, the Disbursing Agent shall combine such distributions with later distributions to such Holder of an Allowed Claim or Allowed Interest so that such Holder may eventually be entitled to a distribution of at least $10.00 in value.  To the extent that the aggregate of such distributions never exceeds $10.00, such funds shall remain with and vest in Post-Effective Date CMTSU LLC for distribution to other Holders of Allowed Claims or Allowed Interests.

d.    *Undeliverable Distributions and Unclaimed Property*

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from

64

the date the initial distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to Post-Effective Date CMTSU LLC automatically and without need for a further Order by the Bankruptcy Court for distribution in accordance with the Plan, and the Claim or Interest of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

e.    <em>Manner of Payment Pursuant to the Plan</em>

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Debtors or Post-Effective Date CMTSU LLC by check or by wire transfer.

4.    <u>Compliance with Tax Requirements/Allocations</u>

In connection with the Plan, to the extent applicable, the Debtors and the Post-Effective Date Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions (including distributions made from any reserve for Disputed Claims) pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors and the Post-Effective Date Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. Amounts properly withheld from distributions to a Holder and paid over to any Governmental Unit will be treated as amounts distributed to the Holder.  The Debtors or the Post-Effective Date Debtors, as applicable, may request that any Holder of an Allowed Claim or Allowed Interest provide it with all forms and information required to comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit (the "<u>Required Tax Documents</u>").  Notwithstanding any other provision of the Plan, Holders that receive a distribution pursuant to the Plan are responsible for the payment and satisfaction of all tax obligations, including income, withholding, and other tax obligations imposed with respect to the distribution. In the event that a Holder fails to return Required Tax Documents within six (6) months after a written request by the Post-Effective Date Debtors, such Holder, its Allowed Claim or Allowed Interest, and all distributions on account of such Holder's Allowed Claim or Allowed Interest shall be treated as undeliverable distributions and unclaimed property in accordance with Article VI.C of the Plan.  The Post-Effective Date Debtors shall be responsible for paying only taxes chargeable to them and shall not be responsible for paying the tax obligations of each other.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  It is uncertain whether this allocation will be respected by the tax authorities of a Governmental Unit, which may instead take the position that payments should be allocated first to interest or should be pro-rated between principal and interest. If the tax authorities prevail in this assertion, Holders may be required to recognize ordinary interest

65

income even though they have an overall loss (and possibly a capital loss, the deductibility of which may be limited) with respect to their Claims. Each Holder is urged to consult its own tax advisor regarding the amount of its Claim allocable to accrued but unpaid interest and the character of any loss with respect to accrued but unpaid interest that the Holder previously included in income.

5.    Claims Paid or Payable by Third Parties

a.    *Claims Paid by Third Parties; Recourse to Collateral*

The Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized to reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Post-Effective Date Debtors, as applicable, including on account of recourse to collateral held by third parties that secure such Claim.  To the extent a Holder of a Claim receives a distribution on account of such Claim and also receives payment from a party that is not the Debtors or the Post-Effective Date Debtors on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Debtors or the Post-Effective Date Debtors, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Debtors or the Post-Effective Date Debtors, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

b.    *Claims Payable by Insurance, Third Parties; Recourse to Collateral*

Subject to Article V.G of the Plan, no distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to the Insurance Policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then, subject to Article V.G of the Plan, immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court.

c.    *Applicability of Insurance Policies*

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the Insurance Policies with respect to such policies, including, without limitation, the D&O Policies.

F.      *Procedures For Resolving Contingent, Unliquidated, and Disputed Claims and Interests*

1.      Resolution of Disputed Claims and Interests

a.      *Allowance of Claims and Interests*

Prior to the Effective Date, the Debtors, and, on and after the Effective Date, Post-Effective Date CMTSU LLC, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest, except with respect to any Claim or Interest deemed Allowed as of the Effective Date.  Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.

b.      *Prosecution of Objections to Claims and Interests*

Prior to the Effective Date, the Debtors, and on or after the Effective Date, Post-Effective Date CMTSU LLC shall have the authority and all requisite standing to File objections to Claims and Interests, and the exclusive authority and standing to settle, compromise, withdraw, or litigate to judgment objections on behalf of the Debtors' Estates to any and all such Claims and Interests, regardless of whether such Claims and Interests are in a Class or otherwise.  From and after the Effective Date, Post-Effective Date CMTSU LLC shall have the sole authority to administer and adjust the Claims Register with respect to Claims and Interests to reflect any such settlements or compromises.  No further notice to or action, Order, or approval of the Bankruptcy Court with respect to such settlements or compromises entered into between any of the Post-Effective Date Debtors and the Holder of any Claim or Interest shall be required.

c.      *Claims Estimation*

On and after the Effective Date, Post-Effective Date CMTSU LLC may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, in each case regardless of whether the Debtors or the Post-Effective Date Debtors has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to the maximum extent permitted by law as determined by the Bankruptcy Court to estimate any such Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Post-Effective Date Debtors may elect to pursue additional objections to the ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Post-Effective Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### d.    *Expungement or Adjustment to Claims and Interests Without Objection*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be marked as satisfied, adjusted or expunged (as applicable) on the Claims Register by the Claims and Noticing Agent at the direction of Post-Effective Date CMTSU LLC without an objection having to be Filed and without any further notice to or action, Order or approval of the Bankruptcy Court; provided, that Post-Effective Date CMTSU LLC shall provide thirty (30) days' notice of any of the foregoing modifications to the Claims Register to the Holder of any affected Claim or Interest during which period the Holder may object thereto.

### e.    *Deadline to File Objections to Claims or Interests*

Any objections to Claims or Interests shall be Filed no later than the Claims Objection Bar Date.

### 2.    Disallowance of Claims

To the maximum extent provided by section 502(d) of the Bankruptcy Code, all Claims of any Entity from which property is recoverable by the Post-Effective Date Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Post-Effective Date Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and Post-Effective Date CMTSU LLC on the other hand, agree or it has been determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

### 3.    Amendments to Claims

After the Confirmation Date, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, Order, or approval of the Bankruptcy Court; provided, that such Holder may amend the Claim Filed solely to decrease, but not to increase, the amount, number, or priority of such Claim, unless otherwise provided by the Bankruptcy Court.

G.    *Settlement, Release, Injunction, and Related Provisions*

1.    <u>Compromise and Settlement of Claims, Interests, and Controversies</u>

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements embodied in the Plan and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties in interest, and are fair, equitable, and within the range of reasonableness.  The Plan and the Confirmation Order shall have res judicata, collateral estoppel, and estoppel (judicial, equitable, or otherwise) effect with respect to all matters provided for, or resolved pursuant to, the Plan and/or the Confirmation Order, including, without limitation, the release, injunction, exculpation, and compromise provisions contained in the Plan and/or the Confirmation Order.  The provisions of the Plan, including, without limitation, its release, injunction, exculpation, and compromise provisions, are mutually dependent and non-severable.

2.    <u>Release of Liens</u>

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made to Holders of Claims and Interests pursuant to Article III.B of the Plan, including, for the avoidance of doubt, the satisfaction in full of the portion of a Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert or otherwise transfer to the Debtors or the Post-Effective Date Debtors, as applicable, and their successors and assigns.

3.    <u>Subordinated Claims</u>

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, except to the extent that any Claim or Interest has been Allowed pursuant to this Plan or prior Order of the Bankruptcy Court, the Debtors reserve the right for the Debtors or the Post-Effective Date Debtors, as applicable, to re-

ny-1292331

classify, upon approval by the Bankruptcy Court following notice and a hearing, any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

4. <u>Debtors' Release</u>

ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY SHALL BE EXPRESSLY, UNCONDITIONALLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY RELEASED, ACQUITTED AND DISCHARGED BY THE DEBTORS ON BEHALF OF THEMSELVES, THEIR RESPECTIVE ESTATES, AND THE POST-EFFECTIVE DATE DEBTORS (SUCH THAT THE POST-EFFECTIVE DATE DEBTORS SHALL NOT HOLD ANY CLAIMS OR CAUSES OF ACTION RELEASED PURSUANT TO ARTICLE VIII.D OF THE PLAN), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, FROM ANY AND ALL ACTIONS, CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, ANY OF THE DEBTORS' PRESENT OR FORMER ASSETS, THE RELEASED PARTIES' INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE PLAN, THE DISCLOSURE STATEMENT, THE SALE TRANSACTION, THE BIDDING AND SALE PROCESS FOR THE DEBTORS' ASSETS, THE PURCHASE AGREEMENT, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING OF CLAIMS OR INTERESTS UNDERTAKEN PRIOR TO THE EFFECTIVE DATE, INCLUDING THOSE THAT THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES, EXCEPT FOR ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE FOREGOING "DEBTORS' RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTORS OR THEIR CHAPTER 11 ESTATES AGAINST A RELEASED PARTY ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTORS' RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, *AND*, *FURTHER*, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE

70

DEBTORS' RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTORS' RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR AGAINST ANY OF THE DEBTORS' ESTATES OR THE POST-EFFECTIVE DATE DEBTORS ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTORS' RELEASE.

    5.    <u>Third Party Release</u>

ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE RELEASING PARTIES SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, AND INDIVIDUALLY AND COLLECTIVELY, RELEASED AND ACQUITTED THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY (INCLUDING THE RELEASED PARTIES' PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, AFFILIATES, MANAGED ACCOUNTS OR FUNDS, CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, MEMBERS, PARTNERS (GENERAL AND LIMITED), EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITIES AS SUCH) FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, THAT SUCH RELEASING PARTIES (WHETHER INDIVIDUALLY OR COLLECTIVELY) EVER HAD, NOW HAVE OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, ANY OF THE DEBTORS' PRESENT OR FORMER ASSETS, THE RELEASED PARTIES' INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE PLAN, THE DISCLOSURE STATEMENT, THE SALE TRANSACTION, THE BIDDING AND SALE PROCESS FOR THE DEBTORS' ASSETS, THE PURCHASE AGREEMENT, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING OF CLAIMS OR INTERESTS UNDERTAKEN PRIOR TO THE EFFECTIVE DATE, INCLUDING THOSE THAT THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES, EXCEPT FOR (I) ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND (II) THE RIGHT TO RECEIVE DISTRIBUTIONS FROM THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS

ON ACCOUNT OF AN ALLOWED CLAIM OR ALLOWED INTEREST AGAINST THE DEBTORS PURSUANT TO THE PLAN.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE PLAN, IN NO EVENT SHALL AN ENTITY THAT MAKES THE THIRD PARTY OPT- OUT ELECTION IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER BE A RELEASING PARTY.  FOR THE AVOIDANCE OF DOUBT, AMONG OTHERS, ANY HOLDER OF A CLAIM OR INTEREST THAT DOES NOT MAKE THE THIRD PARTY OPT-OUT ELECTION IS A RELEASING PARTY.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, *AND*, *FURTHER*, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE, INCLUDING ANY CLAIMS FOR INDEMNITY OR CONTRIBUTION RELATING TO SUCH RELEASED CLAIMS.

FOR THE AVOIDANCE OF DOUBT, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE DISCLOSURE STATEMENT, PLAN OR CONFIRMATION ORDER, NO PROVISION SHALL (I) PRECLUDE THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS POLICE OR REGULATORY POWERS AND (II)(X) RELEASE ANY NONDEBTOR FROM LIABILITY IN CONNECTION WITH ANY LEGAL ACTION OR CLAIM BROUGHT BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR (Y) ENJOIN, LIMIT, IMPAIR, OR DELAY THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM BRINGING OR CONTINUING ANY ACTION AGAINST ANY NONDEBTOR IN ANY FORUM.

6.    Exculpation

The Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the liquidation of the Debtors, including the bidding and sale process for the Debtors' assets.  Without limiting the foregoing "Exculpation" provided under Article VIII.F of the Plan, the rights of any Holder of a Claim or Interest to enforce rights arising under the Plan shall be preserved, including the right to compel payment of distributions in accordance

with the Plan; <u>provided</u>, that the foregoing "Exculpation" shall have no effect on the liability of any Entity solely to the extent resulting from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; <u>provided</u>, <u>further</u>, that each Exculpated Party shall be entitled to assert any affirmative defenses, including reliance upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

7. <u>Injunction</u>

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT:  (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OF THE PLAN; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.E OF THE PLAN; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.F OF THE PLAN; OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM:  (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH ENTITY HAS TIMELY

ASSERTED SUCH SETOFF OR SUBROGATION RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; <u>PROVIDED</u>, THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN OR THE SALE ORDER; <u>PROVIDED, FURTHER</u>, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

8.    <u>Waiver of Statutory Limitations on Releases</u>

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER ARTICLE VIII OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY.  THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

9.    <u>Setoffs</u>

Except as otherwise provided in the Plan, prior to the Effective Date, the Debtors, and on and after the Effective Date, the Post-Effective Date Debtors, pursuant to the Bankruptcy Code (including sections 553 and 558 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim on account of any Proof of Claim or other pleading Filed with respect thereto prior to the Confirmation Hearing and the distributions to be made pursuant to the Plan on account of such Allowed Claim

(before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtors' Estates may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Post-Effective Date Debtors, as applicable, of any such claims, rights, and Causes of Action that the Debtors' Estates may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any claim, right, or Cause of Action of the Debtors' Estates unless such Holder has timely Filed a Proof of Claim (including any Proof of Claim timely Filed by the Governmental Bar Date) with the Bankruptcy Court expressly preserving such setoff; provided, that nothing in the Plan shall prejudice or be deemed to have prejudiced the Debtors' or the Post-Effective Date Debtors' right to assert that any Holder's setoff rights were required to have been asserted by motion or pleading filed with the Bankruptcy Court prior to the Effective Date, or any such Holder's right to assert that there was no such requirement.

H.    *Conditions Precedent to the Effective Date of the Plan*

1.    Conditions Precedent to the Effective Date of the Plan

The Plan shall not become effective unless and until each of the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

a.    the Bankruptcy Court shall have approved by Final Order a disclosure statement with respect to this Plan;

b.    the Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with the Plan; and

c.    the Confirmation Order shall be effective and shall not be subject to any stay, whether or not such Confirmation Order shall have become a Final Order.

2.    Waiver of Conditions

The conditions precedent to the Effective Date of the Plan set forth in Article IX.A of the Plan may be waived by the Debtors, in consultation with the Committee, in their reasonable discretion without notice, leave or Order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.  The Debtors shall promptly file a notice with the Bankruptcy Court to reflect such a waiver, including identifying the specific condition(s) subject to such waiver.

3.    Effect of Non-Occurrence of the Effective Date

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (c) constitute an

admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.

I.    *Modification, Revocation, or Withdrawal of the Plan*

1.    <u>Modification and Amendments</u>

Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X.A of the Plan.

2.    <u>Effect of Confirmation on Modifications</u>

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.    <u>Revocation or Withdrawal of the Plan</u>

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

J.    *Retention of Jurisdiction*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

- decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

- resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Obligations pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Post-Effective Date Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article X.A of the Plan, any Executory Contracts or Unexpired Leases set forth on the Contract Assumption Schedule; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

- ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

- adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

- enter and implement such Orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

- enter and enforce any Order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

- resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

- issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.E.1 of the Plan;

- enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

- determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

- adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

- consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Order of the Bankruptcy Court, including the Confirmation Order;

- determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

- hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- enforce all Orders previously entered by the Bankruptcy Court;

- hear any other matter not inconsistent with the Bankruptcy Code; and

- enter an Order concluding or closing the Chapter 11 Cases.

ny-1292331

K.    *Miscellaneous Provisions*

1.    Additional Documents

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, on or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, all Holders of Claims or Interests receiving distributions pursuant to the Plan, and all other parties in interest shall prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

2.    Dissolution of Committee

On the Effective Date, the Committee shall dissolve and members thereof shall be compromised, settled, and released from all rights and duties from or related to the Chapter 11 Cases, except the Committee will remain intact solely with respect to the preparation, filing, review, objection, and resolution of applications for Professional Fee Claims or Committee Member expense claims.  The Debtors and the Post-Effective Date Debtors shall have no obligation to pay any fees or expenses incurred after the Effective Date by the Committee Members, except for fees and expenses incurred in connection with any objection to applications for Professional Fee Claims and/or Committee Member expense claims.

3.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

4.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

5.    Service of Documents

Any pleading, notice, or other document required by the Plan to be served on or delivered to the following parties shall be served via first class mail, overnight delivery, or messenger on:

If to the Debtors or the Post-Effective Date Debtors, to:

CMTSU Liquidation, Inc.
7900 East Union Avenue

ny-1292331

Suite 1100
Denver, Colorado 80237
Attn: Jon Goulding, Chief Restructuring Officer

with copies to:

Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Attn: Brett H. Miller, Esq., Dennis L. Jenkins, Esq., Todd M. Goren, Esq., and Daniel J. Harris, Esq.

If to the Committee, to:

Perkins Coie LLP
30 Rockefeller Plaza, 22nd Floor
New York, New York 10019
Attn: John D. Penn, Esq., Schuyler G. Carroll, Esq., and Tina N. Moss, Esq.

6.      <u>Term of Injunctions or Stays</u>

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any Order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect to the maximum extent permitted by law. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

7.      <u>Entire Agreement</u>

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

8.      <u>Nonseverability of Plan Provisions</u>

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the

80

Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (c) nonseverable and mutually dependent.

9.      Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

## ARTICLE VI.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

A.      *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of a plan. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on November 15, 2017 at 10:00 a.m., prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge for the District of Delaware, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 5th Floor, Courtroom #4, Wilmington, Delaware. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Bankruptcy Court (contemporaneously with a proof of service) and served upon the following notice parties so as to be actually received on or before November 1, 2017 at 4:00 p.m., prevailing Eastern Time:

| Counsel to the Debtors | |
|---|---|
| **Morrison & Foerster  LLP**<br>Brett H. Miller<br>Dennis L. Jenkins<br>Todd M. Goren<br>Daniel J. Harris<br>250 West 55th Street<br>New York, New York 10019 | **Polsinelli PC**<br>Christopher A. Ward<br>Justin K. Edelson<br>222 Delaware Avenue, Suite 1101<br>Wilmington, Delaware 19801 |
| **Counsel to the Committee** | |
| **Perkins Coie LLP**<br>John D. Penn<br>Schuyler G. Carroll<br>Tina N. Moss<br>30 Rockefeller Plaza, 22nd Floor<br>New York, New York 10019 | **Shaw Fishman Glantz & Towbin LLC**<br>Thomas M. Horan<br>300 Delaware Avenue, Suite 1370<br>Wilmington, Delaware 19801 |
| **U.S. Trustee** | |
| Office of the United States Trustee<br>844 King Street, Suite 2207<br>Wilmington, Delaware   19801<br>Attn: Timothy J. Fox, Jr. | |

B.    *Confirmation Standards*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

1.    <u>Feasibility</u>

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that Confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan.  This condition is often referred to as the "feasibility" of the Plan.  The Debtors believe that the Plan satisfies this requirement.

The Plan provides for the liquidation and distribution of the Debtors' assets.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

ny-1292331

2.      Best Interests Test

The "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan that each holder of impaired claims or impaired interests receive property with a value not less than the amount such holder would receive in a liquidation carried out under chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims and Allowed Interests under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established by the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  Unsecured creditors are paid from any remaining liquidation proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid in full.

Substantially all of the Debtors' assets were liquidated through the Sale Transaction in accordance with the Purchase Agreement.  Although the Plan effects a liquidation of the Debtors' remaining assets and a chapter 7 liquidation would achieve the same goal, the Debtors believe that Confirmation of the Plan will result in a greater recovery for Holders of Allowed Claims and Allowed Interests in Classes 3 and 4 than would result from a chapter 7 liquidation. This is due in part to the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense that would be incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' assets and liabilities. Finally, the conversion to chapter 7 would require entry of a new bar date.  *See* Fed. R. Bankr. P. 1019(2); 3002(c).  Thus, the amount of Claims ultimately Filed and Allowed against the Debtors' Estates could materially increase, thereby reducing creditor recoveries.

The Debtors do not believe that the Plan will result in expenses that would not exist in a chapter 7 liquidation.  Although the Plan proposes to give the Debtors' Board Members Allowed General Unsecured Claims and Allowed Administrative Claims relating to the Debtors' obligations under the Indemnity Provisions, the Debtors believe that this treatment is comparable to what would be realized in a chapter 7 liquidation.  In addition, the Debtors do not believe that the Post-Effective Date Debtors will incur any non-trivial compliance costs.  Because the Interests in CMTSU Liquidation, Inc. are no longer traded on an exchange, the Debtors anticipate that the cost of complying with SEC reporting obligations will be *de minimis*.

The information contained in the Liquidation Analysis attached hereto as **Exhibit C** compares the anticipated recoveries under the Plan and the recoveries that could be expected in a hypothetical chapter 7 liquidation.  As reflected in the Liquidation Analysis, and for the reasons

83

outlined above, the Debtors believe that a hypothetical chapter 7 liquidation would result in reduced recoveries for Holders of Allowed Claims and Allowed Interests in Classes 3 and 4.

C.      *Alternative Plans*

The Debtors do not believe that there are any alternative plans for the reorganization or liquidation of the Debtors' Estates. The Debtors believe that the Plan, as described therein, enables Holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

D.      *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, that except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan, among other things: (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (2) cures any default, reinstates the original terms of such obligation, and compensates the applicable party in question.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class that are entitled to vote on the plan, but for that purpose counts only those who actually vote to accept or to reject a plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number entitled to vote and actually voting cast their Ballots in favor of acceptance, subject to Article III of the Plan.

Only Holders of Claims in Class 3 will be entitled to vote on the Plan.

Article III.F of the Plan provides in full: "If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request that the Bankruptcy Court deem the Plan accepted by the Holders of such Claims or Interests in such Class." Such "deemed acceptance" by an impaired class in which no class members submit ballots satisfies section 1129(a)(10) of the Bankruptcy Code. *See In re Tribune Co.*, 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("Would 'deemed acceptance' by a non-voting impaired class, in the absence of objection, constitute the necessary 'consent' to a proposed 'per plan' scheme? I conclude that it may." (footnote omitted)); *see In re Adelphia Commc'ns Corp.*, 368 B.R. 14, 259–63 (Bankr. S.D.N.Y. 2007).

ny-1292331

E.    *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan if it is accepted by at least one impaired voting class even if other impaired voting classes vote to reject it.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

1.    No Unfair Discrimination

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of Classes of Claims of equal rank (*e.g.*, classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for nonconsensual Confirmation.

2.    Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Interests in such Class.

a.    *Secured Claims*

A plan is "fair and equitable" with respect to a non-accepting class of secured creditors if either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

b.    *Unsecured Claims*

A plan is "fair and equitable" with respect to a non-accepting class of unsecured creditors if either: (i) the plan provides that each holder of a claim in such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the

allowed amount of such claim; or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

      c.    *Equity Interests*

A plan is "fair and equitable" with respect to a non-accepting class of equity interests if: (i) the plan provides that each holder of an interest in such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

## ARTICLE VII.

## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.    *Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims and Allowed Interests Under the Plan*

    1.    <u>The Amount of Allowed Claims May Adversely Affect Recoveries</u>

The Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed, and thus the projected recoveries disclosed in this Disclosure Statement are highly speculative. A large amount of Allowed Claims may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims and Allowed Interests under the Plan. Depending on the accuracy of the Debtors' various assumptions, even those Holders entitled to a recovery under the terms of the Plan may ultimately receive no recovery.

    2.    <u>The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims and Allowed Interests</u>

The Debtors cannot know with certainty, at this time, the number or amount of Claims that will ultimately be Allowed. Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims and Allowed Interests.

3.     Any Valuation of the Post-Effective Date Debtors' Assets is Speculative and Could Potentially Be Zero

A portion of the Cash to be distributed to Holders of Allowed Claims and Allowed Interests under the Plan is expected to come from the liquidation of the Post-Effective Date Debtors' Assets.  Any valuation of these assets is necessarily speculative, and the value of such assets could potentially be zero.  Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Holders of Claims and Interests.

4.     The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries

Although the Debtors have made commercially reasonable efforts to disclose projected recoveries in this Disclosure Statement, it is possible that the amount of Allowed Claims will be materially higher than any range of possible Allowed Claims the Debtors have considered to date, and thus recoveries could be materially reduced or eliminated.  In addition, the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim or Allowed Interest.

5.     Certain Tax Implications of the Debtors' Chapter 11 Cases

Holders of Allowed Claims and Allowed Interests should carefully review Article VIII of this Disclosure Statement, "Certain United States Federal Income Tax Consequences," for a description of certain tax implications of the Plan and the Chapter 11 Cases.

B.     *Certain Bankruptcy Law Considerations*

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of Class 3 to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in Class 3.

1.     Parties in Interest May Object to the Plan's Classification of Claims and Interests or the Amount of Such Claims or Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim or Interest.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is or may be subject to an objection or is not yet Allowed.  Any Holder of a

Claim or Interest that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

2.     <u>Failure to Satisfy Vote Requirements</u>

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind down the Estates, such as, among other things, an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, or conversion to cases under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

3.     <u>The Debtors May Not Be Able to Secure Confirmation of the Plan</u>

The Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation Procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests. The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

ny-1292331

4.      <u>Nonconsensual Confirmation</u>

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class of claims has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes.

Here, since Class 3 is the only Class of Claims that is impaired under the Plan, the Plan cannot be confirmed if Class 3 does not vote to accept the Plan.  However, the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation with respect to Class 4 (Interests in CMTSU Liquidation, Inc.).  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

5.      <u>Risk of Nonoccurrence of the Effective Date</u>

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur.

6.      <u>Contingencies May Affect the Votes of Class 3 to Accept or Reject the Plan</u>

The distributions available to Holders of Allowed Claims and Allowed Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be Allowed.  The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by Class 3 to accept or reject the Plan or require any sort of revote by Class 3.

C.      *Disclosure Statement Disclaimer*

1.      <u>The Financial Information Contained in this Disclosure Statement Has Not Been Audited</u>

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2.      <u>Information Contained in this Disclosure Statement Is for Soliciting Votes</u>

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      <u>This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission</u>

This Disclosure Statement was not Filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained in this Disclosure Statement.

4.      <u>This Disclosure Statement May Contain Forward Looking Statements</u>

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The information contained herein is an estimate only, based upon information currently available to the Debtors.

5.      <u>No Legal or Tax Advice is Provided to You by this Disclosure Statement</u>

***This Disclosure Statement is not legal advice to you***.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6.      <u>No Admissions Made</u>

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

7.      <u>Failure to Identify Projected Objections</u>

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Post-Effective Date Debtors, as applicable, may object to Claims or Interests

after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies objections to such Claims or Interests.

8.      No Waiver of Right to Object or to Recover Transfers and Assets

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

9.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.      No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

D.      *Liquidation Under Chapter 7*

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be elected or

appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

## ARTICLE VIII.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of implementation of the Plan to the Debtors and certain Holders of Claims and Interests.  This discussion is intended for general information purposes only, and is not a complete analysis of all potential U.S. federal income tax consequences that may be relevant to the Debtors or any particular Holder.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "IRC") and the Treasury Regulations promulgated thereunder, judicial decisions and published administrative rulings, and pronouncements of the Internal Revenue Service (the "IRS"), each as in effect on the date hereof.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the discussion set forth below with respect to the U.S. federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences described herein.

Except as otherwise set forth herein, this discussion does not address the U.S. federal income tax consequences to (a) Holders of Claims that (i) are Unimpaired or will otherwise receive payment in full in Cash on the Effective Date, or (ii) are otherwise not entitled to vote under the Plan; or (b) Holders of Interests in CMTSU Liquidation 2, Inc.  The discussion assumes that each Holder of a Claim or an Interest holds only Claims or Interests in a single Class.

The U.S. federal income tax consequences of the Plan are complex and are subject to substantial uncertainties.  The discussion set forth below of certain U.S. federal income tax consequences of the Plan is not binding upon the IRS.  Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a position different from any discussed herein, resulting in U.S. federal income tax consequences to the Debtors and/or Holders of Claims or Interests that are substantially different from those discussed herein.  The Debtors have not requested and does not expect to request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan, and no opinion is given by this Disclosure Statement.

This discussion does not apply to a Holder of a Claim or Interest that is not a "United States person," as such term is defined in the IRC.  Moreover, this discussion does not address U.S. federal taxes other than income taxes, nor any state, local, U.S. possession, or non-U.S. tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to United States persons in light of their individual circumstances or to United States persons that may be subject to special tax rules, such as persons who are related to the Debtors within the meaning of the IRC, governments or governmental entities, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business

investment companies, regulated investment companies, real estate mortgage investment conduits, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, Subchapter S corporations, employees of the Debtors, persons who received their Claims as compensation, persons that hold Claims or Interests as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark to market method of accounting, and Holders of Claims or Interests that are themselves in bankruptcy. If a partnership or entity treated as a partnership for U.S. federal income tax purposes holds Claims or Interests, the tax treatment of a partner generally will depend on the status of the partner and the activities of the partnership.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR AN INTEREST. THIS SUMMARY IS LIMITED TO THE U.S. FEDERAL INCOME TAX ISSUES ADDRESSED IN THIS DISCLOSURE STATEMENT. ADDITIONAL ISSUES MAY EXIST THAT ARE NOT ADDRESSED IN THIS SUMMARY AND THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF CONSUMMATION OF THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, U.S. POSSESSION INCOME, NON-U.S. INCOME, ESTATE, GIFT, AND OTHER TAX CONSEQUENCES OF THE PLAN.

A.    *Certain United States Federal Income Tax Consequences to the Debtors*

1.    General

For U.S. federal income tax purposes, CMTSU Liquidation, Inc. and CMTSU Liquidation 2, Inc. are members of a consolidated group of corporations of which CMTSU Liquidation, Inc. is the common parent. CMTSU Liquidation 3, LLC is wholly owned by CMTSU Liquidation, Inc. and is treated as a disregarded entity for U.S. federal income tax purposes. As a result, for U.S. federal income tax purposes, each of the Debtors are currently either (a) a member of an affiliated group of corporations of which CMTSU Liquidation, Inc. is the common parent; or (b) a disregarded entity with CMTSU Liquidation, Inc. as its sole owner (collectively, the "Tax Group"). For U.S. federal income tax purposes, the Tax Group has significant consolidated net operating losses ("NOLs").[21]

2.    Post-Effective Date CMTSU LLC

On the Effective Date, for the limited purpose of implementing the Plan and winding down the business and affairs of the Debtors and the Post-Effective Date Debtors, the Manager shall have sole management and governance responsibility of Post-Effective Date CMTSU LLC. However, other than receiving professional compensation for its services, the Manager shall not have any economic interest in Post-Effective Date CMTSU LLC. Under this arrangement, it is unclear whether the Manager would be treated as a member of Post-Effective Date CMTSU LLC

---

[21] According to Ciber's Schedules of Assets and Liabilities [Docket No. 212], the Debtors estimated that Ciber had federal NOLs of approximately $102.23 million that are available to offset future taxable income. The Plan was structured to preserve the NOLs, subject to the risks noted herein.

93

for U.S. federal income tax purposes and it is unclear whether as a result Post-Effective Date CMTSU LLC would be treated as a partnership for U.S. federal income tax purposes. Such determination depends on all the facts and circumstances. The Debtors intend to treat Manager as not being a member of CMTSU LLC for U.S. federal income tax purposes and intend to treat Post-Effective Date CMTSU LLC as a disregarded entity for U.S. federal income tax purposes because the Manager's sole management and governance power is limited to only implementing the Plan and winding down the business and affairs of the Debtors and the Post-Effective Date Debtors and the Manager does not share in the profits and losses of Post-Effective Date CMTSU LLC beyond its professional compensation. There can be no assurance that the IRS would not be successful if it sought to treat Manager as a member of Post-Effective Date CMTSU LLC for U.S. federal income tax purposes and as a result to treat Post-Effective Date CMTSU LLC as a partnership for U.S. federal income tax purposes. If CMTSU LLC were so treated, the Post-Effective Date CMTSU Inc. may be limited in its ability to use its existing NOLs.

3.    Transfer of Post-Effective Date Debtors' Assets to Post-Effective Date CMTSU LLC and Liquidation of CMTSU Liquidation 2, Inc.

Pursuant to the Plan, all the rights, title, and interests in the Post-Effective Date Debtors' Assets are transferred to Post-Effective Date CMTSU LLC.  Assuming that Post-Effective Date CMTSU LLC is properly treated as a disregarded entity, such transfer, assignment and delivery by each of the Debtors on the Effective Date to Post-Effective Date CMTSU LLC should not result in any gain or loss recognition to the Debtors for U.S. federal income tax purposes. Either no gain or loss should be recognized or any gain or loss should be deferred by Post-Effective Date CMTSU Inc. on the receipt of property distributed in complete liquidation of CMTSU Liquidation 2, Inc. on the Effective Date.

4.    Cancellation of Debt

In general, the IRC provides that a debtor in a bankruptcy case must reduce certain of its tax attributes—including NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets (but not below the amount of liabilities to which the debtor remains subject)—by the amount of any cancellation of debt ("COD") incurred pursuant to a confirmed chapter 11 plan. The amount of COD incurred for U.S. federal income tax purpose is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor.  Certain statutory or judicial exceptions may apply to limit the amount of COD incurred. If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Where the borrower joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced. Any reduction in tax attributes in respect of COD incurred does not occur until the end of the taxable year after such attributes have been applied. As a result, any income incurred on the Effective Date in connection with the implementation of the Plan, or prior to the end of such taxable year, generally could be offset by any NOL carryforwards or current year NOLs of the Tax Group prior to any attribute reduction on account of any COD incurred, but subject any ownership change limitation.

94

5.    IRC Section 382

Under section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its pre-change losses (including certain losses or deductions which are "built-in," i.e., economically accrued but unrecognized, as of the date of the ownership change) that may be utilized to offset future income generally are subject to an annual limitation.  It is unclear whether the implementation of the Plan would result in an ownership change of the Debtors.  Such determination depends, in part, on the treatment of the Interests of Post-Effective Date CMTSU Inc. as "stock" for purposes of Section 382.  The Debtors intend to treat the Interests of Post-Effective Date CMTSU Inc. as "stock" because although the Sole Officer and Director of Post-Effective Date CMTSU Inc. is appointed pursuant to the Plan, such Sole Officer and Director can be removed by a vote of the Interest Holders of Post-Effective Date CMTSU Inc.  There can be no assurance, however, that the IRS would not be successful if it sought to recharacterize the Interests of Post-Effective Date CMTSU Inc. as not "stock" because, for example, it lacked certain voting rights of a "stock". In that case, the NOL available to Post-Effective Date CMTSU Inc. could be subject to the annual limitation imposed by section 382 of the IRC with the result that its U.S. federal income tax liability could be materially higher than without such limitation.

B.    *Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims in Class 3 and Allowed Interests in Class 4*

1.    Consequences to Holders of Allowed Claims in Class 3

The U.S. federal income tax consequences to a Holder receiving, or entitled to receive, a payment in partial or total satisfaction of a Claim will depend on a number of factors, including the nature of the Claim, the Holder's method of tax accounting, and its own particular tax situation.

Because the Holders' Claims and tax situations differ, Holders should consult their own tax advisors to determine how the Plan affects them for U.S. federal, state, local, and non-U.S. tax purposes, based on their particular tax situations.  Among other things, the U.S. federal income tax consequences of a payment to a Holder may depend initially on the nature of the original transaction pursuant to which the Claim arose.

The U.S. federal income tax consequences of a transfer to a Holder may also depend on whether the item to which the payment relates has previously been included in the Holder's gross income or has previously been subject to a loss or a worthless security or bad debt deduction. For example, if a payment is made in satisfaction of a receivable acquired in the ordinary course of a Holder's trade or business, the Holder had previously included the amount of such receivable payment in its gross income under its method of tax accounting, and had not previously claimed a loss or a worthless security or bad debt deduction for that amount, the receipt of the payment should not result in additional income to the Holder but may result in a loss.  Conversely, if the Holder had previously claimed a loss or worthless security or bad debt deduction with respect to the item previously included in income, the Holder generally would be required to include the amount of the payment in income.

A Holder receiving a payment pursuant to the Plan in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (a) the amount of Cash, and (b) its adjusted tax basis in the Claim.  For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item.  The character of any income or loss that is recognized will depend upon a number of factors, including the status of the Holder, the nature of the Claim in the Holder's hands, whether the Claim was purchased at a discount, whether and to what extent the Holder has previously claimed a bad debt deduction with respect to the Claim, and the Holder's holding period of the Claim.  Each Holder of the Claim should consult its own tax advisor to determine the character of any gain or loss recognized by such Holder.  It is possible that any loss, or a portion of any gain, realized by a Holder of a Claim may have to be deferred until all of the distributions to such Holder are received.

2.      Consequences to Holders of Allowed Interests in Class 4

Distributions made to Holders of Allowed Interests in Class 4 will generally constitute dividends for U.S. federal income tax purposes to the extent of CMTSU Liquidation, Inc.'s current or accumulated earnings and profits as determined under U.S. federal income tax principles.

To the extent that a Holder of an Allowed Interest in Class 4 receives distributions in excess of CMTSU Liquidation, Inc.'s current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its stock. Any such distributions in excess of the Holder's basis in its stock generally will be treated as capital gain.

3.      Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of an Allowed Claim or Allowed Interest may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded or credited against the Holder's U.S. federal income tax liability to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

The Debtors or the applicable withholding agent will withhold all amounts required by law to be withheld. The Debtors will comply with all applicable reporting requirements of the IRS.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE**

RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, U.S. POSSESSION, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

THE FOREGOING SUMMARY IS PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY.  HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING FEDERAL, STATE, LOCAL, U.S. POSSESSION, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN TO THEM.

## ARTICLE IX.

### RECOMMENDATION OF THE DEBTORS

The Debtors believe that the Plan is in the best interests of all Holders of Claims against and Interests in the Debtors, and urges all Holders of Claims against the Debtors entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by Prime Clerk by the Voting Deadline.

Respectfully Submitted,

Dated:  September 28, 2017

CMTSU LIQUIDATION, INC.
for itself and its Debtor affiliates

By:      */s/* Jon Goulding _____
Name:  Jon Goulding
Title:    Chief Restructuring Officer

Prepared by:

**MORRISON & FOERSTER LLP**
Brett H. Miller (admitted *pro hac vice*)
Dennis L. Jenkins (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
Daniel J. Harris (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921

*Counsel for Debtors and Debtors-in-Possession*

ny-1292331

# **EXHIBIT A**

Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code

SOLICITATION VERSION

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CMTSU Liquidation, Inc., *et al.*,[1] f/k/a CIBER, Inc., *et al.* | Case No. 17-10772 (BLS) |
| Debtors. | Jointly Administered |

---

## DEBTORS' PLAN OF LIQUIDATION PURSUANT
## TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**MORRISON & FOERSTER LLP**
Brett H. Miller (admitted *pro hac vice*)
Dennis L. Jenkins (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
Daniel J. Harris (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921

*Counsel for Debtors and Debtors-in-Possession*

---

[1]  The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

# TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ........................................................................................... **1**
    A.    Defined Terms ....................................................................................................... 1
    B.    Rules of Interpretation ....................................................................................... 12
    C.    Computation of Time ......................................................................................... 13
    D.    Governing Law ................................................................................................... 13
    E.    Reference to Monetary Figures .......................................................................... 13
    F.    Controlling Document ........................................................................................ 13

**ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, PROFESSIONAL FEE CLAIMS, AND U.S. TRUSTEE STATUTORY FEES** ............................................... **13**
    A.    Administrative Claims ........................................................................................ 13
    B.    Priority Tax Claims ............................................................................................ 14
    C.    Professional Fee Claims ..................................................................................... 15
    D.    U.S. Trustee Statutory Fees ............................................................................... 15

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS** ........ **16**
    A.    Summary of Classifications ............................................................................... 16
    B.    Treatment of Classes of Claims and Interests ................................................... 17
    C.    Interest on Allowed Claims ............................................................................... 19
    D.    Special Provision Governing Unimpaired Claims ............................................ 19
    E.    Elimination of Vacant Classes .......................................................................... 20
    F.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ................. 20
    G.    Limited Substantive Consolidation ................................................................... 20

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ................................................ **20**
    A.    Distributions on Account of Allowed Claims and Allowed Interests ................ 20
    B.    Sources of Consideration for Plan Distributions ............................................... 21
    C.    Post-Effective Date Debtors ............................................................................... 21
    D.    Management of the Post-Effective Date Debtors ............................................... 23
    E.    Creation of the Oversight Committee ................................................................ 25
    F.    Standard of Care for Manager, Sole Officer and Director, and Oversight Committee ................ 26
    G.    Creation of Administrative and Priority Claims Reserve .................................. 26
    H.    Creation of Wind Down Reserve ....................................................................... 27
    I.    Creation of General Unsecured Claims Reserve ............................................... 27
    J.    Zayo Settlement ................................................................................................. 27
    K.    D&O Policies ...................................................................................................... 28
    L.    Sale Order; Purchase Agreement ....................................................................... 28
    M.    Wind Down ........................................................................................................ 28
    N.    Cancellation of Securities and Agreements ...................................................... 29
    O.    Corporate Action ............................................................................................... 29
    P.    Effectuating Documents; Further Transactions ................................................ 30
    Q.    Exemption from Certain Taxes and Fees ........................................................... 30
    R.    Causes of Action ............................................................................................... 30
    S.    Post-Effective Date Fees and Expenses ............................................................ 31
    T.    Closing the Chapter 11 Cases ............................................................................ 31

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................... **31**
    A.    Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases ................ 31
    B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ................ 32
    C.    Claims Based on Rejection of Executory Contracts and Unexpired Leases ................ 33
    D.    Purchase Agreement; Assigned Contracts ......................................................... 33
    E.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ................ 33
    F.    Insurance Policies .............................................................................................. 34
    G.    Indemnification Claims ...................................................................................... 34
    H.    Reservation of Rights ......................................................................................... 35

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ..................................................... **35**
    A.    Calculation of Amounts to Be Distributed ........................................................ 35

B.     Disbursing Agent ................................................................................................ 36
C.     Delivery of Distributions and Undeliverable or Unclaimed Distributions ..................................... 36
D.     Compliance with Tax Requirements/Allocations.................................................................. 37
E.     Claims Paid or Payable by Third Parties........................................................................... 38

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS............................................................. 39**
A.     Resolution of Disputed Claims and Interests ..................................................................... 39
B.     Disallowance of Claims ............................................................................................ 41
C.     Amendments to Claims ............................................................................................. 41

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ................ 41**
A.     Compromise and Settlement of Claims, Interests, and Controversies ......................................... 41
B.     Release of Liens .................................................................................................... 42
C.     Subordinated Claims ................................................................................................ 42
D.     Debtors' Release .................................................................................................... 42
E.     Third Party Release ................................................................................................. 43
F.     Exculpation .......................................................................................................... 45
G.     Injunction ............................................................................................................ 45
H.     Waiver of Statutory Limitations on Releases .................................................................... 47
I.     Setoffs .............................................................................................................. 47

**ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE OF THE PLAN .................... 48**
A.     Conditions Precedent to the Effective Date of the Plan ......................................................... 48
B.     Waiver of Conditions ............................................................................................... 48
C.     Effect of Non-Occurrence of the Effective Date ................................................................ 48

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN........................... 48**
A.     Modification and Amendments..................................................................................... 48
B.     Effect of Confirmation on Modifications .......................................................................... 49
C.     Revocation or Withdrawal of the Plan ............................................................................ 49

**ARTICLE XI. RETENTION OF JURISDICTION ............................................................... 49**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................................. 51**
A.     Additional Documents .............................................................................................. 51
B.     Dissolution of Committee .......................................................................................... 51
C.     Reservation of Rights ............................................................................................... 52
D.     Successors and Assigns............................................................................................. 52
E.     Service of Documents .............................................................................................. 52
F.     Term of Injunctions or Stays....................................................................................... 53
G.     Entire Agreement ................................................................................................... 53
H.     Nonseverability of Plan Provisions ............................................................................... 53
I.     Waiver or Estoppel................................................................................................. 53

## INTRODUCTION

The Debtors propose the following *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in Article I hereof. Reference is made to the Disclosure Statement, filed in connection herewith, for a discussion of the Debtors' history, as well as a summary and analysis of the Plan and certain related matters. The Debtors are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.      "*Administrative and Priority Claims Reserve*" means the reserve to be established, maintained, and funded in Cash by Post-Effective Date CMTSU LLC in an amount equal to the Administrative and Priority Claims Reserve Amount pursuant to Article IV.G hereof.

2.      "*Administrative and Priority Claims Reserve Amount*" means (i) on the Effective Date, an amount determined by the Debtors, and (ii) at any time after the Effective Date, an amount determined by the Manager, which amount, in each case, shall be sufficient to pay all accrued but unpaid U.S. Trustee Fees and Priority Claims that are Allowed after the Effective Date to the extent that such Claims have not been paid in full on or before the Effective Date and include reserves for Disputed Priority Claims, amounts needed to fund the ongoing costs and expenses of such reserve, and the payment of taxes, if any.

3.      "*Administrative Claim*" means any Claim for the costs and expenses of the administration of the Debtors' Estates pursuant to sections 503(b) or 507(b) of the Bankruptcy Code to the extent not previously paid, including (a) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the Estates; (b) all U.S. Trustee Fees; (c) any indebtedness or obligations assumed by the Debtors in connection with the conduct of their businesses; and (d) any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code, but excluding Professional Fee Claims.

4.      "*Administrative Claims Objection Bar Date*" means the first Business Day that is one hundred and eighty (180) days after the Effective Date, subject to being extended by Order of the Bankruptcy Court upon motion of the Post-Effective Date Debtors.

5.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.      "*Allowed*" means with respect to Claims: (a) any Claim, proof of which is timely Filed by the applicable Claims Bar Date (or a Claim for which a Proof of Claim is not required to be Filed under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court); (b) any

1

Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided, that with respect to any Claim described in clause (a) above, such Claim shall be considered Allowed only if no objection to the allowance of such Claim has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed and the Claim shall have been Allowed by a Final Order; provided, further, that the Debtors or the Post-Effective Date Debtors, as applicable, may affirmatively determine to allow any Claim notwithstanding the fact that the period within which an objection may be interposed has not yet expired. "*Allowed*" means with respect to Interests, the 82,897,395 shares of common stock of CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.) issued and outstanding, or such other Interests as may be allowed by agreement of the Manager or pursuant to an Order of the Bankruptcy Court. Claims or Interests allowed solely for purposes of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed" hereunder for any other purpose, unless otherwise specified in this Plan or by order of the Bankruptcy Court. Any Claim that is listed in the Schedules as of the Effective Date as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is disallowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or Order of the Bankruptcy Court. "Allow" and "Allowing" shall have correlative meanings.

7.     "*Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation*" means the amended and restated certificate of incorporation for CMTSU Inc., Filed by the Debtors as part of the Plan Supplement and as may be further amended or supplemented by the Debtors in accordance with the Plan prior to the Effective Date.

8.     "*Amended and Restated Post-Effective Date CMTSU Inc. Bylaws*" means the amended and restated bylaws for CMTSU Inc., Filed by the Debtors as part of the Plan Supplement and as may be further amended or supplemented by the Debtors in accordance with the Plan prior to the Effective Date.

9.     "*Amended and Restated Post-Effective Date CMTSU LLC Agreement*" means the amended and restated limited liability company agreement for CMTSU Liquidation 3, LLC, Filed by the Debtors as part of the Plan Supplement and as may be further amended or supplemented by the Debtors in accordance with the Plan prior to the Effective Date.

10.     "*Assigned Contracts*" has the meaning ascribed to such term in the Purchase Agreement.

11.     "*Avoidance Actions*" means any and all actual or potential claims and Causes of Action to avoid or recover a transfer of property or avoid an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547–553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws. Avoidance Actions shall not include any such claims or Causes of Action that were conveyed to the Purchaser in connection with the Sale Transaction.

2

12. "*Ballot*" means a ballot, e-ballot, or master ballot, as applicable, authorized by the Bankruptcy Court pursuant to the Solicitation Procedures Order to indicate acceptance or rejection of the Plan and to opt out of the release provided by Article VIII.E hereof.

13. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as the same may be amended from time to time.

14. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases, or any other court of the United States exercising competent jurisdiction over the Chapter 11 Cases or any proceeding therein.

15. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general rules, Local Bankruptcy Rules, and chambers rules of the Bankruptcy Court.

16. "*Bar Date Order*" means that certain *Order (A) Establishing Bar Dates for Filing Proofs of Claim, (B) Approving the Form and Manner of Notice Thereof, and (C) Granting Related Relief*, entered on May 30, 2017 [Docket No. 294].

17. "*Bid Procedures Order*" means the *Order (I) Establishing Bidding Procedures and Granting Related Relief and (II) Approving the Bid Protections Related to the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Interests*, entered on May 2, 2017 [Docket No. 150].

18. "*Board of Directors*" means the duly-appointed board of directors, respectively, of CMTSU Liquidation, Inc. and CMTSU Liquidation 2, Inc.

19. "*Board Members*" means the members of the Board of Directors.

20. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

21. "*Cash*" means the legal tender of the United States or the equivalent thereof.

22. "*Causes of Action*" means, subject to the releases, exculpations, and injunctions set forth in the Plan, any claim, cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment, and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, including Avoidance Actions, that were property of the Debtors or in which the Debtors held rights as of the Effective Date.

23. "*Chapter 11 Cases*" means the chapter 11 cases commenced by the Debtors on the Petition Date and styled In re CMTSU Liquidation, Inc., *et al*., f/k/a CIBER, Inc., *et al.*, Case No. 17-10772 (BLS), which are currently pending before the Bankruptcy Court.

3

24.     "*Claim*" means a "claim" (as defined in section 101(a)(5) of the Bankruptcy Code) against any of the Debtors.

25.     "*Claims and Noticing Agent*" means Prime Clerk LLC, in its capacity as claims and noticing agent for the Debtors pursuant to 28 U.S.C. § 156(c), and any successor thereto after the Effective Date.

26.     "*Claims Bar Date*" means the bar date by which a Proof of Claim must be or must have been Filed, as established (a) by a Final Order of the Bankruptcy Court, including, without limitation, the Bar Date Order, or (b) pursuant to the Plan.

27.     "*Claims Objection Bar Date*" means the first Business Day that is one hundred and eighty (180) days after the Effective Date, subject to being extended by Order of the Bankruptcy Court upon motion of the Post-Effective Date Debtors.

28.     "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

29.     "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code, as set forth in Article III.B hereof.

30.     "*Class 3 Cash-Out Election*" means the election by a Holder of an Allowed Class 3 Claim to receive Cash in an amount equal to 35% of such Holder's Allowed Class 3 Claim on the Effective Date or as soon as reasonably practicable thereafter.

31.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code pursuant to that certain *Notice of Appointment of Committee of Unsecured Creditors* filed by the U.S. Trustee on April 19, 2017 [Docket No. 87], as amended by the *Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 437] filed by the U.S. Trustee on July 7, 2017.

32.     "*Committee Members*" means all current and former members of the Committee.

33.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

34.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

35.     "*Confirmation Hearing*" means the hearing to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

36.     "*Confirmation Order*" means the Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

37.     "*Consummation*" means the occurrence of the Effective Date.

4

38.     "*Contract Assumption Schedule*" means the list of Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan Filed by the Debtors as part of the Plan Supplement and as may be further amended or supplemented by the Debtors in accordance with the Plan prior to the Effective Date.

39.     "*Cure Obligations*" means: (a) all amounts required to cure any monetary defaults (or such other amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease); and (b) any other obligations required to cure any nonmonetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

40.     "*D&O Policies*" means all insurance policies for liability of any past, present or future Board of Directors and the Debtors' past, present or future members, managers, trustees, directors, and officers, and those persons serving in a functionally equivalent role, either maintained by the Debtors or with ongoing coverage obligations as of the Effective Date, including, but not limited to, any "tail policy."

41.     "*Debtors' Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties other than the Debtors as set forth in Article VIII.D hereof.

42.     "*Debtors*" means CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.), CMTSU Liquidation 2, Inc. (f/k/a Ciber Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a Ciber International LLC).

43.     "*Disbursing Agent*" means Post-Effective Date CMTSU LLC.

44.     "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*, dated September 29, 2017 [Docket No. 665-3], as amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

45.     "*Disputed*" means, with respect to any Claim, any Claim that is not yet Allowed.

46.     "*Distribution Date*" means a date or dates, as determined by the Disbursing Agent, on which the Disbursing Agent makes a distribution, or causes a distribution to be made, of Cash to the Holders of Allowed Claims or Allowed Interests.

47.     "*Distribution Record Date*" means, with respect to any distributions to the Holders of Allowed Claims or Allowed Interests, the date that is fifteen (15) days prior to any such distribution.

48.     "*Effective Date*" means a Business Day as determined by the Debtors on which: (a) the Confirmation Date has occurred; (b) no stay of the Confirmation Order is in effect; and (c) all conditions precedent specified in Article IX hereof have been satisfied or waived.

49.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

5

50. "*Estates*" means the estates created for the Debtors on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

51. "*Exculpated Parties*" means, solely to the extent of the Exculpation, each of (a) the Debtors and any of their respective Related Parties; and (b) the Committee and any of its respective Related Parties.

52. "*Exculpation*" means the exculpation provision set forth in Article VIII.F hereof.

53. "*Executory Contract*" means a contract or lease to which a Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

54. "*Federal Judgment Rate*" means the rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the Effective Date.

55. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Claims and Noticing Agent.

56. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended from time to time, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

57. "*General Unsecured Claim*" means any unsecured Claim that is not a Priority Claim.

58. "*General Unsecured Claims Reserve*" means the reserve established on the Effective Date, or as soon thereafter as practicable, to provide for the payment of Allowed Class 3 Claims, which reserve shall be funded solely with the Cash, if any, held or otherwise owned by Post-Effective Date CMTSU LLC that is not used or otherwise needed to fund fully the Administrative and Priority Claims Reserve and the Wind Down Reserve.

59. "*Governmental Bar Date*" means October 6, 2017, at 5:00 p.m. (prevailing Eastern Time).

60. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

61. "*Holder*" means any Entity holding a Claim or an Interest.

6

62.    "*Impaired*" means, with respect to a Claim or an Interest, or a Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

63.    "*Indemnification Claim*" means any Claim asserted by an Indemnified Person against any of the Debtors arising from the Indemnification Provisions.

64.    "*Indemnification Provisions*" means each of the Debtors' indemnification or advancement provisions currently in place, whether in the Debtors' bylaws, other formation documents, Board of Directors' resolutions, employment contracts for any Indemnified Person, or otherwise contained in an order of the Court.

65.    "*Indemnified Person*" means any Board Member or officer of the Debtors who served in such capacity on or after the Petition Date and such Board Members' and officers' respective Affiliates.

66.    "*Initial Distribution Date*" means the date on which the Disbursing Agent makes initial distributions to Holders of Allowed Claims pursuant to the Plan.

67.    "*Insurance Policies*" means any insurance policies issued at any time to or providing coverage at any time to the Debtors and any agreements or instruments related thereto (including, without limitation, the D&O Policies).

68.    "*Interest*" means any interest, equity, or share in the Debtors, including all options, warrants, or other rights to obtain such an interest or share in the Debtors, whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or membership interests or a similar security, including any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising therefrom.

69.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

70.    "*Law*" means any statute, law, ordinance, ruling, consent decree, permit, policy, rule or regulation of, issued by, or entered into by any Governmental Unit and all judicial or administrative interpretations thereof and any common law doctrine.

71.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

72.    "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Delaware.

73.    "*Manager*" means initially Jon Goulding and any Person that replaces such initial manager in accordance with the Amended and Restated Post-Effective Date CMTSU LLC Agreement and the terms of this Plan.

74.    "*Order*" means any judgment, order, injunction, decree, writ or license issued or entered by or with any Court, Governmental Unit, or arbitrator, whether preliminary, interlocutory or final, including any order entered by the Bankruptcy Court in the Chapter 11 Cases.

75. "*Other Priority Claim*" means a Claim asserting a priority described in section 507(a) of the Bankruptcy Code, other than an Administrative Claim, Professional Fee Claim, or a Priority Tax Claim.

76. "*Oversight Committee*" means the committee of three (3) members created pursuant to Article IV.E of the Plan.

77. "*Oversight Committee Members*" means the members of the Oversight Committee.

78. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

79. "*Petition Date*" means April 9, 2017.

80. "*Plan*" means this *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*, as further amended, supplemented, or otherwise modified from time to time, including the Plan Supplement, which is incorporated in the Plan by reference and made part of the Plan as if set forth in the Plan.

81. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be filed at least fourteen (14) days prior to the Voting Deadline, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including:  (a) the Contract Assumption Schedule; (b) the Amended and Restated Post-Effective Date CMTSU LLC Agreement; (c) the Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation; (d) the Amended and Restated Post-Effective Date CMTSU Inc. Bylaws; (e) the form of engagement letter between the Post-Effective Date Debtors and the initial Manager and Sole Officer and Director; (f) the identities of the initial Oversight Committee Members; (g) a list of the Post-Effective Date Debtors' Retained Causes of Action; and (h) the amount to be reserved in the General Unsecured Claims Reserve on account of the Post-Effective Date Indemnification Claims.

82. "*Post-Effective Date CMTSU Inc.*" means CMTSU Liquidation, Inc., on and after the Effective Date.

83. "*Post-Effective Date CMTSU LLC*" means CMTSU Liquidation 3, LLC, on and after the Effective Date.

84. "*Post-Effective Date Debtors*" means Post-Effective Date CMTSU Inc. and Post-Effective Date CMTSU LLC.

85. "*Post-Effective Date Debtors' Assets*" means, except as otherwise explicitly provided in this Plan, all assets and rights that constitute property of the Debtors' Estates pursuant to section 541 of the Bankruptcy Code, including but not limited to:  (a) all rights with respect to the Insurance Policies and any rights to assert claims with respect to such insurance policies; (b) the Debtors' rights under the Purchase Agreement and any Transaction Document; (c) the Debtors' rights with respect to any Executory Contracts or Unexpired Leases identified on the Contract Assumption Schedule; (d) the Cash remaining in the Debtors' Estates on and after

8

the Effective Date; and (e) the Debtors' rights with respect to the Post-Effective Date Debtors' Retained Causes of Action and any proceeds generated therefrom; provided, however, for purposes of clarification, Post-Effective Date CMTSU Inc. shall continue to hold the Interests in Post-Effective Date CMTSU LLC.

86.     "*Post-Effective Date Debtors' Retained Causes of Action*" means all Claims and Causes of Action of the Post-Effective Date Debtors, including those Claims and Causes of Action listed in the Plan Supplement.

87.     "*Post-Effective Date Indemnification Claims*" means those Allowed Claims set forth in Article V.G.a.iii hereof, which shall constitute General Unsecured Claims for voting purposes.

88.     "*Priority Claims*" means, collectively: (a) Administrative Claims; (b) Priority Tax Claims; (c) Other Priority Claims; and (d) Professional Fee Claims.

89.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

90.     "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claims or Allowed Interests under the Plan.

91.     "*Professional*" means any Entity retained in the Chapter 11 Cases in accordance with sections 327, 328, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 326, 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

92.     "*Professional Fee Claims*" means all Claims for accrued fees and expenses (including success fees) for services rendered and expenses incurred by a Professional from the Petition Date through and including the Effective Date to the extent that such fees and expenses have not been paid or are not disallowed pursuant to an Order of the Bankruptcy Court and regardless of whether a fee application has been filed for such fees and expenses.

93.     "*Professional Fee Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, entered on May 11, 2017, [Docket No. 198].

94.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

95.     "*Purchase Agreement*" means that certain Asset Purchase Agreement, dated as of May 17, 2017, by and between HTC Global Ventures, LLC, as Purchaser and Ciber, Inc. (n/k/a CMTSU Liquidation, Inc.), as Seller, as amended, supplemented, or modified from time to time.

9

96.     "*Purchaser*" means HTC Global Ventures, LLC, together with its successors and permitted assigns.

97.     "*Reinstated*" means rendering a Claim or Interest Unimpaired.

98.     "*Related Parties*" means, with respect to any Person or Entity, any past or present representative, officer, director, agent, attorney, advisor, employee (other than the Debtors' current or former employees), subsidiary or affiliate (other than the Debtors' foreign subsidiaries or affiliates), shareholder, partner (general or limited), member, manager, trustee, executor, predecessor in interest, successor or assign of any such Person or Entity (each solely in their capacities as such).

99.     "*Released Parties*" means: (a) the Debtors; (b) the Debtors' current and former Board Members, officers, and managers; (c) the Committee and the Committee Members (each solely in their capacities as such); and (d) each of the foregoing Entities' respective Related Parties (each solely in their capacities as such); <u>provided</u>, that as a condition to receiving or enforcing any release granted pursuant to Article VIII.E hereof, each Released Party and its Affiliates shall be deemed to have released the Releasing Parties, the Estates, and the Debtors from any and all Claims or Causes of Action arising from or related to their relationship with the Debtors, but not, for the avoidance of doubt, Professional Fee Claims.

100.     "*Releasing Parties*" means (a) the Released Parties and (b) all Holders of Claims or Interests that do not, by the Voting Deadline, make the Third Party Opt-Out Election.

101.     "*Remaining Funds*" means the funds remaining in the General Unsecured Claims Reserve after payment of all Allowed Class 3 Claims and reserving for Disputed Class 3 Claims that may become Allowed until such Claims are withdrawn or disallowed pursuant to a Final Order, each in full in Cash pursuant to the Plan, including any interest payable pursuant to Article III.C hereof.

102.     "*Sale Order*" means the *Order (A) Approving the Sale of Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief*, entered on May 19, 2017 [Docket No. 246].

103.     "*Sale Transaction*" means that certain sale transaction between the Debtors and the Purchaser as set forth in the Purchase Agreement and the Sale Order.

104.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as the same may have been or may be amended, modified, or supplemented from time to time.

105.     "*SEC Inquiry*" means the pending Securities and Exchange Commission inquiry.

106.     "*Secured Claim*" means a Claim: (a) secured by a Lien on property in which the Estates have an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of an Order entered by the Bankruptcy Court, or that is subject to setoff

pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, including Secured Tax Claims; or (b) otherwise Allowed pursuant to the Plan or a Final Order as a Secured Claim.

107.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

108.    "*Sole Officer and Director*" means initially the Manager, appointed to serve as the initial sole officer and director of Post-Effective Date CMTSU Inc. and any Person(s) that replaces such initial sole officer and director pursuant to the Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation, the Amended and Restated Post-Effective Date CMTSU Inc. Bylaws, and the terms of this Plan.

109.    "*Solicitation Date*" means the date upon which the Debtors commenced the solicitation process in accordance with the Solicitation Procedures Order.

110.    "*Solicitation Procedures*" means the solicitation procedures approved by the Solicitation Procedures Order.

111.    "*Solicitation Procedures Order*" means the *Order (A) Approving Disclosure Statement; (B) Establishing Voting Record Date, Voting Deadline, and Other Dates; (C) Approving Procedures For Soliciting, Receiving, and Tabulating Votes on Plan and For Filing Objections to Plan; (D) Approving Manner and Forms of Notice and Other Related Documents; and (E) Granting Related Relief*, entered on September 29, 2017 [Docket No. 667].

112.    "*Subsequent Distribution Date*" means any date following the Initial Distribution Date on which the Manager, in its reasonable discretion, elects to make a distribution to Holders of Allowed Claims or Allowed Interests pursuant to the Plan.

113.    "*Third Party Opt-Out Election*" means (a) with respect to Holders of Claims or Interests that are entitled to vote on the Plan, the item set forth in the Ballots, required to be completed by the Voting Deadline, pursuant to which such Holders may opt out of the releases set forth in Article VIII.E of the Plan, and (b) with respect to Holders of Claims or Interests that are not entitled to vote on the Plan, the item set forth in a separate notice, required to be completed by the Voting Deadline, pursuant to which such Holders may opt out of the releases set forth in Article VIII.E of the Plan.

114.    "*Transaction Documents*" means all documents relating to the Sale Transaction including, but not limited to, any transition services agreement and/or any reverse transition services agreement entered into pursuant to section 8.15 of the Purchase Agreement.

115.    "*Unexpired Lease*" means a lease of nonresidential real property to which a Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

11

116.    "*Unimpaired*" means, with respect to a Claim or an Interest, or a Class of Claims or Interests, "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

117.    "*United States*" means the United States of America and its departments and agencies.

118.    "*U.S. Trustee*" means the Office of the United States Trustee, Region 3, serving the federal judicial district established for the District of Delaware.

119.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

120.    "*Wind Down Reserve*" means the reserve to be established, maintained, and funded in Cash by Post-Effective Date CMTSU LLC in an amount equal to the Wind Down Reserve Amount pursuant to Article IV.H hereof.

121.    "*Wind Down Reserve Amount*" means (i) on the Effective Date, an amount determined by the Debtors, and (ii) at any time after the Effective Date, an amount determined by the Manager, which, in each case, shall be sufficient to pay all actual and estimated fees and expenses relating to the implementation of the Plan and wind down and dissolution of the Debtors and Post-Effective Date Debtors pursuant to the Plan.

122.    "*Zayo*" means Zayo Group, LLC.

123.    "*Zayo Settlement Termination Date*" means December 31, 2017.

124.    "*Zayo Stipulation*" means that stipulation entered into by the Debtors and Zayo filed approved by the Bankruptcy Court [Docket No. 563]

B.    *Rules of Interpretation*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference in the Plan to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified, any reference in the Plan to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented from time to time; (d) unless otherwise specified, all references in the Plan to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or

the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) references to "directors" and/or "officers" shall also include "members" and/or "managers," as applicable, and vice versa, as such terms are defined under the applicable state incorporation and/or limited liability company laws and vice versa; and (k) any immaterial effectuating provisions may be interpreted by the Debtors or the Post-Effective Date Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, Order, or approval of the Bankruptcy Court or any other Entity.

C.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.

D.    *Governing Law*

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to conflict of laws principles.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States, unless otherwise expressly provided in the Plan.

F.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or the Confirmation Order).  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, PROFESSIONAL FEE CLAIMS, AND U.S. TRUSTEE STATUTORY FEES

A.    *Administrative Claims*

Subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors or Post-Effective Date CMTSU LLC agree to less favorable treatment, or such Holder has been paid by the Debtors prior to the Effective Date, Post-Effective Date CMTSU LLC shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash from the Debtors' Estates in full and final satisfaction, settlement,

13

and release of and in exchange for such Holder's Allowed Administrative Claim:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Effective Date Debtors, as applicable; or (d) at such time and upon such terms as set forth in an Order of the Bankruptcy Court; provided, however, that any Administrative Claim that has been assumed by the Purchaser pursuant to the Purchase Agreement shall not be an obligation of the Debtors or the Post-Effective Date Debtors.  "Allowed Administrative Claim" shall not for any purpose under the Plan include interest attributable to or otherwise accrued during any period on or after the Petition Date.

ADMINISTRATIVE CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE.  THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

1.      Administrative Claims Bar Date

Holders of Administrative Claims incurred but unpaid prior to the Effective Date must File and serve such Claims on the Post-Effective Date Debtors within thirty (30) days after the Effective Date or such claims shall be forever barred against the Debtors or their Estates. Objections to the requests for payment of such Administrative Claims must be Filed and served on the Post-Effective Date Debtors and the requesting party on or before the Administrative Claims Objection Bar Date.

2.      Administrative and Priority Claims Reserve

On the Effective Date or as soon as practicable thereafter, the Debtors or Post-Effective Date CMTSU LLC, as applicable, shall fund the Administrative and Priority Claims Reserve in Cash as described in Article IV.G hereof.  Any amounts remaining in the Administrative and Priority Claims Reserve after payment of all Allowed Priority Claims and the U.S. Trustee Fees shall be used by Post-Effective Date CMTSU LLC to make distributions in accordance with the Plan.

B.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and, as applicable, the Debtors or the Post-Effective Date Debtors agree to a less favorable treatment, or such Holder has been paid by the Debtors prior to the Effective Date, in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive payment in Cash in accordance with section 1129(a)(9)(C) of the Bankruptcy Code from Post-Effective Date CMTSU LLC on the Effective Date or as soon as reasonably practicable thereafter.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course

14

of business as such obligations become due.  Any Claims asserted by a Governmental Unit on account of any penalties and assessments shall not be Priority Tax Claims.  On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or Order of the Bankruptcy Court, act, or action under applicable law, regulation, Order or rule, or the vote, consent, authorization, or approval of any Person or Governmental Unit.

PRIORITY TAX CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE.  THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

C.    *Professional Fee Claims*

1.    <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims shall be Filed and served on the Post-Effective Date Debtors no later than the first Business Day that is forty-five (45) days after the Effective Date.  After notice provided in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court Orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

2.    <u>Professional Fee Claims</u>

The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash by Post-Effective Date CMTSU LLC to such Professionals, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by an Order of the Bankruptcy Court, which Order is not subject to a stay.

PROFESSIONAL FEE CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE.  THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

D.    *U.S. Trustee Statutory Fees*

All U.S. Trustee Fees that are due prior to the Effective Date shall be paid in full by the Debtors or Post-Effective Date CMTSU LLC, as applicable, on the Effective Date or as soon as reasonably practicable thereafter.  In accordance with Article IV.M hereof, from and after the Effective Date, Post-Effective Date CMTSU LLC shall pay all U.S. Trustee Fees in Cash for each quarter (including any fraction thereof) from the Administrative and Priority Claims Reserve and, as applicable, to the extent that such fees are based on the disbursements made by the Post-Effective Date Debtors, until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

# ARTICLE III.

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article III.

*A.     Summary of Classifications*

All Claims and Interests, other than Administrative Claims, Priority Tax Claims, and Professional Fee Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distribution under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.     Class Identification

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as set forth below.  To the extent that there are no Holders of Claims or Interests in a particular Class or Classes, such Claims or Interests shall be treated as set forth in Article III.B hereof.

| Class | Claims and Interests | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Interests in CMTSU Liquidation, Inc. | Impaired | Not Solicited[2] |
| 5 | Interests in CMTSU Liquidation 2, Inc. | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[2] Although the votes of Holders of Interests in CMTSU Liquidation, Inc. in Class 4 are not being solicited, each such Holder is entitled to opt out of the "Third Party Release" provision in Article VIII.E of the Plan by timely returning an Opt-Out Form (as defined in the Solicitation Procedures Order) to Prime Clerk.

ny-1288977

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 6 | Interests in CMTSU Liquidation 3, LLC | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |

B.      *Treatment of Classes of Claims and Interests*

Except to the extent that the Debtors or Post-Effective Date CMTSU LLC, as applicable, and a Holder of an Allowed Claim or Allowed Interest, as applicable, agree to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Claim or Allowed Interest.

1.      Class 1—Other Priority Claims

(a)     *Classification:*  Class 1 consists of all Other Priority Claims against the Debtors.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Claim in Class 1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Claim in Class 1, each such Holder shall receive on the Effective Date or as soon as reasonably practicable thereafter, to the extent not already paid by the Debtors prior to the Effective Date, Cash in an amount equal to such Allowed Class 1 Claim.

(c)     *Voting:*  Class 1 is Unimpaired.  Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan with respect to Class 1 Claims.

2.      Class 2—Secured Claims

(a)     *Classification:*  Class 2 consists of all Secured Claims against the Debtors.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Claim in Class 2 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Claim in Class 2, each such Holder shall receive, on the Effective Date or as soon as reasonably practicable thereafter, as the Debtors or Post-Effective Date CMTSU LLC, as applicable, determines:

(i)     payment in full in Cash of such Holder's Allowed Class 2 Claim;

(ii)    the collateral securing such Holder's Allowed Class 2 Claim; or

(iii)   such other treatment rendering such Holder's Allowed Class 2 Claim Unimpaired.

17

(c) *Voting:* Class 2 is Unimpaired. Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan with respect to Class 2 Claims.

3.   Class 3—General Unsecured Claims

(a) *Classification:* Class 3 consists of all General Unsecured Claims against the Debtors.

(b) *Treatment:* Except to the extent that a Holder of an Allowed Claim in Class 3 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Claim in Class 3, each such Holder shall receive its Pro Rata share of Cash in the General Unsecured Claims Reserve; provided, however, that each Holder of an Allowed Class 3 Claim may make the Class 3 Cash-Out Election on such Holder's Class 3 Ballot or upon allowance of such Class 3 Claim; provided, further, that a Holder of a Class 3 Claim shall not be permitted to exercise the Class 3 Cash-Out Election unless such Holder votes to accept the Plan. "Allowed General Unsecured Claim" shall not, except to the limited extent provided in Article III.C hereof, include interest attributable to or otherwise accrued during any period on or after the Petition Date.

(c) *Voting:* Class 3 is Impaired. Therefore, Holders of Class 3 Claims are entitled to vote to accept or reject the Plan with respect to Class 3 Claims.

4.   Class 4—Interests in CMTSU Liquidation, Inc.

(a) *Classification:* Class 4 consists of all Interests in CMTSU Liquidation, Inc.

(b) *Treatment:* Except to the extent that a Holder of an Allowed Interest in Class 4 agrees to a less favorable treatment of its Allowed Interest, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Interest in Class 4, each such Holder shall be entitled to retain such Interests, which shall entitle such Holder to receive its Pro Rata share of Cash, if any, from the Remaining Funds.

(c) *Voting:* Class 4 is Impaired. However, the votes of Holders of Class 4 Interests are not being solicited with respect to Class 4 Interests.

5.   Class 5—Interests in CMTSU Liquidation 2, Inc.

(a) *Classification:* Class 5 consists of all Interests in CMTSU Liquidation 2, Inc.

18

       (b)    *Treatment:*  On the Effective Date, all Interests in CMTSU Liquidation 2, Inc. shall be deemed cancelled, terminated, extinguished, and void.

       (c)    *Voting:*  Class 5 is Impaired.  Holders of Interests in Class 5 are deemed to have rejected the Plan with respect to Class 5 Interests pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan with respect to Class 5 Interests.

   6.    <u>Class 6—Interests in CMTSU Liquidation 3, LLC</u>

       (a)    *Classification:*  Class 6 consists of all Interests in CMTSU Liquidation 3, LLC.

       (b)    *Treatment:*  On the Effective Date, all Interests in CMTSU Liquidation 3, LLC shall be Reinstated.

       (c)    *Voting:*  Class 6 is Unimpaired.  Holders of Interests in Class 6 are deemed to have accepted the Plan with respect to Class 6 Interests pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan with respect to Class 6 Interests.

## C.    *Interest on Allowed Claims*

Unless otherwise specifically provided for in the Plan (including this Article III.C), by applicable law (including, without limitation, section 506(b) of the Bankruptcy Code), or agreed to by, as applicable, the Debtors or the Post-Effective Date Debtors, interest shall not accrue or be paid on any Claim or Interest, and no Holder of any Claim or Interest shall be entitled to interest accruing on and after the Petition Date on account of any Claim or Interest. Notwithstanding the preceding sentence, in the event that the Cash in the General Unsecured Claims Reserve exceeds the sum of all Allowed General Unsecured Claims, excluding any amounts of such Claims attributable to interest accruing on such Allowed Claims on or after the Petition Date, such excess Cash shall be distributed on a Pro Rata basis to the Holders of Allowed General Unsecured Claims on account of any portion of their respective Allowed Claims attributable to interest accruing on or after the Petition Date through the Effective Date, until such interest is paid in full.  All such interest shall accrue at the Federal Judgment Rate, and no other postpetition interest shall be paid in respect of any Allowed General Unsecured Claims. Without limiting the foregoing, interest shall not accrue or be paid on any Claim or Interest after the Effective Date, and except as otherwise provided in this Plan, Holders of Allowed Claims and Allowed Interests shall not be entitled to interest, dividends, or accruals on the distributions regardless of whether such distributions are delivered on or at any time after the Effective Date.

## D.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors, the Post-Effective Date Debtors, or the Debtors' Estates with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

E.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Interests to render such Class of Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.      *Limited Substantive Consolidation*

For purposes of voting, Confirmation, and distributions under the Plan, the Chapter 11 Cases shall be deemed to be one consolidated case as of the Effective Date.  All property of each of the Debtors' Estates shall be deemed to be property of a consolidated Entity consisting of all of the Debtors' Estates.  Each Claim against any of the Debtors will be deemed to be a Claim against a consolidated Entity consisting of all of the Debtors, and any proof of Claim Filed against one or more of the Debtors will be deemed to have been Filed against the consolidated Entity.  All guarantees by one of the Debtors in favor of any of the other Debtors will be eliminated, and all guarantees executed by any of the Debtors in favor of a creditor will be deemed to be a single obligation.  Any and all Claims among or between Debtor entities shall be waived and not entitled to any distribution under the Plan.  Substantive consolidation shall have no effect on valid, enforceable and unavoidable Liens except for Liens that secure a Claim that is eliminated by virtue of substantive consolidation and Liens against collateral that cease to exist by virtue of substantive consolidation.  Substantive consolidation shall not (a) create a Claim in a Class different from the Class in which a Claim would have been placed in the absence of substantive consolidation; (b) change the priority or nature of a Claim in a manner different from the priority or nature of such Claim in the absence of substantive consolidation; (c) affect each Debtors' separate corporate existence or independent ownership of property for any purposes other than for the limited purpose of making distributions under the Plan; or (d) affect any Causes of Action of each of the Debtors.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Distributions on Account of Allowed Claims and Allowed Interests*

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim becomes an Allowed Claim or Allowed Interest, or as soon as

20

reasonably practicable thereafter), each Holder of an Allowed Administrative Claim, Allowed Priority Tax Claim, Allowed Professional Fee Claim, Allowed Secured Claim, Allowed Other Priority Claim, Allowed General Unsecured Claim, and Allowed Interest shall receive distributions under the Plan in full in Cash to the extent not already paid prior to the Effective Date.

B.      *Sources of Consideration for Plan Distributions*

The Plan provides for the distribution of all Cash held by or for the benefit of the Debtors on and after the Effective Date.  In addition to Cash on hand, the Debtors' property consists primarily of: (a) the Debtors' rights under the Purchase Agreement and other Transaction Documents, in each case in accordance with the terms of the Purchase Agreement and any other Transaction Document, as applicable; (b) the Debtors' rights with respect to any Executory Contracts or Unexpired Leases identified on the Contract Assumption Schedule; (c) the Debtors' rights with respect to the Insurance Policies, including the D&O Policies; and (d) the Debtors' rights with respect to the Post-Effective Date Debtors' Causes of Action and any proceeds generated therefrom.

C.      *Post-Effective Date Debtors*

    1.      <u>Vesting and Transfer of Assets</u>

On the Effective Date, pursuant to section 1141 of the Bankruptcy Code, all property of the Estates, and any property acquired by the Debtors during the Chapter 11 Cases, shall vest in the respective Debtors, free and clear of all Claims, Liens, charges, or other encumbrances and Interests except as provided in the Plan and the Confirmation Order.  On the Effective Date, each of the Debtors will assign, convey, and transfer to Post-Effective Date CMTSU LLC, all of their respective right, title, and interest in and to the Post-Effective Date Debtors' Assets (other than, for the avoidance of doubt, the Interests in Post-Effective Date CMTSU LLC, which shall remain with Post-Effective Date CMTSU Inc.).  No Person (other than Post-Effective Date CMTSU LLC) will have any interest, legal, beneficial, reversionary, or otherwise, in the Post-Effective Date Debtors' Assets upon their assignment, conveyance and transfer to Post-Effective Date CMTSU LLC (other than as provided in this Plan).  Value equal to any proceeds or consideration that is obtained by Post-Effective Date CMTSU Inc. through the application or use of the Debtors' tax attributes shall be transferred to Post-Effective Date CMTSU LLC and distributed in accordance with the Plan.  Notwithstanding the foregoing, the Debtors reserve the right to create a new corporate entity to serve as the vehicle through which the Post-Effective Date Debtors will conduct the wind down of their business and affairs in which case all of the Post-Effective Date Debtors' Assets shall be transferred to such entity as described herein and all references to Post-Effective Date CMTSU LLC in the Plan shall instead be deemed to apply to such newly created entity.  Such assignment, conveyance, and transfer to Post-Effective Date CMTSU LLC, and any subsequent assignment, conveyance or transfer of all or any portion of the Post-Effective Date Debtors' Assets, will be exempt from any stamp, transfer, deed, sales, use or other similar tax and will be free and clear of any liens, claims and encumbrances. Without limiting the foregoing, the Confirmation Order shall specifically authorize and order each respective clerk, recorder or other governmental official charged with accepting, filing or

21

recording any instrument of conveyance or transfer to file or record any such document without imposition or collection of any such tax or charge.

2.    General

From and after the Effective Date, the Post-Effective Date Debtors shall continue in existence for purposes of: (a) winding down the Debtors' businesses and affairs as expeditiously and efficaciously as reasonably possible; (b) resolving and making distributions on all Allowed Claims and Allowed Interests; (c) administering the Post-Effective Date Debtors' Assets; (d) filing appropriate tax returns for the Debtors and the Post-Effective Date Debtors, as necessary; (e) dissolving the Debtors and the Post-Effective Date Debtors in accordance with the Plan; (f) administering the Plan in an efficacious manner, with no objective to continue or engage in the conduct of a trade or business; (g)  filing the final monthly report (for the month in which the Effective Date occurs) and any subsequent quarterly reports required under the U.S. Trustee guidelines, and paying all U.S. Trustee Fees from the Effective Date through the date of a final decree closing the Chapter 11 Cases; and (h) maintaining the D&O Policies and transferring or terminating any other insurance policies, as deemed necessary by the Post-Effective Date Debtors in accordance with the terms of the Plan.

In connection with the Post-Effective Date Debtors' Assets, any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity attaching to any documents or communications (in any form, including, without limitation, written, electronic or oral) shall be transferred and shall vest in Post-Effective Date CMTSU LLC.  Post-Effective Date CMTSU LLC's receipt of such privileges associated with the Post-Effective Date Debtors' Assets shall not operate as a waiver of other privileges possessed or retained by the Debtors.  For the avoidance of doubt, the privileges and immunities that shall be transferred and vest in Post-Effective Date CMTSU LLC shall include all privileges and immunities that existed prior to the entry of the Sale Order as related (in any manner) to Causes of Action and objections to any Claims or Interests.

3.    Post-Effective Date CMTSU LLC

On the Effective Date, the limited liability company agreement of Post-Effective Date CMTSU LLC shall be amended and restated in form of the Amended and Restated Post-Effective Date CMTSU LLC Agreement, which shall provide, among other things that, except as set forth herein:  (a) for the limited purpose of implementing the Plan, administering and distributing the Post-Effective Date Debtors' Assets, and winding down the business and affairs of the Debtors and the Post-Effective Date Debtors, all management and governance responsibility of Post-Effective Date CMTSU LLC shall rest solely with the Manager; (b) the Manager shall not have any interest in Post-Effective Date CMTSU LLC; (c) it is the intention of the parties that Post-Effective Date CMTSU LLC shall continue to be treated as a disregarded entity for U.S. federal income tax purposes; and (d) the Manager shall only be replaced for cause as set forth in Article IV.D hereof.

4.      Post-Effective Date CMTSU Inc.

On the Effective Date, the certificate of incorporation and bylaws of CMTSU Liquidation, Inc. shall be amended and restated in the form of the Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation and the Amended and Restated Post-Effective Date CMTSU Inc. Bylaws. Post-Effective Date CMTSU Inc. shall remain in existence until such time as the wind down of the Debtors and the Post-Effective Date Debtors is complete, at which point the Sole Officer and Director shall have the authority to dissolve Post-Effective Date CMTSU Inc. under applicable law and without the necessity of a shareholder vote. On and after the Effective Date, the Sole Officer and Director shall be appointed as the sole officer and director of Post-Effective Date CMTSU Inc., without further Order of the Bankruptcy Court. The Sole Officer and Director shall be vested with the authority granted to him or her pursuant to the Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation and the Amended and Restated Post-Effective Date CMTSU Inc. Bylaws.

5.      Dissolution of CMTSU Liquidation 2, Inc.

On the Effective Date, CMTSU Liquidation 2, Inc. shall be deemed to have dissolved as of the Effective Date.

D.      *Management of the Post-Effective Date Debtors*

Subject to the limitations of this Plan, including the other provisions of this section, the powers of the Manager shall include any and all powers and authority to implement the Plan and to administer and distribute the Post-Effective Date Debtors' Assets and wind down the business and affairs of the Debtors and the Post-Effective Date Debtors, including: (a) liquidating, receiving, holding, and investing, supervising, and protecting the Post-Effective Date Debtors' Assets; (b) commencing, asserting, litigating, and prosecuting any and all Causes of Action; (c) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Post-Effective Date Debtors' Assets; (d) objecting to, resolving and/or making distributions to Holders of Allowed Claims and Allowed Interests from the Post-Effective Date Debtors' Assets as contemplated under the Plan; (e) establishing and maintaining bank accounts in the name of Post-Effective Date CMTSU LLC, including the Administrative and Priority Claims Reserve, the Wind Down Reserve, and the General Unsecured Claims Reserve; (f) employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (g) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (h) maintaining, transferring, or terminating the Insurance Policies; (i) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns and, to the extent applicable, using the Debtors' tax attributes; (j) representing the interests of the Post-Effective Date Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (k) exercising such other powers as may be vested in it pursuant to Order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

Until such time as Holders of Class 3 Claims are paid in full in accordance with the Plan, the Oversight Committee may, as determined by it in good faith, and subject to the approval of

the Bankruptcy Court on notice to the Manager and the Post-Effective Date Debtors, remove the Manager for cause (including any of the following forms of misconduct, whether during Manager's employment by any of the Debtors either before or after the Petition Date): violation of any term of his employment agreement with the Debtors; commission of any felony or of any misdemeanor involving dishonesty or moral turpitude; theft or misuse of the Debtors' property or time; use of alcohol on the Debtors' premises or appearing on such premises while intoxicated; illegal use of any controlled substance; illegal gambling; discriminatory or harassing behavior, whether or not illegal under federal, state or local law; willful misconduct; or falsifying any document or making any false or misleading statement relating to the Manager's employment by any of the Debtors.  If the Manager is removed, the Oversight Committee, in its sole discretion, shall select a replacement Manager who shall serve on an "at will" basis, in the Oversight Committee's sole discretion and on terms and conditions acceptable to both parties.

The Manager may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court, the Oversight Committee, and the Post-Effective Date Debtors.   Any successor Manager shall serve on an "at will" basis, in the Oversight Committee's sole discretion and on terms and conditions acceptable to it, and, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor, and all responsibilities of the predecessor Manager relating to Post-Effective Date CMTSU LLC shall be terminated.

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Manager and the Sole Officer and Director on or after the Effective Date (including taxes) and any reasonable fee and expense reimbursement claims (including attorneys' and advisors' fees and expenses) made by the Manager or the Sole Officer and Director shall be paid in Cash from the Post-Effective Date Debtors' Assets without any further notice to or action, Order, or approval of the Bankruptcy Court.  The Manager shall be authorized to engage counsel and advisors, including, for the avoidance of doubt, Alvarez & Marsal North America, LLC.  The initial Manager and Sole Officer and Director shall be retained on terms consistent with his prepetition engagement.  The form of engagement letter between the Post-Effective Date Debtors and the Manager shall be included in the Plan Supplement.

In executing his duties and responsibilities under the Plan, the Manager and the Sole Officer and Director may rely, and shall be protected from liability in acting upon: (a) any books, records, documents, instruments or papers maintained by the Debtors or the Post-Effective Date Debtors in the ordinary course of business; (b) any instrument, paper, pleading, notice, Order, or other document on file with the Bankruptcy Court that the Manager or the Sole Officer and Director, as applicable, believes to be genuine and signed or presented by the proper party or parties; (c) the advice of counsel; (d) the Plan; or (e) any direction or approval by the Oversight Committee.  Neither the Manager nor the Sole Officer and Director shall be required to give any bond or surety or other security for the performance of its respective duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Manager or the Sole Officer and Director is so otherwise ordered, all costs and expenses of the Manager or the Sole Officer and Director in procuring any such bond or surety shall be paid for with Cash derived from the Post-Effective Date Debtors' Assets.

E.      *Creation of the Oversight Committee*

On the Effective Date, the Oversight Committee shall be formed.  The Oversight Committee shall be comprised of three (3) individuals consisting of: (a) a designee appointed by the Debtors that shall be a creditor; (b) a designee appointed by the Committee; and (c) a designee appointed to represent the Holders of Class 4 Interests.  In the event that an Oversight Committee Member resigns, remaining Oversight Committee Members may, in their discretion, select a replacement Oversight Committee Member.  After all Class 3 Claims have been paid in full in accordance with Article III.B hereof, representatives of the Holders of Class 4 Interests shall select three (3) individuals to serve on the Oversight Committee, and all Oversight Committee Members then serving on the Oversight Committee shall be discharged and shall have no further obligations under the Plan.

The Oversight Committee's authority, duties, and responsibilities shall be:  (a) meeting with the Manager on a periodic basis (as the Oversight Committee and the Manager agree, or as may be requested by the Oversight Committee in its reasonable discretion) regarding the execution of the Manager's duties under the Plan and the status of the same; (b) consulting with the Manager regarding all matters covered by the Plan including (i) the pursuit of Causes of Action against third parties; (ii) objecting to and/or resolving Claims; and (iii) such other matters affecting administration of the Estates as may be agreed upon by the Oversight Committee and the Manager; and (c) the matters addressed below.

The Oversight Committee shall be authorized to engage counsel and advisors for the Oversight Committee.  Subject to review and approval of the Oversight Committee, Post-Effective Date CMTSU LLC shall pay in the ordinary course all reasonable fees and expenses of professionals and advisors retained on its behalf or on behalf of the Oversight Committee, and such fees and expenses shall not be subject to the review and approval of the Bankruptcy Court. The Oversight Committee Members may be entitled to compensation as may be agreed to by the Manager and the Oversight Committee.

The Manager may, in his discretion, seek the consent of the Oversight Committee regarding any matter at issue and shall not take any of the actions set forth below without the prior consent (such consent not to be unreasonably withheld) or authorization of the Oversight Committee or Order of the Court:  (a) allowance of any disputed, unliquidated or contingent Claim over $500,000; (b) engaging, terminating or altering the engagement of any professionals or advisors representing or otherwise acting on behalf of the Post-Effective Date Debtors; (c) making a disbursement to any individual, Entity, or professional or advisor representing or otherwise acting on behalf of Post-Effective Date CMTSU LLC or the Oversight Committee in excess of $100,000; (d) modifying or seeking authority from the Bankruptcy Court to amend, modify or change the Plan, any document in the Plan Supplement, or the Confirmation Order; (e) releasing any Claim or Cause of Action (including Claims and Causes of Action assertable under Chapter 5 of the Bankruptcy Code); (f) pursuing Causes of Action against any party, including commencing litigation on behalf of Post-Effective Date CMTSU LLC; (g) increasing any item of remuneration that Manager or the Sole Officer and Director may receive for work on behalf of the Post-Effective Date Debtors; (h) objecting to Claims or Interests; or (i) establishing or funding the Administrative and Priority Claims Reserve, the Wind Down Reserve, or the General Unsecured Claims Reserve, or adding or disbursing any funds therefrom.  With respect

to the allowance of any disputed, unliquidated or contingent Claim over $3 million, the Manager shall obtain written consent or authorization of the Oversight Committee and approval of the Bankruptcy Court, after notice and a hearing (with notice to all parties requesting notice of pleadings in these Chapter 11 Cases plus the Holders of the twenty (20) largest Class 3 Claims).

The Oversight Committee shall dissolve upon the later of (a) the date that all distributions are made in accordance with Article III.B hereof and (b) the closing of the Chapter 11 Cases and entry of a final decree.

F.      *Standard of Care for Manager, Sole Officer and Director, and Oversight Committee*

The Manager and the Sole Officer and Director, in performance of his duties, will exercise sound discretion and independent judgment while exerting his best efforts to perform his duties in a professional manner.  The Manager and the Sole Officer and Director shall not be liable to the Debtors, Post-Effective Date CMTSU LLC, and any Holder of a Claim or Interest, except as determined by a Final Order of a court of competent jurisdiction not subject to appeal that the Manager and the Sole Officer and Director was grossly negligent, willfully disregarded his duties and responsibilities under the Plan, acted for his benefit to the derogation of the rights of Post-Effective Date CMTSU LLC or has otherwise engaged in either willful misconduct or the abandonment of his duties.

The Oversight Committee Members shall perform their respective duties with reasonable diligence and care.  Neither the Oversight Committee nor the Oversight Committee Members or their successors or assigns, affiliates, directors, officers, employees, agents, shareholders, attorneys or other professionals shall be liable to the Debtors, Post-Effective Date CMTSU LLC, or any Holder of a Claim or Interest, except as determined by a Final Order of a court of competent jurisdiction not subject to appeal that any such Oversight Committee Member willfully disregarded his duties and responsibilities under the Plan or has otherwise engaged in willful misconduct in the performance of his duties under the Plan.

G.      *Creation of Administrative and Priority Claims Reserve*

On the Effective Date or as soon as reasonably practicable thereafter, Post-Effective Date CMTSU LLC shall establish and thereafter maintain the Administrative and Priority Claims Reserve in an authorized depository in the United States.  Funds in the Administrative and Priority Claims Reserve shall be used by Post-Effective Date CMTSU LLC only for the payment of U.S. Trustee Fees and Allowed Priority Claims to the extent that such Allowed Claims have not been paid in full on or prior to the Effective Date.  Any amounts remaining in the Administrative and Priority Claims Reserve, after payment in full of all Allowed Priority Claims and the U.S. Trustee Fees, or reserving for any Disputed Priority Claims sufficient to permit payment in full of such Priority Claims, may be released from the reserve, transferred to the General Unsecured Claims Reserve, and used for other distributions by Post-Effective Date CMTSU LLC pursuant to the Plan.

26

H.      *Creation of Wind Down Reserve*

On the Effective Date or as soon as reasonably practicable thereafter, Post-Effective Date CMTSU LLC shall establish and thereafter maintain the Wind Down Reserve with the Wind Down Reserve Amount in an authorized depository in the United States.  Post-Effective Date CMTSU LLC may replenish the Wind Down Reserve at any time in the sole discretion of the Manager in consultation with the Oversight Committee.  Funds in the Wind Down Reserve shall be used by Post-Effective Date CMTSU LLC only for the payment of fees and expenses relating to the implementation of the Plan and wind down and dissolution of the Debtors and Post-Effective Date Debtors pursuant to the Plan.  Any amounts remaining in the Wind Down Reserve after payment of all fees and expenses relating to the implementation of the Plan and wind down and dissolution of the Debtors may be released from the reserve, transferred to the General Unsecured Claims Reserve, and used for distributions by Post-Effective Date CMTSU LLC pursuant to the Plan.

I.      *Creation of General Unsecured Claims Reserve*

On the Effective Date or as soon as reasonably practicable thereafter, Post-Effective Date CMTSU LLC shall establish and thereafter maintain the General Unsecured Claims Reserve in an authorized depository in the United States.  Funds in the General Unsecured Claims Reserve shall be used by Post-Effective Date CMTSU LLC only for payment of Allowed Class 3 Claims.  Any amounts remaining in the General Unsecured Claims Reserve (including any amounts transferred from the Administrative and Priority Claims Reserve or the Wind Down Reserve) after payment of all Allowed Class 3 Claims and reserving for Disputed Class 3 Claims that may become Allowed, each in full in Cash pursuant to the Plan, including any interest payable pursuant to Article III.C hereof, shall constitute Remaining Funds.

J.      *Zayo Settlement*

In full and final satisfaction of any and all Claims, including, for the avoidance of doubt, the Claims identified in the Proofs of Claim filed by Zayo (Claim Nos. 345, 453, and 631), any other Claims or Administrative Claims reserved in the Zayo Stipulation, and any rights that Zayo asserts, has or may have against the Debtors and their Estates, Zayo shall be granted an Allowed Class 3 Claim against CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.) in the amount of $27,750,000. Zayo shall be deemed to have made the Class 3 Cash-Out Election without the need to return a Ballot exercising such election.  The Debtors and their Estates agree to waive any Avoidance Actions that could be asserted against Zayo.

The settlement reflected in this Article IV.J shall only be effective if: (i) the Effective Date occurs on or before the Zayo Settlement Termination Date, and (ii) Zayo receives its distribution on account of its Allowed Class 3 Claim on or before the Zayo Settlement Termination Date.  Should the Effective Date or Zayo's distribution on account of its Allowed Class 3 Claim occur after the Zayo Settlement Termination Date, the settlement reflected in this Article IV.J shall no longer be effective and the parties' rights are reserved, unless Zayo provides express written consent waiving these conditions.

*K.     D&O Policies*

Notwithstanding anything to the contrary contained herein or in the Confirmation Order, Confirmation of the Plan and the assignment of the D&O Policies to the Post-Effective Date Debtors in connection with the Plan shall not impair or otherwise modify (i) any obligations arising under the D&O Policies or (ii) any Board Member's or officer's rights to receive any benefits or coverage under such D&O Policies subject to the terms thereof.  In addition, after the Effective Date, the Post-Effective Debtors shall not terminate or otherwise reduce coverage under any D&O Policy, and all Board Members and officers of the Debtors covered by such policy shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such Board Members and/or officers remain in such positions after the Effective Date, all subject to the terms of the D&O Policies.

*L.     Sale Order; Purchase Agreement*

Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in the Plan or the Confirmation Order shall, or shall be deemed to, amend, modify, or waive any term or condition of the Sale Order, the Purchase Agreement, or any other Transaction Document or limit, alter, or impair any of the rights or remedies of the Purchaser under any of the foregoing.

*M.     Wind Down*

On the Effective Date, the persons acting as Board Members, managers, and officers of the Debtors shall be deemed to have resigned and relieved of all duties under the Debtors' organizational documents.

On and after the Effective Date, the Post-Effective Date Debtors shall be authorized to implement the Plan and any applicable Orders of the Bankruptcy Court.  As soon as reasonably practicable after the Effective Date, the Post-Effective Date Debtors shall take such other actions as the Post-Effective Date Debtors may determine to be necessary or desirable to carry out the purposes of the Plan.  From the Effective Date through the date of the filing of a final decree closing the Chapter 11 Cases, the Post-Effective Date Debtors shall file the final monthly report (for the month in which the Effective Date occurs) and any subsequent quarterly reports required under the U.S. Trustee guidelines.

The Post-Effective Date Debtors shall have the power and authority to take any action necessary to implement the Plan and wind down and dissolve the Debtors and Post-Effective Date Debtors.  Any expenses and costs incurred by the Post-Effective Date Debtors in connection with the wind down and dissolution activities described in the preceding sentence shall be paid solely from the Post-Effective Date Debtors' Assets.  In addition, the Post-Effective Date Debtors shall execute and file for the Debtors a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under applicable law.  Upon such filings, the Debtors and the Post-Effective Date Debtors:  (a) for all purposes shall be deemed to have withdrawn their business operations from any state or territory in which they were previously conducting, or were registered or licensed to conduct, their business operations, and shall not be required to file any

document, pay any sum, or take any other action in order to effectuate such withdrawal; (b) shall be deemed to have terminated the requisite corporate formation documents relating to each such Debtor and Post-Effective Date Debtor; and (c) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

N.    *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan: (a) the obligations of the Debtors under any certificate, share, note, bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled as to the Debtors; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; provided, that, notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of allowing such Holders to receive distributions under the Plan as provided herein; provided, further, that notwithstanding anything to the contrary herein, any right of the Debtors to, or any benefit to the Debtors with respect to, any escrowed funds, letters of credit, financial assurances, trust accounts, or other accounts shall not be cancelled, released, settled, or compromised.

O.    *Corporate Action*

On the Effective Date, the certificate of incorporation and bylaws of Post-Effective Date CMTSU Inc. shall be amended and restated in the form of the Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation and the Amended and Restated Post-Effective Date CMTSU Inc. Bylaws.  The Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation will prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code without any further actions by the stockholders or directors of the Debtors or the Post-Effective Date Debtors.  After the Effective Date, the Amended and Restated Post-Effective Date CMTSU Inc. may amend and restate its Amended and Restated Post-Effective Date CMTSU Inc. Certificate of Incorporation as provided therein or by applicable law.

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Post-Effective Date Debtors) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

The Manager and Sole Officer and Director shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents, and take such other actions as it may deem necessary or appropriate in its reasonable discretion to implement the provisions of this Article IV.

The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under applicable nonbankruptcy law.

P.    *Effectuating Documents; Further Transactions*

Prior to the Effective Date, the Debtors, and, on and after the Effective Date, the Post-Effective Date Debtors, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

Q.    *Exemption from Certain Taxes and Fees*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (b) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R.    *Causes of Action*

On the Effective Date, all interests in and to the Causes of Action shall be transferred from the Post-Effective Date Debtors to Post-Effective Date CMTSU LLC.  The Manager, in the exercise of its business judgment and acting in accordance with the Plan, will determine whether to pursue such Causes of Action in accordance with the best interests of the Holders of Claims and Interests entitled to distributions under this Plan, and shall have all requisite authorization, approval and standing (without further action by the Debtors, Post-Effective Date Debtors or the Bankruptcy Court) to prosecute any of the Causes of Action in the name of, on behalf of, in the stead of, or as assignee of the Debtors, the Post-Effective Date Debtors, and/or the Debtors' respective Estates.

Any recovery of Cash on such Causes of Action shall be distributed pursuant to the Plan. A nonexclusive schedule of the Post-Effective Date Debtors' Retained Causes of Action is

contained in the Plan Supplement. In accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any Cause of Action in the Plan Supplement shall not be deemed an admission, denial or waiver of any Cause of Action that any Debtor or Estate may hold against any Entity. Post-Effective Date CMTSU LLC shall have the ability to settle any and all Post-Effective Date Debtors' Causes of Action without further Order of the Bankruptcy Court.

S.    *Post-Effective Date Fees and Expenses*

Except as otherwise specifically provided in the Plan, from and after the Effective Date, Post-Effective Date CMTSU LLC shall, in the ordinary course of business and without any further notice or application to or action, Order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Post-Effective Date Debtors.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code, the Local Bankruptcy Rules, or the Professional Fee Order in seeking retention or compensation for services rendered after such date shall terminate, and the Post-Effective Date Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, Order, or approval of the Bankruptcy Court.

T.    *Closing the Chapter 11 Cases*

When all Disputed Claims and Interests have become Allowed or disallowed, the Post-Effective Date Debtors have dissolved in accordance with Article IV.M hereof and all remaining Post-Effective Date Debtors' Assets have been distributed in accordance with the Plan, and the business and affairs of the Debtors have been otherwise wound down, the Post-Effective Date Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan and the Contract Assumption Schedule; (b) is subject to a pending motion to assume or assume and assign such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be, or has been, assumed or assumed and assigned to the Purchaser or another third party, as applicable, in connection with the Sale Transaction; (d) is

31

a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan or with the Purchaser; or (e) is one of the Insurance Policies. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Contract Assumption Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

B.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Obligations under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Obligation in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, by the Debtors or Post-Effective Date CMTSU LLC, as applicable, as an Allowed Administrative Claim, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (a) the amount of the Cure Obligation; (b) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure Obligations shall be satisfied following the later to occur of the Effective Date or entry of a Final Order or Orders resolving the dispute and approving the assumption; <u>provided</u>, that prior to the Effective Date, the Debtors, and on and after the Effective Date, the Post-Effective Date Debtors, may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, Order, or approval of the Bankruptcy Court.

The Debtors shall cause notice of the proposed assumption and proposed Cure Obligations (solely to the extent such Cure Obligations were not already established in connection with the Sale Transaction and Sale Order) to be sent to applicable counterparties. Any objection by such counterparty shall be Filed and served within fourteen (14) days after service of the Contract Assumption Schedule. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Obligation shall be deemed to have assented to such assumption or Cure Obligation. For the avoidance of doubt, in accordance with the Bid Procedures Order and the Sale Order, the Cure Obligations relating to the Assigned Contracts shall be binding on the parties thereto for all purposes in the Chapter 11 Cases and otherwise, and shall constitute a final determination of the total Cure Obligations required to be paid in connection with the assumption and assignment of such Executory Contracts and Unexpired Leases.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Anything in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed**

32

**disallowed and expunged, without further notice to or action, Order, or approval of the Bankruptcy Court or any other Entity**.

C.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an Order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Claims and Noticing Agent and served on the Debtors or, after the Effective Date, the Post-Effective Date Debtors, no later than thirty (30) days after the earlier of the Confirmation Date or the effective date of the rejection of the applicable Executory Contract or Unexpired Lease.   In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors or, after the Effective Date, the Post-Effective Date Debtors, no later than fourteen (14) days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease or the Confirmation Order if deemed rejected under the Plan.

**Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed as set forth in the paragraph above shall not (1) be treated as a creditor with respect to such Claim; (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection; or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Post-Effective Date Debtors, the Debtors' Estates, or the property of any of the foregoing without the need for any objection by the Debtors or the Post-Effective Date Debtors, or further notice to, or action, Order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary**.  All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims in Class 3 against the Debtors, except as otherwise provided by Order of the Bankruptcy Court.

D.      *Purchase Agreement; Assigned Contracts*

The Debtors' assumption or rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to the Purchaser's rights and obligations, including any Cure Obligations assumed by the Purchaser in accordance with the Purchase Agreement, with respect to any such Executory Contracts or Unexpired Leases that constitute Assigned Contracts.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all

33

Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors or on behalf of the Debtors' Estates during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.    *Insurance Policies*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, and any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases) (a) pursuant to sections 365 and 1123 of the Bankruptcy Code, the Insurance Policies shall be assumed by the Debtors and assigned to the Post-Effective Date Debtors on the Effective Date unless any such Insurance Policy previously was rejected by the Debtors or the Debtors' Estates pursuant to an Order of the Bankruptcy Court or is the subject of a motion to reject pending on the Effective Date; (b) coverage for defense and indemnity under any Insurance Policies, including the D&O Policies, shall remain available to all individuals within the definition of "Insured" in any such Insurance Policies, including the D&O Policies, as if the Chapter 11 Cases had not been filed; (c) nothing shall affect any party's rights under any of the Insurance Policies, and all obligations and liabilities of the Debtors thereunder, whether arising before or after the Effective Date, shall survive, shall be or become obligations of the Post-Effective Date Debtors, and shall not be amended, modified, waived, released, discharged or impaired, and the Debtors' insurers shall not be required to file a Proof of Claim, Administrative Claim or Claim related to a Cure Obligation with respect thereto; provided, however, that the assignment of the Insurance Policies shall be effective as of the Effective Date and not alter, modify, amend, affect, impair or prejudice any rights, obligations or defenses of any insurers, the Debtors (or, after the Effective Date, the Post-Effective Date Debtors) or any other individual or entity, as applicable, under any Insurance Policy.

G.    *Indemnification Claims*

Indemnification Claims that have been or may be asserted by the Board Members shall be treated as follows: (a) each Board Member shall be granted an Allowed General Unsecured Claim against CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.) consisting of (i) $475,097.60 for prepetition costs or expenses incurred by the Board Members relating to the SEC Inquiry, (ii) costs or expenses incurred by the Board Members between the Petition Date and the Effective Date relating to any action (including any Cause of Action), proceeding, or demand, whether formal or informal, other than the SEC Inquiry, to the extent such costs or expenses are subject to advancement or indemnification under the Indemnification Provisions pursuant to their terms, and (iii) post-Effective Date costs or expenses incurred by the Board Members relating to

34

the SEC Inquiry or any other action (including any Cause of Action), proceeding, or demand, whether formal or informal, to the extent such costs or expenses are subject to advancement or indemnification under the Indemnification Provisions pursuant to their terms; and (b) each Board Member shall be granted an Allowed Administrative Claim against CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.) for all costs or expenses incurred by the Board Members between the Petition Date and the Effective Date relating to the SEC Inquiry; provided, however, that the amount that shall be reserved in the General Unsecured Claims Reserve on account of any General Unsecured Claims Allowed pursuant to this Article V.G shall be set forth in the Plan Supplement; provided, further, that the amount of the Claims Allowed pursuant to this Article V.G shall be allocated among the Board Members in their discretion; provided, further, that for purposes of voting and distributions, the Board Members shall be treated as having one consolidated Allowed Claim in the aggregate amounts set forth above with respect to the Claims Allowed pursuant to this Article V.G; provided, further, that if the Board Members receive more than payment in full on account of their Allowed Claims, the Board Members shall return to Post-Effective Date CMTSU LLC any Cash they received from the Debtors in excess of the full amount of such Allowed Claims, subject to the rights, if any, of any insurance company with respect to such Cash.

## H.    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have ninety (90) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

## A.    Calculation of Amounts to Be Distributed

Each Holder of an Allowed Claim or Allowed Interest against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class from the Debtors or Post-Effective Date CMTSU LLC.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  If and to the extent that there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article III.B hereof.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim or Allowed Interest shall, on account of such Allowed Claim or Allowed Interest, receive a distribution in excess of the Allowed amount of such Claim or

Interest plus any interest accruing on such Claim or Interest that is actually payable in accordance with the Plan.

B.    *Disbursing Agent*

Under the Plan, the Disbursing Agent shall be Post-Effective Date CMTSU LLC.  The Disbursing Agent shall make all distributions under the Plan.

C.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    Record Date for Distribution

On each Distribution Record Date, and solely with respect to those Claims receiving a distribution on each Distribution Record Date, the Claims Register shall be closed and the Disbursing Agent shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on each Distribution Record Date.

2.    Delivery of Distributions in General

(a)    Payments and Distributions on Disputed Claims or Interests

Distributions made after the Effective Date to Holders of Disputed Claims or Interests that are not Allowed Claims or Allowed Interests as of the Effective Date but which later become Allowed Claims or Allowed Interests shall be deemed to have been made by the Disbursing Agent on the Effective Date, unless the Disbursing Agent and the Holder of such Claim or Interest agree otherwise.

(b)    Special Rules for Distributions to Holders of Disputed Claims or Interests

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Disbursing Agent, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest, other than with respect to Professional Fee Claims, until all Disputed Claims or Interests held by the Holder of such Disputed Claim or Interest have become Allowed Claims or Allowed Interests or have otherwise been resolved by settlement or Final Order.

(c)    Distributions

On and after the Effective Date, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims and Allowed Interests under the Plan.

Prior to making any distributions on Allowed Class 3 Claims, the Disbursing Agent shall set aside appropriate reserves of Cash in the General Unsecured Claims Reserve in order to satisfy Disputed Class 3 Claims in accordance with the Plan to the extent such Claims become Allowed Claims.  Any amounts set aside to pay or reserve for Disputed Claims shall include the amounts needed to fund the ongoing costs and expenses of such reserve, including, without limitation, taxes in respect of Disputed Claims, if any.

36

Any distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim or Interest that would have been entitled to receive that distribution is not an Allowed Claim or Allowed Interest on such date shall be held by the Disbursing Agent and distributed on the next Subsequent Distribution Date that occurs after such Claim or Interest is Allowed.

3.      Minimum; De Minimis Distributions

No Cash payment of less than $10.00 in the aggregate, in the reasonable discretion of the Disbursing Agent, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.  If a Holder of an Allowed Claim or Allowed Interest would be entitled to receive less than $10.00 in the aggregate as of the time of a particular distribution, but would be entitled to receive more than $10.00 in combination with later distributions, the Disbursing Agent shall combine such distributions with later distributions to such Holder of an Allowed Claim or Allowed Interest so that such Holder may eventually be entitled to a distribution of at least $10.00 in value.  To the extent that the aggregate of such distributions never exceeds $10.00, such funds shall remain with and vest in Post-Effective Date CMTSU LLC for distribution to other Holders of Allowed Claims or Allowed Interests.

4.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the date the initial distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to Post-Effective Date CMTSU LLC automatically and without need for a further Order by the Bankruptcy Court for distribution in accordance with the Plan, and the Claim or Interest of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

5.      Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Debtors or Post-Effective Date CMTSU LLC by check or by wire transfer.

D.      *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Debtors and the Post-Effective Date Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions (including distributions made from any reserve for Disputed Claims) pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors and the Post-Effective Date Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay

applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. Amounts properly withheld from distributions to a Holder and paid over to any Governmental Unit will be treated as amounts distributed to the Holder.  The Debtors or the Post-Effective Date Debtors, as applicable, may request that any Holder of an Allowed Claim or Allowed Interest provide it with all forms and information required to comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit (the "Required Tax Documents").  Notwithstanding any other provision of the Plan, Holders that receive a distribution pursuant to the Plan are responsible for the payment and satisfaction of all tax obligations, including income, withholding, and other tax obligations imposed with respect to the distribution. In the event that a Holder fails to return Required Tax Documents within six (6) months after a written request by the Post-Effective Date Debtors, such Holder, its Allowed Claim or Allowed Interest, and all distributions on account of such Holder's Allowed Claim or Allowed Interest shall be treated as undeliverable distributions and unclaimed property in accordance with Article VI.C hereof.  The Post-Effective Date Debtors shall be responsible for paying only taxes chargeable to them and shall not be responsible for paying the tax obligations of each other.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  It is uncertain whether this allocation will be respected by the tax authorities of a Governmental Unit, which may instead take the position that payments should be allocated first to interest or should be pro-rated between principal and interest. If the tax authorities prevail in this assertion, Holders may be required to recognize ordinary interest income even though they have an overall loss (and possibly a capital loss, the deductibility of which may be limited) with respect to their Claims.  Each Holder is urged to consult its own tax advisor regarding the amount of its Claim allocable to accrued but unpaid interest and the character of any loss with respect to accrued but unpaid interest that the Holder previously included in income.

E.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties; Recourse to Collateral

The Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized to reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Post-Effective Date Debtors, as applicable, including on account of recourse to collateral held by third parties that secure such Claim.  To the extent a Holder of a Claim receives a distribution on account of such Claim and also receives payment from a party that is not the Debtors or the Post-Effective Date Debtors on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Debtors or the Post-Effective Date Debtors, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim as of the date of any such distribution under the Plan.  The failure of such

Holder to timely repay or return such distribution shall result in the Holder owing the Debtors or the Post-Effective Date Debtors, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.    Claims Payable by Insurance, Third Parties; Recourse to Collateral

Subject to Article V.G hereof, no distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to the Insurance Policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then, subject to Article V.G hereof, immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the Insurance Policies with respect to such policies, including, without limitation, the D&O Policies.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS

A.    *Resolution of Disputed Claims and Interests*

1.    Allowance of Claims and Interests

Prior to the Effective Date, the Debtors, and, on and after the Effective Date, Post-Effective Date CMTSU LLC, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest, except with respect to any Claim or Interest deemed Allowed as of the Effective Date.  Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.

2.     Prosecution of Objections to Claims and Interests

Prior to the Effective Date, the Debtors, and on or after the Effective Date, Post-Effective Date CMTSU LLC shall have the authority and all requisite standing to File objections to Claims and Interests, and the exclusive authority and standing to settle, compromise, withdraw, or litigate to judgment objections on behalf of the Debtors' Estates to any and all such Claims and Interests, regardless of whether such Claims and Interests are in a Class or otherwise.  From and after the Effective Date, Post-Effective Date CMTSU LLC shall have the sole authority to administer and adjust the Claims Register with respect to Claims and Interests to reflect any such settlements or compromises.  No further notice to or action, Order, or approval of the Bankruptcy Court with respect to such settlements or compromises entered into between any of the Post-Effective Date Debtors and the Holder of any Claim or Interest shall be required.

3.     Claims Estimation

On and after the Effective Date, Post-Effective Date CMTSU LLC may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, in each case regardless of whether the Debtors or the Post-Effective Date Debtors has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to the maximum extent permitted by law as determined by the Bankruptcy Court to estimate any such Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Post-Effective Date Debtors may elect to pursue additional objections to the ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Post-Effective Date Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.     Expungement or Adjustment to Claims and Interests Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be marked as satisfied, adjusted or expunged (as applicable) on the Claims Register by the Claims and Noticing Agent at the direction of Post-Effective Date CMTSU LLC without an objection having to be Filed and without any further notice to or action,

40

Order or approval of the Bankruptcy Court; provided, that Post-Effective Date CMTSU LLC shall provide thirty (30) days' notice of any of the foregoing modifications to the Claims Register to the Holder of any affected Claim or Interest during which period the Holder may object thereto.

     5.     <u>Deadline to File Objections to Claims or Interests</u>

Any objections to Claims or Interests shall be Filed no later than the Claims Objection Bar Date.

## B.    *Disallowance of Claims*

To the maximum extent provided by section 502(d) of the Bankruptcy Code, all Claims of any Entity from which property is recoverable by the Post-Effective Date Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Post-Effective Date Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and Post-Effective Date CMTSU LLC on the other hand, agree or it has been determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

## C.    *Amendments to Claims*

After the Confirmation Date, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, Order, or approval of the Bankruptcy Court; provided, that such Holder may amend the Claim Filed solely to decrease, but not to increase, the amount, number, or priority of such Claim, unless otherwise provided by the Bankruptcy Court.

## ARTICLE VIII.

## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

## A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements embodied in the Plan and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties in

interest, and are fair, equitable, and within the range of reasonableness. The Plan and the Confirmation Order shall have res judicata, collateral estoppel, and estoppel (judicial, equitable, or otherwise) effect with respect to all matters provided for, or resolved pursuant to, the Plan and/or the Confirmation Order, including, without limitation, the release, injunction, exculpation, and compromise provisions contained in the Plan and/or the Confirmation Order. The provisions of the Plan, including, without limitation, its release, injunction, exculpation, and compromise provisions, are mutually dependent and non-severable.

B.     *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made to Holders of Claims and Interests pursuant to Article III.B hereof, including, for the avoidance of doubt, the satisfaction in full of the portion of a Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert or otherwise transfer to the Debtors or the Post-Effective Date Debtors, as applicable, and their successors and assigns.

C.     *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, except to the extent that any Claim or Interest has been Allowed pursuant to this Plan or prior Order of the Bankruptcy Court, the Debtors reserve the right for the Debtors or the Post-Effective Date Debtors, as applicable, to re-classify, upon approval by the Bankruptcy Court following notice and a hearing, any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

D.     *Debtors' Release*

ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY SHALL BE EXPRESSLY, UNCONDITIONALLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY RELEASED, ACQUITTED AND DISCHARGED BY THE DEBTORS ON BEHALF OF THEMSELVES, THEIR RESPECTIVE ESTATES, AND THE POST-EFFECTIVE DATE DEBTORS (SUCH THAT THE POST-EFFECTIVE DATE DEBTORS SHALL NOT HOLD ANY CLAIMS OR CAUSES OF ACTION RELEASED PURSUANT TO THIS ARTICLE VIII.D), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, FROM ANY AND ALL ACTIONS, CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER,

INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, ANY OF THE DEBTORS' PRESENT OR FORMER ASSETS, THE RELEASED PARTIES' INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE PLAN, THE DISCLOSURE STATEMENT, THE SALE TRANSACTION, THE BIDDING AND SALE PROCESS FOR THE DEBTORS' ASSETS, THE PURCHASE AGREEMENT, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING OF CLAIMS OR INTERESTS UNDERTAKEN PRIOR TO THE EFFECTIVE DATE, INCLUDING THOSE THAT THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES, EXCEPT FOR ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; PROVIDED, HOWEVER, THAT THE FOREGOING "DEBTORS' RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTORS OR THEIR CHAPTER 11 ESTATES AGAINST A RELEASED PARTY ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTORS' RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTORS' RELEASE IS:   (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTORS' RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR AGAINST ANY OF THE DEBTORS' ESTATES OR THE POST-EFFECTIVE DATE DEBTORS ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTORS' RELEASE.

E.     *Third Party Release*

ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE RELEASING PARTIES SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, AND INDIVIDUALLY AND COLLECTIVELY, RELEASED AND ACQUITTED THE RELEASED PARTIES AND

THEIR RESPECTIVE PROPERTY (INCLUDING THE RELEASED PARTIES' PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, AFFILIATES, MANAGED ACCOUNTS OR FUNDS, CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, MEMBERS, PARTNERS (GENERAL AND LIMITED), EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITIES AS SUCH) FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, THAT SUCH RELEASING PARTIES (WHETHER INDIVIDUALLY OR COLLECTIVELY) EVER HAD, NOW HAVE OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, ANY OF THE DEBTORS' PRESENT OR FORMER ASSETS, THE RELEASED PARTIES' INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE PLAN, THE DISCLOSURE STATEMENT, THE SALE TRANSACTION, THE BIDDING AND SALE PROCESS FOR THE DEBTORS' ASSETS, THE PURCHASE AGREEMENT, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING OF CLAIMS OR INTERESTS UNDERTAKEN PRIOR TO THE EFFECTIVE DATE, INCLUDING THOSE THAT THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES, EXCEPT FOR (I) ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND (II) THE RIGHT TO RECEIVE DISTRIBUTIONS FROM THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS ON ACCOUNT OF AN ALLOWED CLAIM OR ALLOWED INTEREST AGAINST THE DEBTORS PURSUANT TO THE PLAN.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL AN ENTITY THAT MAKES THE THIRD PARTY OPT-OUT ELECTION IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER BE A RELEASING PARTY. FOR THE AVOIDANCE OF DOUBT, AMONG OTHERS, ANY HOLDER OF A CLAIM OR INTEREST THAT DOES NOT MAKE THE THIRD PARTY OPT-OUT ELECTION IS A RELEASING PARTY.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE

44

CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE, INCLUDING ANY CLAIMS FOR INDEMNITY OR CONTRIBUTION RELATING TO SUCH RELEASED CLAIMS.

FOR THE AVOIDANCE OF DOUBT, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE DISCLOSURE STATEMENT, PLAN OR CONFIRMATION ORDER, NO PROVISION SHALL (I) PRECLUDE THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS POLICE OR REGULATORY POWERS AND (II)(X) RELEASE ANY NONDEBTOR FROM LIABILITY IN CONNECTION WITH ANY LEGAL ACTION OR CLAIM BROUGHT BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR (Y) ENJOIN, LIMIT, IMPAIR, OR DELAY THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM BRINGING OR CONTINUING ANY ACTION AGAINST ANY NONDEBTOR IN ANY FORUM.

*F.    Exculpation*

The Exculpated Parties shall neither have nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the liquidation of the Debtors, including the bidding and sale process for the Debtors' assets.  Without limiting the foregoing "Exculpation" provided under this Article VIII.F, the rights of any Holder of a Claim or Interest to enforce rights arising under the Plan shall be preserved, including the right to compel payment of distributions in accordance with the Plan; provided, that the foregoing "Exculpation" shall have no effect on the liability of any Entity solely to the extent resulting from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to assert any affirmative defenses, including reliance upon the advice of counsel, concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

*G.    Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT:  (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D HEREOF; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.E HEREOF; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.F HEREOF; OR (5) ARE OTHERWISE

45

STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM:  (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF OR SUBROGATION RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; <u>PROVIDED</u>, THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN OR THE SALE ORDER; <u>PROVIDED, FURTHER</u>, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO

46

PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

H.      *Waiver of Statutory Limitations on Releases*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER THIS ARTICLE VIII) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY.   THE RELEASES CONTAINED IN THIS ARTICLE VIII ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

I.      *Setoffs*

Except as otherwise provided in the Plan, prior to the Effective Date, the Debtors, and on and after the Effective Date, the Post-Effective Date Debtors, pursuant to the Bankruptcy Code (including sections 553 and 558 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim on account of any Proof of Claim or other pleading Filed with respect thereto prior to the Confirmation Hearing and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtors' Estates may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Post-Effective Date Debtors, as applicable, of any such claims, rights, and Causes of Action that the Debtors' Estates may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any claim, right, or Cause of Action of the Debtors' Estates unless such Holder has timely Filed a Proof of Claim (including any Proof of Claim timely Filed by the Governmental Bar Date) with the Bankruptcy Court expressly preserving such setoff; provided, that nothing in the Plan shall prejudice or be deemed to have prejudiced the Debtors' or the Post-Effective Date Debtors' right to assert that any Holder's setoff rights were required to

have been asserted by motion or pleading filed with the Bankruptcy Court prior to the Effective Date, or any such Holder's right to assert that there was no such requirement.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE OF THE PLAN

A.      *Conditions Precedent to the Effective Date of the Plan*

The Plan shall not become effective unless and until each of the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the Bankruptcy Court shall have approved by Final Order a disclosure statement with respect to this Plan;

2.      the Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with the Plan; and

3.      the Confirmation Order shall be effective and shall not be subject to any stay, whether or not such Confirmation Order shall have become a Final Order.

B.      *Waiver of Conditions*

The conditions precedent to the Effective Date of the Plan set forth in Article IX.A may be waived by the Debtors, in consultation with the Committee, in their reasonable discretion without notice, leave or Order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.  The Debtors shall promptly file a notice with the Bankruptcy Court to reflect such a waiver, including identifying the specific condition(s) subject to such waiver.

C.      *Effect of Non-Occurrence of the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.

## ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and

requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X.A hereof.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

49

3.      resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Obligations pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Post-Effective Date Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article X.A hereof, any Executory Contracts or Unexpired Leases set forth on the Contract Assumption Schedule; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

6.      enter and implement such Orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

7.      enter and enforce any Order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

9.      issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.E.1 hereof;

12.     enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

13.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release,

50

indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

14.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

15.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Order of the Bankruptcy Court, including the Confirmation Order;

16.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

17.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

18.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

19.     enforce all Orders previously entered by the Bankruptcy Court;

20.     hear any other matter not inconsistent with the Bankruptcy Code; and

21.     enter an Order concluding or closing the Chapter 11 Cases.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.     *Additional Documents*

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, on or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, all Holders of Claims or Interests receiving distributions pursuant to the Plan, and all other parties in interest shall prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

B.     *Dissolution of Committee*

On the Effective Date, the Committee shall dissolve and members thereof shall be compromised, settled, and released from all rights and duties from or related to the Chapter 11 Cases, except the Committee will remain intact solely with respect to the preparation, filing, review, objection, and resolution of applications for Professional Fee Claims or Committee Member expense claims.  The Debtors and the Post-Effective Date Debtors shall have no obligation to pay any fees or expenses incurred after the Effective Date by the Committee

51

Members, except for fees and expenses incurred in connection with any objection to applications for Professional Fee Claims and/or Committee Member expense claims.

C.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.   Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

D.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.    *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the following parties shall be served via first class mail, overnight delivery, or messenger on:

If to the Debtors or the Post-Effective Date Debtors, to:

> CMTSU Liquidation, Inc.
> 7900 East Union Avenue
> Suite 1100
> Denver, Colorado 80237
> Attn: Jon Goulding, Chief Restructuring Officer

with copies to:

> Morrison & Foerster LLP
> 250 West 55th Street
> New York, New York 10019
> Attn: Brett H. Miller, Esq., Dennis L. Jenkins, Esq., Todd M.
>       Goren, Esq., and Daniel J. Harris, Esq.

If to the Committee, to:

> Perkins Coie LLP
> 30 Rockefeller Plaza, 22nd Floor
> New York, New York 10019
> Attn: John D. Penn, Esq., Schuyler G. Carroll, Esq., and Tina N.
>       Moss, Esq.

*F.*     *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any Order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect to the maximum extent permitted by law.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*G.*     *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

*H.*     *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (c) nonseverable and mutually dependent.

*I.*     *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

Dated:  September 28, 2017                    Respectfully submitted,

                                              CMTSU LIQUIDATION, INC.
                                              for itself and its Debtor affiliates

                                              By:     /s/ Jon Goulding
                                              Name:  Jon Goulding
                                              Title:   Chief Restructuring Officer

54

**EXHIBIT B**

Solicitation Procedures Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

ORIGINAL

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CMTSU Liquidation, Inc., *et al.*,[1] | ) Case No. 17-10772 (BLS) |
| f/k/a CIBER, Inc., *et al.* | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Re: Docket Nos. 525, 526** |

**ORDER (A) APPROVING DISCLOSURE STATEMENT; (B) ESTABLISHING
VOTING RECORD DATE, VOTING DEADLINE, AND OTHER DATES;
(C) APPROVING PROCEDURES FOR SOLICITING, RECEIVING,
AND TABULATING VOTES ON PLAN AND FOR FILING OBJECTIONS
TO PLAN; (D) APPROVING MANNER AND FORMS OF NOTICE AND
OTHER RELATED DOCUMENTS; AND (E) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors-in-possession (collectively,

the "Debtors") in the above-captioned Chapter 11 Cases, for entry of an order, pursuant to

sections 105(a), 1125, and 1126 of the Bankruptcy Code and Bankruptcy Rules 2002, 3003,

3017, 3018, and 3020: (a) approving the Disclosure Statement;[3] (b) establishing the voting

record date, voting deadline, and other related dates; (c) approving procedures for soliciting,

receiving, and tabulating votes on the Plan and for filing objections to (i) the Plan and (ii) the

rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases under the

Plan; (d) approving the manner and forms of notice and other related documents; and

(e) granting related relief; and upon the record of the hearing on the Motion; and this Court

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

[2] Capitalized terms used in this Order but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Plan (as defined below), as applicable.

[3] As used herein, "Disclosure Statement" means the *Disclosure Statement for the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 665] and "Plan" means the *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 665].

1

having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this District is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required; and upon the *Official Committee of Unsecured Creditors' Objection to Debtors' Disclosure Statement* [Docket No. 619] and the *Official Committee of Unsecured Creditors' Objection to Motion For Approval of Disclosure Statement and Related Relief* [Docket No. 620]; and this Court having found that the relief requested by the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:

A.      Notice of the Motion and the Disclosure Statement Hearing was good and sufficient notice to all interested parties and no other or further notice need be provided.

B.      The Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code.

C.      The forms of the notices attached hereto as Exhibits 1, 2, 3, 5, 6-A, 6-B, and 7 contain sufficient information and are appropriate under the circumstances.

D.      The form of the Ballot attached hereto as Exhibit 4 (a) is sufficiently consistent with Official Form No. B314, (b) adequately addresses the particular needs of the Chapter 11 Cases, and (c) is appropriate for the Class of Claims entitled to vote to accept or reject the Plan.

E.     The time period set forth below during which the Debtors may solicit votes on the Plan is a reasonable period of time for creditors to make an informed decision as to whether to accept or reject the Plan.

F.     The procedures set forth below for the solicitation and tabulation of votes to accept or reject the Plan provide for a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code.

G.     The procedures set forth below regarding the Confirmation Hearing Notice and the contents of the Solicitation Package comply with Bankruptcy Rules 2002 and 3017 and constitute sufficient notice to all interested parties.

**THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

1.     The Motion is granted as set forth herein.

## I.     Approval of the Disclosure Statement

2.     Pursuant to Bankruptcy Rule 3017(b), the Disclosure Statement is approved as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code, and the Debtors are authorized to distribute the Disclosure Statement and the Solicitation Packages in order to solicit votes on, and pursue confirmation of, the Plan.

## II.     Confirmation Hearing and Objections

3.     Pursuant to Bankruptcy Rule 3020(b)(2), the Confirmation Hearing shall be held on **November 15, 2017, at 10:00 a.m. (prevailing Eastern Time)**.  The Debtors may adjourn or continue the Confirmation Hearing from time to time.

4.     Pursuant to Bankruptcy Rule 3020(b)(1), the deadline to File and serve objections to confirmation of the Plan ("Confirmation Objections") shall be **November 1, 2017 at 4:00 p.m. (prevailing Eastern Time)** (the "Plan Objection Deadline").

3

5.       Confirmation Objections, if any, shall (a) be in writing, (b) comply with the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objector and the nature and amount of any Claim or Interest asserted by the objector against or in the Debtors, (d) state with particularity the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan that would resolve such objection, and (e) be filed, contemporaneously with proof of service, with the Court and served so that they are **actually received** by the undersigned counsel and the following Notice Parties no later than the Plan Objection Deadline:

(a)     <u>Counsel for the Debtors</u>: (i) Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Brett H. Miller, Dennis L. Jenkins, Todd M. Goren and Daniel J. Harris, and (ii) Polsinelli, PC, 222 Delaware Avenue, Wilmington, Delaware 19801, Attn: Christopher A. Ward and Justin K. Edelson;

(b)     <u>Counsel for the Committee</u>: (i) Perkins Coie LLP, 30 Rockefeller Plaza, 22nd Floor, New York, New York, 10112, Attn: John D. Penn and Schuyler G. Carroll, and (ii) Shaw Fishman Glantz & Towbin LLC, 300 Delaware Avenue, Suite 1370, Wilmington, Delaware 19801, Attn: Thomas M. Horan; and

(c)     <u>The Office of the United States Trustee</u>: District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, 3rd Floor, Room 3209, Wilmington, Delaware 19801, Attn: Timothy J. Fox.

6.       The deadline for the Debtors and/or other parties supporting Confirmation of the Plan to file and serve a confirmation brief and replies to Confirmation Objections shall be **November 10, 2017** (or, in the event that the Confirmation Hearing is adjourned, the date that is three (3) business days prior to the adjourned hearing).

### III.   Procedures with Respect to Rejection or Assumption of Executory Contracts and Unexpired Leases Under the Plan

7.       The following deadlines and procedures with respect to the rejection of Executory Contracts and Unexpired Leases under the Plan are hereby approved:

(a)     The Debtors shall serve the *Notice of (I) Rejection of Contracts and Leases and (II) Deadline to Object Thereto* (the "<u>Rejection Notice</u>"), substantially in the form attached hereto as <u>Exhibit 1</u>, which notice is hereby approved, on all non-debtor

4

parties to all Executory Contracts and Unexpired Leases to be rejected under the Plan by **October 18, 2017**;

(b)      The non-debtor parties to the Rejected Contracts and Leases shall have until **November 1, 2017, at 4:00 p.m. (prevailing Eastern Time)**, which deadline may be extended in the sole discretion of the Debtors, to object to the Debtors' proposed rejection of the Rejected Contracts and Leases;

(c)      Unless otherwise provided by an order of the Court, any Proof of Claim based on the rejection of an Executory Contract or Unexpired Lease under the Plan must be filed with Prime Clerk, the Debtors' Claims and Noticing Agent, and served on the Debtors or the Post-Effective Date Debtors, as applicable, no later than thirty (30) days after the Effective Date. Proof of Claim forms may be obtained at the following websites: https://cases.primeclerk.com/CIBER or http://www.uscourts.gov/forms/bankruptcy-forms/proof-claim-0. Any Claim based upon such rejection not filed within such time shall be automatically disallowed, forever barred from being asserted, and unenforceable against the Debtors or the Post-Effective Date Debtors without the need for any objection or further notice to, or action, order, or approval of, the Court; and

(d)      The Debtors shall have the right to amend or supplement the Rejection Notice by, among other things, removing or adding Executory Contracts or Unexpired Leases at any time, provided that in the event of any such amendment of supplement, the affected counterparty shall have no less than fourteen (14) days to respond to such amendment or supplement.

8.      The following deadlines and procedures with respect to the assumption of Executory Contracts and Unexpired Leases under the Plan, including procedures for determining Cure Obligations, are hereby approved:

(a)      The Debtors shall serve the *Notice of (I) Assumption of Contracts and Leases and (II) Deadline to Object Thereto* (the "Assumption Notice"), in substantially the form attached hereto as Exhibit 2, which notice is hereby approved, on all non-debtor parties to all Executory Contracts and Unexpired Leases to be assumed under the Plan by **October 18, 2017**. The Assumption Notice shall include (x) the name of the non-debtor counterparty, (y) the legal description of the Executory Contract or Unexpired Lease to be assumed, and (z) the proposed Cure Obligation, if any;

(b)      The non-debtor parties to the Assumed Contracts and Leases shall have until **November 1, 2017 at 4:00 p.m. (prevailing Eastern Time)** (the "Assumption Objection Deadline"), which deadline may be extended in the sole discretion of the Debtors, to object to the proposed assumption or Cure Obligation, if any;

(c)     Any counterparty to an Executory Contract or Unexpired Lease that fails to object to the proposed assumption or Cure Obligation by the Assumption Objection Deadline shall be deemed to have assented to such assumption or Cure Obligation;

(d)     The Debtors shall have the right to amend or supplement the Contract Assumption Schedule by, among other things, removing or adding Executory Contracts or Unexpired Leases at any time, provided that in the event of any such amendment of supplement, the affected counterparty shall have no less than fourteen (14) days to respond to such amendment or supplement.

**III.    Establishment of Voting Record Date, Disallowance of Claims for Voting Purposes, and Procedures for Temporary Allowance of Claims that are Subject to an Objection Filed by the Debtors**

9.     Pursuant to Bankruptcy Rule 3017(d), **September 25, 2017** shall be the Voting Record Date for determining which creditors are entitled to vote on the Plan; provided, however, that those Persons or Entities that timely File a Claim between the Voting Record Date and October 6, 2017 shall be deemed to have Filed such Claim before the Voting Record Date for voting purposes only and will be entitled to vote on the Plan. The Debtors shall use the Voting Record Date for determining which (a) creditors are entitled to receive Solicitation Packages, (b) creditors are entitled to vote to accept or reject the Plan, and (c) non-voting creditors and interest holders are entitled to receive notice of the Confirmation Hearing.

10.     With respect to any transferred claim, the transferee shall be entitled to receive a Solicitation Package and cast a Ballot on account of the transferred claim only if: (a) all actions necessary to effect the transfer of the claim pursuant to Bankruptcy Rule 3001(e) have been completed by the Voting Record Date including passage of the 21-day objection period set forth therein; or (b) the transferee files, no later than the Voting Record Date, (i) the documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (ii) a sworn statement of the transferor supporting the validity of the transfer. Regardless of the number of Claims obtained,

ny-1298687

each transferee shall be treated as a single creditor for purposes of the numerosity requirements of section 1126(c) of the Bankruptcy Code and the other procedures set forth in this Order.

11.     In the event the Debtors object to a Claim, the Holder of such Claim shall not be entitled to vote on the Plan and such Claim shall not be counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met with respect to the Plan (except to the extent and in the manner as may be set forth in the objection) unless (a) the Claim has been temporarily allowed for voting purposes pursuant to Bankruptcy Rule 3018(a) and in accordance with this Order or (b) on or before the Voting Deadline, the objection to such Claim has been withdrawn or resolved in favor of the creditor asserting the Claim.  Recipients of an objection to expunge and/or disallow their Claim shall receive a notice, substantially in the form attached hereto as Exhibit 3 (the "Notice of Non-Voting Status: Disputed Claims"), which notice is hereby approved.

12.     Objections to Claims for voting purposes only shall be filed on or before **October 9, 2017**.

13.     The deadline for the filing and service of any Rule 3018(a) Motion shall be **October 23, 2017 at 4:00 p.m. (prevailing Eastern Time)**.  A Rule 3018(a) Motion must be filed with this Court and served on counsel to the Debtors and the other Notice Parties so as to be **actually received** not later than such deadline.

14.     Any party having a Claim subject to a timely filed and served Rule 3018(a) Motion shall be permitted to cast a provisional Ballot to accept or reject the Plan.  If, and to the extent that, the Debtors and such party are unable to resolve the issues raised by a Rule 3018(a) Motion prior to the Voting Deadline, then, at the Confirmation Hearing, the Court shall determine whether the provisional Ballot should be counted as a vote on the Plan.

15.     The Debtors and a Holder of a Claim may agree and stipulate to treatment of a specific Claim for voting purposes pursuant to a notice filed with the Court.

16.     Nothing in this Order shall affect or limit the Debtors' (or any other party in interest's) rights to object to any Proof of Claim or Rule 3018(a) Motion.

## IV.     Approval of Solicitation Procedures

### A.     Duties of Prime Clerk

17.     Prime Clerk shall assist the Debtors in, among other things, (a) mailing the Confirmation Hearing Notice; (b) mailing Solicitation Packages; (c) soliciting votes on the Plan; (d) receiving, tabulating, and reporting on Ballots cast for or against the Plan by Holders of Claims against the Debtors; (e) responding to inquiries from creditors and interest holders relating to the Plan, the Disclosure Statement, the Ballots and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan; and (f) if necessary, contacting creditors and interest holders regarding the Plan and/or their Ballots.

18.     Solicitation of votes on the Plan shall commence on or before **October 2, 2017**.

### B.     Ballot and Other Notices

19.     The Ballot to be used in connection with the solicitation of votes on, and confirmation of, the Plan, substantially in the form attached hereto as Exhibit 4, is hereby approved.

20.     The Ballot will be distributed to Holders of Claims in Class 3.

21.     All Ballots shall be accompanied by a pre-addressed, postage prepaid return envelope.

8

22.     The Debtors shall mail to the Holders of Claims in Classes 1 and 2 a notice, substantially in the form attached hereto as <u>Exhibit 5</u> (the "<u>Notice of Non-Voting Status: Conclusively Presumed to Accept</u>"), which notice is hereby approved.

23.     The Debtors shall mail to the Holders of Interests in Class 4 the notices, substantially in the form attached hereto as <u>Exhibit 6-A</u> and <u>6-B</u> (together, the "<u>Notice of Non-Voting Status: Holder of Class 4 Interest</u>," and together with the Notice of Non-Voting Status: Disputed Claims and the Notice of Non-Voting Status: Conclusively Presumed to Accept, the "<u>Notices of Non-Voting Status</u>"), which notice is hereby approved.

### C.     Content and General Transmittal of Solicitation Packages; Notice of Confirmation Hearing

24.     The Debtors are authorized to transmit, or cause to be transmitted, on or before the date that is five (5) business days after entry of this Order, to the persons listed below, subject to the limitations contained herein, by United States mail, first-class postage prepaid, personal service, or overnight delivery, a Solicitation Package consisting of the following documents:

(a)     the notice of the hearing to consider confirmation of the Plan (the "<u>Confirmation Hearing Notice</u>"), substantially in the form attached hereto as <u>Exhibit 7</u>, which notice is hereby approved;

(b)     if the recipient is entitled to vote on the Plan (as set forth herein), a Ballot customized for each Holder and conforming to Official Bankruptcy Form No. B314, and a postage-prepaid return envelope; and

(c)     a CD-ROM or USB Flash Drive containing the Disclosure Statement, which shall include the Plan as an exhibit thereto (except as provided below) together with a complete copy of this Order including all attachments, and any supplemental documents that the Court orders to be included in the Solicitation Package.

25.     The Debtors shall provide copies of the Solicitation Package (other than a Ballot, unless any such party is otherwise entitled to receive a Ballot pursuant to the terms of this Order) to (a) the Office of the United States Trustee; (b) counsel for the Committee; (c) the Securities

and Exchange Commission; (d) the Internal Revenue Service; and (e) all parties that have filed requests for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

26.     Persons or Entities holding Claims in Class 3 that (a) have timely filed Proofs of Claim (or filed untimely Proofs of Claim that have been allowed as timely by the Court under applicable law on or before the Voting Record Date) that have not been disallowed by an order of the Court entered on or before the Voting Record Date (for voting or distribution purposes) or (b) hold Claims that are listed in the Schedules, other than those scheduled as (i) unliquidated, contingent, or disputed or (ii) zero or unknown in amount, shall receive a Solicitation Package (with exclusions as noted herein).

27.     Holders of Class 4 Interests that are listed on the depository listings with the Depository Trust Company and the records of the applicable stock transfer agent as a Holder of an Interest in CMTSU Liquidation, Inc. shall receive a Notice of Non-Voting Status: Holder of Class 4 Interest.

28.     Persons or Entities that have filed duplicate Claims against the same Debtor in any given Class shall be entitled to receive only one Solicitation Package and allowed one Ballot for voting their Claims with respect to that Class.

29.     The Debtors shall publish the Confirmation Hearing Notice on or prior to **October 6, 2017** in the national edition of *The Financial Times* (or another national newspaper of like circulation).

30.     Publication of the Confirmation Hearing Notice as described herein shall constitute sufficient notice of the Confirmation Hearing to persons who do not otherwise receive notice by mail as provided for in this Order.

ny-1298687

**D.     When No Notice or Transmittal Necessary**

31.     The Debtors are not required to send Solicitation Packages, individual solicitation materials, or other notices to (a) any creditor that filed a Proof of Claim if the amount asserted in such Proof of Claim is less than or equal to the amount that has already been paid to such creditor on account of such Proof of Claim or (b) the Holder of a Claim that has been disallowed in full by order of the Court.

32.     The Debtors are not required to give notice of any kind to any Person or Entity to whom the Debtors mailed the Disclosure Statement Hearing Notice and received the Disclosure Statement Hearing Notice returned by the United States Postal Service marked "undeliverable as addressed," "moved – left no forwarding address," "forwarding order expired," or any similar reason, unless the Debtors have been informed in writing by such Person or Entity of that Person's or Entity's new address.

33.     The Debtors are not required to attempt to re-deliver Solicitation Packages, Confirmation Hearing Notices, and Notices of Non-Voting Status that are returned as undeliverable if the Debtors have not been timely provided with corrected address information by such parties.

**V.     Deadlines and Procedures for Tabulation of Ballots and Notices of Non-Voting Status**

34.     The last date and time by which Ballots accepting or rejecting the Plan must be received by Prime Clerk in order to be counted shall be **November 1, 2017 at 4:00 p.m. (prevailing Eastern Time)** (the "Voting Deadline"); provided, however, that the Debtors may extend the Voting Deadline with the consent of the Committee (such consent not to be unreasonably withheld) or further order of the Court.

11

35.     The last date and time by which Notices of Non-Voting Status opting out of the

"Third Party Release" provision in Article VIII.E of the Plan (the "Opt-Out Form") must be

received by Prime Clerk in order to be effective shall be **November 8, 2017 at 4:00 p.m.**

**(prevailing Eastern Time)**; provided, however, that the Debtors may such deadline with the

consent of the Committee (such consent not to be unreasonably withheld) or further order of the

Court.

36.     Any timely received Ballot that contains sufficient information to permit the

identification of the claimant and is cast as an acceptance or rejection of the Plan shall be

counted and shall be deemed to be cast as an acceptance or rejection, as the case may be, of the

Plan, subject to the following exceptions:

(a)     If a Claim is deemed allowed in accordance with the Plan, such Claim shall be allowed for voting purposes in the deemed allowed amount set forth in the Plan;

(b)     If a Claim for which a Proof of Claim has been timely filed (i) is wholly contingent or unliquidated (*i.e.*, a claim based on litigation) (as determined on the face of the Proof of Claim or after a review of the supporting documentation by the Debtors) or (ii) does not otherwise specify a fixed or liquidated amount, the claimant shall be allowed to cast one vote valued at one dollar ($1.00) for voting purposes only;

(c)     If a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim shall be temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution, unless the Court, prior to the Voting Deadline, enters an order disallowing such Claim;

(d)     If a Claim is represented by a timely filed Proof of Claim and determined by the Debtors (after a review by the Debtors of the supporting documentation attached to the Proof of Claim) to be contingent or unliquidated in part, such Claim shall be temporarily allowed in the amount that it is liquidated and non-contingent for voting purposes only, unless such Claim is disputed as set forth in subparagraph (g) below;

(e)     If a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim shall be temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

12

(f) If a Claim is not listed on the Schedules, or is scheduled at $0.00, in an unknown amount, or as unliquidated, contingent, or disputed, and a Proof of Claim was not (i) timely filed by the date established in the Bar Date Order or (ii) deemed timely filed by an order of the Court prior to the Voting Deadline, such Claim shall be disallowed for voting purposes;

(g) If the Debtors file and serve an objection to a Claim on or before October 9, 2017, such Claim shall be temporarily disallowed for voting purposes only and not for the purposes of allowance or distribution, except to the extent and in the manner as may be set forth in the objection, and subject to the outcome of any Rule 3018(a) Motion. If the Debtors file an objection to a portion of a Claim, the undisputed portion of such Claim shall be temporarily allowed for voting purposes only and not for the purposes of allowance or distribution, except to the extent and in the manner as may be set forth in the objection, and subject to the outcome of any Rule 3018(a) Motion;

(h) Proofs of Claim filed in the amount of $0.00 shall not be entitled to vote; and

(i) A Ballot cast in an amount in excess of the allowed amount of the applicable Claim shall only be counted to the extent of the allowed amount of such Claim.

37. If a Person or Entity that is entitled to vote has more than one Claim against the Debtors based upon different transactions, the Debtors request that such Person or Entity be entitled to one vote for numerosity purposes in the aggregate dollar amount of all of such Claims. Moreover, given that the Plan provides for limited substantive consolidation of the Debtors, the Ballots of Holders of Claims that have filed duplicate Proofs of Claim in any given class, or that have asserted guarantee or other multi-debtor Claims for the same underlying liability that are classified in the same class, shall only be counted once.

38. The Debtors shall use reasonable efforts to notify (a) a Holder of a Claim and (b) the Committee of defects or irregularities with respect to Ballots received by Prime Clerk. Neither the Debtors nor Prime Clerk shall incur any liability in the event such efforts are unsuccessful. Further, in the event such efforts are unsuccessful, the Debtors may disregard, with no further notice, defective Ballots.

ny-1298687

39.     The Debtors are authorized to accept Ballots and Opt-Out Forms via electronic, online transmissions, solely through a customized "E-Ballot" portal on the Debtors' case information website (located at https://cases.primeclerk.com/CIBER) to be maintained by Prime Clerk. Parties may cast an electronic Ballot or return an Opt-Out Form and electronically sign and submit such Ballot or Opt-Out Form by utilizing the online portal (which allows submission of an electronic signature).  Instructions for electronic, online transmission of Ballots and Opt-Out Forms are set forth on the forms of Ballots and Notices of Non-Voting Status.  The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot or Opt-Out Form submitted in this manner and the claimant's electronic signature shall be deemed to be immediately legally valid and effective.   Other than Holders of Class 4 Interests that hold Interests through brokers, banks, commercial banks, trust companies, dealers, or other agents or nominees (a "Nominee"), parties entitled to vote or opt out of the Third Party Release provisions may choose to send in their Ballots or Opt-Out Forms by mail, overnight courier, or personal delivery or cast an electronic Ballot or Opt-Out Form and electronically sign and submit the Ballot or Opt-Out Form through the Debtors' website maintained by Prime Clerk.  Holders of Class 4 Interests that receive a Notice of Non-Voting Status: Holder of Class 4 Interest from a Nominee must send in their Opt-Out Forms by mail, overnight courier, or personal delivery to Prime Clerk.

40.     The following Ballots shall not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

(a)     Any Ballot received after the Voting Deadline unless the Debtors, with the consent of the Committee (such consent not to be unreasonably withheld) or further order of the Court, have granted an extension of the Voting Deadline in writing with respect to such Ballot, which extension shall be disclosed in the voting certification;

14

(b)    Any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

(c)    Any Ballot cast by a Person or Entity that does not hold a Claim in Class 3;

(d)    Any Ballot cast for a Claim for which no Proof of Claim was timely filed or that was filed after the Voting Record Date and that is (i) not listed on the Schedules or (ii) scheduled at (x) zero, (y) in an unknown amount, or (z) as unliquidated, contingent, or disputed;

(e)    Any Ballot that is properly completed, executed, and timely filed, but (i) does not indicate an acceptance or rejection of the Plan, (ii) indicates both an acceptance and rejection of the Plan, or (iii) partially accepts and partially rejects the Plan;

(f)    Any Ballot submitted by facsimile, telecopy, or electronic mail, except the E-Ballot portal noted above or as otherwise agreed by the Debtors in writing;

(g)    Any unsigned Ballot;

(h)    Any Ballot sent to an entity other than Prime Clerk, including, but not limited to, the Court, the Debtors, the Debtors' agents/representatives, the Committee, the Committee's agents/representatives, or the Debtors' financial or legal advisors; or

(i)    Any Ballot not cast in accordance with the procedures approved in this Order.

41.    Any duplicate Ballot shall only be counted once.

42.    If two or more valid Ballots are cast that attempt to vote the same Claim prior to the Voting Deadline, the last valid Ballot received prior to the Voting Deadline shall be deemed to reflect the voter's intent and thus to supersede any prior Ballots; provided, however, that where an ambiguity exists as to which Ballot was the latest mailed, Prime Clerk reserves the right to contact the Holder of the Claim and calculate the vote according to such voter's stated intent, which shall be noted in Prime Clerk's voting certification.  This procedure is without prejudice to the right of any party to object to the validity of any Ballot on any basis permitted by law and, if the objection is sustained, to count a prior Ballot for all purposes.

43.    Claim splitting is not permitted.

44.    The deadline for Prime Clerk to file its voting certification shall be **November 8, 2017.**

15

ny-1298687

### VII.   **Miscellaneous**

45.    The service of Solicitation Packages and other notices and documents described herein in the time and manner set forth herein constitutes adequate and sufficient notice of the Confirmation Hearing, and no further notice is necessary.

46.    The Debtors are authorized to take all actions necessary to implement the relief granted in this Order.

47.    To the extent there is any conflict or inconsistency between the terms of this Order and the terms set forth in the Ballots, the Rejection Notice, the Assumption Notice, the Notices of Non-Voting Status, the Confirmation Hearing Notice, and/or any other document approved by this Order, the terms of this Order shall control.

48.    The Debtors shall have authority to make nonsubstantive and nonmaterial changes to the Disclosure Statement, the Plan, the Ballots, the Rejection Notice, the Assumption Notice, the Notices of Non-Voting Status, the Confirmation Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, insert dates, and to make conforming changes among the Disclosure Statement, the Plan, the Ballots, the Rejection Notice, the Assumption Notice, the Notices of Non-Voting Status, the Confirmation Hearing Notice, and any other materials in the Solicitation Package prior to mailing.  If such changes are made, the Debtors shall promptly file a notice on the Court's docket reflecting all such changes in a manner that highlights each such change.

49.    Notwithstanding any applicable Bankruptcy Rule, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

50.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

16

51.    Copies of the Plan, the Disclosure Statement, and all pleadings and orders of the Court are publicly available, for a fee via PACER at: http://www.deb.uscourts.gov, or free of charge from Prime Clerk at https://cases.primeclerk.com/CIBER/.    Such documents and pleadings may also be obtained by: (a) calling the Debtors' restructuring hotline at (844) 648-5578 or (b) writing to CIBER Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at ciberballots@primeclerk.com.

Dated: _September 29_, 2017
       Wilmington, Delaware

_____
HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

ny-1298687

# **EXHIBIT 1**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CMTSU Liquidation, Inc., *et al.*, | ) | Case No. 17-10772 (BLS) |
| f/k/a CIBER, Inc., *et al.*[1] | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

## NOTICE REGARDING EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE REJECTED BY THE DEBTORS PURSUANT TO THE PLAN

**PLEASE TAKE NOTICE** that on [•], 2017, the Debtors filed the (a) *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Plan**") and (b) *Disclosure Statement for the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Disclosure Statement**"). On [•], 2017, the Bankruptcy Court entered an order (a) approving the Disclosure Statement; (b) establishing the voting record date, voting deadline, and other dates; (c) approving procedures for soliciting, receiving, and tabulating votes on Plan and for filing objections to Plan; (d) approving manner and forms of notice and other related documents; and (e) granting related relief [Docket No. [•]] (the "**Disclosure Statement Order**").[2]

**PLEASE TAKE FURTHER NOTICE** that, under the Plan, the Debtors are proposing to reject the Executory Contract(s) and Unexpired Lease(s) on **Schedule 1** hereto to which you are a party:[3]

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the proposed rejection of the above Executory Contract(s) or Unexpired Lease(s) must be filed with the Bankruptcy Court and served so as to be actually received by the Debtors' undersigned counsel no later than [•], 2017 (the "**Rejection Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if you fail to object timely to the proposed rejection by the Rejection Objection Deadline, you will be deemed to have assented to such rejection.

**PLEASE TAKE FURTHER NOTICE** that unless otherwise provided by an Order of the Bankruptcy Court, any Proof of Claim based on the rejection of an Executory Contract or Unexpired

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement Order or the Plan, as applicable.

[3] The Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from this Notice and assume such Executory Contract or Unexpired Lease pursuant to the terms of the Plan up until the Effective Date and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease.

Lease under the Plan must be filed with Prime Clerk, the Debtors' Claims and Noticing Agent, and served on the Debtors or the Post-Effective Date Debtors, as applicable, no later than thirty (30) days after the Effective Date. Proof of Claim forms may be obtained at the following websites: https://cases.primeclerk.com/CIBER or http://www.uscourts.gov/forms/bankruptcy-forms/proof-claim-0. **Any Claim based upon such rejection not filed within such time will be automatically disallowed, forever barred from being asserted, and unenforceable against the Debtors or the Post-Effective Date Debtors, without the need for any objection or further notice to, or action, order, or approval of, the Bankruptcy Court.**

      **PLEASE TAKE FURTHER NOTICE** that, if you would like to obtain a copy of the Plan or the Disclosure Statement, you may contact the Debtors' Claims and Noticing Agent by: (a) calling the Debtors' restructuring hotline at (844) 648-5578 or (b) writing to Prime Clerk at 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at ciberinfo@primeclerk.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at https://cases.primeclerk.com/CIBER.

---

**PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE REJECTED PURSUANT TO THE PLAN.**

**YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.**

---

**NO PERSON, INCLUDING PRIME CLERK, HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, INCLUDING LEGAL ADVICE, OR TO MAKE ANY REPRESENTATION REGARDING THE DEBTORS OR THE PLAN.**

**MORRISON & FOERSTER LLP**
Brett H. Miller (admitted *pro hac vice*)
Dennis L. Jenkins (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
Daniel J. Harris (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921

*Counsel for Debtors and Debtors-in-Possession*

ny-1293525

## Schedule 1

| Counterparty Name | Description of Contract |
|---|---|
|  |  |

ny-1293525

# EXHIBIT 2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CMTSU Liquidation, Inc., *et al.*, | ) Case No. 17-10772 (BLS) |
| f/k/a CIBER, Inc., *et al.*[1] | ) |
|  | ) Jointly Administered |
| Debtors. | ) |
|  | ) |

## NOTICE REGARDING EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED BY THE DEBTORS PURSUANT TO THE PLAN

**PLEASE TAKE NOTICE** that on [•], 2017, the Debtors filed the (a) *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Plan**") and (b) *Disclosure Statement for the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Disclosure Statement**"). On [•], 2017, the Bankruptcy Court entered an order (a) approving the Disclosure Statement; (b) establishing the voting record date, voting deadline, and other dates; (c) approving procedures for soliciting, receiving, and tabulating votes on Plan and for filing objections to Plan; (d) approving manner and forms of notice and other related documents; and (e) granting related relief [Docket No. [•]] (the "**Disclosure Statement Order**").[2]

**PLEASE TAKE FURTHER NOTICE** that, under the Plan, the Debtors are proposing to assume the Executory Contract(s) and Unexpired Lease(s) on **Schedule 1** hereto to which you are a party.[3]

**PLEASE TAKE FURTHER NOTICE** that section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. The Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s) to which you are a party, which amounts (the "**Cure Obligations**") are listed on **Schedule 1**. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no Cure Obligation outstanding for such contract or lease.

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement Order or the Plan, as applicable.

[3] The Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from this Notice and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan up until the Effective Date and (b) contest any Claim asserted in connection with assumption of any Executory Contract or Unexpired Lease.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the proposed assumption of the above Executory Contract(s) or Unexpired Lease(s) and/or the Cure Obligation (an "**Assumption Objection**") must be filed with the Bankruptcy Court and served so as to be actually received by the Debtors' undersigned counsel no later than [•], 2017 (the "**Assumption Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if you fail to object timely to the proposed assumption by the Assumption Objection Deadline, you will be deemed to have assented to such assumption or Cure Obligation. **The assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any claims against or defaults by the Debtors, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date the Debtors assume such Executory Contract or Unexpired Lease.**

**PLEASE TAKE FURTHER NOTICE** that if you file an Assumption Objection and you and the Debtors are not able to settle or resolve the Assumption Objection, the Bankruptcy Court shall determine the amount of any disputed Cure Obligation(s) or objection to assumption at the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") or such other hearing date to which the parties may mutually agree or as ordered by the Bankruptcy Court. The Confirmation Hearing will commence **on [•], 2017, at 10:00 a.m. prevailing Eastern Time**, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware 19801.

**PLEASE TAKE FURTHER NOTICE** that, if you would like to obtain a copy of the Plan or the Disclosure Statement, you may contact Prime Clerk LLC, the Debtors' Claims and Noticing Agent, by: (a) calling the Debtors' restructuring hotline at (844) 648-5578 or (b) writing to Prime Clerk at 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at ciberinfo@primeclerk.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at https://cases.primeclerk.com/CIBER.

---

**PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE ASSUMED PURSUANT TO THE PLAN.**

**YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.**

---

**NO PERSON, INCLUDING PRIME CLERK, HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, INCLUDING LEGAL ADVICE, OR TO MAKE ANY REPRESENTATION REGARDING THE DEBTORS OR THE PLAN.**

ny-1293530

**MORRISON & FOERSTER LLP**
Brett H. Miller (admitted *pro hac vice*)
Dennis L. Jenkins (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
Daniel J. Harris (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921

*Counsel for Debtors and Debtors-in-Possession*

ny-1293530

**Schedule 1**

| Counterparty Name | Description of Contract | Proposed Cure Obligation |
|---|---|---|
|  |  |  |

4

# EXHIBIT 3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CMTSU Liquidation, Inc., *et al.*, | ) | Case No. 17-10772 (BLS) |
| f/k/a CIBER, Inc., *et al.*[1] | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

## NOTICE OF NON-VOTING STATUS TO HOLDERS OF
## CLAIMS FOR WHICH AN OBJECTION HAS BEEN FILED

**PLEASE TAKE NOTICE** that on [•], 2017, the Debtors filed the (a) *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Plan**") and (b) *Disclosure Statement for the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Disclosure Statement**"). On [•], 2017, the Bankruptcy Court entered an order (a) approving the Disclosure Statement; (b) establishing the voting record date, voting deadline, and other dates; (c) approving procedures for soliciting, receiving, and tabulating votes on Plan and for filing objections to Plan; (d) approving manner and forms of notice and other related documents; and (e) granting related relief [Docket No. [•]] (the "**Disclosure Statement Order**").[2]

**PLEASE TAKE FURTHER NOTICE** that you are receiving this notice because you are the Holder of a Claim in a Voting Class, which is subject, in whole or in part, to an objection (a "**Disputed Claim**"). As such, subject to the procedures below, you are not entitled to vote on the Plan for any purpose and you have not been sent a Ballot. Accordingly, this notice is provided solely to permit you to "opt out" of the Third Party Release contained in Article VIII.E of the Plan (as described below).

If an objection has been filed to a portion of your Claim, you are not entitled to vote such disputed portion on the Plan and only the undisputed portion of your Claim shall be temporarily allowed for voting purposes. If you disagree with the treatment of your Claim for voting purposes as a result of the filing of an objection, then you **MUST** file with the Bankruptcy Court and serve upon the Notice Parties listed below, on or before 4:00 p.m. prevailing Eastern Time on [•] **, 2017** (the "**Rule 3018(a) Motion Deadline**"), a motion requesting temporary allowance of your Claim solely for voting purposes in accordance with Bankruptcy Rule 3018 (a "**Rule 3018(a) Motion**").

**PLEASE TAKE FURTHER NOTICE** that any party timely filing and serving a Rule 3018(a) Motion will be permitted to cast a provisional vote to accept or reject the Plan and will be provided a Solicitation Package, including a Ballot. You must return your Ballot according to the instructions

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement Order or the Plan, as applicable.

ny-1293575

attached thereto so it is **actually received** by Prime Clerk LLC, the Debtors' voting agent (the "**Voting Agent**"), on or before [•], 2017 (the "**Voting Deadline**").

      **PLEASE TAKE FURTHER NOTICE** that the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") will commence **on** [•], 2017, at [_____] a.m./p.m. (prevailing Eastern Time)**, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

      **PLEASE TAKE FURTHER NOTICE** that the deadline for filing objections to the Plan is [•], **2017, at 4:00 p.m. prevailing Eastern Time** (the "**Confirmation Objection Deadline**"). Any objection to the Plan must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the name of the objector and the nature and amount of any Claim or Interest asserted by the objector against or in the Debtors; (d) state with particularity the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed, contemporaneously with proof of service, with the Bankruptcy Court and served so that it is actually received no later than the Confirmation Objection Deadline by the Notice Parties set forth below. OBJECTIONS NOT FILED BY THE CONFIRMATION OBJECTION DEADLINE AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

**NOTICE PARTIES**

    a.   Counsel for the Debtors: (i) Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Brett H. Miller, Dennis L. Jenkins, Todd M. Goren and Daniel J. Harris, and (ii) Polsinelli, PC, 222 Delaware Avenue, Wilmington, Delaware 19801, Attn: Christopher A. Ward and Justin K. Edelson;

    b.   Counsel for the Committee: (i) Perkins Coie LLP, 30 Rockefeller Plaza, 22nd Floor, New York, New York, 10112, Attn: John D. Penn and Schuyler G. Carroll, and (ii) Shaw Fishman Glantz & Towbin LLC, 300 Delaware Avenue, Suite 1370, Wilmington, Delaware 19801, Attn: Thomas M. Horan; and

    c.   The Office of the United States Trustee: District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, 3rd Floor, Room 3209, Wilmington, Delaware 19801, Attn: Timothy J. Fox.

      **PLEASE TAKE FURTHER NOTICE** that the Debtors reserve all of their rights and objections regarding any and all Rule 3018(a) Motions that may be filed with the Bankruptcy Court and that the distribution of a Solicitation Package is not and shall not constitute a waiver or release of such rights and objections. If, and to the extent that, the Debtors and such party are unable to resolve the issues raised by the Rule 3018(a) Motion prior to the Voting Deadline, then at the Confirmation Hearing this Court shall determine whether the provisional ballot should be counted as a vote on the Plan.

2

PLEASE TAKE FURTHER NOTICE that Article VIII of the Plan contains certain release, injunction, and exculpation provisions. You are advised to carefully review and consider the Plan, including the release, injunction, and exculpation provisions, as your rights may be affected.

**Article VIII.E of the Plan contains the following Third Party Release provision:** [3]

ON THE <u>EFFECTIVE DATE</u> OF THE <u>PLAN</u> AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE <u>RELEASING PARTIES</u>[4] SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, AND INDIVIDUALLY AND COLLECTIVELY, RELEASED AND ACQUITTED THE <u>RELEASED PARTIES</u>[5] AND THEIR RESPECTIVE PROPERTY (INCLUDING THE <u>RELEASED PARTIES'</u> PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, <u>AFFILIATES,</u> MANAGED ACCOUNTS OR FUNDS, CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, MEMBERS, PARTNERS (GENERAL AND LIMITED), EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITIES AS SUCH) FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, <u>CAUSES OF ACTION</u>, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE <u>DEBTORS</u>, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, THAT SUCH <u>RELEASING PARTIES</u> (WHETHER INDIVIDUALLY OR COLLECTIVELY) EVER HAD, NOW HAVE OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR RELATED IN ANY WAY TO THE <u>DEBTORS</u>, ANY OF THE <u>DEBTORS'</u> PRESENT OR FORMER ASSETS, THE <u>RELEASED PARTIES'</u> INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE <u>DEBTORS</u> AND ANY <u>RELEASED PARTY</u>, THE <u>PLAN</u>, THE <u>DISCLOSURE STATEMENT</u>, THE <u>SALE TRANSACTION</u>, THE BIDDING AND SALE PROCESS FOR THE <u>DEBTORS'</u> ASSETS, THE <u>PURCHASE AGREEMENT</u>, THESE <u>CHAPTER 11 CASES</u>, OR ANY RESTRUCTURING OF <u>CLAIMS</u> OR <u>INTERESTS</u> UNDERTAKEN PRIOR TO THE <u>EFFECTIVE DATE</u>, INCLUDING THOSE THAT THE <u>DEBTORS</u> OR THE <u>POST-EFFECTIVE DATE DEBTORS</u> WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A <u>CLAIM</u> AGAINST OR <u>INTEREST</u> IN THE <u>DEBTORS</u> OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE <u>DEBTORS</u> OR THEIR <u>ESTATES</u>, EXCEPT FOR (I) ANY <u>CLAIMS</u> AND <u>CAUSES OF ACTION</u> FOR ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL

---

[3] Underlined terms in the following Third Party Release provision have the meanings ascribed to such terms in the Plan.

[4] "*Releasing Parties*" means (a) the Released Parties and (b) all Holders of Claims or Interests that do not, by the Voting Deadline, make the Third Party Opt-Out Election.

[5] "*Released Parties*" means: (a) the Debtors; (b) the Debtors' current and former Board Members, officers, and managers; (c) the Committee and the Committee Members (each solely in their capacities as such); and (d) each of the foregoing Entities' respective Related Parties (each solely in their capacities as such); provided, that as a condition to receiving or enforcing any release granted pursuant to Article VIII.E hereof, each Released Party and its Affiliates shall be deemed to have released the Releasing Parties, the Estates, and the Debtors from any and all Claims or Causes of Action arising from or related to their relationship with the Debtors, but not, for the avoidance of doubt, Professional Fee Claims.

3

MISCONDUCT AND (II) THE RIGHT TO RECEIVE DISTRIBUTIONS FROM THE <u>DEBTORS</u> OR THE <u>POST-EFFECTIVE DATE DEBTORS</u> ON ACCOUNT OF AN ALLOWED <u>CLAIM</u> OR ALLOWED <u>INTEREST</u> AGAINST THE <u>DEBTORS</u> PURSUANT TO THE <u>PLAN</u>.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL AN ENTITY THAT MAKES THE <u>THIRD PARTY OPT-OUT ELECTION</u> IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER BE A <u>RELEASING PARTY</u>.  FOR THE AVOIDANCE OF DOUBT, AMONG OTHERS, ANY HOLDER OF A <u>CLAIM</u> OR <u>INTEREST</u> THAT DOES NOT MAKE THE <u>THIRD PARTY OPT-OUT ELECTION</u> IS A <u>RELEASING PARTY</u>.

ENTRY OF THE <u>CONFIRMATION ORDER</u> SHALL CONSTITUTE THE <u>BANKRUPTCY COURT'S</u> APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE <u>PLAN</u>, AND, FURTHER, SHALL CONSTITUTE THE <u>BANKRUPTCY COURT'S</u> FINDING THAT THE THIRD PARTY RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE <u>RELEASED PARTIES</u>; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE <u>CLAIMS</u> RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE <u>DEBTORS</u> AND ALL HOLDERS OF <u>CLAIMS</u> AND <u>INTERESTS</u>; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE <u>RELEASING PARTIES</u> ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE, INCLUDING ANY CLAIMS FOR INDEMNITY OR CONTRIBUTION RELATING TO SUCH RELEASED CLAIMS.

FOR THE AVOIDANCE OF DOUBT, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE <u>DISCLOSURE STATEMENT</u>, <u>PLAN</u> OR <u>CONFIRMATION ORDER</u>, NO PROVISION SHALL (I) PRECLUDE THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS POLICE OR REGULATORY POWERS AND (II)(X) RELEASE ANY NONDEBTOR FROM LIABILITY IN CONNECTION WITH ANY LEGAL ACTION OR CLAIM BROUGHT BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR (Y) ENJOIN, LIMIT, IMPAIR, OR DELAY THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM BRINGING OR CONTINUING ANY ACTION AGAINST ANY NONDEBTOR IN ANY FORUM.

| <u>HOW TO OPT OUT OF THE THIRD PARTY RELEASE BY MAIL</u> |
| --- |

1. IF YOU WISH TO OPT OUT OF THE THIRD PARTY RELEASE PROVISION CONTAINED IN ARTICLE VIII.E OF THE PLAN SET FORTH ABOVE, CHECK THE BOX IN ITEM 1 BELOW.

2. REVIEW THE CERTIFICATIONS CONTAINED IN ITEM 2 BELOW.

3. SIGN AND DATE THIS NOTICE OF NON-VOTING STATUS AND FILL OUT THE OTHER REQUIRED INFORMATION IN THE APPLICABLE AREA BELOW.

4. IN ORDER FOR YOUR ELECTION TO OPT OUT OF THE THIRD PARTY RELEASE PROVISION BY MAIL TO BE COUNTED, YOUR NOTICE OF NON-VOTING STATUS MUST BE PROPERLY COMPLETED AND ACTUALLY RECEIVED BY THE VOTING AGENT BELOW NO LATER THAN [•], 2017, at [_____] p.m. (ET). YOU MAY USE THE

4

---

POSTAGE-PAID ENVELOPE PROVIDED OR SEND YOUR NOTICE OF NON-VOTING STATUS TO THE FOLLOWING ADDRESS:

CIBER BALLOT PROCESSING
C/O PRIME CLERK LLC
830 3RD AVENUE, 3RD FLOOR
NEW YORK, NY 10022

---

### HOW TO OPT OUT OF THE THIRD PARTY RELEASE ONLINE

This Notice of Non-Voting Status may also be returned by electronic, online transmission solely by clicking on the "E-Ballot" section on the Debtors' case information website (https://cases.primeclerk.com/ciber) and following the directions set forth on the website regarding submitting your Notice of Non-Voting Status as described more fully below.  Please choose only one method of return of your Notice of Non-Voting Status.

1.      **PLEASE VISIT HTTPS://CASES.PRIMECLERK.COM/CIBER.**

2.      **CLICK ON THE "E-BALLOT" SECTION OF THE DEBTORS' WEBSITE.**

3.      **IN ORDER FOR YOUR ELECTION TO OPT OUT OF THE THIRD PARTY RELEASE PROVISION TO BE COUNTED, YOUR NOTICE OF NON-VOTING STATUS MUST BE PROPERLY COMPLETED AND ACTUALLY RECEIVED BY NO LATER THAN [•], 2017, at [_____] p.m. (ET).  IF YOU CHOOSE TO SUBMIT YOUR NOTICE OF NON-VOTING STATUS VIA THE VOTING AGENT'S E-BALLOT SYSTEM, YOU SHOULD NOT RETURN A HARD COPY OF YOUR NOTICE OF NON-VOTING.**

**IMPORTANT NOTE: YOU WILL NEED THE FOLLOWING INFORMATION TO RETRIEVE AND SUBMIT YOUR CUSTOMIZED NOTICE OF NON-VOTING STATUS:**

          **UNIQUE E-BALLOT ID#_____**

**"E-BALLOTING" IS THE SOLE MANNER IN WHICH NOTICE OF YOUR NON-VOTING STATUS MAY BE DELIVERED VIA ELECTRONIC TRANSMISSION.   NOTICES OF NON-VOTING STATUS SUBMITTED BY FACSIMILE OR EMAIL WILL NOT BE ACCEPTED.**

<u>Item 1</u>.  Opt Out of Third Party Release.

**PLEASE TAKE NOTICE** that you may check the box below to opt out of the Third Party Release provision contained in Article VIII.E of the Plan (as set forth above).  **If you do not opt out of the Third Party Release provision by checking the box below and properly and timely submitting this Notice of Non-Voting Status, you will be deemed to have unconditionally, irrevocably, and forever released and discharged the Released Parties (as defined in the Plan) from, *inter alia*, any and all Causes of Action (as defined in the Plan) except as otherwise specifically provided in the Plan.**

---

☐       <u>**Opt out**</u> of the Third Party Release in Article VIII.E of the Plan

---

**Item 2. Certifications.**

By signing this Notice of Non-Voting Status, the undersigned certifies and otherwise acknowledges to the Bankruptcy Court and the Debtors that: (a) the undersigned is the Holder of a Disputed Claim(s) as of the Voting Record Date and/or it has full power and authority to opt out of the Third Party Release provision for the Holder of the Disputed Claim(s) identified below and (b) it understands the scope of the Third Party Release:

YOUR RECEIPT OF THIS NOTICE OF NON-VOTING STATUS DOES NOT SIGNIFY THAT YOUR CLAIM HAS BEEN OR WILL BE ALLOWED.

Signature:_____

Name of Claimant (print/type):_____

Name/Title of Signatory:_____

If signed by authorized agent, name/title of agent:_____

Telephone Number:_____

E-mail address:_____

Dated:_____

**PLEASE TAKE FURTHER NOTICE** that, if you have questions regarding the procedures and requirements for opting out of the Third Party Release, you may contact the Debtors' voting agent, Prime Clerk LLC (the "**Voting Agent**"), by: (a) calling the Debtors' restructuring hotline at (844) 648-5578 or (b) writing to CIBER Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at ciberballots@primeclerk.com.

**PLEASE TAKE FURTHER NOTICE** that you may also obtain copies of the Plan, the Disclosure Statement, and any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at https://cases.primeclerk.com/CIBER.

---

**IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE.**

---

ny-1293575

**NO PERSON, INCLUDING THE VOTING AGENT, HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, INCLUDING LEGAL ADVICE, OR TO MAKE ANY REPRESENTATION REGARDING THE DEBTORS OR THE PLAN.**

| | |
|---|---|
| **MORRISON & FOERSTER LLP** | **POLSINELLI PC** |
| Brett H. Miller (admitted *pro hac vice*) | Christopher A. Ward (Del. Bar No. 3877) |
| Dennis L. Jenkins (admitted *pro hac vice*) | Justin K. Edelson (Del. Bar No. 5002) |
| Todd M. Goren (admitted *pro hac vice*) | 222 Delaware Avenue, Suite 1101 |
| Daniel J. Harris (admitted *pro hac vice*) | Wilmington, Delaware 19801 |
| 250 West 55th Street | Telephone: (302) 252-0920 |
| New York, New York 10019 | Facsimile: (302) 252-0921 |
| Telephone: (212) 468-8000 | |
| Facsimile: (212) 468-7900 | |

*Counsel for Debtors and Debtors-in-Possession*

7

# EXHIBIT 4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CMTSU Liquidation, Inc., *et al.*, | ) Case No. 17-10772 (BLS) |
| f/k/a CIBER, Inc., *et al.*[1] | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |

**BALLOT FOR VOTING ON THE ABOVE-CAPTIONED
DEBTORS' CHAPTER 11 PLAN**

<u>**CLASS 3 – GENERAL UNSECURED CLAIMS**</u>

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR
COMPLETING THIS BALLOT CAREFULLY <u>BEFORE</u> COMPLETING THIS BALLOT.

**THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO
THAT IT IS <u>ACTUALLY RECEIVED</u> BY PRIME CLERK LLC
(THE "<u>VOTING AGENT</u>") ON OR BEFORE [•], 2017 AT 4:00 P.M.
PREVAILING EASTERN TIME (THE "<u>VOTING DEADLINE</u>").**

The above-captioned debtors and debtors-in-possession (the "**Debtors**") are soliciting votes with respect to the *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•] (as it may be amended, modified, or supplemented from time to time, the "**Plan**"). You are receiving this Ballot because the Debtors' records indicate that you are a Holder of a Class 3 General Unsecured Claim as of the Voting Record Date (the close of business on [•]). Accordingly, you have the right to vote to accept or reject the Plan.

Your rights are described in the Plan and the *Disclosure Statement for the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Disclosure Statement**"). The Bankruptcy Court approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code by entry of an order on [•], 2017 [Docket No. [•]] (the "**Disclosure Statement Order**"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order.

The Disclosure Statement, the Plan, the Disclosure Statement Order, and certain other materials are contained in the Solicitation Package you are receiving with this Ballot. If you would like to obtain additional materials, you may contact the Voting Agent by: (a) calling the Debtors' restructuring hotline at (844) 648-5578; (b) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/CIBER;

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

ny-1293533

or (c) writing to CIBER Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at ciberballots@primeclerk.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at https://cases.primeclerk.com/CIBER.

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan.  If you believe you have received this Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Voting Agent immediately at the address, email, or telephone number set forth above.

**You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 3 General Unsecured Claims under the Plan.  If you hold both a Claim and an Interest in more than one Class, you will receive a Ballot for each Class in which you are entitled to vote.**

The Bankruptcy Court can confirm the Plan and bind all Holders of Claims if (a) it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of the Claims in each Impaired Class that vote on the Plan, and (b) the Plan otherwise satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code

If the Voting Agent does not **actually receive** your Ballot on or before the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.  **If the Court confirms the Plan, the Plan will bind you regardless of whether you vote.**

*****************************

## <u>INSTRUCTIONS FOR COMPLETING THIS BALLOT</u>

1.  The Debtors are soliciting the votes of Holders of Claims in Class 3 with respect to the Plan, which is attached as <u>Exhibit A</u> to the Disclosure Statement.

2.  To ensure that your vote is counted, you <u>must</u> complete the Ballot by taking the following steps: (a) make sure that the amount of your Claim is set forth in Item 1 (if you do not know the amount of your Claim, please contact the Voting Agent); (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2; (c) review the information regarding releases set forth in Item 3 and, if you choose do to so, elect whether to opt out of the releases; (d) review the information regarding the Class 3 Cash-Out Election in Item 4 and, if you choose do to so, elect to make the Class 3 Cash-Out Election; and (e) provide the information required by Item 5 on the Ballot <u>and</u> sign, date, and return an original of your Ballot to the address set forth on the enclosed pre-addressed envelope (unless you elect to complete your Ballot online by following the instructions set forth below).

3.  If a Ballot is received <u>after</u> the Voting Deadline, it will not be counted unless the Debtors, with the consent of the Committee (such consent not to be unreasonably withheld) or by order of the Court, have granted an extension of the Voting Deadline in writing with respect to such Ballot. Additionally, the following Ballots will **NOT** be counted:

    ➤ Any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

    ➤ Any Ballot cast by a Person or Entity that does not hold a Claim in a Voting Class;

2

> Any Ballot cast for a Claim for which no Proof of Claim was timely filed or that was filed after the Voting Record Date and that is (i) not listed on the Schedules or (ii) scheduled at (x) zero, (y) in an unknown amount, or (z) as unliquidated, contingent, or disputed;

> Any Ballot that is properly completed, executed, and timely filed, but (i) does not indicate an acceptance or rejection of the Plan, (ii) indicates both an acceptance and rejection of the Plan, or (iii) partially accepts and partially rejects the Plan;

> Any Ballot submitted by facsimile, telecopy, or electronic mail, except as otherwise agreed by the Debtors in writing;

> Any unsigned Ballot;

> Any Ballot sent to an entity other than Prime Clerk, including, but not limited to, the Court, the Debtors, the Debtors' agents/representatives, the Committee, the Committee's agents/representatives, or the Debtors' financial or legal advisors; or

> Any Ballot not cast in accordance with the procedures approved in the Disclosure Statement Order.

4. The method of delivery of Ballots to the Voting Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Voting Agent **actually receives** the originally executed Ballot. If you choose not to use the Voting Agent's online portal, as described below, it is recommended, though not required, that Holders use an overnight or hand delivery service. In all cases, Holders should allow sufficient time to assure timely delivery.

5. If multiple Ballots are received from the same Holder of a Claim with respect to the same Claim prior to the Voting Deadline, the last valid Ballot timely received will supersede and revoke any earlier received Ballots.

6. You must vote all of your Claims within a particular Class either to accept or reject the Plan and may not split your vote. Further, if a Holder has multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

7. This Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at this time, Holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor the Voting Agent will accept delivery of any such certificates or instruments surrendered together with a Ballot.

8. This Ballot does not constitute nor shall be deemed to be (a) a Proof of Claim or Interest or (b) an assertion or admission of a Claim or Interest.

9. Please be sure to sign and date your Ballot. If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

3

Case 17-10772-BLS    Doc 667-4    Filed 10/03/17    Page 5 of 249

10. If you hold Claims and Interests in more than one Class under the Plan, you may receive more than one Ballot coded for each different Class. Each Ballot votes only your Claims or Interests indicated on that Ballot, so please complete and return each Ballot you receive.

*[Remainder of Page Intentionally Left Blank]*

4

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT,
THESE BALLOT INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CONTACT THE VOTING AGENT BY TELEPHONE AT:  (844) 648-5578
OR VIA EMAIL AT CIBERBALLOTS@PRIMECLERK.COM.

## INSTRUCTIONS FOR COMPLETING YOUR BALLOT ONLINE

To submit your Ballot via the Voting Agent's online portal, please visit https://cases.primeclerk.com/CIBER.  Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.

IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#:_____

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email or other means of electronic transmission will not be counted, except as otherwise agreed by the Debtors in writing.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.  Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

---

**IF THE VOTING AGENT DOES NOT UNDERLINE ACTUALLY RECEIVE
THIS BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS
[•], 2017 AT 4:00 P.M. PREVAILING EASTERN TIME, THEN
YOUR VOTE TRANSMITTED HEREBY WILL NOT BE COUNTED.**

---

NO PERSON, INCLUDING THE VOTING AGENT, HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, INCLUDING LEGAL ADVICE, OR TO MAKE ANY REPRESENTATION REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE SOLICITATION PACKAGE MAILED HEREWITH.

ny-1293533

---

**CLASS 3 – GENERAL UNSECURED CLAIMS**

---

## BALLOT

**Item 1. Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date (the close of business on [•], 2017), the undersigned was the Holder (or the authorized signatory of such Holder) of a Class 3 General Unsecured Claim against the Debtors in the amount listed in the box below, without regard to any accrued but unpaid interest (insert unpaid amount in box below if not already completed):

$\$\underline{\hspace{3cm}}$

**Item 2. Vote on Plan.**

The Holder of the Class 3 General Unsecured Claim against the Debtors set forth in Item 1 above votes to (please check <u>one</u> box below):

☐　　**ACCEPT** (vote FOR) the Plan　　　　☐　　**REJECT** (vote AGAINST) the Plan

**Item 3. Important Information Regarding Releases.**

<u>Article VIII.E of the Plan Contains the Following Third Party Release Provision</u>

ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE RELEASING PARTIES SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, AND INDIVIDUALLY AND COLLECTIVELY, RELEASED AND ACQUITTED THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY (INCLUDING THE RELEASED PARTIES' PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, AFFILIATES, MANAGED ACCOUNTS OR FUNDS, CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, MEMBERS, PARTNERS (GENERAL AND LIMITED), EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITIES AS SUCH) FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, THAT SUCH RELEASING PARTIES (WHETHER INDIVIDUALLY OR COLLECTIVELY) EVER HAD, NOW HAVE OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, ANY OF THE DEBTORS' PRESENT OR FORMER ASSETS, THE RELEASED PARTIES' INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE PLAN, THE DISCLOSURE STATEMENT, THE SALE TRANSACTION, THE BIDDING AND SALE PROCESS FOR THE

6

DEBTORS' ASSETS, THE PURCHASE AGREEMENT, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING OF CLAIMS OR INTERESTS UNDERTAKEN PRIOR TO THE EFFECTIVE DATE, INCLUDING THOSE THAT THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES, EXCEPT FOR (I) ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND (II) THE RIGHT TO RECEIVE DISTRIBUTIONS FROM THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS ON ACCOUNT OF AN ALLOWED CLAIM OR ALLOWED INTEREST AGAINST THE DEBTORS PURSUANT TO THE PLAN.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL AN ENTITY THAT MAKES THE THIRD PARTY OPT-OUT ELECTION IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER BE A RELEASING PARTY. FOR THE AVOIDANCE OF DOUBT, AMONG OTHERS, ANY HOLDER OF A CLAIM OR INTEREST THAT DOES NOT MAKE THE THIRD PARTY OPT-OUT ELECTION IS A RELEASING PARTY.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE, INCLUDING ANY CLAIMS FOR INDEMNITY OR CONTRIBUTION RELATING TO SUCH RELEASED CLAIMS.

FOR THE AVOIDANCE OF DOUBT, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE DISCLOSURE STATEMENT, PLAN OR CONFIRMATION ORDER, NO PROVISION SHALL (I) PRECLUDE THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS POLICE OR REGULATORY POWERS AND (II)(X) RELEASE ANY NONDEBTOR FROM LIABILITY IN CONNECTION WITH ANY LEGAL ACTION OR CLAIM BROUGHT BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR (Y) ENJOIN, LIMIT, IMPAIR, OR DELAY THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM BRINGING OR CONTINUING ANY ACTION AGAINST ANY NONDEBTOR IN ANY FORUM.

**As a Holder of an Impaired Claim under the Plan, you may check the box below to opt out of the "Third Party Release" set forth in Article VIII.E of the Plan.**

The undersigned Holder of the Class 3 General Unsecured Claim set forth in Item 1 elects to:

| | |
|---|---|
| ☐ | **Opt out** of the Third Party Release in Article VIII.E of the Plan |

ny-1293533

**Item 4.** **Class 3 Cash-Out Election.**

ARTICLE III.B.3.b OF THE PLAN ALLOWS HOLDERS OF ALLOWED CLASS 3 CLAIMS TO MAKE A CASH-OUT ELECTION. IF A HOLDER OF SUCH CLAIM MAKES THE CLASS 3 CASH-OUT ELECTION (BY CHECKING THE BOX BELOW), SUCH HOLDER WILL RECEIVE CASH IN AN AMOUNT EQUAL TO 35% OF SUCH HOLDER'S ALLOWED CLASS 3 CLAIM IN LIEU OF THE OTHER TREATMENT PROVIDED FOR IN ARTICLE III.B.3.b OF THE PLAN.

CHECK THE BOX BELOW IF YOU ELECT TO MAKE THE CLASS 3 CASH-OUT ELECTION AS DESCRIBED IN ARTICLE III.B.3.b OF THE PLAN. THE CLASS 3 CASH-OUT ELECTION IS AT YOUR OPTION. IF YOU <u>DO NOT</u> ELECT TO MAKE THE CLASS 3 CASH-OUT ELECTION BY CHECKING THE BOX BELOW, YOU WILL RECEIVE THE OTHER TREATMENT PROVIDED FOR IN ARTICLE III.B.3.b OF THE PLAN.

YOU <u>MUST</u> VOTE TO ACCEPT THE PLAN IN ORDER FOR YOUR CLASS 3 CASH-OUT ELECTION TO BE VALID. IF YOU SUBMIT YOUR BALLOT WITHOUT CHECKING THE BOX BELOW, YOU WILL BE DEEMED TO HAVE <u>NOT</u> MADE THE CLASS 3 CASH-OUT ELECTION.

The undersigned Holder of the Class 3 General Unsecured Claim set forth in Item 1 elects to:

☐ **Make the Class 3 Cash-Out Election** provided for in Article III.B.3.b of the Plan.

**Item 5.** **Certifications.**

By signing this Ballot, the undersigned certifies and otherwise acknowledges to the Bankruptcy Court and the Debtors:

1. that either: (a) the undersigned is the Holder of the Class 3 General Unsecured Claim(s) being voted; or (b) the undersigned is an authorized signatory for an entity that is the Holder of the Class 3 General Unsecured Claim(s) being voted. In either case, the undersigned has the full power and authority to vote to accept or reject the Plan with respect to the Claim(s) identified in Item 1 above;

2. that the undersigned has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

3. that the undersigned has cast the same vote with respect to all Class 3 General Unsecured Claim(s) in a single Class; <u>and</u>

4. that no other Ballots with respect to the amount of the Class 3 General Unsecured Claim(s) identified in Item 1 above have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are hereby revoked.

Signature:_____

Name of Claimant (print/type):_____

Name/Title of Signatory:_____

If signed by authorized agent, name/title of agent:_____

ny-1293533

Telephone Number:_____ ._____

E-mail address:_____

Dated:_____

ny-1293533

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT <u>PROMPTLY</u> IN THE ENVELOPE PROVIDED TO:**

CIBER Ballot Processing
c/o Prime Clerk
830 3rd Avenue, 3rd Floor
New York, New York 10022

**-or-**

**SUBMIT YOUR BALLOT VIA THE VOTING AGENT'S ONLINE PORTAL BY
VISITING https://cases.primeclerk.com/CIBER. Click on the "Submit E-Ballot" section of
the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit
your customized electronic Ballot:**

**Unique E-Ballot ID#:**_____

**Creditors who cast a Ballot using the Voting Agent's online portal should NOT also submit
a paper Ballot.**

**THIS BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY THE VOTING AGENT ON OR
BEFORE [•], 2017 AT 4:00 P.M. PREVAILING EASTERN TIME. BALLOTS SENT BY
FACSIMILE, TELECOPY, OR ELECTRONIC MAIL WILL <u>NOT</u> BE ACCEPTED,
EXCEPT AS NOTED ABOVE OR IN THE DISCLOSURE STATEMENT ORDER.**

10

ny-1293533

# EXHIBIT 5

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | )  | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CMTSU Liquidation, Inc., *et al.*, | ) | Case No. 17-10772 (BLS) |
| f/k/a CIBER, Inc., *et al.*[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

## NOTICE OF NON-VOTING STATUS TO HOLDERS OF
## UNIMPAIRED CLAIMS PRESUMED TO ACCEPT THE PLAN

### (CLASSES 1 AND 2)

**PLEASE TAKE NOTICE** that on [•], 2017, the Debtors filed the (a) *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Plan**") and (b) *Disclosure Statement for the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Disclosure Statement**"). On [•], 2017, the Bankruptcy Court entered an order (a) approving the Disclosure Statement; (b) establishing the voting record date, voting deadline, and other dates; (c) approving procedures for soliciting, receiving, and tabulating votes on Plan and for filing objections to Plan; (d) approving manner and forms of notice and other related documents; and (e) granting related relief [Docket No. [•]] (the "**Disclosure Statement Order**").[2]

**PLEASE TAKE FURTHER NOTICE** that because of the treatment of your Claim under the Plan, <u>you are not entitled to vote on the Plan</u>. Specifically, you are the Holder of a Claim in Class 1 or 2 that (as currently asserted against the Debtors) is Unimpaired under the Plan and **you are conclusively presumed to have accepted the Plan** pursuant to section 1126(f) of the Bankruptcy Code. For these reasons, you have not been sent a Ballot for voting on the Plan. Accordingly, this notice is provided solely to permit you to "opt out" of the Third Party Release contained in Article VIII.E of the Plan (as described below).

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") will commence **on [•], 2017, at [_____] a.m./p.m. (prevailing Eastern Time)**, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement Order or the Plan, as applicable.

such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

     **PLEASE TAKE FURTHER NOTICE** that the deadline for filing objections to the Plan is [•], 2017, at 4:00 p.m. prevailing Eastern Time (the "**Confirmation Objection Deadline**"). Any objection to the Plan must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the name of the objector and the nature and amount of any Claim or Interest asserted by the objector against or in the Debtors; (d) state with particularity the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed, contemporaneously with proof of service, with the Bankruptcy Court and served so that it is actually received no later than the Confirmation Objection Deadline by the Notice Parties set forth below. OBJECTIONS NOT FILED BY THE CONFIRMATION OBJECTION DEADLINE AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

## NOTICE PARTIES

a.    Counsel for the Debtors: (i) Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Brett H. Miller, Dennis L. Jenkins, Todd M. Goren and Daniel J. Harris, and (ii) Polsinelli, PC, 222 Delaware Avenue, Wilmington, Delaware 19801, Attn: Christopher A. Ward and Justin K. Edelson;

b.    Counsel for the Committee: (i) Perkins Coie LLP, 30 Rockefeller Plaza, 22nd Floor, New York, New York, 10112, Attn: John D. Penn and Schuyler G. Carroll, and (ii) Shaw Fishman Glantz & Towbin LLC, 300 Delaware Avenue, Suite 1370, Wilmington, Delaware 19801, Attn: Thomas M. Horan; and

c.    The Office of the United States Trustee: District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, 3rd Floor, Room 3209, Wilmington, Delaware 19801, Attn: Timothy J. Fox.

     **PLEASE TAKE FURTHER NOTICE** that Article VIII of the Plan contains certain release, injunction, and exculpation provisions. You are advised to carefully review and consider the Plan, including the release, injunction, and exculpation provisions, as your rights may be affected.

**Article VIII.E of the Plan contains the following Third Party Release provision:[3]**

     ON THE <u>EFFECTIVE DATE</u> OF THE <u>PLAN</u> AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE <u>RELEASING PARTIES</u>[4] SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, AND INDIVIDUALLY AND COLLECTIVELY, RELEASED AND ACQUITTED THE <u>RELEASED PARTIES</u>[5] AND THEIR

---

[3] Underlined terms in the following Third Party Release provision have the meanings ascribed to such terms in the Plan.

[4] "*Releasing Parties*" means (a) the Released Parties and (b) all Holders of Claims or Interests that do not, by the Voting Deadline, make the Third Party Opt-Out Election.

[5] "*Released Parties*" means: (a) the Debtors; (b) the Debtors' current and former Board Members, officers, and managers; (c) the Committee and the Committee Members (each solely in their capacities as such); and (d) each of the foregoing Entities' respective Related Parties (each solely in their capacities as such); <u>provided</u>, that as a condition to receiving or enforcing any release granted pursuant to Article VIII.E hereof, each Released Party and its

RESPECTIVE PROPERTY (INCLUDING THE <u>RELEASED PARTIES'</u> PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, <u>AFFILIATES,</u> MANAGED ACCOUNTS OR FUNDS, CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, MEMBERS, PARTNERS (GENERAL AND LIMITED), EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITIES AS SUCH) FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, <u>CAUSES OF ACTION</u>, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE <u>DEBTORS,</u> WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, THAT SUCH <u>RELEASING PARTIES</u> (WHETHER INDIVIDUALLY OR COLLECTIVELY) EVER HAD, NOW HAVE OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR RELATED IN ANY WAY TO THE <u>DEBTORS,</u> ANY OF THE <u>DEBTORS'</u> PRESENT OR FORMER ASSETS, THE <u>RELEASED PARTIES'</u> INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE <u>DEBTORS</u> AND ANY <u>RELEASED PARTY</u>, THE <u>PLAN</u>, THE <u>DISCLOSURE STATEMENT</u>, THE <u>SALE TRANSACTION</u>, THE BIDDING AND SALE PROCESS FOR THE <u>DEBTORS'</u> ASSETS, THE <u>PURCHASE AGREEMENT</u>, THESE <u>CHAPTER 11 CASES</u>, OR ANY RESTRUCTURING OF <u>CLAIMS</u> OR <u>INTERESTS</u> UNDERTAKEN PRIOR TO THE <u>EFFECTIVE DATE</u>, INCLUDING THOSE THAT THE <u>DEBTORS</u> OR THE <u>POST-EFFECTIVE DATE DEBTORS</u> WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A <u>CLAIM</u> AGAINST OR <u>INTEREST</u> IN THE <u>DEBTORS</u> OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE <u>DEBTORS</u> OR THEIR <u>ESTATES</u>, EXCEPT FOR (I) ANY <u>CLAIMS</u> AND <u>CAUSES OF ACTION</u> FOR ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND (II) THE RIGHT TO RECEIVE DISTRIBUTIONS FROM THE <u>DEBTORS</u> OR THE <u>POST-EFFECTIVE DATE DEBTORS</u> ON ACCOUNT OF AN ALLOWED <u>CLAIM</u> OR ALLOWED <u>INTEREST</u> AGAINST THE <u>DEBTORS</u> PURSUANT TO THE <u>PLAN</u>.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL AN ENTITY THAT MAKES THE <u>THIRD PARTY OPT-OUT ELECTION</u> IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER BE A <u>RELEASING PARTY</u>.  FOR THE AVOIDANCE OF DOUBT, AMONG OTHERS, ANY HOLDER OF A <u>CLAIM</u> OR <u>INTEREST</u> THAT DOES NOT MAKE THE <u>THIRD PARTY OPT-OUT ELECTION</u> IS A <u>RELEASING PARTY</u>.

ENTRY OF THE <u>CONFIRMATION ORDER</u> SHALL CONSTITUTE THE <u>BANKRUPTCY COURT'S</u> APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE <u>PLAN</u>, AND, FURTHER, SHALL CONSTITUTE THE <u>BANKRUPTCY COURT'S</u> FINDING THAT THE THIRD PARTY RELEASE IS:  (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE <u>RELEASED PARTIES</u>; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE <u>CLAIMS</u> RELEASED BY THE THIRD PARTY RELEASE; (3) IN

---

Affiliates shall be deemed to have released the Releasing Parties, the Estates, and the Debtors from any and all Claims or Causes of Action arising from or related to their relationship with the Debtors, but not, for the avoidance of doubt, Professional Fee Claims.

THE BEST INTERESTS OF THE <u>DEBTORS</u> AND ALL HOLDERS OF <u>CLAIMS</u> AND <u>INTERESTS</u>; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE <u>RELEASING PARTIES</u> ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE, INCLUDING ANY CLAIMS FOR INDEMNITY OR CONTRIBUTION RELATING TO SUCH RELEASED CLAIMS.

FOR THE AVOIDANCE OF DOUBT, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE <u>DISCLOSURE STATEMENT</u>, <u>PLAN</u> OR <u>CONFIRMATION ORDER</u>, NO PROVISION SHALL (I) PRECLUDE THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS POLICE OR REGULATORY POWERS AND (II)(X) RELEASE ANY NONDEBTOR FROM LIABILITY IN CONNECTION WITH ANY LEGAL ACTION OR CLAIM BROUGHT BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR (Y) ENJOIN, LIMIT, IMPAIR, OR DELAY THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM BRINGING OR CONTINUING ANY ACTION AGAINST ANY NONDEBTOR IN ANY FORUM.

---

### HOW TO OPT OUT OF THE THIRD PARTY RELEASE BY MAIL

1. IF YOU WISH TO OPT OUT OF THE THIRD PARTY RELEASE PROVISION CONTAINED IN ARTICLE VIII.E OF THE PLAN SET FORTH ABOVE, CHECK THE BOX IN ITEM 1 BELOW.

2. REVIEW THE CERTIFICATIONS CONTAINED IN ITEM 2 BELOW.

3. SIGN AND DATE THIS NOTICE OF NON-VOTING STATUS AND FILL OUT THE OTHER REQUIRED INFORMATION IN THE APPLICABLE AREA BELOW.

4. IN ORDER FOR YOUR ELECTION TO OPT OUT OF THE THIRD PARTY RELEASE PROVISION BY MAIL TO BE COUNTED, YOUR NOTICE OF NON-VOTING STATUS MUST BE PROPERLY COMPLETED AND ACTUALLY RECEIVED BY NO LATER THAN [•], 2017, at [_____] p.m. (ET).   YOU MAY USE THE POSTAGE-PAID ENVELOPE PROVIDED OR SEND YOUR NOTICE OF NON-VOTING STATUS TO THE FOLLOWING ADDRESS:

**CIBER BALLOT PROCESSING**
**C/O PRIME CLERK LLC**
**830 3RD AVENUE, 3RD FLOOR**
**NEW YORK, NY 10022**

---

### HOW TO OPT OUT OF THE THIRD PARTY RELEASE ONLINE

This Notice of Non-Voting Status may also be returned by electronic, online transmission solely by clicking on the "E-Ballot" section on the Debtors' case information website (https://cases.primeclerk.com/ciber) and following the directions set forth on the website regarding submitting your Notice of Non-Voting Status as described more fully below.  Please choose only one method of return of your Notice of Non-Voting Status.

1. PLEASE VISIT HTTPS://CASES.PRIMECLERK.COM/CIBER.

---

ny-1293534

2.      **CLICK ON THE "E-BALLOT" SECTION OF THE DEBTORS' WEBSITE.**

3.      **IN ORDER FOR YOUR ELECTION TO OPT OUT OF THE THIRD PARTY RELEASE PROVISION TO BE COUNTED, YOUR NOTICE OF NON-VOTING STATUS MUST BE PROPERLY COMPLETED AND ACTUALLY RECEIVED BY NO LATER THAN [•], 2017, at [_____] p.m. (ET). IF YOU CHOOSE TO SUBMIT YOUR NOTICE OF NON-VOTING STATUS VIA THE VOTING AGENT'S E-BALLOT SYSTEM, YOU SHOULD NOT RETURN A HARD COPY OF YOUR NOTICE OF NON-VOTING.**

**IMPORTANT NOTE: YOU WILL NEED THE FOLLOWING INFORMATION TO RETRIEVE AND SUBMIT YOUR CUSTOMIZED NOTICE OF NON-VOTING STATUS:**

        **UNIQUE E-BALLOT ID#_____**

**"E-BALLOTING" IS THE SOLE MANNER IN WHICH NOTICE OF NON-VOTING STATUSMAY BE DELIVERED VIA ELECTRONIC TRANSMISSION. NOTICES OF NON-VOTING STATUS SUBMITTED BY FACSIMILE OR EMAIL WILL NOT BE COUNTED.**

**Item 1. Opt Out of Third Party Release.**

**PLEASE TAKE NOTICE** that you may check the box below to opt out of the Third Party Release provision contained in Article VIII.E of the Plan (as set forth above). **If you do not opt out of the Third Party Release provision by checking the box below and properly and timely submitting this Notice of Non-Voting Status, you will be deemed to have unconditionally, irrevocably, and forever released and discharged the Released Parties (as defined in the Plan) from,** *inter alia*, **any and all Causes of Action (as defined in the Plan) except as otherwise specifically provided in the Plan.**

☐      <u>**Opt out**</u> of the Third Party Release in Article VIII.E of the Plan

**Item 2. Certifications.**

By signing this Notice of Non-Voting Status, the undersigned certifies and otherwise acknowledges to the Bankruptcy Court and the Debtors that: (a) the undersigned is the Holder of Unimpaired Claim(s) as of the Voting Record Date and/or it has full power and authority to opt out of the Third Party Release provision for the Holder of the Unimpaired Claim(s) identified below and (b) it understands the scope of the Third Party Release:

YOUR RECEIPT OF THIS NOTICE OF NON-VOTING STATUS DOES NOT SIGNIFY THAT YOUR CLAIM HAS BEEN OR WILL BE ALLOWED.

        Signature:_____

        Name of Claimant (print/type):_____

        Name/Title of Signatory:_____

        If signed by authorized agent, name/title of agent:_____

        Telephone Number:_____

E-mail address:_____

Dated:_____

    **PLEASE TAKE FURTHER NOTICE** that, if you have questions regarding the procedures and requirements for opting out of the Third Party Release, you may contact the Debtors' voting agent, Prime Clerk LLC (the "**Voting Agent**"), by: (a) calling the Debtors' restructuring hotline at (844) 648-5578 or (b) writing to CIBER Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at ciberballots@primeclerk.com.

    **PLEASE TAKE FURTHER NOTICE** that you may also obtain copies of the Plan, the Disclosure Statement, and any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at https://cases.primeclerk.com/CIBER.

---

**IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE.**

---

**NO PERSON, INCLUDING THE VOTING AGENT, HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, INCLUDING LEGAL ADVICE, OR TO MAKE ANY REPRESENTATION REGARDING THE DEBTORS OR THE PLAN.**

**MORRISON & FOERSTER LLP**
Brett H. Miller (admitted *pro hac vice*)
Dennis L. Jenkins (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
Daniel J. Harris (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921

*Counsel for Debtors and Debtors-in-Possession*

ny-1293534

# EXHIBIT 6-A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CMTSU Liquidation, Inc., *et al.*, | ) | Case No. 17-10772 (BLS) |
| f/k/a CIBER, Inc., *et al.*[1] | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

## NOTICE OF NON-VOTING STATUS TO HOLDERS OF CLASS 4 INTERESTS

### (BENEFICIAL HOLDER)

**PLEASE TAKE NOTICE** that on [•], 2017, the Debtors filed the (a) *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Plan**") and (b) *Disclosure Statement for the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Disclosure Statement**"). On [•], 2017, the Bankruptcy Court entered an order (a) approving the Disclosure Statement; (b) establishing the voting record date, voting deadline, and other dates; (c) approving procedures for soliciting, receiving, and tabulating votes on Plan and for filing objections to Plan; (d) approving manner and forms of notice and other related documents; and (e) granting related relief [Docket No. [•]] (the "**Disclosure Statement Order**").[2]

**PLEASE TAKE FURTHER NOTICE** that because you are the Holder of a Class 4 Interest under the Plan, <u>you are not entitled to vote on the Plan</u>. Accordingly, this notice is provided solely to permit you to "opt out" of the Third Party Release contained in Article VIII.E of the Plan (as described below).

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") will commence **on [•], 2017, at [____] a.m./p.m. (prevailing Eastern Time)**, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement Order or the Plan, as applicable.

**PLEASE TAKE FURTHER NOTICE** that the deadline for filing objections to the Plan is [•], **2017, at 4:00 p.m. prevailing Eastern Time** (the "**Confirmation Objection Deadline**"). Any objection to the Plan must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the name of the objector and the nature and amount of any Claim or Interest asserted by the objector against or in the Debtors; (d) state with particularity the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed, contemporaneously with proof of service, with the Bankruptcy Court and served so that it is actually received no later than the Confirmation Objection Deadline by the Notice Parties set forth below. OBJECTIONS NOT FILED BY THE CONFIRMATION OBJECTION DEADLINE AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

## NOTICE PARTIES

a.   Counsel for the Debtors: (i) Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Brett H. Miller, Dennis L. Jenkins, Todd M. Goren and Daniel J. Harris, and (ii) Polsinelli, PC, 222 Delaware Avenue, Wilmington, Delaware 19801, Attn: Christopher A. Ward and Justin K. Edelson;

b.   Counsel for the Committee: (i) Perkins Coie LLP, 30 Rockefeller Plaza, 22nd Floor, New York, New York, 10112, Attn: John D. Penn and Schuyler G. Carroll, and (ii) Shaw Fishman Glantz & Towbin LLC, 300 Delaware Avenue, Suite 1370, Wilmington, Delaware 19801, Attn: Thomas M. Horan; and

c.   The Office of the United States Trustee: District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, 3rd Floor, Room 3209, Wilmington, Delaware 19801, Attn: Timothy J. Fox.

**PLEASE TAKE FURTHER NOTICE** that Article VIII of the Plan contains certain release, injunction, and exculpation provisions. You are advised to carefully review and consider the Plan, including the release, injunction, and exculpation provisions, as your rights may be affected.

**Article VIII.E of the Plan contains the following Third Party Release provision:[3]**

ON THE **EFFECTIVE DATE** OF THE **PLAN** AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE **RELEASING PARTIES[4]** SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, AND INDIVIDUALLY AND COLLECTIVELY, RELEASED AND ACQUITTED THE **RELEASED PARTIES[5]** AND THEIR RESPECTIVE PROPERTY (INCLUDING THE **RELEASED PARTIES'** PREDECESSORS,

---

[3]  Underlined terms in the following Third Party Release provision have the meanings ascribed to such terms in the Plan.

[4]  "*Releasing Parties*" means (a) the Released Parties and (b) all Holders of Claims or Interests that do not, by the Voting Deadline, make the Third Party Opt-Out Election.

[5]  "*Released Parties*" means: (a) the Debtors; (b) the Debtors' current and former Board Members, officers, and managers; (c) the Committee and the Committee Members (each solely in their capacities as such); and (d) each of the foregoing Entities' respective Related Parties (each solely in their capacities as such); provided, that as a condition to receiving or enforcing any release granted pursuant to Article VIII.E hereof, each Released Party and its Affiliates shall be deemed to have released the Releasing Parties, the Estates, and the Debtors from any and all Claims or Causes of Action arising from or related to their relationship with the Debtors, but not, for the avoidance of doubt, Professional Fee Claims.

2

SUCCESSORS AND ASSIGNS, SUBSIDIARIES, <u>AFFILIATES</u>, MANAGED ACCOUNTS OR FUNDS, CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, MEMBERS, PARTNERS (GENERAL AND LIMITED), EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITIES AS SUCH) FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, <u>CAUSES OF ACTION</u>, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE <u>DEBTORS</u>, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, THAT SUCH <u>RELEASING PARTIES</u> (WHETHER INDIVIDUALLY OR COLLECTIVELY) EVER HAD, NOW HAVE OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR RELATED IN ANY WAY TO THE <u>DEBTORS</u>, ANY OF THE <u>DEBTORS'</u> PRESENT OR FORMER ASSETS, THE <u>RELEASED PARTIES'</u> INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE <u>DEBTORS</u> AND ANY <u>RELEASED PARTY</u>, THE <u>PLAN</u>, THE <u>DISCLOSURE STATEMENT</u>, THE <u>SALE TRANSACTION</u>, THE BIDDING AND SALE PROCESS FOR THE <u>DEBTORS'</u> ASSETS, THE <u>PURCHASE AGREEMENT</u>, THESE <u>CHAPTER 11 CASES</u>, OR ANY RESTRUCTURING OF <u>CLAIMS</u> OR <u>INTERESTS</u> UNDERTAKEN PRIOR TO THE <u>EFFECTIVE DATE</u>, INCLUDING THOSE THAT THE <u>DEBTORS</u> OR THE <u>POST-EFFECTIVE DATE DEBTORS</u> WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A <u>CLAIM</u> AGAINST OR <u>INTEREST</u> IN THE <u>DEBTORS</u> OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE <u>DEBTORS</u> OR THEIR <u>ESTATES</u>, EXCEPT FOR (I) ANY <u>CLAIMS</u> AND <u>CAUSES OF ACTION</u> FOR ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND (II) THE RIGHT TO RECEIVE DISTRIBUTIONS FROM THE <u>DEBTORS</u> OR THE <u>POST-EFFECTIVE DATE DEBTORS</u> ON ACCOUNT OF AN ALLOWED <u>CLAIM</u> OR ALLOWED <u>INTEREST</u> AGAINST THE <u>DEBTORS</u> PURSUANT TO THE <u>PLAN</u>.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL AN ENTITY THAT MAKES THE <u>THIRD PARTY OPT-OUT ELECTION</u> IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER BE A <u>RELEASING PARTY</u>. FOR THE AVOIDANCE OF DOUBT, AMONG OTHERS, ANY HOLDER OF A <u>CLAIM</u> OR <u>INTEREST</u> THAT DOES NOT MAKE THE <u>THIRD PARTY OPT-OUT ELECTION</u> IS A <u>RELEASING PARTY</u>.

ENTRY OF THE <u>CONFIRMATION ORDER</u> SHALL CONSTITUTE THE <u>BANKRUPTCY COURT'S</u> APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE <u>PLAN</u>, AND, FURTHER, SHALL CONSTITUTE THE <u>BANKRUPTCY COURT'S</u> FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE <u>RELEASED PARTIES</u>; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE <u>CLAIMS</u> RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE <u>DEBTORS</u> AND ALL HOLDERS OF <u>CLAIMS</u> AND <u>INTERESTS</u>; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE <u>RELEASING PARTIES</u> ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD

3

**PARTY RELEASE, INCLUDING ANY CLAIMS FOR INDEMNITY OR CONTRIBUTION RELATING TO SUCH RELEASED CLAIMS.**

**FOR THE AVOIDANCE OF DOUBT, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE** DISCLOSURE STATEMENT, **PLAN OR** CONFIRMATION ORDER, **NO PROVISION SHALL (I) PRECLUDE THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS POLICE OR REGULATORY POWERS AND (II)(X) RELEASE ANY NONDEBTOR FROM LIABILITY IN CONNECTION WITH ANY LEGAL ACTION OR CLAIM BROUGHT BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR (Y) ENJOIN, LIMIT, IMPAIR, OR DELAY THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM BRINGING OR CONTINUING ANY ACTION AGAINST ANY NONDEBTOR IN ANY FORUM.**

---

**HOW TO OPT OUT OF THE THIRD PARTY RELEASE**

1. **IF YOU WISH TO OPT OUT OF THE THIRD PARTY RELEASE PROVISION CONTAINED IN ARTICLE VIII.E OF THE PLAN SET FORTH ABOVE, CHECK THE BOX IN ITEM 1 BELOW.**

2. **REVIEW THE CERTIFICATION CONTAINED IN ITEM 2 BELOW.**

3. **SIGN AND DATE THIS NOTICE OF NON-VOTING STATUS AND FILL OUT THE OTHER REQUIRED INFORMATION IN THE APPLICABLE AREA BELOW.**

4. **IN ORDER FOR YOUR ELECTION TO OPT OUT OF THE THIRD PARTY RELEASE PROVISION BY MAIL TO BE COUNTED, YOUR NOTICE OF NON-VOTING STATUS MUST BE PROPERLY COMPLETED AND ACTUALLY RECEIVED BY THE VOTING AGENT BELOW NO LATER THAN [•], 2017, at [_____] p.m. (ET). YOU MAY SEND YOUR NOTICE OF NON-VOTING STATUS TO THE FOLLOWING ADDRESS:**

**CIBER BALLOT PROCESSING**
**C/O PRIME CLERK LLC**
**830 3RD AVENUE, 3RD FLOOR**
**NEW YORK, NY 10022**

---

<u>Item 1</u>. **Opt Out of Third Party Release.**

**PLEASE TAKE NOTICE** that you may check the box below to opt out of the Third Party Release provision contained in Article VIII.E of the Plan (as set forth above). **If you do not opt out of the Third Party Release provision by checking the box below and properly and timely submitting this Notice of Non-Voting Status, you will be deemed to have unconditionally, irrevocably, and forever released and discharged the Released Parties (as defined in the Plan) from,** *inter alia*, **any and all Causes of Action (as defined in the Plan) except as otherwise specifically provided in the Plan.**

---

☐     <u>**Opt out**</u> of the Third Party Release in Article VIII.E of the Plan

---

4

**Item 2.** **Certifications.**

By signing this Notice of Non-Voting Status, the undersigned certifies and otherwise acknowledges to the Bankruptcy Court and the Debtors that: (a) the undersigned is the Holder of the Class 4 Interest(s) as of and/or it has full power and authority to opt out of the Third Party Release provision for the Holder of the Class 4 Interest(s) identified below and (b) it understands the scope of the Third Party Release:

YOUR RECEIPT OF THIS NOTICE OF NON-VOTING STATUS DOES NOT SIGNIFY THAT YOUR INTEREST HAS BEEN OR WILL BE ALLOWED.

Signature:_____

Name of Claimant (print/type):_____

Name/Title of Signatory:_____

If signed by authorized agent, name/title of agent:_____

Telephone Number:_____

E-mail address:_____

Dated:_____

    **PLEASE TAKE FURTHER NOTICE** that, if you have questions regarding the procedures and requirements for opting out of the Third Party Release, you may contact the Debtors' voting agent, Prime Clerk LLC (the "**Voting Agent**"), by: (a) calling the Debtors' restructuring hotline at (844) 648-5578 or (b) writing to CIBER Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at ciberballots@primeclerk.com.

    **PLEASE TAKE FURTHER NOTICE** that you may also obtain copies of the Plan, the Disclosure Statement, and any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at https://cases.primeclerk.com/CIBER.

---

| **IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE.** |
|---|

ny-1299599

**NO PERSON, INCLUDING THE VOTING AGENT, HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, INCLUDING LEGAL ADVICE, OR TO MAKE ANY REPRESENTATION REGARDING THE DEBTORS OR THE PLAN.**

**MORRISON & FOERSTER LLP**
Brett H. Miller (admitted *pro hac vice*)
Dennis L. Jenkins (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
Daniel J. Harris (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921

*Counsel for Debtors and Debtors-in-Possession*

6

# EXHIBIT 6-B

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CMTSU Liquidation, Inc., *et al.*, | ) | Case No. 17-10772 (BLS) |
| f/k/a CIBER, Inc., *et al.*[1] | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

## NOTICE OF NON-VOTING STATUS TO HOLDERS OF CLASS 4 INTERESTS

### (DIRECTLY REGISTERED HOLDER)

**PLEASE TAKE NOTICE** that on [•], 2017, the Debtors filed the (a) *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Plan**") and (b) *Disclosure Statement for the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Disclosure Statement**"). On [•], 2017, the Bankruptcy Court entered an order (a) approving the Disclosure Statement; (b) establishing the voting record date, voting deadline, and other dates; (c) approving procedures for soliciting, receiving, and tabulating votes on Plan and for filing objections to Plan; (d) approving manner and forms of notice and other related documents; and (e) granting related relief [Docket No. [•]] (the "**Disclosure Statement Order**").[2]

**PLEASE TAKE FURTHER NOTICE** that because you are the Holder of a Class 4 Interest under the Plan, you are not entitled to vote on the Plan. Accordingly, this notice is provided solely to permit you to "opt out" of the Third Party Release contained in Article VIII.E of the Plan (as described below).

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") will commence **on [•], 2017, at [_____] a.m./p.m. (prevailing Eastern Time)**, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement Order or the Plan, as applicable.

ny-1299684

**PLEASE TAKE FURTHER NOTICE** that the deadline for filing objections to the Plan is [•], **2017, at 4:00 p.m. prevailing Eastern Time** (the "**Confirmation Objection Deadline**"). Any objection to the Plan must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the name of the objector and the nature and amount of any Claim or Interest asserted by the objector against or in the Debtors; (d) state with particularity the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed, contemporaneously with proof of service, with the Bankruptcy Court and served so that it is actually received no later than the Confirmation Objection Deadline by the Notice Parties set forth below. OBJECTIONS NOT FILED BY THE CONFIRMATION OBJECTION DEADLINE AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

**NOTICE PARTIES**

a.   Counsel for the Debtors: (i) Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Brett H. Miller, Dennis L. Jenkins, Todd M. Goren and Daniel J. Harris, and (ii) Polsinelli, PC, 222 Delaware Avenue, Wilmington, Delaware 19801, Attn: Christopher A. Ward and Justin K. Edelson;

b.   Counsel for the Committee: (i) Perkins Coie LLP, 30 Rockefeller Plaza, 22nd Floor, New York, New York, 10112, Attn: John D. Penn and Schuyler G. Carroll, and (ii) Shaw Fishman Glantz & Towbin LLC, 300 Delaware Avenue, Suite 1370, Wilmington, Delaware 19801, Attn: Thomas M. Horan; and

c.   The Office of the United States Trustee: District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, 3rd Floor, Room 3209, Wilmington, Delaware 19801, Attn: Timothy J. Fox.

**PLEASE TAKE FURTHER NOTICE** that Article VIII of the Plan contains certain release, injunction, and exculpation provisions. You are advised to carefully review and consider the Plan, including the release, injunction, and exculpation provisions, as your rights may be affected.

**Article VIII.E of the Plan contains the following Third Party Release provision:** [3]

ON THE **EFFECTIVE DATE** OF THE **PLAN** AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE **RELEASING PARTIES**[4] SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, AND INDIVIDUALLY AND COLLECTIVELY, RELEASED AND ACQUITTED THE **RELEASED PARTIES**[5] AND THEIR RESPECTIVE PROPERTY (INCLUDING THE **RELEASED PARTIES'** PREDECESSORS,

---

[3]  Underlined terms in the following Third Party Release provision have the meanings ascribed to such terms in the Plan.

[4]  "*Releasing Parties*" means (a) the Released Parties and (b) all Holders of Claims or Interests that do not, by the Voting Deadline, make the Third Party Opt-Out Election.

[5]  "*Released Parties*" means: (a) the Debtors; (b) the Debtors' current and former Board Members, officers, and managers; (c) the Committee and the Committee Members (each solely in their capacities as such); and (d) each of the foregoing Entities' respective Related Parties (each solely in their capacities as such); provided, that as a condition to receiving or enforcing any release granted pursuant to Article VIII.E hereof, each Released Party and its Affiliates shall be deemed to have released the Releasing Parties, the Estates, and the Debtors from any and all Claims or Causes of Action arising from or related to their relationship with the Debtors, but not, for the avoidance of doubt, Professional Fee Claims.

2

SUCCESSORS AND ASSIGNS, SUBSIDIARIES, AFFILIATES, MANAGED ACCOUNTS OR FUNDS, CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, MEMBERS, PARTNERS (GENERAL AND LIMITED), EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITIES AS SUCH) FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, THAT SUCH RELEASING PARTIES (WHETHER INDIVIDUALLY OR COLLECTIVELY) EVER HAD, NOW HAVE OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, ANY OF THE DEBTORS' PRESENT OR FORMER ASSETS, THE RELEASED PARTIES' INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE PLAN, THE DISCLOSURE STATEMENT, THE SALE TRANSACTION, THE BIDDING AND SALE PROCESS FOR THE DEBTORS' ASSETS, THE PURCHASE AGREEMENT, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING OF CLAIMS OR INTERESTS UNDERTAKEN PRIOR TO THE EFFECTIVE DATE, INCLUDING THOSE THAT THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES, EXCEPT FOR (I) ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND (II) THE RIGHT TO RECEIVE DISTRIBUTIONS FROM THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS ON ACCOUNT OF AN ALLOWED CLAIM OR ALLOWED INTEREST AGAINST THE DEBTORS PURSUANT TO THE PLAN.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL AN ENTITY THAT MAKES THE THIRD PARTY OPT-OUT ELECTION IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER BE A RELEASING PARTY. FOR THE AVOIDANCE OF DOUBT, AMONG OTHERS, ANY HOLDER OF A CLAIM OR INTEREST THAT DOES NOT MAKE THE THIRD PARTY OPT-OUT ELECTION IS A RELEASING PARTY.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD

3

**PARTY RELEASE, INCLUDING ANY CLAIMS FOR INDEMNITY OR CONTRIBUTION RELATING TO SUCH RELEASED CLAIMS.**

**FOR THE AVOIDANCE OF DOUBT, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE <u>DISCLOSURE STATEMENT</u>, <u>PLAN</u> OR <u>CONFIRMATION ORDER</u>, NO PROVISION SHALL (I) PRECLUDE THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS POLICE OR REGULATORY POWERS AND (II)(X) RELEASE ANY NONDEBTOR FROM LIABILITY IN CONNECTION WITH ANY LEGAL ACTION OR CLAIM BROUGHT BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR (Y) ENJOIN, LIMIT, IMPAIR, OR DELAY THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM BRINGING OR CONTINUING ANY ACTION AGAINST ANY NONDEBTOR IN ANY FORUM.**

---

<u>HOW TO OPT OUT OF THE THIRD PARTY RELEASE BY MAIL</u>

1. **IF YOU WISH TO OPT OUT OF THE THIRD PARTY RELEASE PROVISION CONTAINED IN ARTICLE VIII.E OF THE PLAN SET FORTH ABOVE, CHECK THE BOX IN ITEM 1 BELOW.**

2. **REVIEW THE CERTIFICATIONS CONTAINED IN ITEM 2 BELOW.**

3. **SIGN AND DATE THIS NOTICE OF NON-VOTING STATUS AND FILL OUT THE OTHER REQUIRED INFORMATION IN THE APPLICABLE AREA BELOW.**

4. **IN ORDER FOR YOUR ELECTION TO OPT OUT OF THE THIRD PARTY RELEASE PROVISION BY MAIL TO BE COUNTED, YOUR NOTICE OF NON-VOTING STATUS MUST BE PROPERLY COMPLETED AND ACTUALLY RECEIVED BY THE VOTING AGENT BELOW NO LATER THAN [•], 2017, at [____] p.m. (ET). YOU MAY SEND YOUR NOTICE OF NON-VOTING STATUS TO THE FOLLOWING ADDRESS:**

**CIBER BALLOT PROCESSING
C/O PRIME CLERK LLC
830 3RD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

---

<u>HOW TO OPT OUT OF THE THIRD PARTY RELEASE ONLINE</u>

This Notice of Non-Voting Status may also be returned by electronic, online transmission solely by clicking on the "E-Ballot" section on the Debtors' case information website (https://cases.primeclerk.com/ciber) and following the directions set forth on the website regarding submitting your Notice of Non-Voting Status as described more fully below. Please choose only one method of return of your Notice of Non-Voting Status.

1. **PLEASE VISIT HTTPS://CASES.PRIMECLERK.COM/CIBER.**

2. **CLICK ON THE "E-BALLOT" SECTION OF THE DEBTORS' WEBSITE.**

3. **IN ORDER FOR YOUR ELECTION TO OPT OUT OF THE THIRD PARTY RELEASE PROVISION TO BE COUNTED, YOUR NOTICE OF NON-VOTING STATUS MUST BE PROPERLY COMPLETED AND ACTUALLY RECEIVED BY NO LATER THAN [•], 2017, at [____] p.m. (ET). IF YOU CHOOSE TO SUBMIT YOUR NOTICE OF NON-**

---

4

> **VOTING STATUS VIA THE VOTING AGENT'S E-BALLOT SYSTEM, YOU SHOULD NOT RETURN A HARD COPY OF YOUR NOTICE OF NON-VOTING.**
>
> **IMPORTANT NOTE: YOU WILL NEED THE FOLLOWING INFORMATION TO RETRIEVE AND SUBMIT YOUR CUSTOMIZED NOTICE OF NON-VOTING STATUS:**
>
> **UNIQUE E-BALLOT ID#**_____
>
> **"E-BALLOTING" IS THE SOLE MANNER IN WHICH NOTICE OF YOUR NON-VOTING STATUSMAY BE DELIVERED VIA ELECTRONIC TRANSMISSION.  NOTICES OF NON-VOTING STATUS SUBMITTED BY FACSIMILE OR EMAIL WILL NOT BE ACCEPTED.**

**Item 1.  Opt Out of Third Party Release.**

**PLEASE TAKE NOTICE** that you may check the box below to opt out of the Third Party Release provision contained in Article VIII.E of the Plan (as set forth above).  **If you do not opt out of the Third Party Release provision by checking the box below and properly and timely submitting this Notice of Non-Voting Status, you will be deemed to have unconditionally, irrevocably, and forever released and discharged the Released Parties (as defined in the Plan) from, *inter alia*, any and all Causes of Action (as defined in the Plan) except as otherwise specifically provided in the Plan.**

> ☐     **Opt out** of the Third Party Release in Article VIII.E of the Plan

**Item 2.  Certifications.**

By signing this Notice of Non-Voting Status, the undersigned certifies and otherwise acknowledges to the Bankruptcy Court and the Debtors that: (a) the undersigned is the Holder of the Class 4 Interest(s) as of and/or it has full power and authority to opt out of the Third Party Release provision for the Holder of the Class 4 Interest(s) identified below and (b) it understands the scope of the Third Party Release:

YOUR RECEIPT OF THIS NOTICE OF NON-VOTING STATUS DOES NOT SIGNIFY THAT YOUR INTEREST HAS BEEN OR WILL BE ALLOWED.

Signature:_____

Name of Claimant (print/type):_____

Name/Title of Signatory:_____

If signed by authorized agent, name/title of agent:_____

Telephone Number:_____

E-mail address:_____

Dated:_____

**PLEASE TAKE FURTHER NOTICE** that, if you have questions regarding the procedures and requirements for opting out of the Third Party Release, you may contact the Debtors' voting agent, Prime

Clerk LLC (the "**Voting Agent**"), by: (a) calling the Debtors' restructuring hotline at (844) 648-5578 or (b) writing to CIBER Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at ciberballots@primeclerk.com.

**PLEASE TAKE FURTHER NOTICE** that you may also obtain copies of the Plan, the Disclosure Statement, and any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at https://cases.primeclerk.com/CIBER.

| |
|---|
| **IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE.** |

**NO PERSON, INCLUDING THE VOTING AGENT, HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, INCLUDING LEGAL ADVICE, OR TO MAKE ANY REPRESENTATION REGARDING THE DEBTORS OR THE PLAN.**

**MORRISON & FOERSTER LLP**
Brett H. Miller (admitted *pro hac vice*)
Dennis L. Jenkins (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
Daniel J. Harris (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921

*Counsel for Debtors and Debtors-in-Possession*

6

# EXHIBIT 7

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CMTSU Liquidation, Inc., *et al.*, | ) | Case No. 17-10772 (BLS) |
| f/k/a CIBER, Inc., *et al.*[1] | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

### NOTICE OF (A) PLAN CONFIRMATION HEARING, (B) OBJECTION AND
### VOTING DEADLINES, AND (C) SOLICITATION AND VOTING PROCEDURES

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY BE ENTITLED
> TO VOTE ON THE PLAN. THEREFORE, YOU SHOULD READ THIS
> NOTICE CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY. IF
> YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

TO:     PARTIES-IN-INTEREST IN THE ABOVE-CAPTIONED CHAPTER 11 CASES:

**PLEASE TAKE NOTICE** that on [•], 2017, the Debtors filed the (a) *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Plan**") and (b) *Disclosure Statement for the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [•]] (as it may be amended, modified, or supplemented from time to time, the "**Disclosure Statement**"). On [•], 2017, the Bankruptcy Court entered an order (a) approving the Disclosure Statement; (b) establishing the voting record date, voting deadline, and other dates; (c) approving procedures for soliciting, receiving, and tabulating votes on Plan and for filing objections to Plan; (d) approving manner and forms of notice and other related documents; and (e) granting related relief [Docket No. [•]] (the "**Disclosure Statement Order**").[2]

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") will commence **on [•], 2017, at [_____] a.m./p.m. (prevailing Eastern Time)**, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement Order or the Plan, as applicable.

necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

1.    In accordance with sections 1122 and 1123 of the Bankruptcy Code, the Plan classifies Holders of Claims and Interests into various Classes for all purposes, including with respect to voting on the Plan, as follows:

### SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Interest | Status | Voting Rights |
|-------|---------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Interests in CMTSU Liquidation, Inc. | Impaired | Not Solicited[3] |
| 5 | Interests in CMTSU Liquidation 2, Inc. | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Interests in CMTSU Liquidation 3, LLC | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |

2.    Voting Record Date.  The Voting Record Date is [•], 2017 with respect to Claims in Class 3.  The Voting Record Date is the date on which the Debtors will determine which Holders of Claims in Class 3 are entitled to vote on the Plan.

3.    Voting Deadline.  The deadline for voting on the Plan is [•], 2017 at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline").  If you hold a Claim against the Debtors as of the Voting Record Date and are entitled to vote to accept or reject the Plan, you should have received a Ballot and corresponding voting instructions.  For your vote to be counted, you must: (a) follow such voting instructions carefully, (b) complete all the required information on the Ballot; and (c) sign, date, and return your completed Ballot so that it is actually received by Prime Clerk LLC, the Debtors' voting agent (the "Voting Agent"), according to and as set forth in detail in the voting instructions on or before the Voting Deadline. *The failure to follow such instructions may disqualify your vote.*

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

4.    Confirmation Objection Deadline.  The deadline for filing objections to the Plan is [•], 2017, at 4:00 p.m. prevailing Eastern Time (the "Confirmation Objection Deadline").

---

[3] Although the votes of Holders of Interests in CMTSU Liquidation, Inc. in Class 4 are not being solicited, each such Holder is entitled to opt out of the "Third Party Release" provision in Article VIII.E of the Plan by timely returning an Opt-Out Form (as defined in the Solicitation Procedures Order) to Prime Clerk.

2

5.     Objections to the Plan.  Any objection to the Plan must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the name of the objector and the nature and amount of any Claim or Interest asserted by the objector against or in the Debtors; (d) state with particularity the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed, contemporaneously with proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the Notice Parties set forth below.  OBJECTIONS NOT FILED BY THE CONFIRMATION OBJECTION DEADLINE AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

## NOTICE PARTIES

a.   Counsel for the Debtors: (i) Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Brett H. Miller, Dennis L. Jenkins, Todd M. Goren and Daniel J. Harris, and (ii) Polsinelli, PC, 222 Delaware Avenue, Wilmington, Delaware 19801, Attn: Christopher A. Ward and Justin K. Edelson;

b.   Counsel for the Committee: (i) Perkins Coie LLP, 30 Rockefeller Plaza, 22nd Floor, New York, New York, 10112, Attn: John D. Penn and Schuyler G. Carroll, and (ii) Shaw Fishman Glantz & Towbin LLC, 300 Delaware Avenue, Suite 1370, Wilmington, Delaware 19801, Attn: Thomas M. Horan; and

c.   The Office of the United States Trustee: District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, 3rd Floor, Room 3209, Wilmington, Delaware 19801, Attn: Timothy J. Fox.

## ADDITIONAL INFORMATION

6.     Obtaining Solicitation Materials.  If you would like to obtain a Solicitation Package (excluding Ballots) or if you have questions regarding the procedures and requirements for objecting to the Plan, you may contact the Voting Agent by: (a) calling the Debtors' restructuring hotline at (844) 648-5578 or (b) writing to CIBER Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at ciberballots@primeclerk.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at https://cases.primeclerk.com/CIBER.

7.     Filing the Plan Supplement.  The Debtors will file the Plan Supplement, other than the Contract Assumption Schedule, no later than fourteen (14) days prior to the Voting Deadline.  Copies of the Plan Supplement may be obtained in the manner set forth in the preceding paragraph.

ARTICLE VIII OF THE PLAN CONTAINS THE FOLLOWING RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS.  YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**Debtors' Release.**

ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY SHALL BE EXPRESSLY, UNCONDITIONALLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY RELEASED, ACQUITTED AND DISCHARGED

3

BY THE DEBTORS ON BEHALF OF THEMSELVES, THEIR RESPECTIVE ESTATES, AND THE POST-EFFECTIVE DATE DEBTORS (SUCH THAT THE

POST-EFFECTIVE DATE DEBTORS SHALL NOT HOLD ANY CLAIMS OR CAUSES OF ACTION RELEASED PURSUANT TO THIS ARTICLE VIII.D), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, FROM ANY AND ALL ACTIONS, CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, ANY OF THE DEBTORS' PRESENT OR FORMER ASSETS, THE RELEASED PARTIES' INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE PLAN, THE DISCLOSURE STATEMENT, THE SALE TRANSACTION, THE BIDDING AND SALE PROCESS FOR THE DEBTORS' ASSETS, THE PURCHASE AGREEMENT, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING OF CLAIMS OR INTERESTS UNDERTAKEN PRIOR TO THE EFFECTIVE DATE, INCLUDING THOSE THAT THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES, EXCEPT FOR ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; PROVIDED, HOWEVER, THAT THE FOREGOING "DEBTORS' RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTORS OR THEIR CHAPTER 11 ESTATES AGAINST A RELEASED PARTY ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTORS' RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTORS' RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTORS' RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR AGAINST ANY OF THE DEBTORS' ESTATES OR THE POST-EFFECTIVE DATE DEBTORS ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTORS' RELEASE.

<u>Third Party Release</u>.

ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE RELEASING PARTIES SHALL BE DEEMED

4

TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, AND INDIVIDUALLY AND COLLECTIVELY, RELEASED AND ACQUITTED THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY (INCLUDING THE RELEASED PARTIES' PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, AFFILIATES, MANAGED ACCOUNTS OR FUNDS, CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, MEMBERS, PARTNERS (GENERAL AND LIMITED), EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITIES AS SUCH) FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, THAT SUCH RELEASING PARTIES (WHETHER INDIVIDUALLY OR COLLECTIVELY) EVER HAD, NOW HAVE OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, ANY OF THE DEBTORS' PRESENT OR FORMER ASSETS, THE RELEASED PARTIES' INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE PLAN, THE DISCLOSURE STATEMENT, THE SALE TRANSACTION, THE BIDDING AND SALE PROCESS FOR THE DEBTORS' ASSETS, THE PURCHASE AGREEMENT, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING OF CLAIMS OR INTERESTS UNDERTAKEN PRIOR TO THE EFFECTIVE DATE, INCLUDING THOSE THAT THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES, EXCEPT FOR (I) ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND (II) THE RIGHT TO RECEIVE DISTRIBUTIONS FROM THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS ON ACCOUNT OF AN ALLOWED CLAIM OR ALLOWED INTEREST AGAINST THE DEBTORS PURSUANT TO THE PLAN.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL AN ENTITY THAT MAKES THE THIRD PARTY OPT-OUT ELECTION IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER BE A RELEASING PARTY. FOR THE AVOIDANCE OF DOUBT, AMONG OTHERS, ANY HOLDER OF A CLAIM OR INTEREST THAT DOES NOT MAKE THE THIRD PARTY OPT-OUT ELECTION IS A RELEASING PARTY.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER

5

DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE, INCLUDING ANY CLAIMS FOR INDEMNITY OR CONTRIBUTION RELATING TO SUCH RELEASED CLAIMS.

FOR THE AVOIDANCE OF DOUBT, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE DISCLOSURE STATEMENT, PLAN OR CONFIRMATION ORDER, NO PROVISION SHALL (I) PRECLUDE THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS POLICE OR REGULATORY POWERS AND (II)(X) RELEASE ANY NONDEBTOR FROM LIABILITY IN CONNECTION WITH ANY LEGAL ACTION OR CLAIM BROUGHT BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR (Y) ENJOIN, LIMIT, IMPAIR, OR DELAY THE U.S. SECURITIES AND EXCHANGE COMMISSION FROM BRINGING OR CONTINUING ANY ACTION AGAINST ANY NONDEBTOR IN ANY FORUM.

**Exculpation.**

The Exculpated Parties shall neither have nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the liquidation of the Debtors, including the bidding and sale process for the Debtors' assets. Without limiting the foregoing "Exculpation" provided under this Article VIII.F, the rights of any Holder of a Claim or Interest to enforce rights arising under the Plan shall be preserved, including the right to compel payment of distributions in accordance with the Plan; provided, that the foregoing "Exculpation" shall have no effect on the liability of any Entity solely to the extent resulting from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to assert any affirmative defenses, including reliance upon the advice of counsel, concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

**Injunction.**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D HEREOF; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.E HEREOF; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.F HEREOF; OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS OR ANY

6

ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF OR SUBROGATION RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED, THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN OR THE SALE ORDER; PROVIDED, FURTHER, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO PREVENT AN ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

7

**MORRISON & FOERSTER LLP**
Brett H. Miller (admitted *pro hac vice*)
Dennis L. Jenkins (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
Daniel J. Harris (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921

*Counsel for Debtors and Debtors-in-Possession*

8

**EXHIBIT C**

Liquidation Analysis

# HYPOTHETICAL LIQUIDATION ANALYSIS[1]

## CMTSU LIQUIDATION, INC., *ET AL.*

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Allowed Claim or Impaired Allowed Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7") on the Effective Date.  This legal standard is known as the "best interests" test.

Based on the following hypothetical analysis comparing the estimated distributions to creditors and interest holders under the Plan and the estimated distributions to creditors and interest holders under a hypothetical liquidation of the Debtors under Chapter 7 (the "Liquidation Analysis"), the Debtors believe that the Plan satisfies the best interests test.  The Debtors believe that the Liquidation Analysis and the conclusions set forth herein are fair and accurate, and represent the Debtors' best judgment with regard to the results of a liquidation under Chapter 7. The Liquidation Analysis was prepared solely to assist the Bankruptcy Court in making the legal determination required by section 1129(a)(7) of the Bankruptcy Code, and it should not be used for any other purpose.  Nothing contained in the Liquidation Analysis is intended to or may be deemed to constitute a concession of, or admission by, the Debtors, or a guaranty that any creditor or interest holder will receive the amounts listed herein.

The first step in determining whether the best interests test has been satisfied is to determine the estimated amount of Cash that would be generated from liquidating the Debtors' assets in Chapter 7.  The gross amount of Cash available to the Holders of Claims against, and Interests in, the Debtors is the sum of the Cash held by the Debtors at the time of the commencement of the Chapter 7 cases.  The second step is to satisfy secured claims (to the extent of the value of the underlying collateral) and administrative expenses associated with the Chapter 7 liquidation.  The third step is to allocate any remaining Cash to Holders of Claims and Interests in accordance with the priorities set forth in section 726 of the Bankruptcy Code.

**THE LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE CONVERSION DATE (AS DEFINED BELOW). THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.  THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE VALUES AND RECOVERIES**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (as the same may be amended, modified, and/or supplemented from time to time, the "Disclosure Statement") or the *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (as the same may be amended, modified, and/or supplemented from time to time, the "Plan").

**REPRESENTED IN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.**

**NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS.   THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS.   THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.**

A general summary of the assumptions used in preparing the Liquidation Analysis follows:

### Estimate of Net Proceeds

The Liquidation Analysis assumes that the Chapter 11 Cases would convert to Chapter 7 on or about November 6, 2017 (the "Conversion Date"), and that such converted cases would be administered by a Chapter 7 trustee for one year.  The Debtors expect that the Chapter 7 trustee would retain professionals to assist in the liquidation and distribution of assets to creditors and, if applicable, interest holders, and pursue certain litigation recoveries.[2]

The fees of the Chapter 7 trustee under section 326(a) of the Bankruptcy Code as well as those of any professionals retained by the Chapter 7 trustee are the primary drivers of the reduced recoveries to creditors in a hypothetical Chapter 7 liquidation as opposed to under the Plan.

### Estimate of Cost

The Liquidation Analysis assumes that the wind-down of the Debtors will last for one year, during which time the assets of the Estates would be liquidated and distributed to creditors and, if applicable, interest holders, and certain litigation claims would be pursued.  The Debtors' cost of liquidation under Chapter 7 would include fees payable to a Chapter 7 trustee, as well as overhead costs and fees that would be payable to attorneys and other professionals in the Chapter 7 cases.

### Distribution of Net Proceeds under Absolute Priority Rule

The Liquidation Analysis assumes that the costs, expenses, fees, and other claims that may arise and constitute necessary costs and expenses in the Chapter 7 cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to creditors or interest holders.  Under the absolute priority rule, no junior creditor or interest holder would receive any distribution until all senior creditors were paid in full.

---

[2] As detailed in the Disclosure Statement, the Debtors have litigation claims pending against HIDOT in which the Debtors seek approximately $17 million in damages.  However, recoveries from HIDOT are not included in the Liquidation Analysis.

The Liquidation Analysis considers the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and, if applicable, interest holders. The Debtors have determined, as summarized herein, that confirmation of the Plan would provide more value to creditors and interest holders than a liquidation of the Debtors under Chapter 7.

Underlying the Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties, as well as contingencies beyond the control of the Debtors or a Chapter 7 trustee. In addition, various assumptions made in this Liquidation Analysis are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the Debtors' assets will result in an accurate estimate of the proceeds that would be realized. Most notably, in a Chapter 7 liquidation, a new bar date for Filing Proofs of Claim would be established. As a result, the actual amounts of Claims against the Debtors could vary significantly from the estimates set forth herein, depending on the Claims asserted during the pendency of the Chapter 7 cases. Moreover, the Liquidation Analysis may not include all liabilities that may arise as a result of additional litigation, potential tax assessments, or other potential claims. The Liquidation Analysis does not include potential recoveries from Avoidance Actions or intangible assets, and includes no incremental costs for the pursuit of such recoveries. Therefore, the actual liquidation value of the Debtors' assets could vary materially from the estimates provided herein.

The Liquidation Analysis is based on the estimated or known fair market values of the Debtors' assets on June 30, 2017 for all assets other than Cash, and the Debtors' estimated Cash balance as of September 23, 2017. An independent public accounting firm has not examined, compiled, or otherwise applied procedures to these values and, consequently, no such firm has expressed an opinion or any other form of assurance with respect to these values.

## ASSET RECOVERY ASSUMPTIONS

All recoveries cited in the asset recovery assumptions below are presented on a consolidated basis, which means the assets are not attributed to any particular Debtor. The Liquidation Analysis assumes that there are no proceeds from the recoveries of any potential preferences, fraudulent conveyances, or other causes of action.

### *Cash*

As of the Conversion Date, the Debtors are assumed to have a Cash balance of $29,532,000. This amount is the result of (a) an estimated Cash balance of $39,112,000 on September 23, 2017, plus (b) $1,047,000 in Cash receipts that are estimated to be collected prior to the Conversion Date, less (c) $10,627,000 in expenses that are estimated to be incurred prior to the Conversion Date.

### *Federal Tax Refunds*

As of the Conversion Date, the Debtors are assumed to be entitled to a $319,000 federal tax refund.

*Other Assets*

The Debtors are assumed to have other assets with a recoverable value of approximately $2,000,000. These assets include (a) certain potential tax refunds relating to corporate taxes paid in the State of Washington; and (b) proceeds from certain insurance policies. The Debtors' right to recover on account of these assets is subject to a number of contingencies and uncertainties, and it is accordingly not clear that these assets will generate additional proceeds for distribution to stakeholders.

## CLAIMS

### *Chapter 7 Administrative Claims*

Chapter 7 administrative claims include wind-down expenses, professional fees, and Chapter 7 trustee fees required for the duration of the Chapter 7 liquidation (assumed to be one year).

- Wind-Down Expenses: Wind-down expenses deemed necessary to operate the Debtors during the pendency of the Chapter 7 liquidation include $465,000 in payroll and other benefits for employees who would be needed to help administer the liquidation and between $290,000 and $540,000 in other operating expenses. Other operating expenses include, among other things, rent, tax expenses, and telephone and internet expenses.

- Professional Fees: Professional fees are the assumed costs and expenses of attorneys, financial advisors, and other professionals retained by the Chapter 7 trustee to administer wind-down activities, claims reconciliation, and distribution of estate assets, and to defend against certain litigation claims asserted against the Debtors and/or pursue certain litigation claims asserted by the Debtors. Total professional fees are estimated to be between $2,150,000 and $4,990,000. The range of professional fees is dependent upon the degree and intensity of efforts in opposing certain litigation claims asserted against the Debtors and/or to recover on certain litigation claims asserted by the Debtors.[3]

- Chapter 7 Trustee Fees: Pursuant to section 326(a) of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for a chapter 7 trustee's services, not to exceed 25% of the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% of any amount in excess of $50,000 but not in excess of $1 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1 million, upon all moneys disbursed or turned over in the Chapter 7 cases by the trustee to parties in interest. For

---

[3] For purposes of the Liquidation Analysis, it is assumed that professionals retained by the Chapter 7 trustee would incur a higher amount of fees than the Debtors' Chapter 11 professionals. Among other reasons, professionals retained by the Chapter 7 trustee are assumed to incur additional costs associated with time spent on familiarizing themselves with the Chapter 11 Cases and the Debtors' assets and liabilities.

purposes of this Liquidation Analysis, the Debtors have estimated that the Chapter 7 trustee would incur between $736,000 and $878,000 in fees pursuant to section 326(a) of the Bankruptcy Code.

### Administrative and Priority Tax Claims

The Liquidation Analysis assumes that there will be approximately $474,000 in Administrative and Priority Tax Claims on the Conversion Date. The estimated recovery for Administrative and Priority Tax Claims is 100%.

### Other Priority Claims

The Liquidation Analysis assumes that there will be approximately $31,000 in Other Priority Claims on the Conversion Date. The estimated recovery for Other Priority Claims is 100%.

### Secured Claims

The Liquidation Analysis assumes that there will be approximately $7,000 in Secured Claims on the Conversion Date. The estimated recovery for Secured Claims is 100%.

### General Unsecured Claims

The Liquidation Analysis assumes that there will be between $45,024,000 and $71,871,000 in Allowed General Unsecured Claims on the Conversion Date. The range is based on the Debtors' books and records, proofs of claim that have been filed in the Chapter 11 Cases, and the Debtors' estimates regarding the amounts that are ultimately Allowed on account of those General Unsecured Claims that are unliquidated, contingent, or Disputed. The low-end of the range assumes a favorable resolution of the unliquidated, contingent, or Disputed General Unsecured Claims, while the high-end assumes an unfavorable resolution.

The estimated recovery for General Unsecured Claims is between 34% and 61%.

### Interests in CMTSU Liquidation, Inc.

The Liquidation Analysis assumes that there will be no recovery on account of Interests in CMTSU Liquidation, Inc.

# Ciber Inc.

## Comparison of Recoveries Under Chapter 11 Plan and Hypothetical Chapter 7 Liquidation

(In thousands of US dollars)

| | Estimated Recovery | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Ch 11 Plan of Liquidation | | | | Ch 7 Liquidation Analysis | | | |
| | Low | | High | | Low | | High | |
| | (%) | ($000s) | (%) | ($000s) | (%) | ($000s) | (%) | ($000s) |
| Administrative and Priority Tax Claims | 100% | 474 | 100% | 474 | 100% | 474 | 100% | 474 |
| Class 1. Other Priority Claims | 100% | 31 | 100% | 31 | 100% | 31 | 100% | 31 |
| Class 2. Secured Claims | 100% | 7 | 100% | 7 | 100% | 7 | 100% | 7 |
| Class 3. General Unsecured Claims (1) | 37% | 25,844 | 100% | 27,150 | 34% | 24,608 | 61% | 27,556 |
| Class 4. Interests in CMTSU Liquidation, Inc. (2) | N/A | - | N/A | 1,784 | N/A | - | N/A | - |
| Class 5. Interests in CMTSU Liquidation 2, Inc. | N/A | - | N/A | - | N/A | - | N/A | - |
| Class 6. Interests in CMTSU Liquidation 3, Inc. | N/A | - | N/A | - | N/A | - | N/A | - |
| **Total Claims and Recoveries** | | **26,356** | | **29,446** | | **25,120** | | **28,068** |

(1) The recovery percentage under the Chapter 11 Plan assumes approval of the Zayo settlement, while the recovery percentage in the Chapter 7 does not.

(2) The $1,784,000 estimated recovery to the Holders of Class 4 Interests in the high scenario under the Chapter 11 Plan amounts to a recovery of $0.022 per share based on 82,897,395 shares outstanding.

# Ciber Inc.

## Proposed Chapter 11 Plan of Liquidation

### (In thousands of US dollars)

| | Low | High |
|---|---:|---:|
| **Assets Available For Distributions to Creditors** | | |
| **Beg. Cash Balance as of WE 09/23:** | $ 39,112 | $ 39,112 |
| **Pre-Effective Date Estimated Receipts (1)** | 1,047 | 1,047 |
| **Wind-down Expenses Through the Effective Date** | | |
| Health & Benefits Claim | (330) | (330) |
| KERP | (71) | (71) |
| KEIP | (740) | (740) |
| Other Wind-Down Expenses Not Reflected Above (2) | (9,485) | (9,485) |
| **Total** | (10,627) | (10,627) |
| **Post-Effective Date Estimated Receipts (3)** | 319 | 319 |
| **Wind-Down Expenses Post-Effective Date** | | |
| Payroll | (465) | (465) |
| Other Operating Expenses | (540) | (290) |
| Professional Fees (4) | (4,490) | (1,650) |
| **Total** | (5,495) | (2,405) |
| **Other Potential Post-Effective Date Receipts (5)** | 2,000 | 2,000 |
| **Gross Proceeds Available For Creditors** | $ 26,356 | $ 29,446 |

| | | Estimated Chapter 11 Recovery | | | | | |
|---|---|---|---|---|---|---|---|
| | | Estimated Claims | | Low Recovery Scenario | | High Recovery Scenario | |
| | Filed Claims | Low ($000s) | High ($000s) | (%) | ($000s) | (%) | ($000s) |
| **Application of Net Proceeds Available For Creditors** | | | | | | | |
| **Effective Date Distributions** | | | | | | | |
| Administrative and Priority Tax Claims | 1,326 | 474 | 474 | 100% | 474 | 100% | 474 |
| Class 1. Other Priority Claims | 1,202 | 31 | 31 | 100% | 31 | 100% | 31 |
| Class 2. Secured Claims | 292 | 7 | 7 | 100% | 7 | 100% | 7 |
| Class 3. General Unsecured Claims (6) | 38,068 | 27,750 | 27,750 | 35% | 9,713 | 35% | 9,713 |
| Class 4. Interests in CMTSU Liquidation, Inc. | N/A | N/A | N/A | | - | | - |
| Class 5. Interests in CMTSU Liquidation 2, Inc. | N/A | N/A | N/A | | - | | - |
| Class 6. Interests in CMTSU Liquidation 3, Inc. | N/A | N/A | N/A | | - | | - |
| **Total Effective Date Distributions** | | 28,262 | 28,262 | | 10,225 | | 10,225 |
| **Net Assets after Effective Date** | | | | | $ 16,131 | | $ 19,221 |
| **Post-Effective Date Distributions** | | | | | | | |
| Administrative and Priority Tax Claims | - | - | - | 0% | - | 0% | - |
| Class 1. Other Priority Claims | - | - | - | 0% | - | 0% | - |
| Class 2. Secured Claims | - | - | - | 0% | - | 0% | - |
| Class 3. General Unsecured Claims (7) | 150,647 | 17,274 | 44,121 | 37% | 16,131 | 100% | 17,438 |
| Class 4. Interests in CMTSU Liquidation, Inc. (8) | N/A | N/A | N/A | | - | | 1,784 |
| Class 5. Interests in CMTSU Liquidation 2, Inc. | N/A | N/A | N/A | | - | | - |
| Class 6. Interests in CMTSU Liquidation 3, Inc. | N/A | N/A | N/A | | - | | - |
| **Total Post-Effective Date Distributions** | | 17,274 | 44,121 | | 16,131 | | 19,221 |
| **Total Claims and Recoveries** | | $ 45,536 | $ 72,383 | | $ 26,356 | | $ 29,446 |

(1) These receipts consist primarily of reimbursements, including amounts under the Transition Services Agreement with the Purchaser.
(2) These expenses consist primarily of fees of the Debtors' and the Committee's respective professionals.
(3) These receipts include reimbursement for certain payroll tax overpayments.
(4) The range of professional fees is dependent upon the degree and intensity of efforts to recover on certain litigation.
(5) These receipts consist of potential tax refunds and insurance recoveries, some of which are dependent upon the outcome of certain litigation, and exclude any potential recoveries from HIDOT.
(6) The Chapter 11 Plan assumes approval of the Zayo settlement and that no other creditors take the Class 3 Cash Out Election.
(7) Distributions to Holders of Class 3 General Unsecured Claims are assumed to occur post-Effective Date due to certain undetermined litigation and vendor claims in Class 3. The High Recovery Scenario includes the payment of interest calculated using an assumed Federal Judgment Rate of 1.25% for the period from the Petition Date through the Effective Date.
(8) The $1,784,000 estimated recovery to Holders of Class 3 [...] Interests [...] amounts to [...] $0.02 per share based on 82,897,395 shares outstanding.

# Ciber Inc.

## Hypothetical Chapter 7 Liquidation Analysis

### (In thousands of US dollars)

| | Low | High |
|---|---:|---:|
| **Assets Available For Distributions to Creditors** | | |
| **Beg. Cash Balance as of WE 09/23:** | $ 39,112 | $ 39,112 |
| **Pre-Conversion Date Estimated Receipts (1)** | 1,047 | 1,047 |
| **Wind-down Expenses Through the Conversion Date** | | |
| Health & Benefits Claim | (330) | (330) |
| KERP | (71) | (71) |
| KEIP | (740) | (740) |
| Other Non-Chapter 7 Wind-Down Expenses Not Reflected Above (2) | (9,485) | (9,485) |
| **Total** | (10,627) | (10,627) |
| **Chapter 7 Estimated Receipts (3)** | 319 | 319 |
| **Chapter 7 Administrative Costs** | | |
| Chapter 7 Trustee Fees and Commissions | (736) | (878) |
| Payroll | (465) | (465) |
| Other Operating Expenses | (540) | (290) |
| Professional Fees (4) | (4,990) | (2,150) |
| **Total** | (6,731) | (3,783) |
| **Other Potential Recoveries in the Chapter 7 (5)** | 2,000 | 2,000 |
| **Gross Proceeds Available For Creditors** | $ 25,120 | $ 28,068 |

| | | Estimated Chapter 7 Recovery | | | | | |
|---|---|---|---|---|---|---|---|
| | | **Estimated Claims** | | **Low Recovery Scenario** | | **High Recovery Scenario** | |
| **Application of Net Proceeds Available For Creditors** | **Filed Claims** | **Low** ($000s) | **High** ($000s) | **(%)** | ($000s) | **(%)** | ($000s) |
| Administrative and Priority Tax Claims | 1,326 | 474 | 474 | 100% | 474 | 100% | 474 |
| Class 1. Other Priority Claims | 1,202 | 31 | 31 | 100% | 31 | 100% | 31 |
| Class 2. Secured Claims | 292 | 7 | 7 | 100% | 7 | 100% | 7 |
| Class 3. General Unsecured Claims (6) | 188,715 | 45,024 | 71,871 | 34% | 24,608 | 61% | 27,556 |
| Class 4. Interests in CMTSU Liquidation, Inc. | N/A | N/A | N/A | | - | | - |
| Class 5. Interests in CMTSU Liquidation 2, Inc. | N/A | N/A | N/A | | - | | - |
| Class 6. Interests in CMTSU Liquidation 3, Inc. | N/A | N/A | N/A | | - | | - |
| **Total Claims and Recoveries** | | $ 45,536 | $ 72,383 | | $ 25,120 | | $ 28,068 |

(1) These receipts consist primarily of reimbursements, including amounts under the Transition Services Agreement with the Purchaser.

(2) These expenses consist primarily of fees of the Debtors' and the Committee's respective professionals.

(3) These receipts include reimbursement for certain payroll tax overpayments.

(4) The range of professional fees is dependent upon the degree and intensity of efforts to recover on certain litigation.

(5) These receipts consist of potential tax refunds and insurance recoveries, some of which are dependent upon the outcome of certain litigation, and exclude any potential recoveries from HIDOT.

(6) The recovery scenario under the Chapter 7 scenario assumes Zayo claim ultimately allowed in the settled amount.