# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CMTSU Liquidation, Inc., *et al.*,[1] | ) Case No. 17-10772 (BLS) |
| f/k/a CIBER, Inc., *et al.* | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Re: Docket No. 760** |

## DEBTORS' OBJECTION TO STATE OF HAWAI'I, DEPARTMENT OF TRANSPORTATION'S MOTION TO ESTIMATE ITS CLAIM SOLELY FOR VOTING PURPOSES PURSUANT TO BANKRUPTCY RULE 3018

The debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this objection (the "Objection") to the *State of Hawai'i, Department of Transportation's Motion to Estimate its Claim Solely For Voting Purposes Pursuant to Bankruptcy Rule 3018* [Docket No. 760] (the "Motion"). In support of this Objection, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT[2]

1. HIDOT—the holder of a disputed, contingent, litigation-based claim against the Debtors—filed the Motion seeking an unsubstantiated and excessive voting amount of $46 million. As the Court is aware from the previous briefing on this matter, the Debtors dispute HIDOT's claims in full and believe that it is the Debtors that are owed amounts from HIDOT. More critically, allowing HIDOT to vote in the amount of $46 million would give it a blocking position on confirmation, a result that would undermine the fact that the overwhelming majority

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of Debtor CMTSU Liquidation, Inc.'s federal tax identification number (the other Debtors do not have EINs) are: CMTSU Liquidation, Inc. (6833) (f/k/a CIBER, Inc.), CMTSU Liquidation 2, Inc. (f/k/a CIBER Consulting, Incorporated), and CMTSU Liquidation 3, LLC (f/k/a CIBER International LLC).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan (as defined below).

ny-1304010

of voting creditors voted to accept the Plan. On this basis alone, the Court should deny the Motion as it would provide HIDOT with a disproportionate level of control over the Debtors' Chapter 11 Cases and allow HIDOT to hold the Debtors' Estates hostage pending resolution of its claim.

2. If the Court is inclined to give HIDOT a voting amount in excess of $1.00 based upon the allegations made to date, HIDOT should only be able to vote in the amount that it could potentially recover from the Debtors' Estates. It is difficult to ascertain the breakdown of HIDOT's claims due to ambiguity in its proof of claim. The Motion likewise provides no additional color. In any event, the Debtors have been steadfast that the vast majority of HIDOT's claims, regardless of the breakdown, will be covered by the Debtors' Insurance Policies. Because the Plan requires HIDOT to first recover from insurance before looking to the Debtors' Estates, the Debtors' actual exposure to HIDOT's claims is a fraction of the $46 million voting amount sought. By the Debtors' assessment, based on the Motion and HIDOT's Claim, HIDOT could only recover approximately $1.87 million from the Debtors (on account of HIDOT's claims for non-trebled damages under the Hawaii False Claims Act and for fraud[3]) even if HIDOT is ultimately successful in its litigation. Accordingly, the maximum amount of HIDOT's claim for voting purposes should be set at $1.87 million.

## BACKGROUND

### I. General

3. On April 9, 2017, each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of

---

[3] As noted below, the Motion seeks a total of $5.6 million in trebled damages on account of these claims.

the Bankruptcy Code. The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). On April 19, 2017, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee"), which was subsequently amended by the U.S. Trustee on July 7, 2017 [Docket No. 437]. No party has requested the appointment of a trustee or examiner in these Chapter 11 Cases.

4. A detailed description of the Debtors and their business is set forth in the *Declaration in Support of Chapter 11 Petitions and First Day Pleadings* filed on April 10, 2017 [Docket No. 3] and incorporated herein by reference.

5. On May 19, 2017, the Court entered the *Order (A) Approving the Sale of Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 246] (the "Sale Order"), pursuant to which, among other things, the Court approved the sale of the Purchased Assets (as defined in the Sale Order) to Ciber Global, LLC (f/k/a HTC Global Ventures, LLC). The Sale (as defined in the Sale Order) closed on June 8, 2017 [Docket No. 354].

6. On October 2, 2017, the Debtors filed the *Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 671] (the "Plan") and the *Disclosure Statement For the Debtors' Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 672] (the "Disclosure Statement").

7. Under the Plan, Holders of Allowed Claims must first recover from the Debtors' Insurance Policies before receiving a distribution from the Debtors' Estates. Article VI.E.2 of the Plan provides as follows:

> Subject to Article V.G. hereof, no distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to the Insurance Policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable. To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then, subject to Article V.G hereof, immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court.

*Id.*

## II.  The HIDOT Contract

8.  In September 2008, HIDOT, a department of the State of Hawaii responsible for the planning, design, construction, operation and maintenance of various modes of public transportation throughout Hawaii, contracted with CMTSU Liquidation, Inc. (f/k/a Ciber, Inc.) ("Ciber") to replace HIDOT's existing financial management computer system with a new Enterprise Resource Planning ("ERP") computer system (the "System"). Declaration of Jason S. Takenouchi, dated August 22, 2017 ("Takenouchi Decl.") [Docket No. 543] Ex. 1 ¶ 2. Under the contract's statement of work, the parties agreed to work together collaboratively to design, develop, install, and implement the System. *Id.* ¶ 35. For example, as part of its responsibilities, Ciber agreed to develop a functional/technical design for data conversion, while HIDOT would extract relevant data from legacy systems and cleanse and reconcile such data. *Id.* ¶ 35.

9.  During the course of Ciber's performance, HIDOT demanded that Ciber add to its obligations numerous out-of-scope tasks. For instance, HIDOT demanded that Ciber obtain Federal Highways Administration ("FHWA") certification for the System despite the fact that

the contract never required Ciber to obtain such certification. *Id.* ¶¶ 36, 37. Additionally, HIDOT inhibited Ciber's performance of the contract by failing to hold up its side of the bargain. In particular, HIDOT's administration failed to timely approve critical design stage documents, failed to complete testing and database responsibilities allocated to HIDOT under the contract, and failed to provide adequate administrative support for the project. *Id.* ¶¶ 51, 52, 55, 56, 58, 59, 61. As one recently deposed witness concluded, HIDOT "didn't really want" the System, and it showed. Declaration of Steven T. Rappoport, dated September 13, 2017 ("Rappoport Decl.") [Docket No. 599] Ex. A [Radcliffe Tr. 24:14].

10. In September 2012, the parties negotiated and executed Supplemental Contract No. 1, which formalized many of HIDOT's additional requests (while continuing to exclude FHWA Certification from the requirements) and limited the number of changes that HIDOT could make to the requirements in the future. Takenouchi Decl. Ex. 1 ¶¶ 46, 47. Nevertheless, even after this agreement, HIDOT continued to request out-of-scope changes to the System and continued to complicate Ciber's performance by failing to perform responsibilities allocated to HIDOT under the contract. *Id.* ¶ 49. As a result of HIDOT's failures, Ciber was forced to suspend its work on the System in early 2014. *Id.* ¶ 8. In a good faith effort to ensure successful completion of the project, the parties reached yet another agreement in June 2014 (Supplemental Contract No. 2) to revise the scope of work, increase the contract price by $2,900,000 and continue the project. *Id.* ¶¶ 11, 12, 49, 68.

11. While Ciber met its payment milestones, HIDOT refused to approve invoices or make payments in accordance with the contract, Supplemental Contract No. 1, or Supplemental Contract No. 2. *Id.* ¶ 64. In Supplemental Contract No. 2, HIDOT acknowledged that it owed Ciber $7,589,371.06, which included amounts owing under the original contracts plus the

additional $2,900,000 increase. *Id.* ¶ 73. To date, HIDOT has paid only $651,300 of that amount, leaving around $7 million outstanding. *Id.* ¶ 19. HIDOT's purported justifications for withholding payment were that (i) Ciber did not achieve FHWA certification, which was not a requirement of any contractual duty of Ciber and, in fact, could not be achieved without HIDOT's performance of its responsibilities regarding such certification (which it never performed), and (ii) the mutually agreed, additional contract scope directed by HIDOT in the contracts must be performed by Ciber at no additional cost to HIDOT (which was not true). *Id.* ¶ 65.

12. Because HIDOT refused to pay Ciber what it was owed, in February 2015, pursuant to the Hawaii Public Procurement Code, Ciber presented claims for non-payment to HIDOT's Chief Procurement Officer. *Id.* ¶¶ 18-19. Ciber sought damages based on HIDOT's repudiation of the contract in the amount of $6,938,071.06 based on what the parties agreed would be paid to Ciber under Supplemental Contract No. 2. *Id.* ¶ 19. Alternatively, Ciber sought $17,039,904 based on its total costs of performance due to the extensive, interactive nature of the changed, impeded and delayed work caused by HIDOT over several years. *Id.* HIDOT responded by terminating the contracts on March 26, 2015. *Id.* ¶ 21. Five months later, in August 2015, the Chief Procurement Officer denied Ciber's claims. *Id.* ¶ 22.

### III. The HIDOT Case

13. On September 25, 2015, Ciber filed a complaint in Hawaii Circuit Court. *Id.* ¶¶ 1, 22. Ciber's complaint appealed the August 28, 2015 decision of the Chief Procurement Officer that denied Ciber's claim related to HIDOT's non-payment. *Id.* ¶¶ 19, 22. Ciber also asserted claims for breach of contract, unjust enrichment and promissory estoppel based on HIDOT's

6

ny-1304010

non-payment and wrongful termination of the contract, as amended. *Id.* ¶¶ 94, 102, 112, 122, 126.

14. On November 16, 2015, HIDOT filed counterclaims against Ciber for false claims under H.R.S. § 661-21 et seq., fraud, fraudulent inducement, negligent misrepresentation, declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of express warranty, unjust enrichment, and violation of H.R.S. § 480-2 et seq. *See* Takenouchi Decl. Ex. 2 ¶¶ 61-94. HIDOT seeks compensatory damages "in any event no less than $19 million," plus punitive damages, restitution, fines and trebled damages under the Hawaii False Claims Act and the costs of a replacement System. *See id* at p. 50. Ciber denied, and has vigorously contested, HIDOT's counterclaims. Rappoport Decl. Ex. B ¶ 4.

15. The Hawaii Circuit Court dismissed HIDOT's claims for negligent misrepresentation and breach of the implied covenant of good faith and fair dealing on February 23, 2016. *See* Takenouchi Decl. Ex. 28. The matter then progressed to discovery. To date, more than 250,000 documents have been produced by the parties, but only two depositions have been taken—HIDOT took a corporate representative deposition of Ciber, and Ciber took the deposition of John Radcliffe, Ciber's former lobbyist in Hawaii, to preserve his testimony. Declaration of Jonathan Goulding, dated September 13, 2017 ("Goulding Decl.") [Docket No. 600] ¶ 6.

16. On September 29, 2017, this Court granted, in part, a motion by HIDOT for relief from the automatic stay to, among other things, allow certain specified discovery to proceed [Docket No. 669].

## IV.  HIDOT's Claim

17.  On October 6, 2017, HIDOT asserted a proof of claim (the "Claim") against Ciber consisting of the following:

   a. $6.8 million in fees paid by HIDOT to Ciber;

   b. $8.1 million in fees paid by HIDOT to FAST contracts are part of the Ciber-led project;

   c. $1.9 million in costs related to software and hardware licenses and maintenance paid by HIDOT to support the Ciber-led FAST project;

   d. $2.6 million in other FAST costs paid by HIDOT as part of the Ciber-led project;

   e. Trebled damages for violations of the Hawaii False Claims Act (Haw. Rev. Stat. §§ 661-21 *et seq.*) and Hawaii Revised Statutes Section 480-2 *et seq.* in excess of $5.6 million;

   f. Punitive damages;

   g. Attorneys' fees as required by the HIDOT contract and applicable state law, currently in excess of $1 million; and

   h. The cost of a replacement ERP system, currently estimated at no less than $20 million.

## OBJECTION

18.  Bankruptcy Rule 3018 provides for the temporary allowance of a claim "in an amount which the court deems proper" for voting purposes only. Fed. R. Bankr. P. 3018(a) ("Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan."). Courts in this District have recognized that "[t]he policy behind Bankruptcy Rule 3018 is to prevent possible abuse by plan proponents who might ensure acceptance of a plan by filing last minute objections to the claims of dissenting creditors." *In re Pac. Sunwear of Cal., Inc.*, No. 16-10882 (LSS), 2016 WL 4250681, at *3 (Bankr. D. Del. Aug. 8, 2016) (internal quotations omitted). "Neither the Bankruptcy Code nor the Bankruptcy

Rules provide guidance on a methodology to be used, but commend the determination to the court's discretion." *Id.* (citing *In re Quigley Co.*, 346 B.R. 647, 653 (Bankr. S.D.N.Y. 2006)); *In re Frascella Enters., Inc.*, 360 B.R. 435, 458 (Bankr. E.D. Pa. 2007) (considering the Third Circuit's guidance in *Bittner v. Borne Chem. Co.*, 691 F.2d 134 (3d Cir. 1982) in the context of a motion to estimate a claim under Bankruptcy Rule 3018(a)).

19. Courts have suggested that a determination under Bankruptcy Rule 3018 "should ensure that the voting power is commensurate with the creditor's economic interests in the case." *Pac. Sunwear of Cal., Inc.*, 2016 WL 4250681, at *3 (citing *Quigley*, 346 B.R. at 654). Courts have recognized that "[i]t is not inappropriate to value a party's claim at zero where the claim is contingent and where the bankruptcy court finds that the party probably would not succeed on the merits in a state court action." *In re Kaplan*, 186 B.R. 871, 874 (Bankr. D.N.J. 1995); *In re Innovasystems, Inc.*, No. 11-36228-ABA, 2014 WL 7235527, at *7 (Bankr. D.N.J. Dec. 18, 2014). Indeed, "the estimation process protects the interests of other creditors in not having their distributions diminished by allowing a claim whose contingency may never occur." *Kaplan*, 186 B.R. at 874.

20. Courts also consider the influence that allowance of a claim for voting purposes will have on the overall confirmation process in reaching a determination on a proper voting amount pursuant to Bankruptcy Rule 3018(a). *See, e.g.*, *Matter of Gardinier, Inc.*, 55 B.R. 601, 604-05 (Bankr. M.D. Fla. 1985) (concluding that a creditor should not be permitted to vote on a plan where it held 20% of the claims in a voting class and allowing the claim to vote would give it a veto power because it could exert enough leverage on other creditors in the class and persuade them to vote to reject the plan); *Innovasystems, Inc.*, 2014 WL 7235527, at *9 (estimating claim at $0 because doing so would move the case forward to plan confirmation).

## I. HIDOT Should Not Be Permitted To Vote The Full Amount Of Its Disputed, Contingent Claim

21.     HIDOT asserts in its Motion that it should have its Claim allowed solely for voting purposes in the amount of $46 million because the Claim "is not only substantial but also supported by the documents that the DOT has discovered to date" that "overwhelmingly substantiate[] the basis and legitimacy of DOT's Claim." Mot. ¶ 44. The reality is far different. In fact, HIDOT's claims lack merit and, thus, HIDOT's claim is properly viewed as a disputed, contingent claim that should be valued at no more than $1.00 for voting purposes.

22.     With respect to HIDOT's contract-based claims, the record reflects that while HIDOT asserts that Ciber "never delivered a working system, much less a system that could meet FHWA requirements," Mot. ¶ 36, the fault lies with HIDOT, not Ciber. John Radcliffe, a former lobbyist for Ciber, testified during his deposition that HIDOT and its personnel "didn't really want" the System that they had hired Ciber to install. Rappoport Decl. Ex. A [Radcliffe Tr. 24:14]. According to Mr. Radcliffe, who has worked with Hawaii government agencies for decades, HIDOT's officials, like those in other state departments, "like paper and pencil and they intend to do it as long as they can do it." *Id.* [Radcliffe Tr. 25:3-7].

23.     Because of this aversion to new technology, Ciber encountered resistance from HIDOT's personnel throughout the project. The Statement of Work ("SOW") agreed to by the parties reflected that the definition of requirements and solutions for various functions was a joint responsibility. Takenouchi Decl. Ex. 3 pp. 30-31. But, as Mr. Holley testified, with respect to certain FHWA-related requirements in particular, Ciber encountered a "lack of cooperation" when it came to obtaining agreement from HIDOT on certain requirements for the System, and "[w]ithout those agreements in place there was not going to be a good performance of the FHW[A] system in testing." Rappoport Decl. Ex. J [Holley Tr. 207:25-208:5]. The SOW also

10

ny-1304010

placed solely in HIDOT's hands the responsibility of extracting data from its legacy computer systems and cleansing that data of irregularities before it was introduced into the System. Takenouchi Decl. Ex. 3 p. 31. Yet, HIDOT did not timely complete such "data conversion," which impeded Ciber's work on the System. *Id.* Ex. 1 ¶¶ 56-57.

24.     The resistance Ciber encountered also manifested itself in the form of HIDOT employees failing to attend meetings with Ciber staff and not diligently training with Ciber to understand and competently use the System. For instance, in a December 15, 2014 email, Ciber employee James Hammons wrote to Jeanne Whitmire and Gayla Napier from the State of Hawaii that "I am concerned when monitoring multiple FAST project meetings I am frequently witnessing key DOTH stakeholders routinely joining 15-20 minutes late [] with no explanation or apology to the Ciber consultant who scheduled." Rappoport Decl. Ex. K at CIBER0065017. Mr. Holley also observed that despite Ciber spending significant resources to train HIDOT personnel on the System, "they didn't exemplify a client who had understood the application features and functionality. So it was almost as the education did not take. They didn't understand it. . . . They still had not grasped the functionality of the EBS system after a period of almost 4 or 5 years." Rappoport Decl. Ex. J [Holley Tr. 189:23-190:19].

25.     HIDOT also seeks to run away from Supplemental Contract No. 2, in which it specifically acknowledged that "For the avoidance of doubt, the total below ($7,589,371.06) represents the amounts remaining payable for the scope of service from the [Original] Contract and Supplement No. 1 and the $2,900,000 additional scope of service under" the SOW for Supplemental Contract No. 2. Takenouchi Decl. Ex. 1 ¶ 81. In particular, HIDOT states that Ciber never signed Supplemental Contract No. 2 and that, while HIDOT signed, its representative noted that the new contract "would need to be approved by the Attorney General

or the director of the Office of Information Management and Technology." *See* Docket No. 540. ¶ 12. In fact, the HIDOT representative's notation does not say that anyone had to "approve" the contract, only that the "Attorney General +/or OIMT need to *review* latest version." Takenouchi Decl. Ex. 14 (emphasis added). Moreover, HIDOT paid Ciber $650,000 pursuant to Supplemental Contract No. 2 and approved another $1,350,000 for payment based on accepted project milestones agreed under the contract. Takenouchi Decl. Ex. 1 ¶ 79. For its part, Ciber started work on the projects agreed to under Supplemental Contract No. 2 immediately after the parties agreed to its terms. *Id.* ¶ 74. Thus, however much the current Governor's Office wishes to undo agreements made by the prior Governor, HIDOT and Ciber both engaged in a course of conduct that reflected their understanding that Supplemental Contract No. 2 was binding. And HIDOT, by paying Ciber money under Supplemental Contract No. 2 ratified the agreement.

26. HIDOT's claims against Ciber for fraud similarly lack merit. HIDOT's fraud-based claims appear to be based entirely on a presentation in which a Ciber project manager stated that the previous project manager submitted "erroneous invoices and fictitious change orders." Takenouchi Decl. Ex. 2 ¶¶ 69-70. But HIDOT has not produced any evidence suggesting that any invoices HIDOT received were erroneous or that any change orders for which HIDOT was billed were, in fact, "fictitious." Nor has Brian McKee, the former Ciber employee who wrote that presentation, been deposed in the HIDOT case about what his statement meant.[4] Instead, HIDOT has relied on testimony that McKee provided in another case reflecting that McKee personally believed that project had been not been managed adequately and that certain Ciber personnel were not competent, but, crucially, none of the testimony quoted

---

[4] The Debtors note that on October 31, 2017, at HIDOT's request, the Hawaii Circuit Court issued a subpoena for Mr. McKee's deposition. Although the deposition has been noticed by HIDOT for December 15, 2017, the parties have not yet confirmed that date.

12

ny-1304010

by HIDOT related to the allegations made in his presentation or supports any claim for fraud against Ciber. Mot. ¶ 23.

27.    Further, Nathaniel Holley, a Ciber project manager and its corporate representative for a Rule 30(b)(6) deposition, testified under oath that he conducted an investigation into the allegation made in Mr. McKee's presentation in 2013, reviewing financial information, invoices, and change requests that were submitted, among other information. Rappoport Decl. Ex. J [Holley Tr. 183:10-185:1]. Mr. Holley testified that he concluded following his review that Mr. McKee "was wrong." *Id.* [Holley Tr. 188:24-189:1].

28.    Setting aside Ciber's strong factual defenses, several of HIDOT's claims also are time-barred. Fraudulent inducement claims are subject to a six-year limitations period that begins to run when the claimant discovers or should have discovered the alleged fraud. H.R.S. § 657-1(4); *Au v. Au*, 63 Haw. 210, 215-18 (1981). HIDOT's fraudulent inducement claim centers on its allegation that Ciber said that it would staff the project with "consultants with deep skills, experience and expertise in the Oracle EBS system" and that "some of the consultants Ciber specifically identified were never actually staffed on the Project at all, and that other such specifically identified consultants served on the Project for only a limited time before being rolled off to other projects." Takenouchi Decl. Ex. 2 ¶¶ 146-47, 149. But, based on HIDOT's own allegations, it should have discovered Ciber's alleged fraud in November 2008, either when Ciber recruited consultants for key positions on the Project team or when Ciber assigned Michael Spain as Project Manager instead of Jim Jennings, as promised. *Id.* ¶¶ 39, 41. At the latest, HIDOT should have made its discovery by January 2009, when Ciber replaced Steve Hamilton, the promised Project Director, with Mr. Jennings. *Id.* ¶ 40. Yet, HIDOT did not bring its counterclaims until November 2015. *See* Takenouchi Decl. Ex. 2.

13

29. HIDOT's Unfair Methods of Competition claim also is time-barred. The statute of limitations for an Unfair Methods of Competition claim is four years from the occurrence of the alleged violation. H.R.S. § 480-24. *See also Kersh v. Manulife Fin. Corp.*, 792 F. Supp. 2d 1111, 1122 (D. Haw. 2011) (explaining that the limitations period begins "begins to run from the date of the occurrence of the violation, and not the date of discovery") (citing *McDevitt v. Guenther*, 522 F. Supp. 2d 1272, 1289 (D. Haw. 2007)). HIDOT filed its Counterclaim on November 16, 2015. Accordingly, the Unfair Method of Competition claim is barred to the extent it is based on any conduct or events occurring before November 16, 2011, regardless of when HIDOT might have learned of them: To the extent HIDOT bases its unfair competition claim on Ciber's alleged conduct in competing for the contract, the claim is barred in full because HIDOT awarded the Contract on September 30, 2008. To the extent HIDOT attempts to base its claim on Ciber's conduct in performing the contract, the claim is barred as to events before November 16, 2011.[5]

30. HIDOT's unjust enrichment claim fails because there is an existing contract. To state a claim for unjust enrichment, HIDOT must allege: (1) "receipt of a benefit without adequate legal basis"; and (2) "unjust retention of that benefit at the expense of" the other party. *Porter v. Hu*, 116 Haw. 42, 53 (Haw. App. Ct. 2007) (citing *Small v. Badenhop*, 67 Haw. 626, 636, 701 P.2d 647, 654 (1985)). But to state a claim, there must be an "absence of an adequate remedy at law." *Id.* at 55 (citations omitted). An unjust enrichment claim therefore "necessarily fails where there is an express contract." *Long v. Deutsche Bank Nat'l Tr. Co.*, 2011 U.S. Dist. LEXIS 122617, at *34 n.8 (D. Haw. Oct. 24, 2011) (citing *Amina v. WMC Mortg. Corp.*, 2011

---

[5] Although the Hawaii state court rejected these arguments without comment in a summary order denying Ciber's motion for judgment on the pleadings with respect to these claims, that ruling does not prevent Ciber from raising these defenses at summary judgment or at trial.

WL 1869835, at *10 n.4 (D. Haw. May 16, 2011) ("[A]n unjust enrichment claim cannot lie where there is an express contract governing the relationship of the parties.") (citing *AAA Haw., LLC v. Haw. Ins. Consultants, Ltd.*, 2008 WL 4907976, at *3 (D. Haw. Nov. 12, 2008)). Here, HIDOT not only bases its claim on the contract, but it asserts claims for breach of contract, breach of express warranty, and declaratory relief for breach of contract. Therefore, HIDOT's unjust enrichment claim fails because an adequate remedy at law—based on the contract—exists.

## II. HIDOT's Claim Should Be Valued For Voting Purposes At No More Than $1.87 Million

31. HIDOT, if allowed to vote its disputed, contingent claim in the $46 million asserted amount, would have a blocking position on the Plan, which was overwhelmingly accepted by voting creditors. *See Matter of Gardinier, Inc.*, 55 B.R. at 604; *Innovasystems, Inc.*, 2014 WL 7235527, at *9. The Debtors anticipate filing a voting certification in the coming weeks indicating that 53 creditors voting approximately $36.6 million in claims accepted the Plan, while 17 creditors voting approximately $8.4 million in claims rejected the Plan. If the Court were to give HIDOT a voting amount of $46 million, its vote would exceed the *aggregate* amount of claims that timely voted on the Plan before the voting deadline. Such a result would provide HIDOT with excessive control over the voting and Plan confirmation process. A litigation claimant, with alleged claims that are disputed by the Debtors and the subject of ongoing litigation, should not be allowed to control the fate of every other stakeholder of the Debtors' Estates.

32. In the event that the Court determines that HIDOT's Claim should be valued at more than $1.00 for voting purposes, HIDOT should not be entitled to vote in an amount greater than $1.87 million, or the asserted damages arising from the alleged violation of the Hawaii False Claims Act (Haw. Rev. Stat. §§ 661-21 *et seq.*) and Hawaii Revised Statutes Section 480-2

15

ny-1304010

*et seq.* before accounting for any trebling.[6] While, for the reasons set forth above, the Debtors strongly believe that HIDOT's False Claims Act and fraud claims are wholly without merit, even if HIDOT's allegations are taken as true, due to the availability of insurance, such claims likely represent the Estates' maximum exposure to HIDOT.

33. Specifically, as HIDOT is aware and has previously acknowledged, its Claim is likely covered by the Debtors' Insurance Policies. *See* Docket No. 540 ¶¶ 27, 43. In fact, the Debtors disclosed in the Disclosure Statement as follows: "XL Catlin, one of the Debtors' policy providers, [previously agreed to cover 50% of the Debtors' costs relating to the [DOT] Action,] subject to a $1 million retention and a $10 million aggregate limit of liability. That policy may also cover certain amounts that the Debtors could become obligated to pay on account of [DOT's] affirmative claims." Disclosure Statement at 27. In addition, the Debtors recently informed HIDOT that up to $60 million in excess insurance coverage may also be available. If HIDOT is able to establish the validity of its Claim, in accordance with Article VI.E.2 of the Plan, HIDOT must look to the Debtors' Insurance Policies for its recovery before recovering from the Debtors' Estates.

34. Indeed, XL Catlin is well aware of HIDOT's Claim and the status of the ongoing litigation in Hawaii state court. By letter dated September 13, 2017, XL Catlin reserved its rights with respect to the coverage of HIDOT's Claim.[7] As set forth in the reservation, XL Catlin takes the position that insurance would not be available for any claims arising under the alleged

---

[6] The Debtors note that the Claim and the Motion speculate about the value of HIDOT's alleged claims against the Debtors. In responding to the Motion, the Debtors have made certain assumptions regarding how the damages arising from the alleged violations of the Hawaii False Claims Act were calculated. The Debtors reserve the right to modify or supplement this response if HIDOT's responsive pleadings shed further light on how it calculated such damages.

[7] The Debtors disagree with XL Catlin's reservation with respect to coverage of HIDOT's Claim and reserve their rights to contest such reservation. For purposes of voting, however, the Debtors believe that $1.87 million is the most that HIDOT could recover from the Debtors' Estates given XL Catlin's asserted position.

violations of the Hawaii False Claims Act (Haw. Rev. Stat. §§ 661-21 *et seq.*) and Hawaii Revised Statutes Section 480-2 *et seq.*, which is calculated by HIDOT to be "in excess of $5.6 million" after trebling.[8] While unclear from either the Motion or HIDOT's Claim, it appears that HIDOT is asserting approximately $1.87 million pursuant to these claims, which it asserts should be trebled to $5.6 million. However, even in the unlikely event HIDOT's Hawaii False Claims Act and fraud claims are successful, HIDOT is not entitled to an Allowed Claim on account of treble damages under these circumstances.

35.  Several courts have held that even though a plaintiff might ordinarily be entitled to treble damages as a matter of statutory law, where, as here, those damages are punitive rather than compensatory, and other unsecured creditors are not being paid in full, such damages are subject to equitable subordination. *See, e.g.*, *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 724 (D. Del. 2005) ("[If] subordination of punitive damage claims is mandated in Chapter 7 liquidations, it seems entirely appropriate to subordinate such claims in the Chapter 11 setting."); *In re Friedman's, Inc.*, 356 B.R. 766, 776 (Bankr. S.D. Ga. Aug. 23, 2006) (noting that penalty/punitive claims may be viewed as inherently unfair, even in the absence of any

---

[8] XL Catlin's reservation also asserts that it is not responsible for covering HIDOT's claims seeking the return of fees, costs, or expenses paid by HIDOT to Ciber. The Debtors do not believe that any portion of HIDOT's damages claim should trigger this exclusion. Nonetheless, to the extent this exclusion was triggered, the Debtors assert that such claims would ultimately be disallowed or subject to offset on account of amounts owed to Ciber.

mention of creditor misconduct, if paid at the expense of innocent creditors).[9] If HIDOT's treble damages are not subordinated, other unsecured creditors will be effectively paying the treble damages from their own recoveries, and the policy of deterrence that underlies the trebling provisions would not be served. Thus, after deducting $3.75 million of the $5.6 million presumably asserted on account of treble damages for violation of the Hawaii False Claims Act, the maximum uninsured amount that HIDOT could recover from the Debtors' Estates is $1.87 million.

36. In addition, the Debtors have their own claims against HIDOT, amounting to either $6,938,071.06, based on what the parties agreed would be paid to Ciber under Supplemental Contract No. 2, or $17,039,904 based on Ciber's total costs of performance due to the extensive, interactive nature of the changed, impeded and delayed work caused by HIDOT over several years. If the Debtors were to succeed in recovering on under either of those damages theories, the amount the Debtors would receive would off-set—and, indeed, exceed— the uninsured amount of HIDOT's Claim.

37. In sum, the Debtors believe that HIDOT's Claim remains contingent and unliquidated and, thus, HIDOT's Claim should be valued at $1.00 for voting purposes. But, at most, as set forth above, in no event should HIDOT's Claim be valued at greater than $1.87 million, or the amount that HIDOT would likely be able to recover from the Debtors' Estates

---

[9] In *U.S. v. Noland*, 517 U.S. 535 (1996), the Supreme Court held that while subordination could apply to any claim, the decision to do so must be based on some characteristic of the claim and not upon a categorical view of the claim's merits. In fact, the court in *Friedman's*, 356 B.R. at 775, cited several pre-*Noland* cases with approval. *Id.* (*citing Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)*, 162 B.R. 935, 947 (Bankr. S.D.N.Y. 1994) ("[The debtor] correctly argues that a Bankruptcy Court can subordinate, disallow or limit punitive damage claims."); *In re Bicoastal Corp.*, 134 B.R. 50, 54 (Bankr. M.D. Fla. 1991) ("It is clear that even though Chapter 11 of the Bankruptcy Code does not specifically provide for the treatment of claims based on a fine, penalty, or punitive damages, the Code traditionally has not favored such claims."); *In re Celotex Corp.*, 128 B.R. 478, 484 n.12 (Bankr. M.D. Fla. 1991) ("Although Section 726(a)(4) is inapplicable to Chapter 11 reorganizations, it is well-established that bankruptcy courts have inherent equitable power to disallow, limit, or subordinate claims for punitive damages in Chapter 11 reorganizations."); *In re Allegheny Int'l Inc.*, 106 B.R. 75, 79 (Bankr. W.D. Pa. 1989) (stating that a bankruptcy court's equitable powers allow it to eliminate, subordinate, or limit claims for punitive damages)).

(even if successful in its claims) after application of the Insurance Policies and a reduction of the remaining claim due to the likely disallowance of treble damages.

[*Remainder of Page Intentionally Left Blank*]

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, the Debtors respectfully request that the Court enter an order (a) denying the Motion or, alternatively, allowing HIDOT a maximum voting amount of $1.87 million, and (b) granting such other and further relief as is just and proper.

Dated: November 8, 2017
      Wilmington, Delaware

**POLSINELLI PC**

/s/ Justin K. Edelson_____
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com

-and-

**MORRISON & FOERSTER LLP**

Brett H. Miller (admitted *pro hac vice*)
Dennis L. Jenkins (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
Daniel J. Harris (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
brettmiller@mofo.com
djenkins@mofo.com
tgoren@mofo.com
dharris@mofo.com

*Counsel for Debtors and Debtors-in-Possession*